FILED
2024 Aug-08 PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

**EXHIBIT 1**

Page 1

1

2    UNITED STATES DISTRICT COURT

     NORTHERN DISTRICT OF ALABAMA

3    WESTERN DIVISION

     ------------------------------------------X

4    KAI SPEARS,

5                                    PLAINTIFF,

6        -against-                   Index No.:

                                7:23-CV-00692-LSC

7

8    THE NEW YORK TIMES COMPANY,

                                     DEFENDANT.

9    ------------------------------------------X

10

11                     DATE:  July 10, 2024

12                     TIME:  9:32 A.M.

13

14

15          DEPOSITION of the Defendant,

16   THE NEW YORK TIMES COMPANY, by a Witness,

17   BILLY WITZ, taken by the Plaintiff,

18   pursuant to a Notice and to the Federal

19   Rules of Civil Procedure, held at

20   Ballard Spahr, LLP, 1675 Broadway,

21   19th Floor, New York, New York 10019,

22   before Amanda Tartaglia, a Notary Public of

23   the State of New York.

24

25

## EXHIBIT 1

Page 2

```
1
2   A P P E A R A N C E S :
3
4   STEPHEN NEW & ASSOCIATES
        Attorneys for Plaintiff
5   KAI SPEARS
        430 Harper Park Drive
6   Beckley, West Virginia 25801
        BY:  STEPHEN NEW, ESQ.
7
8
    PRINCE GLOVER HAYES
9       Attorneys for Plaintiff
        KAI SPEARS
10      701 Rice Mine Road N
        Tuscaloosa, Alabama 35406
11      BY:  MATT GLOVER, ESQ.
12
13  BALLARD SPAHR, LLP
        Attorneys for Defendant
14  THE NEW YORK TIMES COMPANY
        1909 K Street, NW, 12th Floor
15  Washington, DC 20006-1157
        BY:  CHAD BOWMAN, ESQ.
16
17
    ALSO PRESENT:
18  VIRGINIA BUCK, ATTORNEY AT LAW
        Attorney for Plaintiff
19  KAI SPEARS
20  DEVERELL WRITE
        Videographer
21  VERITEXT LEGAL SOLUTIONS
22  DANA GREEN
        Vice President and Assistant
23  General Counsel
    THE NEW YORK TIMES COMPANY
24
25          *  *  *
```

Page 3

```
1
2   F E D E R A L  S T I P U L A T I O N S
3
4
5   IT IS HEREBY STIPULATED AND AGREED by and
6   between the counsel for the respective
7   parties herein that the sealing, filing and
8   certification of the within deposition be
9   waived; that the original of the deposition
10  may be signed and sworn to by the witness
11  before anyone authorized to administer an
12  oath, with the same effect as if signed
13  before a Judge of the Court; that an
14  unsigned copy of the deposition may be used
15  with the same force and effect as if signed
16  by the witness, 30 days after service of
17  the original & 1 copy of same upon counsel
18  for the witness.
19
20  IT IS FURTHER STIPULATED AND AGREED that
21  all objections except as to form, are
22  reserved to the time of trial.
23
24          *  *  *  *
25
```

Page 4

```
1           PROCEEDINGS
2       (Whereupon, an Article was
3   premarked as Plaintiff's Exhibit 1
4   for identification as of this date by
5   the reporter.)
6       (Whereupon, a Photocopy of an
7   Article was premarked as Plaintiff's
8   Exhibit 2 for identification as of
9   this date by the reporter.)
10      (Whereupon, Social Media Post
11  Segments were premarked as
12  Plaintiff's Exhibit 3 for
13  identification as of this date by the
14  reporter.)
15      (Whereupon, an Article was
16  premarked as Plaintiff's Exhibit 4A
17  for identification as of this date by
18  the reporter.)
19      (Whereupon, an Article was
20  premarked as Plaintiff's Exhibit 4B
21  for identification as of this date by
22  the reporter.)
23      (Whereupon, an Article was
24  premarked as Plaintiff's Exhibit 4C
25  for identification as of this date by
```

Page 5

```
1           PROCEEDINGS
2   the reporter.)
3       (Whereupon, an Article was
4   premarked as Plaintiff's Exhibit 4D
5   for identification as of this date by
6   the reporter.)
7       (Whereupon, Guidelines on
8   Integrity was premarked as
9   Plaintiff's Exhibit 5 for
10  identification as of this date by the
11  reporter.)
12      THE VIDEOGRAPHER:  We are going
13  on the record at -- yes, we are going
14  on the record at 9:32 a.m. on
15  July 10th, 2024.  This is Media Unit
16  1 of the video recorded deposition of
17  Billy Witz taken by Counsel for the
18  Plaintiff in the matter of Kai
19  Spears versus The New York Times
20  Company.  This case is filed in the
21  United States District Court in the
22  Northern District of Alabama, Western
23  Division.  My name is Deverell Write
24  representing Veritext Legal
25  Solutions.  The court reporter is
```

## EXHIBIT 1

1          PROCEEDINGS
2    Amanda Larrea from Veritext Legal
3    Solutions.
4        At this time, will Counsel
5    state appearances.
6        COUNSELOR NEW:  Stephen New on
7    behalf of the Plaintiff.
8        COUNSELOR BUCK:  Virginia Buck
9    on behalf of the Plaintiff.
10       COUNSELOR GLOVER:  Matt Glover
11    for the Plaintiff.
12       COUNSELOR BOWMAN:  Chad Bowman,
13    Ballard Sphar, on behalf of the
14    witness and of the Defendant.
15       COUNSELOR THOMPSON:  J.T.
16    Thompson, Lightfoot Franklin, for the
17    witness and New York Times.
18       THE VIDEOGRAPHER:  Will the
19    reporter please swear in the witness.
20    B I L L Y  W I T Z, called as a witness,
21    having been first duly sworn by a Notary
22    Public of the State of New York, was
23    examined and testified as follows:
24    EXAMINATION BY
25    COUNSELOR NEW:

1          B. WITZ
2    Q.  Please state your name for the
3    record.
4    A.  Billy Witz.
5    Q.  Please state your current
6    business address.
7    A.  620 8th Avenue, New York, New
8    York 10018.
9       COUNSELOR NEW:  Alright.  Thank
10    you.
11    Q.  Good morning, Mr. Witz.  My
12    name is Stephen New.  You and I have spoke
13    one time prev -- previously.  We're here to
14    take your deposition.  Have you ever given
15    deposition testimony before?
16    A.  No.
17    Q.  Alright, since you have never
18    been deposed before, I'll go over some
19    ground rules.  This is not a conversation.
20    This an under oath question-and-answer
21    session and everything that's being said
22    today will be typed up into a little
23    booklet called a transcript.  Because
24    everything is being taken down in writing,
25    typed up, it's important that we have a

1          B. WITZ
2    clear line of communication.  Along those
3    lines, I'll ask a question, I need you to
4    give me an honest, full, complete answer to
5    it, okay?
6    A.  Yes.
7    Q.  Alright.  I will try my best to
8    allow you to finish your answer before I
9    start my next question and even though you
10    may anticipate where I'm going with my
11    question, I need you to let me get my full
12    question out before you begin your answer,
13    okay?
14    A.  Okay.
15    Q.  If for some reason during this
16    deposition I ask a question that you don't
17    understand or doesn't make any sense to
18    you, feel free to have me restate,
19    rephrase, break down, until you're
20    comfortable giving me full, complete,
21    honest answers to my questions, okay?
22    A.  Yes.
23    Q.  If you answer a question that I
24    ask you without asking me to restate,
25    rephrase, break down, it's going to be

1          B. WITZ
2    presumed by a judge or a jury or anybody
3    who reads this transcript or watches this
4    video that you understood me unless you
5    tell me otherwise, okay?
6    A.  Okay.
7    Q.  Alright.  From time to time
8    today, your lawyer may put a good, proper
9    nonspeaking objection on the record, okay?
10    And if he does that, that's fine.  Unless
11    he tells you not to answer the question
12    that I'm asking you on the basis of some
13    privilege, you go ahead and answer my
14    question just the same as if the objection
15    wasn't lodged, okay?
16    A.  Okay.
17    Q.  Alright.  If you need a break
18    -- this is going to be a long day, but if
19    you need a break today, let me know and
20    we'll be happy to take a break.  Whatever
21    you need.
22       COUNSELOR NEW:  Let me go ahead
23    and ask, do ya'll intend to eat
24    lunch?
25       COUNSELOR BOWMAN:  I believe

## EXHIBIT 1

B. WITZ

1
2  so, yes.
3       COUNSELOR NEW:  Okay.  What
4  time do you want to break for lunch?
5       COUNSELOR BOWMAN:  If you had a
6  natural break, a couple of hours in,
7  maybe 12:30, does that work for you?
8       COUNSELOR NEW:  Yeah.  That
9  works for me.  We'll be about three
10  hours in at that point.
11  Q.   Okay.  Let's go ahead and get
12  started.
13       Now, your full name is William
14  Lecuyer Witz, correct?
15  A.   William Lecuyer Witz.
16  Q.   Lecuyer, is that how you say
17  that middle name?
18  A.   It's French.
19  Q.   Okay.  And what's your date of
20  birth?
21  A.   March 14, 1962.
22  Q.   Last four digits of your Social
23  is 3991, correct?
24  A.   Yes.
25  Q.   And I know you were hesitant to

B. WITZ

1
2  give your residential address on the
3  record, you live at Dorchester Towers Condo
4  here in New York?
5  A.   Yes.
6  Q.   And previously you've lived at
7  155 Quincy Avenue, Long Beach?
8  A.   California, yes.
9  Q.   Yup.  And you've also lived at
10  253 West 1 -- 113th Street, Apartment 2 in
11  New York for a period of time and 1912
12  Prosser Avenue, Los Angeles, correct?
13  A.   Yes.
14  Q.   In your adult life, have you
15  resided in either New Orleans, Louisiana,
16  Long Beach, Los Angeles, California, New
17  Jersey or New York?
18  A.   Can you define "adult life"?
19  From what age?
20  Q.   From 18 years up.
21  A.   Okay.  Sorry, can you --
22  Q.   Yeah, New Orleans, you --
23  A.   Yes.
24  Q.   You went to New Orleans?  You
25  went to Tulane for college, right?

B. WITZ

1
2  A.   Yes.
3  Q.   And so you lived in New Orleans
4  when you went to Tulane?
5  A.   Right.  Right.
6  Q.   You've also lived in Long Beach
7  in Los Angeles, California, correct?
8  A.   Yes.
9  Q.   You lived in New Jersey,
10  correct?
11  A.   Yes.
12  Q.   And you've lived in New York,
13  correct?
14  A.   Yes.
15  Q.   Have you lived anywhere other
16  than those places?
17  A.   No.
18  Q.   Your mobile phone number is
19  (562) 355-6544, correct?
20  A.   Yes.
21  Q.   For the phone number
22  (562) 434-6705, what phone number is that?
23  A.   That's no longer a working
24  number.  It was a -- a landline.
25  Q.   Was that a residential

B. WITZ

1
2  landline?
3  A.   Yes, it was.
4  Q.   (424) 222-5603, what was that
5  phone number?
6  A.   I don't recall.
7  Q.   (310) 470-6441, do you recall
8  that number?
9  A.   Yes.
10  Q.   What was that number?
11  A.   It's a phone number for my
12  mother and father.
13  Q.   Have you ever used any other
14  telephone numbers related to your career in
15  journalism?
16  A.   Yes.
17  Q.   And what would they be?
18  A.   I don't recall.
19  Q.   Have you, within the last five
20  years, used any numbers other than your
21  mobile?
22  A.   I'm not sure.
23  Q.   Have you had any other mobile
24  devices with any other numbers other than
25  the mobile number that we talked about?

4 (Pages 10 - 13)

**EXHIBIT 1**

B. WITZ

1
2    A.    No.
3    Q.    No burner phones, anything like
4  that?
5    A.    No burner phones.
6    Q.    You married Renee Ratay as of
7  November 13, 2021, correct?
8    A.    Yes.
9    Q.    And Sandra Witz is your
10  ex-wife?
11    A.    Yes.
12    Q.    You joined The New York Times
13  in what year?
14    A.    As a staff position?
15    Q.    As a whatever?  When did you
16  first start writing for The New York Times?
17    A.    I first started writing for The
18  New York Times in 2008.
19    Q.    What position was that?
20    A.    I was a - a freelance reporter.
21    Q.    And did that change at some
22  point?
23    A.    Yes.
24    Q.    When?
25    A.    In 2010.

B. WITZ

1
2    Q.    What changed?
3    A.    I took a full-time job.
4    Q.    Working from where?
5    A.    Working?  I'm sorry, working
6  from where or for --
7    Q.    Yeah, from where?
8    A.    From -- from Long Beach.
9    Q.    When your address changed
10  December 23, 2015 to 20 -- April of 2018,
11  to the West 113th Street address, were you
12  still working for The New York Times then?
13    A.    I was hired by The New York
14  Times then.
15    Q.    Alright.  And explain what you
16  mean by "hired by The New York Times"?
17    A.    I was offered a job and I
18  accepted.
19    Q.    Staff position?
20    A.    Staff position.
21    Q.    Which department?
22    A.    Sports.
23    Q.    And who was your supervisor?
24    A.    My --
25    Q.    Yeah, to whom did you report at

B. WITZ

1
2  The New York Times?
3    A.    So do you mean the department
4  head or my direct?
5    Q.    Well, let's do both.
6    A.    The department head was Jason
7  Stallman.
8    Q.    And who was your direct report?
9    A.    Jay Schreiber.
10    Q.    When you joined The New York
11  Times in 2015, or even prior I suppose, did
12  The New York Times provide you with any
13  training on its journalistic standards or
14  ethics?
15    A.    I don't recall.
16    Q.    So you don't recall anyone at
17  The New York Times giving you any types of
18  manuals, computer modules, anything like
19  that on its journalistic standards or
20  ethics?
21    A.    No.  I don't recall.
22    Q.    Is it possible that you got
23  trained and you just don't remember?
24    A.    I don't know.
25    Q.    Alright.

B. WITZ

1
2          What kind of degree did you get
3  from Tulane?
4    A.    A bachelor's.
5    Q.    In?
6          COUNSELOR BOWMAN:  Objection.
7      Witness can answer.
8    Q.    Bachelor's degree in what,
9  Mr. Witz?
10    A.    You mean, do you mean the --
11    Like my bachelor's is from
12  Marshall University in political science as
13  of 1994.
14    A.    Okay.
15    Q.    I'm asking what your degree was
16  in from Tulane University?
17    A.    Sociology.
18    Q.    Sociology.  And as of what
19  year?
20    A.    1984.
21    Q.    When did you begin working as a
22  journalist?
23    A.    In -- my first job was the
24  summer of 1981.
25    Q.    And what was that job and where

**EXHIBIT 1**

Page 18

B. WITZ

1
2  was it?
3      A.   For the Los Angeles Herald
4  Examiner and the position was a clerk,
5  newsroom clerk.
6      Q.   When did you first start
7  writing stories?
8      A.   Around that time.  I don't --
9  around that time.
10     Q.   Do you have any formal
11  education in journalism?
12     A.   Some.
13     Q.   Tell me what that is.
14     A.   Taken a class or two.
15     Q.   Where did you take those
16  classes?
17     A.   I took one class at UCLA and
18  the other was -- Tulane didn't have a
19  journal -- journalism program, so I took a
20  class at -- through Loyola, which is a
21  university next door that had a -- had a
22  communications department at the time.
23     Q.   Any other formal education or
24  training in journalism?
25     A.   Do you mean besides on-the-job?

Page 19

B. WITZ

1
2      Q.   Yeah, besides on-the-job.
3      A.   I don't recall.
4      Q.   In your class that you took at
5  Loyola University in New Orleans, did you
6  become familiar with standards for
7  journalists?
8      A.   I don't recall.
9      Q.   When you worked for The Long
10  Beach Press Telegram, did you become
11  familiar with journalistic standards and
12  ethics?
13     A.   When you say -- when you say
14  "become familiar," how did -- do you mean
15  in a -- can you explain that more?
16     Q.   Yeah.  I mean, did someone,
17  your -- one of your editors, someone at the
18  paper reviewed an article of yours and said
19  this violates some standard of ours or,
20  hey, here's a handbook of standards, you
21  need to make sure that the articles you're
22  writing are in accordance therewith?
23     A.   I don't recall anything
24  specifically stating that, but, yes, I
25  think as a working journalist, you become

Page 20

B. WITZ

1
2  aware of industry standards.
3      Q.   Same question with respect to
4  The Los Angeles Daily News.  Did The Los
5  Angeles Daily News have journalistic --
6  journalistic standards --
7      A.   Yes.
8      Q.   And were you made familiar with
9  those?
10     A.   Not in a -- not in any formal
11  way, but...
12     Q.   Describe in formal ways and the
13  informal ways in which you would have been
14  made familiar with journalistic standards
15  while at The Los Angeles Daily News?
16     A.   Well, I don't recall any
17  specific ways that -- that I was, so rather
18  not speculate on what those might have
19  been.
20     Q.   Now, you worked for FOX Sports
21  for some time, correct?
22     A.   Correct.
23     Q.   Were you ever made familiar
24  with journalistic standards or ethics while
25  working for FOX Sports?

Page 21

B. WITZ

1
2      A.   I don't recall.
3      Q.   Any other media outlets that
4  you have worked for as a journalist that
5  trained you on or made you familiar with
6  journalistic standards?
7      A.   I don't -- I don't recall any
8  -- any places I've worked overtly making me
9  aware of journalistic standards.
10     Q.   And that includes The New York
11  Times, correct?
12     A.   Correct.  Yeah.
13     Q.   Does The New York Times have a
14  handbook policy or standards manuals,
15  online modules, anything like that, which
16  its journalists can refer to when writing a
17  story?
18     A.   I believe so.
19     Q.   And where is that located?
20     A.   Not -- I'm not for sure, but it
21  may be in a portal that's, you know,
22  available to employees.
23     Q.   So if --
24     A.   Sometimes in a hard -- sorry.
25     Q.   That's okay.

6 (Pages 18 - 21)

**EXHIBIT 1**

B. WITZ

1
2    A.    Yeah, and then they're -- I'm
3   sure before -- well, it's my understanding
4   that there may be, like, hardcover copies
5   of that, as well.
6        Q.    And so if when writing a story
7   you're unsure about or want to check a
8   journalistic standard, you have a portal
9   that you can go to to access that if you
10  want to determine whether your article is
11  inside or outside of some standard; is that
12  a fair statement?
13       A.    I believe so.
14       Q.    And The New York Times hired
15  you specifically because you have a knack
16  for spotting stories and then writing those
17  stories with flair, correct?
18           COUNSELOR BOWMAN:  Objection.
19      Witness can answer.
20       A.    Yeah, you -- you would have to
21  ask them why they hired me.  I don't -- I
22  don't know.
23       Q.    Okay.  And you've covered
24  stories such as conference realignments and
25  shakeups at the NCAA, correct?

B. WITZ

1
2    A.    Yes.
3        Q.    And one of the stories you
4   wrote with flair is a Long Beach high
5   school basketball program forging Visa
6   documents for foreign students, correct?
7        A.    Correct.
8        Q.    Racist comments from the L.A.
9   Clippers' owner, correct?
10       A.    Yes.
11       Q.    And then you covered Arlington
12  Texas High School football brain trauma?
13       A.    I don't believe that was
14  Arlington, Texas.  I believe it was
15  Arlington High School in California.
16       Q.    Take a look at Exhibit 1.
17           COUNSELOR BOWMAN:  Let's have
18      the court reporter mark the exhibits.
19           COUNSELOR NEW:  She already
20      has.
21           COUNSELOR BOWMAN:  Great.
22       Q.    Take a look at Exhibit 1,
23  Mr. Witz.  Turn over to the second page.
24           COUNSELOR BOWMAN:  To remind
25      the witness, you can read the entire

B. WITZ

1
2   document if you would like.
3           Counsel, do you have any
4   additional copies?
5           COUNSELOR NEW:  No.  She's got
6      the originals, if you want to take a
7      look at the original, you can pass
8      it.
9           COUNSELOR BOWMAN:  We're fine,
10     Counsel.  Thank you.
11       Q.    Alright, you're ready?
12       A.    Yes.
13       Q.    Alright.
14           This is welcoming you to
15  National, what is National?
16       A.    It's the National desk at The
17  New York Times.
18       Q.    Is that separate from the
19  sports desk?
20       A.    Yes.
21       Q.    And tell me what the National
22  is; does it cover more than sports?
23       A.    Yes.
24       Q.    And realizing you didn't write
25  this, but it's about you, correct?

B. WITZ

1
2    A.    Correct.
3        Q.    "College athletics is about
4   sports, yes, and also cultural and regional
5   identities, big money and higher
6   education."  Do you see that?
7        A.    Yes.  In the first sentence?
8        Q.    Yeah.  Do you agree with that?
9        A.    Generally, yes.
10       Q.    "Billy Witz covers it all with
11  total savvy and expertise, and he will
12  continue on the beat at a fascinating
13  moment when the future of the entire
14  enterprise is at stake."  Why was the
15  future of the entire enterprise of college
16  athletics at stake when you joined The
17  National for The New York Times?
18           COUNSELOR BOWMAN:  Objection.
19      Witness can answer.
20       A.    Well, it's -- I think it's a
21  turbulent time in college sports.  Players
22  are being paid for the first time, at least
23  legally.  There's a lot of turmoil in --
24  among schools with conference realignment
25  and it's a -- it's -- it's a moment of

**EXHIBIT 1**

Page 26

B. WITZ

1
2 great change in college athletics.
3     Q.   College athletes themselves are
4 doing a little better, aren't they?
5     A.   Some.
6     Q.   If you look at the last full
7 paragraph, "2019, he turned his knack for
8 spotting stories and writing flair to the
9 college sports beat covering big stories
10 like changing conferences in the NCAA's
11 plan to let its athletes make endorsement
12 deals." Realize you didn't write that, but
13 that's The New York Times saying that you
14 have a knack for spotting stories and
15 writing flair on the college sports beat,
16 correct?
17         COUNSELOR BOWMAN: Objection.
18     Witness can answer.
19     A.   Yeah.  That's somebody --
20 that's -- that's two of the department
21 heads for the National desk writing an
22 assessment.  You know, it's a welcoming
23 note for me moving to a new department.
24     Q.   Do you agree with what they say
25 about you there?

Page 27

B. WITZ

1
2     A.   Yeah.  I mean, it's, I guess
3 the -- the knack for spotting stories and
4 writing flair, I mean, that's -- that's not
5 for me to say, that's for -- for readers
6 and for editors, but if somebody thinks
7 that -- thinks that, I would like to think
8 it's a compliment.
9     Q.   Exhibit 2, take a look.  Take
10 all the time you need to read it, Mr. Witz.
11         COUNSELOR BOWMAN: Counsel, do
12     you have the rest of the article?
13         COUNSELOR NEW:  Nope.
14         COUNSELOR BOWMAN: Lodge an
15     objection --
16         COUNSELOR NEW:  That's fine.
17     Q.   Ready?
18     A.   Yes.
19     Q.   Alright.  You were the editor
20 of the student newspaper at Tulane in April
21 of 1982, correct?
22     A.   Yes.
23     Q.   And you said Tulane didn't have
24 a journalism department, correct?
25     A.   Yes.

Page 28

B. WITZ

1
2     Q.   But you had a student
3 newspaper?
4     A.   Correct.
5     Q.   Explain to me how that worked.
6     A.   Tulane had a student newspaper.
7     Q.   Well, how was it published?
8     A.   It was taken -- the people
9 working on the paper delivered it to a
10 printer and the printer published it once a
11 week.
12     Q.   And it was called The
13 Hullabaloo, correct?
14     A.   Yes.
15     Q.   And was this a private student
16 organization or was it recognized by Tulane
17 University?
18     A.   It was recognized by Tulane --
19     Q.   Alright.
20     A.   -- as a student organization.
21     Q.   And at some point in time, the
22 paper of which you were the editor issued
23 a, quote, "joke issue", closed quote,
24 called the Helluva-scorch?
25     A.   Yes.

Page 29

B. WITZ

1
2     Q.   And the Helluva-scorch was
3 found by Tulane's media board to be
4 offensive and inappropriate and ordered
5 that the 7,000 issues of that, quote, "joke
6 issue," to be removed from news stands,
7 correct?
8     A.   Yes.  I re -- seem to recall
9 that.
10     Q.   This "joke issue" in 1982
11 depicted several Tulane students as gay,
12 showed a nude torso on the back page and
13 depicted Tulane student, Richard Pope, in a
14 Nazi Secret Service uniform, correct?
15     A.   I seem to recall that, yes.
16     Q.   And at that time, you stated
17 that you had no regrets about being the
18 editor of the Helluva-scorch.  You were
19 quoted as saying, "I think it was a matter
20 of opinion.  I would do it again."  Do you
21 see that, Mr. Witz?
22     A.   Yes.
23     Q.   Do you still hold that opinion
24 today?
25     A.   (No response.)

Veritext Legal Solutions
877-373-3660                                        800.808.4958

EXHIBIT 1

B. WITZ

1
2    Q.    Would you do the
3    Helluva-scorch?
4    A.    Probably not.
5    Q.    Do you still have a copy of
6    that Helluva-scorch?
7    A.    No, not that I know of.
8    Q.    Do you have any regrets about
9    any aspects of the publishing of the
10   March 15th article about Kai Spears?
11   A.    Yes.  That it was -- that we
12   had the information wrong.
13   Q.    Anything else?
14   A.    Yeah.  I mean, I -- I regret
15   that we reported that Kai was a passenger
16   in Brandon Miller's car and -- and he was
17   not.
18   Q.    Knowing everything that you
19   know now, would you still do everything the
20   same way that you did between March 12th
21   and March 16th?
22           COUNSELOR BOWMAN:  Objection.
23   Witness can answer.
24           THE WITNESS:  Can you -- can
25   you repeat that question, please?

B. WITZ

1
2           (Whereupon, the referred-to
3   question was read back by the
4   reporter.)
5           COUNSELOR BOWMAN:  Same
6   objection.
7    A.    No.
8    Q.    What would you have done
9   differently?
10           COUNSELOR BOWMAN:  Objection.
11   Witness can answer.
12   A.    I think -- we would not have
13   identified Kai Spears as the passenger in
14   Brandon Miller's car.
15   Q.    Anything else?
16   A.    Not that I can think of at the
17   moment.
18   Q.    Take a look at Exhibit 3.  Let
19   me know when you're ready.
20   A.    Yes.
21   Q.    Do you recall this?
22   A.    Vaguely.
23   Q.    What did Darren Rovell do or
24   write on or around October 13th, 2021 that
25   it constituted journalistic career suicide?

B. WITZ

1
2    A.    Well, you don't share -- you
3   don't share a story with a source.  You can
4   fact-check certain things, but you don't
5   give them the story to read and, in
6   essence, approve.
7    Q.    And what's your basis for that
8   opinion?  Is there a standard somewhere
9   that tells me you don't have a source
10   review an article for accuracy?
11           COUNSELOR BOWMAN:  Objection.
12   Compound.  Witness can answer.
13   A.    Yeah, I -- I mean, I think it's
14   an understood standard that that's
15   something you don't -- you don't do.  It
16   would give the impression that you're only
17   writing what the source is going to approve
18   you write and that's -- that's a very
19   different thing from checking certain
20   elements of a story for accuracy.
21   Q.    ProFootballTalk, you know Mike
22   Florio?
23   A.    Not personally, only by name.
24   Q.    Where's Mike Florio from?
25   A.    I don't know.

B. WITZ

1
2    Q.    He's from Clarksburg, West
3   Virginia, did you know that?
4    A.    I didn't.
5    Q.    "The Bruce Allen emails include
6   Adam Schefter sending Allen an unpublished
7   story during the 2011 lockout and asking if
8   anything 'should be added, changed,
9   tweaked.'"  So I take it that -- that
10   anybody, ESPN or NBC Sports who says that
11   that might be a practice, you disagree with
12   that, right?
13           COUNSELOR BOWMAN:  Objection.
14   Witness can answer.
15   A.    That -- that what --
16   Q.    Yeah, that a source checking a
17   story for accuracy is an improper
18   journalistic practice?
19           COUNSELOR BOWMAN:  Objection.
20   Misstates.  Witness can answer.
21   A.    That's not what -- I mean, no.
22   It's -- it's perfectly appropriate --
23   appropriate to check a fact or a quote with
24   a source for accuracy, but it's
25   inappropriate, in my opinion, to submit the

**EXHIBIT 1**

B. WITZ

1
2  entire story to them and ask if anything
3  should be added, changed or tweaked.
4      Q.  Take a look at this article.
5  Let me know when you reviewed it.
6          COUNSELOR BOWMAN:  This is, for
7      the record, Exhibit 4A?
8          COUNSELOR NEW:  4A, yes.
9      Sorry.  And I'll go ahead and give
10     the witness 4B, which is the
11     corrected article.
12     Q.  Ready?
13     A.  Sure.
14     Q.  Do you recall writing this
15  article entitled "Orwellabama?  Crimson
16  Tide Track Locations To Keep Students At
17  Games?
18     A.  Yes.
19     Q.  How did this article come
20  about, Mr. Witz?
21     A.  I saw a notice -- I -- I read a
22  story in one of the outlets that cover
23  Alabama, some point over the summer, saying
24  that they were going to use this technology
25  to help keep students in the -- in the

B. WITZ

1
2  stands until the end of the game and I
3  thought, this was really fascinating, so I
4  thought it would be a good thing to write
5  about.
6      Q.  And when you wrote the story,
7  what had to be corrected is your assertion
8  on Page 3 that FanMaker had created an app.
9  "The app it created for Alabama is the only
10  one that tracks the locations of its
11  students," correct?
12     A.  Sorry.  What are you asking?
13     Q.  I'm asking that's the fact in
14  the story that had to be corrected a few
15  weeks later, correct?
16     A.  Yes.  I believe it was a little
17  more quickly than that.
18     Q.  And Alabama wasn't the only
19  college using a loyalty points program like
20  that, correct?
21     A.  Yes.  I -- if I -- if I recall,
22  we didn't -- we didn't know that at the --
23  well, we -- I think this is a -- quite a
24  few years ago now, but if I -- if I -- I
25  seem to remember that we -- there was some

B. WITZ

1
2  -- in speaking with FanMaker, I think they
3  weren't -- they weren't -- they -- if -- I
4  think they came to us afterward and said
5  that, oh, wait, it's not just Alabama, it's
6  Mississippi State and so, is that what it
7  was?  The other one?  Yeah.  So...
8      Q.  And then at the end, you make
9  reference to Coach Saban in the subheading,
10  correct, "gets peeved at students leaving
11  routs early," correct?
12          COUNSELOR BOWMAN:  Objection.
13      Witness can answer.
14     A.  Yes, that was written in the
15  subhead of the story.
16     Q.  Did you ask Coach Saban about
17  this app?
18     A.  Yeah, I mean, I -- I spoke -- I
19  don't know if I spoke to -- I don't recall
20  how the question was formulated, but I
21  talked -- I asked him about this issue of
22  just -- about keeping fans and what he
23  thought of -- of it and, I -- let me see.
24     Q.  And he says, "That's not my cup
25  of tea"?

B. WITZ

1
2      A.  Right.
3      Q.  "I'm trying to figure out how
4  to stop Snag Seven Flat," right?
5      A.  Right.
6      Q.  Right?
7      A.  Right.
8      Q.  Do you dislike The University
9  of Alabama?
10     A.  No.
11     Q.  Do you have a problem with The
12  University of Alabama, and in particular,
13  its athletics department?
14     A.  No.
15     Q.  Do you have a problem with the
16  Southeastern Conference?
17     A.  No.
18     Q.  Do you dislike Nick Saban?
19     A.  No.
20     Q.  Is Nick Saban a hillbilly?
21     A.  No.
22     Q.  Do you know where Nick Saban is
23  from?
24     A.  I believe he grew up in West
25  Virginia.

**EXHIBIT 1**

B. WITZ
1
2     Q.    He's from Monogah, West
3  Virginia.  Is Jimbo Fisher a hillbilly?
4     A.    I don't know him.
5     Q.    He was the coach at Texas
6  A&M --
7     A.    Right, I know -- I know of
8  him --
9     Q.    He's also from West Virginia.
10 Is he a hillbilly?
11        COUNSELOR BOWMAN:  Objection.
12    Witness can answer.
13    A.    No.
14    Q.    The article states, "When we
15 learn of a mistake, we acknowledge it with
16 a correction.  If you spot an error, please
17 let us know at nytnews@nytimes.com."
18 That's The New York Times' policy, correct?
19    A.    Yes.
20    Q.    And so when FanMaker found an
21 inaccuracy in your story, they reached out
22 to The New York Times, correct?
23    A.    I'm not sure exactly how it --
24 it happened, but we -- in -- at some point,
25 we became aware that Alabama was not the

B. WITZ
1
2  only one using this and that FanMaker
3  informed us that Mississippi State was as
4  well, so we amended the story.
5     Q.    You say you don't dislike The
6  University of Alabama, you don't have a
7  problem with it or its athletic department,
8  referencing it as having some
9  Orwellian-type of app tracking students,
10 that's not a positive connotation, is it,
11 Mr. Witz?
12        COUNSELOR BOWMAN:  Objection.
13    Witness can answer.
14    A.    I think it refers to some
15 people in the story, there's Adam Schwartz
16 here, a lawyer for the Electronic Front --
17 Front -- Frontier Foundation said it was
18 "very alarming" --
19    Q.    Did he call it Orwellian?
20        COUNSELOR BOWMAN:  Counsel, let
21    him finish his answer.
22    A.    If you let me finish.  I
23 believe there was a student, yes, Alison
24 Isidore, a graduate student in religious
25 studies said "It's kind of like Big

B. WITZ
1
2  Brother," so I think Big Brother, if I'm
3  not mistaken, isn't that a phrase from one
4  of Orwell's books?
5     Q.    Yeah, 1984.
6     A.    Right.
7        COUNSELOR NEW:  4C.
8     A.    Do you want me to read this?
9     Q.    If you could go to --
10        COUNSELOR BOWMAN:  Just
11    reminding the witness, you have the
12    right to review the document if you
13    would like to do so.
14        THE WITNESS:  Okay.
15    Q.    Page 5 of 7, it was
16 specifically what I was going to ask you
17 about, Coach Saban.
18        COUNSELOR BOWMAN:  Let the
19    attorney know when you're ready.
20        THE WITNESS:  This is the page
21    (indicating)?
22        COUNSELOR NEW:  Yes.
23    Q.    Are you critical in any way
24 with Nick Saban --
25        COUNSELOR BOWMAN:  Just --

B. WITZ
1
2  just, are you ready?
3        THE WITNESS:  I'm ready to,
4    yeah.  Yeah.
5        COUNSELOR BOWMAN:  Just want to
6    make sure.
7        THE WITNESS:  Yeah.  Thank you.
8     Q.    Are you critical of Nick Saban
9  for drawing a late unsportsmanlike penalty
10 ranting at officials in a game that was
11 already decided?
12    A.    I don't look at this as being
13 critical.  I think I just -- I -- I don't
14 recall details of -- of the game, but no, I
15 -- I think I'm just stating a -- an
16 assessment of somebody who looked uncomfort
17 -- you know, this was a game that they
18 won --
19    Q.    31, 14?
20    A.    -- rather comfortably, and, you
21 know, he's a, you know, sort of a, you
22 know, built a reputation as just a very
23 hard-driving coach.  You know, he -- he's
24 called praise rat poison, and so this just
25 struck me as maybe him sort of keeping up

## EXHIBIT 1

B. WITZ

1
2  that persona of somebody whose, you know --
3  he's locked in and he's focussed on a
4  little, you know, there was something that
5  bothered him about the refereeing or --
6      Q.   He's a winner, isn't he?
7      A.   He sure is.  Yeah.
8      Q.   He sure is.  One of the best to
9  ever do it, isn't he?
10      A.   Yes.
11      Q.   I don't need you to read the
12  entire 17-page article --
13      A.   Are these --
14          COUNSELOR BOWMAN:  Although,
15      you have a right to do so.
16          THE WITNESS:  Is this --
17          COUNSELOR NEW:  Not if I have
18      one question about one picture.  This
19      -- you place good nonspeaking
20      objections on the record today,
21      Counsel, and we'll get along just
22      fine.  I'm not asking him about
23      the --
24          COUNSELOR BOWMAN:  You're going
25      to ask him.

B. WITZ

1
2          COUNSELOR NEW:  -- entirety of
3      this 17-page document.  I have one
4      question about one picture.
5          COUNSELOR THOMPSON:  Is this
6      4D?
7          COUNSELOR BOWMAN:  It's 4D.
8      Q.   Turn over to Page 5 of 17.
9      A.   Is this the page (indicating)?
10      Q.   Yes.
11          You recall this article fall of
12  last year?
13      A.   Yes.
14      Q.   How Rich Donors and Loose Rules
15  Are Transforming College Sports, that's the
16  headline, right?
17      A.   Yes.
18      Q.   Now, when articles like this
19  are drafted, who selects the photographs
20  that go in them?
21      A.   I'm not sure on a particular
22  story.  The photo editor would presumably
23  be a -- a photo editor would be involved at
24  some point.  I don't know, precisely, who
25  does that.

B. WITZ

1
2      Q.   Do you know who at The New York
3  Times chose pictures of Alabama fans to put
4  right above "The rapid rise of big-dollar
5  payments from donor collectives is
6  transforming how players are recruited,
7  although NCAA rules prohibit the
8  collectives from offering compensation as a
9  recruitment tool."  Do you know how that
10  picture in that byline came to be in this
11  article, Mr. Witz?
12      A.   No.  I -- I -- I don't, but I
13  -- I don't -- also, I see one or two
14  Alabama fans in here, but I see an LSU
15  shirt, T-shirt, and looks like somebody
16  with Florida colors.  So, no, I -- I don't.
17  I mean, there's no indication that this is
18  at an Alabama game other than a few people
19  wearing Alabama, so I'm not sure what game
20  this was and I'm -- I'm not sure how this
21  was chosen as the photo that ran with the
22  story.
23      Q.   Alright, that's fine.
24          You learned within hours that
25  your March 15th story placing Kai Spears in

B. WITZ

1
2  Brandon Miller's car at the time of the
3  shooting was inaccurate, correct?
4          COUNSELOR BOWMAN:  Objection.
5      Witness can answer.
6      A.   We learned within hours after
7  the story was published that, I guess,
8  officials at -- at Alabama told us that, in
9  an e-mail, that the reporting was
10  inaccurate.
11      Q.   And Kai Spears also, in an
12  Instagram post, indicated that the
13  reporting was inaccurate, correct?
14      A.   I seen that --
15          COUNSELOR BOWMAN:  Objection.
16      Witness can answer.  Sorry.
17      A.   I've seen that since, but I'm
18  not on Instagram, so I didn't see that for
19  a while.
20      Q.   And Christian Spears of
21  Marshall University released a statement
22  saying that the story was inaccurate the
23  following day, correct?
24      A.   Yes.
25      Q.   And I issued a press release

**EXHIBIT 1**

B. WITZ

1
2  saying that the story was demonstratively
3  false, do you recall that?
4      A.   I don't recall the details of
5  your statement, but yes.
6      Q.   And so did The University of
7  Alabama, correct?
8      A.   Yes, as I said.
9      Q.   Jessica Pare told you all
10  within hours that your story was
11  inaccurate, correct?
12      A.   She informed us via e-mail that
13  it was incorrect.
14      Q.   Alright.  And yet, it took The
15  New York Times being sued in this lawsuit
16  to correct your false story, correct?
17          COUNSELOR BOWMAN:  Objection.
18      Witness can answer.
19      Q.   The New York Times did not
20  correct its story for 70-something days
21  after being told that the information about
22  Kai Spears was inaccurate, correct?
23      A.   We -- we corrected the -- we
24  corrected the story when we contacted
25  Cooper Lee and Cooper Lee acknowledged that

B. WITZ

1
2  he was the one in Brandon Miller's car and
3  -- and that there was an affidavit in the
4  lawsuit, I believe, that stated that Kai
5  was not in the car that -- or that he was
6  somewhere else.
7      Q.   Alright.  So let's count the
8  days, alright, after March the 15th after
9  your story.
10      A.   Mm-hmm.
11      Q.   There would have been 16 days
12  in March, correct?
13      A.   Yeah.
14      Q.   Thirty days in April, correct?
15      A.   Yes.
16      Q.   Thirty-one days in May,
17  correct?
18      A.   Yes.
19      Q.   And then one or two days in
20  June until The New York Times corrected its
21  story, correct?
22          COUNSELOR BOWMAN:  Objection.
23      Asked and answered.
24      A.   Yes.
25      Q.   Let me do this Mingo County,

B. WITZ

1
2  West Virginia math.  46, 77, 78 or 79 days
3  it took The New York Times to correct your
4  false article, correct?
5          COUNSELOR BOWMAN:  Objection.
6      Witness can answer.
7      A.   Yeah.  I believe it -- it -- if
8  that's however many days it was until, what
9  was it, June 2nd?
10      Q.   Yup, June 2nd.
11      A.   Then yeah, the difference
12  between March 15th, when the story was
13  published, and June 2nd.
14      Q.   You believe that's reasonable,
15  Mr. Witz?
16      A.   It's -- we corrected the story
17  when we had the information to do so.
18      Q.   Couldn't get anything to
19  correct it in 78, 79 days?
20      A.   We tried.
21      Q.   Okay.  We'll talk about it.
22          Steve Eder was put on the story
23  when?
24          COUNSELOR BOWMAN:  Objection.
25      Witness can answer.

B. WITZ

1
2      A.   I don't know.  I didn't have
3  any involvement in -- in that.  I don't
4  know when, precisely, he was put on the
5  story.
6      Q.   How long did it take Steve Eder
7  to make sure that the story was correct?
8          COUNSELOR BOWMAN:  Objection.
9      Witness can answer.
10      A.   I don't -- I don't know how
11  long it took him to --
12      Q.   Day or two, right?
13          COUNSELOR BOWMAN:  Same
14      objection.
15      Q.   Right?
16      A.   Something like that, yeah.
17      Q.   Steve Eder did in a day or two
18  what you and Oskar Garcia should have done
19  in that 78, 79 days, right?
20          COUNSELOR BOWMAN:  Objection.
21      Witness can answer.
22      A.   No.  Steve Eder had information
23  that -- with, you know, Cooper Lee's
24  affidavit that, you know, if we -- if we
25  had had an affidavit from Cooper Lee, I

**EXHIBIT 1**

B. WITZ

1
2 don't think it would have taken us very
3 long to correct the story.
4     Q.    So you needed an affidavit from
5 the passenger of Brandon Miller's car --
6     A.    If I can correct that.  The
7 information in the affidavit and then we
8 were able to confirm -- Steve, I think in
9 his, if I recall correctly in his
10 reporting, was able to confirm with Cooper
11 Lee that he was, indeed, the person in the
12 car.
13     Q.    Are you a member of The New
14 York Times Guild?
15     A.    Yes.
16     Q.    How long have you been a union
17 journalist?
18     A.    Well, it's been a function of
19 where -- where I've worked, whether it's
20 been a union job or not.
21     Q.    Where have you worked that's
22 been a union job?
23     A.    The Long Beach Press Telegram
24 and I believe The Los Angeles Daily News.
25     Q.    And then you were a union

B. WITZ

1
2 journalist when you joined The New York
3 Times, correct?
4     A.    When I joined them on staff,
5 not as a freelancer.
6     Q.    I don't want to know exactly
7 what it is, but is any part of your
8 compensation package based upon the numbers
9 of times that your articles are shared,
10 liked, engaged with, by readers?
11     A.    Not -- none that I know of.
12         THE WITNESS:  Can we take a
13     break for a few minutes?
14         COUNSELOR BOWMAN:  Sure.
15         THE VIDEOGRAPHER:  Microphone,
16     please.
17         THE WITNESS:  Oh, yeah.  Thanks
18     a lot.
19         COUNSELOR BOWMAN:  Hold on.  Do
20     you want to read us off the video?
21         THE VIDEOGRAPHER:  Time on the
22     video monitor is 10:35 a.m.  We're
23     off the record.  This ends Media 1.
24         (Whereupon, a brief recess was
25     taken.)

B. WITZ

1
2         THE VIDEOGRAPHER:  We are back
3     on the record.  The time on the video
4     monitor is 10:48 a.m.  This is Media
5     Unit 2.
6     Q.    Alright, Mr. Witz, are you
7 familiar with The New York Times Manual of
8 Style and Usage?
9     A.    Yes.
10     Q.    How are you familiar with it?
11     A.    I know that -- I know that it
12 -- it exists.
13     Q.    Anything else?
14     A.    What -- what -- in -- what do
15 you mean?
16     Q.    Do you refer to it when writing
17 your stories?
18     A.    Not on a regular basis, but I
19 would -- I would say it's probably the type
20 of thing where there's elements of this
21 that have, you know, that are points of
22 emphasis from time to time, and were -- you
23 know, there would be e-mails that are
24 distributed to throughout the newsroom as
25 just a, hey, this is a reminder of -- of,

B. WITZ

1
2 you know, an example of something.
3     Q.    Alright.  This Guidelines on
4 Integrity says, "Our greatest strength is
5 the authority and reputation of The Times.
6 We must do nothing that would undermine or
7 dilute it and everything possible to
8 enhance it."  Do you agree with that?
9     A.    Yes.
10     Q.    And the first paragraph, "And
11 it also means that the journalism we
12 practice daily must be beyond reproach."
13 Do you agree with that?
14     A.    I'm sorry.  Where is that?
15     Q.    About midway through the first
16 paragraph.
17     A.    Oh, yes.  I think that's
18 important.  If I -- if I might clarify
19 that.  There's some context, I believe, to
20 this phrase here, and it -- and it refers
21 to -- the previous sentence says "This
22 means that staff members should be vigilant
23 in avoiding any activity that might pose an
24 actual or apparent conflict of interest and
25 thus threaten the newspaper's ethical

**EXHIBIT 1**

---

Page 54

B. WITZ

1    B. WITZ
2    standing." And it also means that the
3    journalism we practice daily must be beyond
4    reproach.
5        Q.    Take a look at Page 3 of 6,
6    Anonymity and Its Devices.
7        A.    There's nothing below that on
8    my page --
9        Q.    It's on Page 4 of 6.
10       A.    On my page, the top of Page 4
11   is -- looks like it's been cut off. I
12   don't know --
13       Q.    Alright --
14           COUNSELOR BOWMAN: I can hand
15       you the official copy. It's the
16       marked version of the exhibit.
17       Mr. Witz, is that more readable?
18           THE WITNESS: What's that?
19           COUNSELOR BOWMAN: Is that --
20           THE WITNESS: Yeah, I'll check.
21       Yes.
22       Q.    Okay.
23       A.    Is it -- it starts "The use of"
24   --
25       Q.    Yes, "The use of unidentified

Page 55

1    B. WITZ
2    sources"...
3        A.    Would you like me to read that?
4        Q.    Yes, please.
5        A.    Mm-hmm.
6        Q.    Is there any portion of that
7    that you disagree with?
8        A.    No.
9        Q.    Alright, turn over to the next
10   portion of that, March 15th, 2016. Do you
11   recall The New York Times cracking down on
12   the use of anonymous sources in 2016?
13       A.    I don't recall that particular
14   instance, no, but I -- I do recall it being
15   a conversation from user -- you know, the
16   upper editors in the newsroom from time to
17   time.
18       Q.    And this is one of those
19   e-mails that you were talking about,
20   correct?
21       A.    I'm sorry. Which e-mail are
22   you -- what are you referring to?
23       Q.    Second paragraph, "An e-mail to
24   the newsroom Tuesday morning from Dean
25   Baquet, executive editor, Matt Purdy, a

Page 56

1    B. WITZ
2    deputy executive editor, and Philip
3    Corbett, the standards editor, said, in
4    part" and then it goes on. That's one of
5    the types of e-mails that you were
6    referring to earlier, correct?
7        A.    Correct. Well, hold on a
8    second. Let me read it first. Yes.
9        Q.    Turn over to the next page.
10   Second paragraph.
11       A.    Mm-hmm.
12       Q.    Alright, your March 15th
13   article about Kai Spears relied primarily
14   on an anonymous source, correct?
15           COUNSELOR BOWMAN: Objection.
16       Witness can answer.
17       A.    No. The story did not. The
18   story, as a whole, did not rely primarily
19   on a -- information from one anonymous
20   source, but the information that Kai Spears
21   was in the passenger seat of Brandon
22   Miller's car at the time of the shooting,
23   that relied on information from two
24   anonymous sources.
25       Q.    As such, that required one of

Page 57

1    B. WITZ
2    three top editors to review and sign off on
3    that article, correct?
4            COUNSELOR BOWMAN: Objection.
5        Witness can answer.
6        A.    I'm not sure if this -- what
7    you're referring to was from March of 2016
8    and so this was what, six years later? I'm
9    not sure if that policy is still in place
10   or -- or not or if it's been amended in any
11   way or strengthened or...
12       Q.    Go over to Page 3 of 6 of that
13   article at the bottom. It says, "Here's
14   the full policy, as described in the e-mail
15   sent to the newsroom. The use of anonymous
16   sources is sometimes crucial to our
17   journalistic mission, but it also puts a
18   strain on our most valuable and delicate
19   asset: our trust with readers." Do you
20   agree or disagree with that, Mr. Witz?
21       A.    Yes, I -- I agree.
22       Q.    Go to the next page, Page 4 of
23   6. The fourth paragraph down, "Our basic,
24   longstanding criteria remain unchanged:
25   Anonymity should be, as our stylebook entry

---

15 (Pages 54 - 57)

## EXHIBIT 1

B. WITZ

1          B. WITZ
2  says, a", quote, "a last resort, for
3  situations in which The Times could not
4  otherwise publish information it considers
5  newsworthy and reliable." Closed quote.
6  Do you agree with that?
7      A.  Yes.
8      Q.  It goes on, "That standard
9  should be taken seriously and applied
10 rigorously." Do you agree with that?
11     A.  Yes.
12     Q.  And did you take that standard
13 seriously and apply it rigorously in
14 writing the March 15th article about Kai
15 Spears?
16     A.  Yes.
17     Q.  Last two sentences, "We have no
18 intention of reducing our urgency in
19 getting news to our readers. But we are
20 prepared to pay the price of losing an
21 occasional scoop in order to protect our
22 precious credibility." Do you agree with
23 that, Mr. Witz?
24     A.  Yes.
25     Q.  Meaning, nothing is so pressing

1          B. WITZ
2  that it should be rushed out that it
3  damages The New York Times' credibility,
4  right?
5          COUNSELOR BOWMAN:  Objection.
6     Document speaks for itself.  Witness
7     can answer.
8      A.  Yeah, I would -- I would -- I
9  would say just with the -- with the
10 standard or I guess this isn't -- is this a
11 standard or -- this is from the policy,
12 right?  Yeah.  Then I would agree with the
13 policy as written.
14     Q.  Writers should tell readers as
15 much as possible without violating the
16 promise of confidentiality to help them
17 assess the sources' credibility, do you
18 agree with that?
19     A.  Sorry.  Where are you reading
20 from?
21     Q.  I'm not reading from anywhere.
22 I'm just asking you generally.
23     A.  I'm sorry.  Can you repeat
24 that, please.
25     Q.  Yes.  Writers should tell

1          B. WITZ
2  readers as much as possible without
3  violating the promise of confidentiality to
4  help them assess the sources' credibility?
5      A.  Right, you never -- well, you
6  -- you never want to just give somebody
7  blanket anonymity to -- you know, as a
8  reporter, you're relying on your
9  experience, you're relying on standards,
10 you're relying on your editors to make
11 these types of assessments of, you know,
12 it's important to know where somebody is
13 coming from and...
14     Q.  And the readers need to be able
15 to judge the anonymous sources'
16 credibility, correct?
17         COUNSELOR BOWMAN:  Objection.
18    Witness can answer.
19     A.  Yes.  With -- also without
20 revealing, you know, without violating the
21 -- the -- the anonymity that's been granted
22 to the source.
23     Q.  Right.  In particular, how does
24 the source know the information and does he
25 or she have a stake in the issue, right?

1          B. WITZ
2      A.  If it's relevant, yes.
3      Q.  When would the source, knowing
4  the information, not be relevant, Mr. Witz?
5          COUNSELOR BOWMAN:  Objection.
6     Witness can answer.
7      A.  I don't -- I -- I don't know.
8  I mean, you're -- that would be a
9  hypothetical.
10     Q.  Well, the source would need to
11 know the information and be critical --
12 credible or otherwise they wouldn't be a
13 reliable source, would they?
14     A.  Correct.  Yeah, you're making
15 an assessment of, yeah, how does -- how
16 does a person know the information that
17 they're giving you.
18     Q.  Why are those rules, like the
19 ones that we just read about, the use of
20 anonymous sources, important?
21         COUNSELOR BOWMAN:  Objection.
22    Witness can answer.
23     A.  Rules regarding the use of
24 anonymous sources are important to provide
25 the readers with a degree of confidence

**EXHIBIT 1**

Page 62

B. WITZ

1
2 that what you're -- what they're reading
3 about is accurate and fair.
4     Q.    Same exact reason that the
5 sources' credibility is explained to the
6 reader, correct?
7         COUNSELOR BOWMAN:  Objection.
8     Witness can answer.
9     A.    In some cases.  I mean to -- to
10 the -- what I mean by that is to the degree
11 that you can, I mean there are some cases
12 where you just, you know, there's some
13 cases you can allow for more -- there's
14 more you can explain to the reader without
15 violating that -- without identifying who,
16 you know, the source is.
17     Q.    Are you familiar with the Radio
18 Television Digital News Association Code of
19 Ethics?
20     A.    What's that organization?
21     Q.    Radio Television Digital News
22 Association?
23     A.    No.
24     Q.    Do you agree that attribution
25 is essential, it adds important information

Page 63

B. WITZ

1
2 and helps the audience evaluate content and
3 it acknowledges those who contribute to the
4 coverage where anonymous sources are
5 concerned?
6         COUNSELOR BOWMAN:  Objection to
7     form.
8     A.    I'm sorry.  Are you reading
9 from a statement, I mean, or the -- that
10 Organization's code of --
11     Q.    Yes.  And I understand and I'm
12 not asking whether you know that, I'm
13 asking whether you agree with that
14 principle?
15         COUNSELOR BOWMAN:  Same
16     objection.  Witness can answer.
17     A.    I -- it would be helpful if I
18 could read the policy or if -- or if you
19 want to restate it.
20     Q.    Alright.
21     A.    Sorry.
22     Q.    That's alright.  Move on over
23 to Page 5 of 6, number 1.  Let me know when
24 you read number 1.
25     A.    Okay.

Page 64

B. WITZ

1
2     Q.    Is there any part of that that
3 you disagree with?
4     A.    No.
5     Q.    The lead of the story of your
6 March 15th article was Kai Spears' presence
7 in Brandon Miller's car at the time of the
8 shooting, correct?
9     A.    No.  I think the -- I don't
10 have the story in front of me, but I -- I
11 believe that the story was how the shooting
12 could have been much worse, as tragic as it
13 was.  I believe that was the first sentence
14 of the story.
15     Q.    We'll get there.  We're going
16 to spend a lot of time in the article, but
17 you don't believe "Fourth Alabama player,"
18 is how it starts, yet you don't believe
19 that that was the lead of that story?
20         COUNSELOR BOWMAN:  Objection.
21     Q.    Right?
22         COUNSELOR BOWMAN:  Witness can
23     answer.
24     A.    Well, if you want to show me
25 the story, but I believe the first

Page 65

B. WITZ

1
2 paragraph was how -- was the, you know,
3 this tragedy could have been far worse.
4     Q.    Well right now I just want to
5 know whether you think, and I don't care
6 what your answer is, whether you think the
7 special rules that are listed here applied
8 to your March 15th story about the
9 shooting?
10     A.    I -- I'm not sure because, like
11 I said, this is in 2016.  I'm not sure if
12 these still apply in 2022.
13     Q.    Alright.  Number two.  Take a
14 look at that.  It's all on Page 5 of 6
15 there.
16     A.    Okay.
17     Q.    "A note on the story should
18 indicate that the sourcing has been
19 approved, and by whom.  Slot editors, copy
20 editors and producers should not publish a
21 story with any anonymous sourcing that does
22 not have a note indicating that the
23 department head or deputy has approved the
24 sourcing."  Do you believe that was done in
25 regard to the March 15th subject article?

17 (Pages 62 - 65)

**EXHIBIT 1**

B. WITZ
1
2     A.   I -- I don't know.  I know I
3  was -- I was asked by my editor, you know,
4  I let him know who the -- who the source
5  was.  I'm not sure who the sources were and
6  I'm not sure, you know, how -- how -- where
7  he went up the chain of command, but I --
8  so I couldn't speak to that.
9     Q.   And that was Oskar Garcia,
10  correct?
11     A.   Correct.  Yes.
12     Q.   Do you believe that you
13  complied with The New York Times standards
14  and the attribution about the anonymous
15  sources in the March 15th article?
16          COUNSELOR BOWMAN:  Objection.
17      Witness can answer.
18     A.   Yes.
19     Q.   Did your March 15th article
20  tell --
21     A.   I'm sorry.  If I could just add
22  to that?  I -- I would say that I added, I
23  mean, I -- I identified my sources with the
24  -- the -- any anonymous sourcing on the
25  story, I informed Oskar who they were.

B. WITZ
1
2     Q.   I'm not talking about telling
3  Oskar.  I'm talking about telling your
4  readers because these standards talk about
5  you and the editors informing the readers
6  about the anonymous source, correct?
7     A.   Correct.
8          COUNSELOR BOWMAN:  Objection.
9      The document speaks for itself.
10     Q.   I'm not talking about telling
11  your editor.  I'm talking about The New
12  York Times telling its readers about the
13  credibility, the believability, the source
14  of the information and whether or not that
15  -- that anonymous source actually knows
16  what it is that they're talking about.  Do
17  you believe that that March 15th article
18  was appropriately attributed to the
19  anonymous source?
20          COUNSELOR BOWMAN:  Objection.
21      Witness can answer.
22     A.   I -- I -- without having the
23  story in front of me, I believe that the
24  story attributed that information to the
25  person who was -- well, I don't know,

B. WITZ
1
2  familiar with the case or who -- familiar
3  with details of the case.
4     Q.   That's what it said, quote, "a
5  person familiar with the case," correct?
6     A.   I -- I don't know.  I mean I
7  don't have it in front of me.
8     Q.   We'll take a look at it.
9     A.   Okay.
10     Q.   And The New York Times readers
11  infer that this information, The Times
12  believed it to be true, correct?
13          COUNSELOR BOWMAN:  Objection.
14      Witness can answer.
15     A.   Can you repeat that?
16     Q.   Yes.  In saying "a person
17  familiar with the case," that leads the
18  reader to believe that this anonymous
19  source is credible and knows what it is
20  that they're talking about, correct?
21     A.   Yes.
22          COUNSELOR BOWMAN:  Same
23      objection.  Same instruction.
24     A.   Yes.
25     Q.   And your testimony under oath

B. WITZ
1
2  here today is that two sources, Source A
3  and Source B, provided the information that
4  went into the March 15th article, correct?
5     A.   They provided some of the
6  information that went into the March 15th
7  article.
8     Q.   Are you familiar with the terms
9  Special Scrutiny in journalism?
10     A.   No.
11     Q.   Regardless of you not being
12  familiar with the term Special Scrutiny,
13  you disagree that the primary news element
14  of the March 15th article was Kai Spears
15  being the previously unidentified passenger
16  in Brandon Miller's vehicle at the time and
17  the scene of the shooting, correct?
18     A.   No, I didn't say that the --
19  the -- that was -- that was -- that was a
20  news element of the -- of the story.  The
21  overarching point of the story was that
22  this horrible tragedy could have been
23  worse.  In fact, it's almost a miracle that
24  it wasn't.
25     Q.   It's almost like angels were

18 (Pages 66 - 69)

Page 70

B. WITZ
2 watching over Brandon Miller and Cooper
3 Lee, right?
4    A.    Yeah.
5    Q.    And it was almost like angels
6 were watching over Kai Spears, Dylan
7 Serafini and Esai Morse, that they were
8 headed back to the dorm to play video
9 games, right?
10        COUNSELOR BOWMAN:  Objection.
11    Witness can answer.
12    A.    I think anybody that was at
13 that scene or saw the video of it, you
14 would realize with all the bullets that
15 were flying, that it's -- you know, it's a
16 tragedy that one person died, but could
17 have been far, far worse.
18    Q.    And that's what you believe the
19 primary news element of that story was, not
20 Kai Spears' presence; do I understand that
21 correctly?
22    A.    No.  I -- maybe -- should
23 explain this again.  But the overarching
24 point of the story was that this could have
25 been far worse.  That another Alabama

Page 71

B. WITZ
2 basketball player was in the car or in one
3 of those cars that was shot, that was what
4 we believed was a new element.
5    Q.    And it was wrong?
6    A.    It was not Kai Spears, but --
7 right, it was another --
8    Q.    It wasn't another Alabama
9 player, either?
10    A.    It was another member of the
11 team.
12    Q.    It was a basketball manager,
13 right?
14    A.    A -- a member of the basketball
15 team.
16    Q.    Well, not knowing what special
17 scrutiny is, do I take it that you don't
18 know whether you had an obligation to apply
19 special scrutiny to the rule or to the
20 March 15th, 2023 subject article?
21        COUNSELOR BOWMAN:  Objection.
22    Witness can answer.
23    A.    I'm not sure what special
24 scrutiny is.
25    Q.    Let's take a look at these

Page 72

B. WITZ
2 rules quickly before we move on to an
3 updated one.  Are you --
4    A.    I'm sorry.  Are you done with
5 this?
6    Q.    No.  You can turn over a couple
7 of more pages, please.
8        Are you a member of the Society
9 of Professional Journalists, Mr. Witz?
10    A.    No.
11    Q.    Are you familiar with their
12 code of ethics?
13    A.    No.
14    Q.    Alright.  If you'll turn
15 through that then --
16    A.    You want me to --
17    Q.    No, turn over to the next thing
18 that we take a look at in that combined
19 exhibit is a New York Times Ethical
20 Journalism.  That would be the next thing
21 that you see.  Let me know when you're
22 there.
23    A.    This one (indicating)?
24    Q.    Yes.
25    A.    Could turn over to Page 4 of

Page 73

B. WITZ
2 37, please, at the top.
3        COUNSELOR BOWMAN:  Steve, mine
4    is cut off.  Could you please tell me
5    what the top line says.
6        COUNSELOR NEW:  "Every staff
7    member is expected to read this
8    document carefully and to think about
9    how it might apply to his or her
10    duties."
11    Q.    Just read that top paragraph,
12 let me know if you agree with that,
13 Mr. Witz.
14    A.    (No response.)
15    Q.    Have you read the top paragraph
16 Page 4 of 37, Mr. Witz?
17    A.    Yes.
18    Q.    Is there any part of that with
19 which you disagree?
20    A.    You know, I -- I'm sorry.  I'm
21 just trying to understand what this -- what
22 this is because it's not something that I
23 recall seeing.  Okay, so this -- so is this
24 from the -- what is this from?
25    Q.    TheNewYorkTimes.com Editorial

**EXHIBIT 1**

Page 74

B. WITZ

1
2 Standards For Ethical Journalism.
3     A.   Okay.
4     Q.   I printed it from yall's
5 website, I believe.
6     A.   No, there's nothing here I
7 would disagree with.
8     Q.   It says in the second sentence,
9 "A lack of familiarity with its provisions
10 cannot excuse a violation.  To the
11 contrary, it makes the violation worse."
12 Correct?
13     A.   Yes.  That's what it says.
14     Q.   At the bottom it says, "Thus we
15 expect staff members to consult their
16 supervisors and the standards editor or the
17 opinion editor or the opinion managing
18 editor if they have any doubts about any
19 particular situation or opportunity covered
20 by this document."  Correct?
21     A.   Yes, that's what it says.
22         COUNSELOR BOWMAN:  Has this
23     been premarked?
24         COUNSELOR NEW:  It has not.
25     Exhibit 6, e-mail.

Page 75

B. WITZ

1
2         (Whereupon, an E-mail was
3     marked as Plaintiff's Exhibit 6 for
4     identification as of this date by the
5     reporter.)
6     Q.   Alright, would you have gotten
7 a copy of this e-mail from Grace Wong on
8 September the 8th, 2021?
9         COUNSELOR BOWMAN:  Objection.
10     This is a partial copy of the
11     e-mail --
12         COUNSELOR NEW:  I understand.
13         COUNSELOR BOWMAN:  But the
14     witness can answer.
15     A.   Likely so because it says to
16 NYHQ newsroom, so that would have included
17 me.
18     Q.   And it appears dated
19 September 2021, correct?
20     A.   Yes.
21     Q.   Ms. Wong says, "it's crucial to
22 adhere to tough standards for anonymous
23 sourcing."  Do you agree with that?
24     A.   Yes.
25     Q.   "This is a reminder of our

Page 76

B. WITZ

1
2 rules and best practices, expanding on the
3 guidance we recovered back in 2016."  Do
4 you see that?
5     A.   I don't see the 2016 part.
6     Q.   It's the last word --
7     A.   Right.
8     Q.   -- in the first paragraph?
9     A.   Right.  I'm sorry.
10     Q.   So between 2016 and 2023, the
11 end of 2022, other than this September 2021
12 e-mail from Grace Wong, did you get any
13 training, instruction, any other guidance
14 on the use of anonymous sourcing?
15     A.   There may have been other
16 e-mails or things.  When you say training,
17 I mean, I don't think there was, like, a
18 seminar or anything like that, but it's --
19 as I said before, this is, you know, this
20 is a -- something that from time to time
21 is, you know, becomes, you know, becomes an
22 issue that the leaders in the newsroom take
23 the time to address, so this may have -- I
24 don't know what was behind this, but, you
25 know, this -- there may have been others

Page 77

B. WITZ

1
2 like this over the years.
3     Q.   Who are Matt Purdy and Phil
4 Corbett?
5     A.   Phil Corbett, I'm not sure if
6 he still is, but he was the head of our
7 standards department and Matt Purdy is a
8 top editor at the -- at The New York Times.
9     Q.   Third paragraph, "But anonymous
10 sourcing puts great strain on our most
11 valuable asset: our readers' trust."  Do
12 you agree with that or disagree?
13     A.   Yes, I agree.  Should be used
14 judiciously.
15     Q.   And the last sentence in that
16 paragraph, "In a few cases, we published
17 information from anonymous sources that
18 turned out to be wrong, a serious blow to
19 our credibility."  You agree with that,
20 right?
21     A.   Yes.
22     Q.   The March 15th article about
23 Kai Spears was wrong and it was a serious
24 blow to The New York Times' credibility; do
25 you agree with that?

**EXHIBIT 1**

Page 78

B. WITZ

1
2    A.   Yes.  The information -- yes,
3    the information that Kai Spears was in the
4    passenger seat was wrong.
5        Q.   It says, "Given the stakes, we
6    should reserve the use of anonymous
7    sourcing for places where it really
8    matters."  Do you agree with that?
9        A.   Yes, I agree with that and
10   that's always a, you know, I think that's
11   -- that's one of the -- that's one of the
12   questions that journalists have to evaluate
13   is just what, you know, where -- where does
14   it really matter.
15       Q.   Well, Kai Spears presence, or
16   lack thereof, in a car involved in a
17   shooting on The Strip in Tuscaloosa,
18   Alabama January of 2023 is not a matter of
19   National Security, was it?
20           COUNSELOR BOWMAN:  Objection.
21       Witness can answer.
22       A.   No, it was not a matter of
23   National Security.
24       Q.   It wasn't a matter of insider
25   trading on Wall Street, was it?

Page 79

B. WITZ

1
2    A.   No, it was not a matter of
3    inside trading on Wall Street.
4        Q.   It was not a matter of
5    governmental waste fraud abuse, was it?
6        A.   No.  What I would say it was
7    was the story, and by "story," I mean, you
8    know, broadly, is that to people who follow
9    -- follow college sports, and even, you
10   know, the NCA tournament is a, you know,
11   it's a cultural event in our country and
12   people who aren't necessarily even college
13   basketball fans are -- are drawn to this
14   and so the story of Alabama as the number
15   one ranked team in the country trying to
16   win a national championship while one of
17   their players is in jail on capital murder
18   charges, that's not an everyday story, and
19   so, you know, I think those are -- those
20   are the questions of, you know, when it --
21   where it really matters, I think what we're
22   thinking about.
23       Q.   And last sentence in that
24   paragraph, "We should apply skepticism and
25   tough scrutiny to every single use of

Page 80

B. WITZ

1
2    anonymity in our report."  You agree with
3    that?
4        A.   Yes.
5        Q.   Alright, when we go through the
6    article and the lead-up to it, we will
7    evaluate your skepticism and tough scrutiny
8    to the use of those anonymous sources, Mr.
9    Witz, is that all right with you?
10           COUNSELOR BOWMAN:
11       Argumentative.  Witness can answer.
12       A.   Yes.
13       Q.   And this says, "Our basic
14   longstanding guideline remains unchanged.
15   Anonymity should be, as our stylebook entry
16   says, a last resort for situations in which
17   The Times could not otherwise publish
18   information it considers newsworthy and
19   reliable."  Anonymous sources, according to
20   this e-mail, should be used as a last
21   resort, correct?
22           COUNSELOR BOWMAN:  Objection to
23       the inquiry about that section, given
24       the rest of the section is not a part
25       of the document.

Page 81

B. WITZ

1
2           COUNSELOR NEW:  That's fine.
3        Q.   That's what it says, doesn't
4    it?
5        A.   It says "Our basic longstanding
6    guideline remains unchanged.  Anonymity
7    should be, as our stylebook entry says,"
8    quote, "a last resort for situations in
9    which The Times could not otherwise publish
10   information it considers newsworthy and
11   reliable."  End quote.
12       Q.   Anonymous sources used as a
13   last resort, right?
14       A.   Yes.
15       Q.   Do the special rules referenced
16   in Grace Wong's e-mail of September 21st
17   apply to the March 15th, 2023 article about
18   Kai Spears?
19       A.   I'm sorry.  What -- where does
20   it say -- which -- what are the special
21   rules here that you're referring to?
22       Q.   The one that she talks about,
23   anonymous sources?
24       A.   Are you talking just about the
25   whole, all these one, two, three, four --

EXHIBIT 1

B. WITZ
1
2    Q.   Yeah.
3    A.   -- things here?  Okay.
4    Q.   That it should have been --
5    that anonymous source should have been used
6    as a last resort?
7    A.   Yeah.  Yeah -- of course, these
8    would all apply to any story that The New
9    York Times is considering publishing,
10    including that one that you mentioned.
11    Q.   Kai Spears alleged presence in
12    Brandon Miller's car at the time of the
13    shooting was based entirely on the
14    information of one anonymous source,
15    correct?
16    A.   No.
17    Q.   What else was it based on?
18    A.   Information from another
19    source.
20    Q.   Source B?
21    A.   In part, yes.
22    Q.   Anything else?
23    A.   Not that I can recall.
24    Q.   As such, because Kai Spears
25    alleged presence in Brandon Miller's car

B. WITZ
1
2    hinges on information from two anonymous
3    sources, that story had to be presented in
4    advance by the relevant department head to
5    Dean, Joe, Matt or Alison, correct?
6        COUNSELOR BOWMAN:  Objection.
7    Witness can answer.
8    A.   I -- I don't -- I don't know.
9    I mean, I think, I -- I don't know if those
10    people were -- I'm not sure if Dean was
11    still editor at the time --
12    Q.   Alright --
13    A.   Yeah, it should go up the chain
14    of command if that's what you're asking.
15    Q.   Tell me who Dean, Joe, Matt or
16    Alison are?
17    A.   Well, Dean Baquet is the -- was
18    the executive editor.  He since retired.
19    And I'm not sure if -- if Joe refers to Joe
20    Khan.  I'm not -- but he was a member of --
21    they're top editors at the -- at the paper,
22    that's generally referred to as the
23    masthead, and so Matt Purdy and -- is the
24    other one Alison Mitchell, is that?
25    Q.   Alright.  Let's talk about your

B. WITZ
1
2    chain of command in March of 2015.
3    A.   Mm-hmm.
4        COUNSELOR BOWMAN:  Do you mean
5    March of 2023?
6        COUNSELOR NEW:  I'm sorry.
7    March of 2023.  Thank you, Counsel.
8    Q.   Your next direct report is
9    whom, Oskar Garcia?
10    A.   Yes, at that time.
11    Q.   And what was his position?
12    A.   I believe he's a -- his title
13    is deputy sports editor, but we -- we --
14    there -- at the time when there was a
15    sports department, they had, you know, the
16    deputy's would work with specific reporters
17    and so, as a college sports reporter,
18    myself and another reporter, we reported to
19    Oskar.
20    Q.   And to whom would Oskar Garcia
21    report if there was an issue that came up
22    about use of anonymous sources or
23    something?
24    A.   I don't -- somebody above him.
25    Q.   Obviously.  Who might that be

B. WITZ
1
2    in March of 2023?
3    A.   Well, it -- I don't recall.  It
4    -- within the sports department, I believe
5    -- well Randy Archibald was the department
6    head and then I believe at that time under
7    him was Mike Wilson.  So I'm not sure if
8    that's the exact, you know, what's -- the
9    organizational chart is that way, but those
10    would have been two people that would --
11    have been above him within the department
12    and then there's above that within the
13    newsroom.
14    Q.   And to whom would Rand
15    Archibald or Mike Wilson go if there was
16    still some question about an article and
17    anonymous sourcing in particular?
18    A.   They could have gone to a
19    number of people.
20    Q.   Like -- Dean, Joe, Matt or
21    Alison?
22    A.   Yeah, that could have been
23    among them or they -- they might have --
24    you know, been able to go to somebody on
25    the standard's desk.

**EXHIBIT 1**

B. WITZ
1
2      Q.   Like Phil Corbett?
3      A.   Yeah.  If he was the -- if he
4    was the head of standards at the time, yes.
5    I mean, the standards desk is, yeah,
6    they're, you know, I think they're
7    consulted pretty regularly on -- on
8    stories, like, hey, we have this issue with
9    a story and, you know, they're kind of like
10   the inhouse guidance on these sorts of
11   things.
12     Q.   You presented your March 15th
13   story to Oskar Garcia, correct?
14     A.   Yes.
15     Q.   And, in fact, Garcia helped you
16   write part of it, correct?
17     A.   Yeah, I don't recall the
18   process in great detail, but, yeah.  I --
19   it, you know, it -- it's kind of a story
20   like that can be a kind of a working
21   document, so depending on the, you know, if
22   it's a feature story, then it's probably
23   the writer, you know, somewhat finishing it
24   and handing it off to an editor.  Something
25   where, you know, it's, you know, a breaking

B. WITZ
1
2    news story, then it could be much more, I
3    guess, editor involvement in the writing
4    and -- but I don't recall what exactly
5    happened in this case.
6      Q.   Is Randy Archibald, or was he
7    in March of 2023, your department head?
8      A.   I -- you know, it's a good
9    question.  I don't recall.  He -- he left
10   the department right around that time, so
11   I'm not sure if -- if he had gone to
12   another position in the newsroom or not at
13   the time the story was published if that's
14   what you're asking, right?
15     Q.   Mm-hmm.  Was your March 15th
16   story about Kai Spears presented in advance
17   by your department head to either Dean,
18   Joe, Matt or Alison with an explanation as
19   to why their approval was being sought?
20     A.   I don't know.
21     Q.   It should have been, shouldn't
22   it?
23          COUNSELOR BOWMAN:  Objection.
24     Witness can answer.
25     A.   I don't -- I don't -- I don't

B. WITZ
1
2    know.  I mean, there's, you know, there's
3    not -- I don't -- I don't know who the -- I
4    just don't know enough about, like, how
5    upper management works to know there's, you
6    know, probably, I don't know, eight, 10
7    people who were -- or on what's called the
8    masthead which is upper management, and
9    then you also have the standards desk, so
10   I'm not sure of what the appropriate, you
11   know, person or persons that this kind of
12   stuff, you know, would go through.
13     Q.   Had you ever had any stories
14   prior to this one where you had to get
15   upper management approval of your use of an
16   anonymous source?
17     A.   I'm not -- I'm not sure.  I
18   know there's -- there's -- there's been --
19   there were a handful of stories, I think
20   with Oskar, where I would have to have
21   sourcing approved, but I don't know where
22   he, you know, it was just very sort of
23   sequential.  I go to him, tell him who it
24   is, and then he, you know, my understanding
25   is that he would take it up the food chain

B. WITZ
1
2    and get it signed off.  I just don't
3    remember.  In fact, I know that -- I -- I
4    know we had that conversation where he
5    said, yeah, you know, so and so signed off
6    on this particular story, but I don't -- I
7    don't recall any of the particulars.
8      Q.   In this case, talking about
9    this article specifically, as you sit here
10   today, you cannot say under oath that your
11   article went above Oskar Garcia for any
12   type of editorial review or approval; is
13   that a fair statement?
14          COUNSELOR BOWMAN:  Objection.
15     Witness can answer.
16     A.   Yeah, I just -- I just don't --
17   I just don't know.  I mean, it's not
18   something that I would, you know, yeah, I
19   just --
20     Q.   I'm not asking you whether you
21   know.  I want to confirm that as you sit
22   here today, you don't have any knowledge
23   that your article went any further up the
24   chain than Oskar Garcia, correct?
25     A.   I just don't -- I -- I just

**EXHIBIT 1**

B. WITZ

1  B. WITZ
2  don't know if it -- if it did or if it
3  didn't.
4  Q.  Given the nature of it, do you
5  believe it should have?
6  COUNSELOR BOWMAN:  Objection.
7  Witness can answer.
8  A.  Well, I don't know.  You're --
9  feels like you're asking me to speculate on
10  something that may or may not have
11  happened.  I mean, I -- yeah --
12  Q.  You work at The New York Times.
13  These are your all standards?
14  A.  Yeah.
15  Q.  I'm not asking you to speculate
16  about anything.  I just read a standard
17  that said you needed to be familiar with
18  those.  I'm not asking you to speculate
19  about anything, Mr. Witz.  I'm asking you
20  to give me your opinion about whether the
21  story, given the nature of it, the
22  seriousness of it, the reliance on
23  anonymous sources, should have gone through
24  an editorial process higher than Oskar
25  Garcia?

1  B. WITZ
2  COUNSELOR BOWMAN:  Objection.
3  Witness can answer.
4  A.  Yeah.  And I would -- I -- I
5  would say, Oskar is a very fastidious
6  editor and, you know, I don't know what
7  happened, but it -- it would be very rough
8  in his -- it wouldn't surprise me if he did
9  take it up the chain of command.
10  Q.  It would me.
11  Let's talk about -- he's not
12  the department head or he wasn't in March
13  of '23, was he?
14  A.  Oskar?
15  Q.  Yeah.
16  A.  No.  He's -- he's never been
17  the department head.
18  Q.  Alright.
19  Have you ever heard anyone say,
20  if that process that we just talked about
21  of going to the department head, to one of
22  these people on what you're calling the
23  masthead, if it sounds as though this will
24  slow the process down, that's part of the
25  point?  A story that hangs on anonymous

1  B. WITZ
2  sourcing should always get special
3  scrutiny.  Have you heard that, that if the
4  use of anonymous sources requires this
5  editorial review process, that might slow
6  your story down; have you ever heard that?
7  A.  I don't recall hearing it
8  explicitly, but I think, yeah, it kind of
9  goes without saying, it's one of the points
10  of, you know, why you want to -- why you
11  want to be careful.
12  Q.  There was no need to rush out
13  this story about Kai Spears on the evening
14  of March 15th, was there?
15  COUNSELOR BOWMAN:  Objection.
16  Witness can answer.
17  A.  We published the story when we
18  felt like we had enough information to
19  publish it.
20  Q.  That's not my question.  My
21  question is, there was no good reason why
22  that story had to be published on the
23  evening of March 15th as opposed to the
24  evening of March 16th or the evening of
25  March 17th, do you agree with that?

1  B. WITZ
2  COUNSELOR BOWMAN:  Same
3  objection.  Witness can answer.
4  A.  We -- we -- you know, as a
5  matter of course, The Times publishes
6  stories when feels like they're ready to be
7  published and we felt like we were ready to
8  publish.
9  Q.  The "we" being you and Oskar
10  Garcia?
11  A.  Yeah, and The New York Times.
12  Q.  If anybody else at The New York
13  Times was involved in that, right?
14  A.  I guess I -- I'm just saying,
15  like, the "royal we" when I was referring
16  to, I mean like the paper.
17  Q.  I'm not asking about the "royal
18  we".  I'm asking about the "peasant we".
19  As you sit here today, the "we" to whom you
20  refer, published it on the March 15th date
21  is you and Oskar Garcia, right?
22  A.  Well, I don't know who -- yeah,
23  I mean, I don't know who -- who else was,
24  you know, brought into this, but I know on
25  other stories, Oskar has -- he's a careful

**EXHIBIT 1**

B. WITZ

1
2  editor and so, you know, he's -- I -- I
3  know there's other things, which as it --
4  with regard to sourcing where he -- where
5  he has gone up the chain of command because
6  he mentioned it and so, but I -- but I
7  don't have any firsthand knowledge in this
8  case of who he might have spoken to.
9      Q.   Explain to us why the article
10 needed to be published on March 15th as
11 opposed to the 16th or the 17th, Mr. Witz?
12      COUNSELOR BOWMAN:  Objection.
13   Witness can answer.
14      A.   Because we felt like we had --
15 the -- the story was ready to publish.
16      Q.   And it wasn't, was it?
17      COUNSELOR BOWMAN:  Objection.
18   Witness can answer.
19      A.   Well, I mean, if you're
20 referring to the -- the story having
21 incorrect information, yeah.  No.  We had,
22 like I said before, he -- you know, we
23 would like to do that again.
24      Q.   What harm would there have been
25 for The New York Times if you had done some

B. WITZ

1
2  more investigative journalism on March 16th
3  or the 17th since you were in Alabama any
4  way?  What harm would there have been to
5  have published an article with accurate
6  information a day or two later, any?
7      COUNSELOR BOWMAN:  Objection.
8   Witness can answer.
9      A.   Well, we -- we believed that
10 the information at that time that we
11 published was accurate.
12      Q.   I understand.  That's not my
13 question, though.  My question is, what
14 harm would have come to The New York Times,
15 if any, to have published an accurate
16 article on March the 16th or March the 17th
17 after a little more investigative
18 journalism on your part?
19      COUNSELOR BOWMAN:  Objection.
20   The witness can answer.
21      A.   Like I said, we -- we felt
22 like, at the time that we -- the -- we felt
23 like at the time, the information we had in
24 the story was accurate and, therefore, we
25 made the -- the decision -- the decision

B. WITZ

1
2  was made to publish.
3      Q.   There would have been no harm
4  to The New York Times to have published an
5  accurate article after two more days of
6  talking to people, no harm to The New York
7  Times, right?
8      COUNSELOR BOWMAN:  Objection.
9   Witness can answer.
10      A.   I don't see where there's ever
11 any harm in publishing an accurate story,
12 so...
13      Q.   Yeah, but you published an
14 inaccurate one?
15      A.   Correct, but we -- at the time,
16 we believed the information that we had was
17 accurate.
18      Q.   We're going to go through the
19 article and we're going to go through the
20 six days leading up to the publishing of
21 the article.
22      The NCAA tournament was still
23 going on March 16th and 17th, correct?
24      A.   Yes.
25      Q.   And so in terms of timeliness,

B. WITZ

1
2  relative to this cultural phenomenon known
3  as the NCAA basketball tournament March
4  Madness, you would have still been right in
5  the middle of March Madness on March 16th
6  or 17th, wouldn't you?
7      A.   Yes.
8      Q.   But you agree with me that
9  there had been no harm to The New York
10 Times to delay the story by a day or two,
11 but tremendous harm to Kai Spears to have
12 been placed in the car at the time of the
13 shooting and involved in the shooting?
14      COUNSELOR BOWMAN:  Objection.
15      Q.   You acknowledge that, don't
16 you, Mr. Witz?
17      COUNSELOR BOWMAN:  Objection.
18   Witness can answer.
19      A.   Can you repeat that?
20      Q.   Yes.  You acknowledge that no
21 harm to The New York Times in waiting a day
22 or two, but tremendous harm to Kai Spears
23 to be named in an article as being present
24 at and involved in a shooting on The Strip,
25 you acknowledge that, don't you, Mr. Witz?

Page 98

```
 1              B. WITZ
 2          COUNSELOR BOWMAN:  Objection.
 3      Witness can answer.
 4      A.    The -- so that's two things.
 5  And the -- the first part of that is just
 6  that as I -- as I said before, the -- the,
 7  you know, we -- the story was published
 8  when we felt like we had accurate
 9  information.  That was not -- not the case,
10  which, you know, I -- there's no question
11  there that's -- that's a regret.  I never
12  looked at this as, you know, that Kai was a
13  -- I forgot the word you used.
14      Q.    Harmed as a result of your
15  inaccurate reporting?
16      A.    That -- that it was, you know,
17  that Kai or whoever was in that car was --
18  you know, as we talked about before, this
19  -- this could have been far, far worse and
20  it wasn't like, you know, he was a -- the
21  story never said -- you know, there was
22  never any indication that he was, you know,
23  a perpetrator in this or --
24      Q.    Oh, we're going to get there,
25  Mr. Witz, this afternoon after lunch --
```

Page 99

```
 1              B. WITZ
 2          COUNSELOR BOWMAN:  Counsel,
 3      will you let the witness finish his
 4      answer.
 5      Q.    We're -- we're going to get to
 6  your use of your word "involvement" after
 7  lunch.  I -- I promise you, we're going to
 8  get there.
 9          The March 15th story should
10  have been held to allow upper editors to go
11  through the special scrutiny processes
12  under The New York Times standards,
13  correct?
14          COUNSELOR BOWMAN:  Objection.
15      Witness can answer.
16      A.    I -- that's a hypothetical.
17      Q.    No, it's not.  This is an
18  actual article.  You're an actual reporter.
19  There were actual upper level editors in
20  place at The New York Times?
21      A.    I don't know that that didn't
22  take place.
23      Q.    And you don't know that it did,
24  do you?
25      A.    No.
```

Page 100

```
 1              B. WITZ
 2      Q.    Your article about Kai Spears
 3  was not "hot news" needing to be printed on
 4  the evening of March 15th, was it?
 5          COUNSELOR BOWMAN:  Objection.
 6      Witness can answer.
 7      A.    It -- I'm sorry it was or was
 8  not?
 9      Q.    Was not "hot news"?
10      A.    What do -- what do you mean by
11  "hot news".
12      Q.    What do you -- have you ever
13  used the term "hot news" before?
14      A.    Not that I can recall.
15      Q.    Alright.
16          Have you been reprimanded or
17  disciplined in any way by The New York
18  Times as the result of your March 15th,
19  2023 article?
20      A.    No.
21      Q.    Not even so much as a harsh
22  speaking to by anybody at The New York
23  Times, right?
24      A.    No.
25      Q.    What I said is right?  You
```

Page 101

```
 1              B. WITZ
 2  haven't even gotten so much as a stern or
 3  harsh speaking to by anybody at The New
 4  York Times, that's correct, right?
 5      A.    I -- I -- I --
 6          COUNSELOR BOWMAN:  Objection.
 7      Asked and answered.
 8      A.    I -- I haven't been -- I
 9  haven't been reprimanded in any way.
10      Q.    You don't believe you distorted
11  any facts in your March 15th article, do
12  you?
13      A.    I would have to see the story
14  to go through it, but no, I don't -- I
15  mean, there were facts that were wrong and
16  -- or at least one significant one, but I
17  don't -- I wouldn't say anything had been
18  distorted.
19      Q.    Do you agree that the voice of
20  The New York Times is loud and far
21  reaching?
22      A.    Yes.
23          COUNSELOR NEW:  Counsel,
24      let's go ahead and take that lunch
25      break.
```

26 (Pages 98 - 101)

## EXHIBIT 1

B. WITZ

1
2  COUNSELOR BOWMAN: Okay.
3  COUNSELOR NEW: How long?
4  COUNSELOR NEW: Let's get
5  off the record and we can sort out
6  the logistics.
7  THE VIDEOGRAPHER: The time on
8  the video monitor is 12:03 p.m. We
9  are off the record. This ends Media
10  Unit 2.
11  (Whereupon, a lunch was taken.)
12  THE VIDEOGRAPHER: We are back
13  on the record. The time on the video
14  monitor is 1:13 p.m. This is Media
15  Unit 3.
16  Q.  Mr. Witz, from January the 15th
17  of 2023 to March 9th of 2023, what, if
18  anything, did you know about the shooting
19  of Jamea Harris?
20  A.  Just stories that I had read.
21  Q.  Do any of those stand out to
22  you as you sit here today?
23  A.  No.
24  Q.  At some point, your interest
25  was piqued in actually covering the story

B. WITZ

1
2  yourself, correct?
3  A.  Not exactly. It felt like as
4  we were getting closer to the -- to the NCA
5  tournament, probably it was mid-February or
6  so, roughly, we had a -- a group of
7  reporters and editors meet to discuss our
8  plans for the tournament and I was one of
9  the ones who -- I -- I -- I had brought up
10  that story as a possibility among other --
11  among other stories that, hey, Alabama is
12  really good, might have a chance to be a
13  top seed going into the tournament and
14  they're trying to do this with one of their
15  players in jail on capital murder charges.
16  That's something that would be a central
17  story, could be, going into the tournament,
18  but it was not. I didn't express any
19  interest in doing it. In fact, I would say
20  on the contrary, I was in the middle of
21  writing a couple of lengthy profiles at the
22  time that I knew I was going to need a few
23  weeks to -- to work on and...
24  Q.  Without using the "royal we",
25  who were the group of reporters and editors

B. WITZ

1
2  that met where you outlined your plans of
3  possibly covering the NCAA tournament?
4  A.  It would have been Oskar Garcia
5  and I don't recall at the time who was --
6  was either -- I was in -- I know I was in
7  the room with others and there may have
8  been people in remotely. I don't recall
9  who those were.
10  Q.  Would there have been e-mails
11  exchanged where the topic of covering
12  Alabama's run to the NCAA tournament would
13  have been discussed?
14  A.  I don't -- I don't -- I don't
15  recall any. It may have -- it's -- it's
16  possible it could have been mentioned, but
17  when you say "discussed," that seems to
18  connote a, you know, back and forth and
19  give and take and I don't believe there was
20  any -- any of that.
21  Q.  Were you assigned to cover
22  Alabama then?
23  A.  At the time, no.
24  Q.  At -- at any time?
25  A.  Well, sure, at some point -- at

B. WITZ

1
2  some point I was.
3  Q.  And who made the assignment?
4  A.  Well, Oskar and I have a very
5  collaborative -- had a very collaborative
6  relationship. We bounce story ideas off
7  each other, so I don't know -- I don't
8  recall details of how it came to be that I
9  was the one that would report on that
10  story.
11  Q.  And the reason why I ask that
12  is that you mentioned a couple of lengthy
13  profiles that you had to draft at the time,
14  other potential stories, so what I'm trying
15  to figure out is how was it that you landed
16  on covering the Alabama Crimson Tide's run
17  up to the NCAA tournament?
18  A.  Right. Those stories were --
19  those stories were done, I mean, you can
20  check the dates on them. I can tell you it
21  was -- one was a profile of Emoni Bates,
22  and the other was a profile of Hansel
23  Emmanuel who is a Division 1 player with
24  one arm. And so I was probably getting,
25  you know, late -- mid to late February is

27 (Pages 102 - 105)

Page 106

B. WITZ
1  B. WITZ
2  when I was working on those, so I don't
3  know -- I -- I -- as I said, I don't recall
4  exactly when that -- when, you know, the
5  story was mine to do.
6      Q.   Now, you said you work
7  collaboratively with Oskar Garcia, correct?
8      A.   Yes.
9      Q.   And so it wasn't as if you had
10  any problems or issues with covering
11  Alabama's run to the NCAA tournament,
12  correct?
13      A.   No.
14      Q.   And you and Oskar Garcia
15  decided that in -- around the time of March
16  Madness, that would be what you would be
17  doing, correct?
18      A.   Not exclusively, but I think
19  that would be -- the discussion was --
20  well, I think the -- what we -- I think the
21  way it unfolded is that I would follow
22  Alabama through the tournament.
23      Q.   Did that include the SEC
24  tournament?
25      A.   That was part of it.  In --

Page 107

B. WITZ
1  B. WITZ
2  typically, at that time of year, I'll
3  bounce around to different -- different
4  conference tournaments to talk to players
5  and coaches and do reporting and I believe
6  this was -- yeah, I -- I think I just
7  wanted -- I was going to be at Alabama's
8  first game of the SEC tournament.  I
9  believe I may have even taken a red eye
10  from Las Vegas to -- to be there, because
11  it was, if I recall correctly, it was -- it
12  was a early start on that Friday and the,
13  you know, if they had lost, I don't know if
14  I would -- I would have stayed for the rest
15  of the weekend.  I may have, and I may have
16  gone somewhere else.
17      Q.   Were you in Las Vegas prior to
18  the SEC tournament for business or
19  personal?
20      A.   If I was in Las Vegas, it would
21  have been for business.
22      Q.   And what were you doing in
23  Vegas?
24      A.   There's a number of conference
25  tournaments that are held in Vegas each

Page 108

B. WITZ
1  B. WITZ
2  March.
3      Q.   More than one conference holds
4  its tournaments in Vegas?
5      A.   Yes.
6      Q.   So you could cover, I'm just
7  spitballing here, the Mountain West or the
8  PAC-12 or the whomever, all at the same
9  time in Vegas, correct?
10      A.   Well, it's a little more
11  complicated than that because sometimes the
12  games, their schedules overlap --
13      Q.   Sure.
14      A.   -- so you can't necessarily be
15  at one, you know, more than one at a -- at
16  a time, obviously, but, you know.
17      Q.   But I mean, the -- the -- the
18  example that I gave would be reasonable,
19  right, if there's two to three conferences
20  from out west playing in Vegas at the same
21  time you could cover, while obviously,
22  unless you possess some supernatural
23  parallel of which I am unaware, but you
24  could cover more than one conference in the
25  same city?

Page 109

B. WITZ
1  B. WITZ
2      A.   Correct.
3      Q.   And you believe you caught a
4  red eye from Vegas to Nashville to cover
5  game one for Alabama in the SEC tournament,
6  correct?
7      A.   I do believe, yes.
8      Q.   And Alabama, one on Friday, one
9  on Saturday, one on Sunday, correct?
10      A.   Yes.
11      Q.   Pretty handily, all three
12  games?
13      A.   I don't recall details of the
14  games.
15      Q.   Alright.
16          At that time, were you also
17  planning to go to, depending on where
18  Alabama was going to play, wherever Alabama
19  was going to be next?
20      A.   I don't recall when that
21  decision was made, if it was before or
22  after the tournament, but I -- it -- it
23  seemed pretty likely, especially once they
24  won that first game, that they would be a
25  number one seed and -- and -- or that they

**EXHIBIT 1**

B. WITZ

1
2  would likely be in Birmingham, so...
3      Q.    You knew prior to the start of
4  the SEC tournament that despite being at
5  the scene of the shooting of Jamea Harris,
6  Brandon Miller had continued to play,
7  correct?
8      A.    Yes.
9      Q.    And Jaden Bradley had not been
10  excused from the team or, according to you,
11  disciplined in any manner, correct?
12     A.    I don't -- Jaden Bradley had
13  been -- had continued -- Jaden Bradley and
14  Brandon Miller had both continued to play
15  after the shooting.
16     Q.    And did that not set well with
17  you?
18          COUNSELOR BOWMAN:  Objection.
19      Witness can answer.
20     A.    I -- I had no opinion on that.
21     Q.    Alright.
22          (Whereupon, an E-mail was
23      marked as Plaintiff's Exhibit 7 for
24      identification as of this date by the
25      reporter.)

B. WITZ

1
2      Q.    Are you ready?
3      A.    Yes.  I've read this.
4      Q.    Alright.
5          This is an e-mail from you,
6  March 9, 2023, 4:43 p.m., Subject:  Alabama
7  basketball shooting.  To whom is this
8  e-mail addressed?
9      A.    To --
10          COUNSELOR BOWMAN:  Counselor, I
11      don't want to interject.  I just want
12      to note that the time, that's still
13      universal time.  We produced these
14      with eastern time.  I just want to
15      make sure that's clear to you.
16          COUNSELOR NEW:  Thank you.
17     A.    That's to our research
18  department.
19     Q.    And the e-mail is pretty
20  self-explanatory, correct?
21     A.    What do you mean by that?
22     Q.    Well, what I mean by that is
23  it's pretty self-explanatory that as of
24  March 9th, 2023 before The University of
25  Alabama had played a game in the SEC

B. WITZ

1
2  tournament, you were planning on going down
3  to Alabama to report on the shooting death
4  in January, correct?
5      A.    When -- when -- what was the
6  date of the SEC tournament?
7      Q.    It was from March 8th to
8  March 12th.  Alabama played on March 10th,
9  March 11th and March 12th.  They won the
10  SEC conference championship on Sunday,
11  March the 12th, Selection Sunday?
12     A.    Okay, so I -- I -- yes, I sent
13  this e-mail the day before Alabama's first
14  game.
15     Q.    And as of that date, you were
16  planning on going down to Alabama to report
17  on the shooting death, correct?
18     A.    Yes.
19     Q.    What do you mean, "a
20  development that came out recently for two
21  other players at the scene, Brandon Miller
22  and Jaden Bradley"?
23     A.    I'm referring to the
24  preliminary hearing.
25     Q.    The preliminary hearing was on

B. WITZ

1
2  what date?
3      A.    I don't recall.
4      Q.    And you asked the research
5  department for transcripts of the
6  preliminary hearing, correct?
7      A.    If they -- if they were
8  publically available documents, I asked the
9  research department to pull those.
10     Q.    Alright.  And you say, "I'll be
11  in Tuscaloosa by Monday at the latest,"
12  meaning that, and it sounds like, and I
13  want you to tell me if my interpretation of
14  your e-mail is incorrect, that you intended
15  to drive or fly from Nashville, Tennessee
16  to Tuscaloosa, Alabama, no later than
17  Monday, March 13th, correct?
18     A.    That was a possibility.  I
19  ended up instead going -- going back to New
20  York on Sunday evening and going to
21  Tuscaloosa on Tuesday.
22     Q.    Okay.  You went to Tuscaloosa
23  what day?
24     A.    I believe it was Tuesday.  Flew
25  to Birmingham early in the morning and got

**EXHIBIT 1**

Page 114

B. WITZ

1
2  to Tuscaloosa, I believe it was Tuesday.
3      Q.   Did you rent a car?
4      A.   Yes.  You mean, driving from --
5      Q.   Birmingham to Tuscaloosa --
6      A.   Yes.
7      Q.   -- you rented a car instead of
8  cab or Uber or whatever?
9          And you're asking the research
10 department here whether "there are any
11 police incident reports or other
12 documentation related to the case that we
13 can get besides the preliminary hearing, a
14 criminal complaint, perhaps," correct?
15     A.   Yes.
16     Q.   And you're looking for contact
17 information, lawyers, police, prosecutors,
18 family members of Darius Miles, Brandon
19 Miller, Jaden Bradley, the Alabama players,
20 as well as the shooter, Michael Davis, and
21 family members of the victim, Jamea Jonae
22 Harris.  Did you ever speak with any of the
23 family members of the victim, Jamea Jonae
24 Harris?
25     A.   No.

Page 115

B. WITZ

1
2      Q.   Did you ever speak with anyone
3  --
4      A.   Not on -- not on the record.
5      Q.   Not on the record.  Did you
6  ever speak with anyone who was also in the
7  vehicle in which Harris was shot?
8      A.   Not on the record.
9      Q.   Did you speak with any family
10 members of the shooter, Michael Davis?
11     A.   No, not on the record.
12     Q.   Well, let's break that down a
13 little bit and back up.  Family members of
14 the victim, Jamea Jonae Harris, I don't
15 care whether it was on the record or off
16 the record, did you speak with any of them?
17         COUNSELOR BOWMAN:  Objection on
18     the basis of Reporter's Privilege
19     under Alabama and New York Law and
20     the 1st Amendment to the extent the
21     question encompasses context that may
22     have been off the record.  Witness
23     can answer this and other questions
24     about on the record contacts.
25     A.   I did not speak with members of

Page 116

B. WITZ

1
2  Jamea Jonae Harris's family on the record.
3      Q.   Same question with Michael
4  Davis?
5          COUNSELOR BOWMAN:  Same
6      objection.  Same instruction.
7      A.   I did not speak with family
8  members of Michael Davis on the record.
9      Q.   Where was Michael Davis
10 incarcerated at the time?
11     A.   I don't recall.
12     Q.   Jaden Bradley was not
13 incarcerated, correct?
14     A.   Correct.
15     Q.   And you would, shortly after
16 this e-mail, you would spend the next three
17 days in Nashville with Jaden Bradley,
18 himself, correct?
19     A.   Jaden Bradley was there with
20 the Alabama basketball team.
21     Q.   Did you ask any questions of
22 Jaden Bradley at the SEC tournament on
23 either March 10, March 11th or March 12th?
24     A.   I don't recall.
25     Q.   If you had, do you believe that

Page 117

B. WITZ

1
2  we'd have notes in your working file?
3      A.   Possibly.
4      Q.   You had the opportunity to ask
5  questions of Jaden Bradley in Nashville,
6  Tennessee on March the 10th, March the 11th
7  and March the 12th, correct?
8      A.   I'm not sure where -- when --
9  which players would have been available, if
10 they would have all been available.  I
11 don't recall the SEC tournament rules of
12 whether they had open locker rooms.  I know
13 that's a NCA tournament rule, but -- and I
14 don't recall which players were brought to
15 post-game news conferences those days.
16     Q.   I'm not talking about something
17 formal, like an SEC rule or anything else,
18 you're asking for contact information for
19 the family members of Darius Miles, Brandon
20 Miller and Jaden Bradley, correct?
21     A.   Yes.
22     Q.   So if you get a phone number
23 for Jaden Bradley's mom or dad, presumably
24 you could text or call Jaden Bradley's mom
25 or dad then and say, hey, Jaden's in

**EXHIBIT 1**

B. WITZ

1  Nashville.  I'm in Nashville.  I would like
2  to speak with him about the shooting that
3  occurred on The Strip on January the 15th,
4  you could do such a thing, could you not?
5      A.   Yes, anybody that I had phone
6  numbers for.
7      Q.   Nothing prohibits you from
8  doing that, does it?
9      A.   No.  I'm not sure at -- at that
10  point I was still gathering information and
11  trying to learn about the case, so -- so --
12  so, no.  I mean, I think generally, you
13  know, you want to -- I think as you could
14  understand, when you're doing an interview
15  with somebody, you want to be -- you want
16  to do your homework.  You want to prepare
17  as much as, you know, you can.  So I -- I
18  think at this point I was trying to learn
19  -- you know, just bone up on details on
20  what had been written and, you know, be --
21  take some -- take some time to be a little
22  more informed then I -- then I was on, I
23  guess it was March 9th.
24      Q.   Same question with respect to

B. WITZ

1  Brandon Miller.  You had the opportunity to
2  speak with either Brandon Miller or his
3  family members in Nashville on March the
4  10th, March the 11th or March the 12th,
5  correct?
6      A.   I believe Brandon Miller was --
7  did speak at the post-game press conference
8  one of the days, so yes.
9      Q.   And did you ask him a specific
10  question in any of the post-game press
11  conferences?
12      A.   I don't -- I don't recall.
13  Somebody did.  I don't -- I don't recall if
14  it was me or not.
15      Q.   And someone asked Brandon
16  Miller, specifically, in a post-game about
17  the shooting and he no-commented it, right?
18      A.   I don't recall the exact
19  question or the -- or his -- his answer.
20      Q.   Same question with respect to
21  Darius Miles.  You had the opportunity to
22  speak with Darius Miles' family members
23  while the SEC tournament was going on,
24  correct?

B. WITZ

1      A.   If I had the, you know, these
2  number -- I don't know when I got the
3  information from our research department on
4  any of these numbers or any of these, you
5  know, these people I was asking for contact
6  information of.  I -- I mean it says here
7  that I sent the request in on March 9th,
8  but I'm not sure what -- when -- I'm not
9  sure when I had that -- whatever
10  information that they could procure.
11      Q.   Alright.
12          Well, let's take this portion
13  of time, when did you leave Nashville
14  headed back to New York?
15      A.   Some time short -- shortly
16  after the SEC championship game.
17      Q.   Okay.  And that would probably
18  been afternoon of Sunday, March the 12th,
19  right, because Selection Shows at 6:00 or
20  7:00 in the evening?
21      A.   Yeah.  Well, I don't recall
22  what time, but I -- do you -- do you recall
23  what time the game was?
24      Q.   I don't.  I would just think

B. WITZ

1  that usually the Big 10 plays the last game
2  of the game that day.
3      A.   Right.
4      Q.   The SEC plays on Selection
5  Sunday itself, so what I'm trying to figure
6  out is what investigative reporting did you
7  do on March the 10th, March the 11th, up to
8  March the 12th before you left Nashville
9  for New York?
10      A.   Right.  Well, I was -- I was in
11  press conferences with players, coaches,
12  and conference officials and I spoke to an
13  Alabama fan who was wearing a T-shirt that
14  got quite a bit of attention and spoke to
15  fans from other schools to see what they
16  thought, so those -- that would have been
17  among the reporting that I did while I was
18  there.
19      Q.   Not report -- I'm not asking
20  about reporting.  I'm asking about
21  investigative journalism.  Did you speak to
22  any lawyers, police or prosecutors about
23  the shooting on March the 10th, March
24  the 11th or March the 12th before you left

**EXHIBIT 1**

B. WITZ

1
2  to come back to New York?
3      A.   Yes.
4      Q.   Who did you speak to in terms
5  of --
6      A.   On the record, yes.
7      Q.   Who did you speak to in terms
8  of lawyers, police or prosecutors on either
9  the March the 10th, March the 11th, March
10  the 12th before you left to come back to
11  New York?
12     A.   I believe I sent out a couple
13  of e-mail queries to attorneys in the case
14  and I'm not sure.  There was a -- on
15  Friday, I believe it was during the game or
16  maybe just at tip-off, there was some sort
17  of development in the case.  I'm not sure
18  the legal -- I don't know if that was an
19  indictment, and so I may have -- like, I'm
20  not sure if I -- I may have followed up
21  with, you know, the -- the court or the
22  lawyer.  Anyway, that's -- that's -- that
23  would have been something that I did.  And
24  -- and I guess also, I don't look at any
25  reporting that I do as investigative

B. WITZ

1
2  reporting and then other reporting.  It's
3  all -- it's all reporting, I mean whether
4  it's for a profile or a hard news story.
5      Q.   The only distinction I was
6  drawing there is the difference between
7  investigation and actual writing.  You --
8  you understand that distinction, right?
9      A.   I would say it's reporting and
10  writing, I mean those are the two elements
11  of a story.
12     Q.   Alright.
13     A.   You do the reporting and you do
14  the writing.
15     Q.   Okay.
16          Anything else that you did on
17  March the 10th, March 11th or March the
18  12th regarding a potential story about this
19  shooting?
20     A.   Not that I recall.
21     Q.   Tell me the players that you
22  asked about the shooting?
23     A.   I don't -- I don't recall which
24  ones I spoke to.
25     Q.   Did they all "no comment" you?

B. WITZ

1
2      A.   I don't recall.
3      Q.   It would be in your working
4  file if a player had given you a comment
5  about the shooting, wouldn't it?
6      A.   Yes.
7      Q.   Did you --
8      A.   Well, I would say a -- a useful
9  comment, an informative comment, yes.
10     Q.   Same question with respect to
11  the coaches.  Tell me, by name, coaches you
12  spoke to March 10th or 11th or 12th about
13  the shooting?
14     A.   Well, I did speak with Nate
15  Oats after the -- the Alabama coach, I
16  believe it was after the championship game,
17  and just told him I was interested in
18  writing a story about how his -- how his
19  team is going to -- how his team -- his,
20  you know, going to be chasing a national
21  championship and how the shooting has
22  impacted him and that he told me he was very
23  interested in talking to me, but -- but he
24  said that he wasn't sure if the University
25  was going to allow him to talk to me and

B. WITZ

1
2  to, you know, just sort of check with one
3  of his associates to see if they could have
4  -- that was going to happen.
5      Q.   Any other coaches besides Nate
6  Oats?
7          COUNSELOR BOWMAN:  And again,
8      same objection, to the extent it
9      applies to confidential sources --
10         THE WITNESS:  Right.
11         COUNSELOR BOWMAN:  You can
12     answer on the record.
13         THE WITNESS:  Yeah.
14     A.   And -- on the record, no.
15     Q.   Alright.
16         You mentioned conference
17  officials, any SEC conference officials by
18  name that you interviewed or spoke to
19  regarding the shooting?
20     A.   Yes.  I asked Greg Sankey a
21  question at a -- at a news conference.
22     Q.   What did he tell you.
23     A.   I don't recall exactly.
24     Q.   Was it anything helpful?
25     A.   It was -- it may -- it may have

**EXHIBIT 1**

Page 126

B. WITZ

1  been. I mean, one of the things I was
2  thinking about at that time was there had
3  been incidents with involving guns at --
4  not -- not just -- there had been several
5  incidents with Alabama athletes, I believe,
6  other than this -- this -- this case
7  involving Darius Miles. I think the others
8  were football players at Alabama. All
9  different types of issues. There was --
10 there had just been a very high profile
11 incident with Georgia football players who
12 were speeding and that, seem to recall that
13 there had been -- that had been an issue
14 that happened at Georgia, and so I think
15 the question, if I recall, to Sankey, was
16 kind of along, you know, just sort of a
17 bigger picture thing. Something you would
18 ask a conference commissioner about who's
19 maybe -- maybe not necessarily, he's not on
20 any of these campuses, but he, you know,
21 oversees the conference and, you know,
22 helps set policy and things like that,
23 so...
24    Q.  You mentioned fans from other

Page 127

B. WITZ

1  schools, what did you ask fans from other
2  schools about this shooting on The Strip in
3  Tuscaloosa?
4     A.  I don't -- I don't recall any
5  particular interactions I had, but I'm
6  guessing that -- well, I don't -- I don't
7  know, I mean...
8     Q.  Let me guess, Auburn fans don't
9  like Alabama, right?
10    A.  I don't -- was Auburn even --
11 were they even there by then?
12    Q.  Not apparently.
13    And in terms of the distasteful
14 T-shirt from the guy that gave you a false
15 name or what have you from Alabaster,
16 Alabama, that T-shirt was banned from the
17 -- from the conference tournament, right?
18    A.  Yes. I believe that the
19 conference put out a statement saying that,
20 you know, those -- yeah, it wouldn't be
21 allowed to wear those the following days.
22    Q.  But you interviewed that
23 Alabama fan, correct?
24    A.  Yes.

Page 128

B. WITZ

1     Q.  And he provided you some
2  opinions that -- about the shooting?
3     A.  Yes, I was asking him about the
4  T-shirt and what he meant by it.
5     Q.  And he also told you that he
6  thought that you and the media were trying
7  to cancel Brandon Miller, right; do you
8  recall that?
9     A.  In -- I don't -- I don't know
10 if he used that exact term, but some --
11 some -- something to that effect, that,
12 yeah...
13    Q.  Okay. And he also made comment
14 to you that he felt like that you and the
15 media were doing what you do in your
16 reporting because of clicks; do you recall
17 that?
18    A.  No.
19    Q.  I mean, was this a -- was this
20 -- did this appear to be a professional
21 person from Alabama or were they more of
22 the "good ol' boy" type from Alabama?
23       COUNSELOR BOWMAN: Objection.
24    Witness can answer.

Page 129

B. WITZ

1     Q.  If you know what a good ol' boy
2  is?
3     A.  Well, I don't know exactly what
4  that means. But it's hard to tell at a
5  basketball game when somebody is wearing a
6  T-shirt whether --
7     Q.  You don't know whether he's a
8  doctor or --
9     A.  Right.
10    Q.  -- bate salesman at a boat
11 dock, right?
12    A.  Yes.
13    Q.  But either way, you don't
14 recall him accusing you and the media of
15 reporting how you were reporting about the
16 shooting to get clicks?
17       COUNSELOR BOWMAN: Objection.
18    Witness can answer.
19    Q.  You don't recall that, do you?
20    A.  No.
21       (Whereupon, an E-mail
22    Communication was marked as
23    Plaintiff's Exhibit 8 for
24    identification as of this date by the

33 (Pages 126 - 129)

Page 130

B. WITZ

1    B. WITZ
2      reporter.)
3      Q.   Who is Alain Delaqueriere?
4      A.   Alain is a -- works in our
5    research department.
6      Q.   And I'll butcher both the first
7    and last, so beg your pardon.  Alain
8    decided or said that he would assist with
9    that research you had asked about, correct?
10     A.   Yes, that's very typical when
11   you -- when you send these e-mails off
12   asking for help on a story from research,
13   it kind of goes into a, what seems like a
14   pool, and then somebody on the research
15   department desk or the research department,
16   whoever may be working, and -- that shift
17   or is free at the time will, you know,
18   respond quickly.  Typically, they'll be on
19   it.
20     Q.   And you'd known as of March
21   the 9th and -- and the weekend of the SEC
22   tournament that you were going to be
23   covering Alabama's run through the NCAA
24   tournament, correct?
25     A.   I don't recall exactly what

Page 131

1    B. WITZ
2    date, but around that time.
3      Q.   This is just to keep my numbers
4    straight, I don't know why he's referring
5    to himself in the third person, but the
6    e-mail from Alain Delaqueriere says "Alain
7    will assist," correct?
8      A.   Yes.
9         (Whereupon, an Article was
10         marked as Plaintiff's Exhibit 9 by
11         identification as of this date by the
12         reporter.)
13     Q.   Take a look at your March 10th
14   article.  Let me know when you reviewed
15   that.
16     A.   (Witness complies.)
17     Q.   You ready?
18     A.   Yes.
19     Q.   Headline, Alabama Championship
20   Push Arrives With Murder Indictment.  "A
21   former Crimson Tide player, Darius Miles,
22   and Miles' friend Michael Davis were
23   indicted by a Grand Jury.  At the
24   Southeastern Conference tournament, Brandon
25   Miller starred for Alabama after being

Page 132

1    B. WITZ
2    interviewed as a witness in the case."  Had
3    Alabama played the game on March the 10th
4    when you wrote this article?
5      A.   Yes.  I believe this was the --
6    for -- this was off the first day of the --
7    that Friday, the first game against
8    Mississippi State.
9      Q.   Alright.  Now, we just looked
10   at the information that you asked the
11   research department for and Alain
12   Delaqueriere tells you "Alain will assist,"
13   do you remember those e-mails?
14     A.   Yes.
15     Q.   Alright.  You wrote this
16   March 10th article without the benefit of
17   any of the information that you had asked
18   Mr. Delaqueriere for the day prior,
19   correct?
20     A.   Yes.
21     Q.   Go to Page 2 of the March 10th
22   article.
23     A.   I would -- yes, I would say --
24   because I don't believe I had gotten a
25   response; is that correct?

Page 133

1    B. WITZ
2      Q.   I haven't been provided with
3    one if you had.
4         Go to Page 2 of the March 10th
5    article, please.
6      A.   Okay.
7      Q.   Third paragraph down, beginning
8    "Alabama officials".
9      A.   Mm-hmm.
10     Q.   "Alabama officials who kicked
11   Miles out of school after his arrest, knew
12   quickly after the January 4th shooting
13   outside of a Tuscaloosa bar that Miller and
14   another freshman, Bradley, had been at the
15   scene."  How did you know that when you
16   wrote that?
17     A.   I believe it had been reported.
18     Q.   And you're not attributing that
19   to Al.com, the Patch or anybody else,
20   right?
21     A.   No.  Typically when something
22   has been widely reported, and/or an -- an
23   amount of time has -- has passed, then you
24   don't always credit -- I mean, I believe
25   there was another place in the story where

**EXHIBIT 1**

B. WITZ

1   I did credit Al.com on something that they
2   had reported, so I don't -- I don't recall
3   the details of what had been reported at
4   that point and how, you know, I guess,
5   broadly it had been reported and -- or
6   repeatedly, but, yeah, that's -- I mean,
7   you know, generally that's -- that's how
8   things work.  If somebody reports something
9   new, then, you know, you might -- you might
10  say that, you know, you're -- the story is
11  confirming a report in another outlet.
12     Q.   Okay.  Next paragraph under
13  that, "A lawyer for Davis said in a text
14  message that the indictment was expected
15  and that Davis was acting in self-defense.
16  'He is not the bad guy in this decision,'
17  said John Robbins, a Birmingham lawyer," so
18  you had texted with John Robbins about the
19  shooting, correct?
20     A.   Yes.
21     Q.   "An attorney for Miles did not
22  return an e-mail seeking comment."
23         COUNSELOR NEW:  Counsel, we're
24         going to look and find out whether

B. WITZ

1    we've got these texts and these
2    e-mails to the lawyers.
3     Q.   By itself, one solo sentence,
4   "Miller has continued to play, as has
5   Bradley.  Questions about Miller's
6   involvement and Alabama's decision not to
7   discipline either him or Bradley have
8   continually shrouded the Crimson Tide in
9   the last month.  The team's coach, Nate
10  Oats, was forced to apologize after he
11  initially characterized Miller's
12  involvement as being in the 'wrong spot at
13  the wrong time.'" How did you know that The
14  University of Alabama did not discipline
15  Jaden Bradley or Brandon Miller; you don't,
16  do you?
17         COUNSELOR BOWMAN:  Objection.
18         Witness can answer.
19     A.   Well, they were not disciplined
20  in any way in terms of missing game time,
21  not starting.
22     Q.   That's not the only discipline
23  that can be meted out by a basketball team.
24  There could be all kinds of other

B. WITZ

1   discipline that The University of Alabama
2   dished out of which you would have no
3   knowledge or reason to know, Mr. Witz, is
4   that a fair statement?
5          COUNSELOR BOWMAN:  Objection.
6          Witness can answer.
7     A.   This -- yeah, I think it would
8   be more accurate if the -- sorry, you said
9   Alabama's decision not to publically
10  discipline either him or Bradley.
11     Q.   Okay.  So we're missing the
12  word publically --
13     A.   Right.
14     Q.   -- from your March 10th story?
15     A.   Right.
16     Q.   That's fair.
17         Have you ever heard of FERPA;
18  do you know what FERPA is?
19     A.   Yes.  Broadly.  It's to protect
20  the --
21     Q.   Students privacy for college
22  students, right?
23     A.   For high school, college, yeah.
24     Q.   Alright.  Last paragraph on

B. WITZ

1   that page.  "In his first home game after
2   the hearing, Miller continued a pregame
3   routine in which he emerged during
4   introductions and stood with his arms
5   spread while a freshman walk-on patted him
6   down, making it appear as though he were a
7   security officer searching for a weapon."
8   Correct?
9     A.   Yes.
10     Q.   Are you telling me that people
11  that are 19, 20, 21 years old might do
12  things that they regret, Mr. Witz?
13     A.   (No response.)
14         COUNSELOR BOWMAN:  Objection.
15     Q.   Like put topless photographs
16  and nazi photographs and suggest that
17  people are gay in a newspaper like you did
18  40 years ago, that young people might do
19  something that they would later might
20  regret?
21         COUNSELOR BOWMAN:  Objection.
22         Argumentative.
23         COUNSELOR NEW:  Yeah, it is
24         argumentative.  You can answer.

35 (Pages 134 - 137)

Page 138

B. WITZ
1
2    A.   Can you ask the question again.
3    Q.   Yeah.  Why comment on this, the
4  pregame routine of being patted down in
5  this article?
6    A.   Because what I'm doing here is
7  detailing some of the things that -- South
8  Carolina fans chanting "lock him up" and
9  this -- this got quite a bit of attention
10  and I believe -- I believe Nate Oats, after
11  that, not sure if apology is the most
12  accurate word, but, you know, I think he
13  either apologized or pledged to put a stop
14  to -- to that.  So what I'm trying to do
15  here is just categorize, I guess these
16  three paragraphs, giving three instances of
17  how, you know, this case has, you know,
18  shrouded the Crimson Tide in the last month
19  and so Oats' wrong spot wrong time comment,
20  the South Carolina fans taunting Miller and
21  then this -- this pat-down scene, which,
22  you know, certainly some fans and I believe
23  some columnists wrote opinion pieces on
24  that was inappropriate --
25    Q.   Do you have any opinion about

Page 139

B. WITZ
1
2  the pat-down, pregame pat-down?
3    A.   No.
4    Q.   Alright.
5       Next page, this -- the
6  questions in the March 10th postgame press
7  conference, correct?
8    A.   On the Friday, yeah, the -- the
9  Mississippi State game, yes.
10    Q.   Alright.  And you don't know
11  whether you asked Brandon Miller, "Brandon,
12  given your involvement on some level in a
13  fatal shooting, how do you reconcile not
14  missing any playing time?"  Did you ask
15  Brandon Miller that question?
16    A.   I don't recall.
17    Q.   So you could have been the one
18  in the postgame presser that asked Brandon
19  Miller, correct?
20    A.   I was in the -- I was in the
21  postgame press conference.  I don't recall
22  whether I asked a question of Brandon
23  Miller or not.  I will say that sometimes,
24  you know, you may have a question in mind
25  that you want to ask at a press conference,

Page 140

B. WITZ
1
2  and if somebody asks it or something close
3  to it, then, you know, you either put your
4  hand down or ask something else, so I -- in
5  this instance, I don't recall.
6    Q.   And Brandon Miller says
7  "Respectfully, I'm not going to be able to
8  say."  Regardless of whether you asked the
9  question of Brandon Miller about his
10  involvement on some level in a fatal
11  shooting, you heard the answer,
12  "Respectfully, I'm not going to be able to
13  say," when Brandon was asked about it,
14  correct?
15    A.   Yes.
16    Q.   And you reported on that, "I'm
17  not going to be able to say," correct?
18    A.   Yes.
19    Q.   So you knew as of March
20  the 10th that at least one of the Alabama
21  players, if asked about the shooting was
22  going to say, I'm not going to be able to
23  say, correct?
24       COUNSELOR BOWMAN:  Objection.
25    Witness can answer.

Page 141

B. WITZ
1
2    A.   You know, you don't always know
3  if -- you -- you -- you don't always know
4  how somebody is going to ask -- I mean, in
5  this -- I think especially in sports, you
6  see this with injuries where, you know,
7  managers, you know, don't want to talk
8  about that, so they, you know, they -- they
9  say I'm going to not talk about injuries,
10  but the questions keep getting asked
11  because the player is still injured.  So,
12  it doesn't -- maybe that's not the best
13  example, I mean, given this case, but it's
14  reasonable to be prepared that he's not
15  going to answer.  He's, you know, you're
16  going to get the same answer, but it
17  doesn't mean that you stop -- it doesn't
18  mean that you should necessarily stop
19  asking the question, if that's clear.
20    Q.   That's a well-asked question
21  there, isn't it?  "Brandon, given your
22  involvement on some level in a fatal
23  shooting, how do you reconcile not missing
24  any playing time?"  That's a well-asked
25  question, isn't it?

36 (Pages 138 - 141)

**EXHIBIT 1**

Page 142

B. WITZ

1
2    A.    Yeah, I think so.  Given the
3    time and place, yes.
4        Q.    I mean, it -- it --
5        A.    And I think also, if I may, I
6    don't -- I'm not sure how often he had
7    spoken to the media in this, like, six,
8    seven weeks since the shooting or certainly
9    since the preliminary hearing when his name
10   came out, so I don't know if this was the
11   first time or not that he was asked about
12   that.
13       Q.    Are you critical of Nate Oats
14   for not suspending Brandon Miller in the
15   wake of the shooting at which he was
16   present?
17           COUNSELOR BOWMAN:  Objection.
18       Witness can answer.
19       A.    No.  I mean, in stories like
20   this, it's not -- it's not a question of
21   critical or not critical.  To me, it's
22   somebody makes a decision that is getting
23   questioned, you want to get out why.  You
24   know, what went into their decisionmaking?
25   Why did they, you know, why -- why did they

Page 143

B. WITZ

1
2    take the path that they took.
3        Q.    Right.  And Nate Oats is
4    telling you and the rest of the press as of
5    March the 10th, based on the information we
6    had, Brandon didn't break any school policy
7    or team policy, so I was comfortable with
8    the decision that was made, right?
9        A.    Yeah, that was his answer to
10   the question.
11       Q.    That's telling you what Nate
12   Oats' decisionmaking process was about
13   continuing to start Brandon Miller for the
14   Crimson Tide basketball team, right?
15           COUNSELOR BOWMAN:  Objection.
16       Witness can answer.
17       A.    In a superficial way.  I mean,
18   I think -- I would want to, you know, I --
19   I don't think that answers, like, all --
20   all the questions about that decision, but
21   it -- it does -- it does at least, you
22   know, address it in, like I said, in a --
23   in a brief manner.
24       Q.    So you weren't satisfied with
25   Nate Oats' answer then, is that what you're

Page 144

B. WITZ

1
2    telling us?
3        A.    No, I didn't say I was
4    satisfied or unsatisfied.
5        Q.    You would have liked to have
6    done some follow-up, right?
7        A.    Yeah.  I mean, I think that's
8    why I wanted to talk to him further.
9        Q.    In the middle of a murder
10   investigation where a former player of his
11   had just been indicted that day, you would
12   want to do a bunch of follow-up, right?
13       A.    Not at that moment, but that's
14   when I think -- when I met -- when I
15   approached him, I think it was after the
16   last game that's, you know, I mean, yeah,
17   that -- that was what I -- my hope was, to
18   be able to sit down with him and talk a bit
19   more about, all the while understanding
20   that, you know, there were -- there were
21   probably things that he couldn't -- you
22   know, with the case ongoing, he might not
23   be able to talk about, but, you know, I
24   thought there might be things he would be
25   able to talk about.

Page 145

B. WITZ

1
2        Q.    And Coach Oats told you on
3    March the 12th, that before talking to you
4    to do this follow-up that you seemed so
5    interested in, he would have to clear that
6    with Alabama officials, correct?
7        A.    In essence, he said, yeah,
8    something to the effect of, I would like to
9    do it, but I don't know if they're going to
10   let me.
11       Q.    Okay.  The "they," being people
12   from The University of Alabama?
13       A.    Correct.
14       Q.    Look at the last paragraph in
15   the March 10th article.  "And when the game
16   was over, he," Brandon Miller, "did a
17   courtside interview with ESPN and left for
18   the locker room after slapping hands with
19   several fans, all, it seemed, without a
20   care in the world."  The University of
21   Alabama was the number one seed in the SEC
22   tournament, right?
23       A.    Yes.
24       Q.    Brandon Miller is the star of
25   the team, correct?

37 (Pages 142 - 145)

## EXHIBIT 1

Page 146

B. WITZ

1
2    A.   Yes.
3    Q.   Projected first round in the
4  NBA draft pick, right?
5    A.   Yes.
6    Q.   How would you have him act
7  after that game, Mr. Witz?
8         COUNSELOR BOWMAN:  Objection.
9    Witness can answer.
10    Q.   How would you -- this says, to
11  me, all it seemed without a care in the
12  world, as if there's something wrong with
13  that, how would you have a 19-year-old kid
14  who had won his first game in an SEC
15  conference tournament in which he's the
16  star of the number one ranked team, how
17  would you have him act?
18         COUNSELOR BOWMAN:  Same
19    objection.  Witness can answer.
20    A.   It's not my position to say how
21  somebody should act and I don't -- I mean,
22  I was just describing his demeanor after
23  the game.
24    Q.   So you're not saying that there
25  was anything wrong with acting like he

Page 147

B. WITZ

1
2  didn't have a care in the world; is that
3  your testimony?
4    A.   What I'm saying is that this --
5  and it's sort of, again, the -- the
6  overarching themes of a story, that all of
7  this was taking place, you know, almost
8  simultaneous from when a murder indictment
9  came down with one of his -- his teammates,
10  so I think that it struck me as how here you
11  have in this -- in this arena, in this
12  bubble, you have this star player with, you
13  know, having a nice moment of -- of, you
14  know, accomplishment, of being interviewed
15  on TV, and slapping hands with the -- with
16  fans and, you know meanwhile, you know,
17  250 miles away, his former teammate, and I
18  think we can say friend, was being indicted
19  on murder charges.
20    Q.   Nate Oats has already said he
21  didn't violate any team rules or school
22  rules, should Brandon Miller be walking
23  around with a dark cloud over his head
24  because a friend made a bad decision that
25  night?

Page 148

B. WITZ

1
2         COUNSELOR BOWMAN:  Objection.
3    Witness can answer.
4    A.   I didn't -- I didn't say that.
5    Q.   Okay.
6    A.   I didn't write that.
7    Q.   You sure didn't.
8         As of this time that you wrote
9  this March 10th article, did you believe
10  Brandon Miller had committed some crime
11  that The University of Alabama wasn't
12  talking about?
13    A.   Not that I knew of.
14    Q.   Did you believe Jaden Bradley
15  had committed some crime that Alabama
16  wasn't disciplining him for?
17    A.   Not that I knew of.
18    Q.   Did you suspect that they had
19  committed crimes?
20    A.   I -- I didn't know.
21    Q.   You understand that there is
22  this thing in the law called accessory
23  before the fact to murder, have you ever
24  heard that term?
25    A.   If I have, I don't understand

Page 149

B. WITZ

1
2  the meaning of it.
3    Q.   Do you know what an accomplice
4  is?
5    A.   Generally.
6         COUNSELOR BOWMAN:  Objection.
7    Witness can answer.
8    Q.   Do you know what a conspirator
9  is?
10         COUNSELOR BOWMAN:  Objection.
11    Witness can answer.
12    A.   Not exactly, no.
13    Q.   Alright.
14         THE WITNESS:  Can I take a
15    bathroom break?
16         COUNSELOR NEW:  Sure.  Sure.
17         THE VIDEOGRAPHER:  Time on the
18    video monitor is 2:17 p.m.  We are
19    off the record.  This ends Media
20    Unit 3.
21         (Whereupon, a brief recess was
22    taken.)
23         (Whereupon, an E-mail was
24    marked as Plaintiff's Exhibit 10 for
25    identification as of this date by the

**EXHIBIT 1**

Page 150

1          B. WITZ
2      reporter.)
3          (Whereupon, Working File was
4      marked as Plaintiff's Exhibit 11 for
5      identification as of this date by the
6      reporter.)
7          (Whereupon, an E-mail was
8      marked as Plaintiff's Exhibit 12 for
9      identification as of this date by the
10     reporter.)
11         (Whereupon, Text Messages were
12     marked as Plaintiff's Exhibit 13 for
13     identification as of this date by the
14     reporter.)
15         (Whereupon, E-mail
16     Communications were marked as
17     Plaintiff's Exhibit 14 for
18     identification as of this date by the
19     reporter.)
20         (Whereupon, E-mail
21     Communications were marked as
22     Plaintiff's Exhibit 15 for
23     identification as of this date by the
24     reporter.)
25         (Whereupon, E-mail

Page 151

1          B. WITZ
2      Communications were marked as
3      Plaintiff's Exhibit 16 for
4      identification as of this date by the
5      reporter.)
6          (Whereupon, E-mail
7      Communications were marked as
8      Plaintiff's Exhibit 17 for
9      identification as of this date by the
10     reporter.)
11         (Whereupon, Draft Notes were
12     marked as Plaintiff's Exhibit 18 for
13     identification as of this date by the
14     reporter.)
15         (Whereupon, Draft Notes were
16     marked as Plaintiff's Exhibit 19 for
17     identification as of this date by the
18     reporter.)
19         (Whereupon, Media Schedule
20     Information was marked as Plaintiff's
21     Exhibit 20 for identification as of
22     this date by the reporter.)
23         (Whereupon, an E-mail was
24     marked as Plaintiff's Exhibit 21 for
25     identification as of this date by the

Page 152

1          B. WITZ
2      reporter.)
3          (Whereupon, E-mail
4      Communications were marked as
5      Plaintiff's Exhibit 22 for
6      identification as of this date by the
7      reporter.)
8          (Whereupon, E-mail
9      Communications were marked as
10     Plaintiff's Exhibit 23 for
11     identification as of this date by the
12     reporter.)
13         (Whereupon, E-mail
14     Communications were marked as
15     Plaintiff's Exhibit 24 for
16     identification as of this date by the
17     reporter.)
18         (Whereupon, Text Messages were
19     marked as Plaintiff's Exhibit 25A for
20     identification as of this date by the
21     reporter.)
22         (Whereupon, Text Messages were
23     marked as Plaintiff's Exhibit 25B for
24     identification as of this date by the
25     reporter.)

Page 153

1          B. WITZ
2          (Whereupon, an Article was
3      marked as Plaintiff's Exhibit 26 for
4      identification as of this date by the
5      reporter.)
6          THE VIDEOGRAPHER:  We are back
7      on the record.  The time on the video
8      monitor is 2:29 p.m.  Starting Unit
9      4.
10     Q.   Take a look at Exhibit 10,
11     Mr. Witz.  Let me know when you're ready.
12     A.   Okay.
13     Q.   Alright.  So in this e-mail,
14     let's start, it's an e-mail from you to
15     Oskar Garcia, correct?
16     A.   Yes.
17     Q.   And it's dated March 11th,
18     2023, 8:17 p.m., correct?
19     A.   Yes.
20         THE WITNESS:  Chad, is that the
21     right time?
22         COUNSELOR NEW:  That's Eastern,
23     Counsel?
24         COUNSELOR BOWMAN:  No.  The
25     one's that we reproduced, that have

39 (Pages 150 - 153)

**EXHIBIT 1**

Page 154

B. WITZ
1
2   Eastern time at the top are stamped
3   Eastern time, so this is U --
4       COUNSELOR NEW:  UTC.
5       COUNSELOR GLOVER:  Mine is
6   four.
7       COUNSELOR BOWMAN:  Four hours.
8       COUNSELOR NEW:  Alright.
9   Q.   And the subject is Fan,
10  correct?
11  A.   Yes.
12  Q.   And you're telling Oskar this
13  was your interaction with the fan with the
14  distasteful T-shirt and you say, "I think
15  it's best to use it later.  Alabama won so
16  I'm off to the presser" correct?
17  A.   Yes.  It was this provacative
18  T-shirt that was getting a lot of
19  attention, so I spoke with the -- one of
20  the people who was wearing it.
21  Q.   Alright.  And the T-shirt said
22  "killing our way through the SEC" T-shirt,
23  correct?
24  A.   Yeah, words to that effect.
25  And I -- I think, I'm not sure if this

Page 155

B. WITZ
1
2   interview may have taken place the day
3   before and this was me just letting Oskar
4   know.
5   Q.   Okay?
6   A.   But anyway --
7   Q.   Thank you.  I'm --
8   A.   Either Friday or Saturday.
9   Q.   I'm glad you clarified that.
10  You may have interviewed T-shirt guy on --
11  on Friday and you're just transmitting it
12  to Oskar on Saturday, March 11th, correct?
13  A.   That could be, yes.
14  Q.   Now the parentheticals in this,
15  that's you, correct?
16  A.   Yeah, that may be just a
17  paraphrase of what I was -- I was asking,
18  but yes, it would have been me or -- yeah.
19  Q.   Did you have audio of this
20  interview with this fan?
21  A.   Yes.
22  Q.   Do you still have that audio?
23  A.   I presume so.
24  Q.   Okay.
25      COUNSELOR NEW:  Counsel, if

Page 156

B. WITZ
1
2   audio of this interview with the fan
3   still exists, I believe we're
4   entitled to it.
5       COUNSELOR BOWMAN:  We'll
6   follow-up on that.
7       COUNSELOR NEW:  Thank you.
8   Q.   This was -- the e-mail was sent
9   after the Alabama Missouri game in
10  Nashville, correct?
11  A.   It would have been the same
12  day, I don't re -- well, yeah, I guess if
13  it says I was off to the presser, then --
14  then yes, this would have been right --
15  right at the end of the game.
16  Q.   "I wanted to ask you about your
17  T-shirt, did you have those made?"  And is
18  the first parenthesis and, again, not
19  having the audio, we don't know whether
20  that's the actual question you asked or
21  you're paraphrasing it when you typed it
22  for Oskar, do I understand that correctly?
23  A.   Yes.
24  Q.   And the fan tells you, no, it's
25  not a pretty provacative shirt.  It's meant

Page 157

B. WITZ
1
2   to make you think.  And the next
3   parenthetical, "That Miller and Bradley
4   shouldn't be playing?"  That's your
5   question, right?
6   A.   Yes.  Yeah.  I was just trying
7   to understand what -- what he meant.
8   Q.   Well, clearly the Alabama fan
9   didn't think that Miller and Bradley
10  shouldn't be playing, did they?
11      COUNSELOR BOWMAN:  Objection.
12  Witness can answer.
13  A.   Well, the shirt itself was --
14  the message on the shirt, whatever exactly
15  it was, you know, was kind of open-ended.
16  It was hard to tell, you know, it -- it
17  begged for some -- that's why I was
18  entrusted to talk to him.  It was like,
19  well, what did you mean by this?
20  Q.   So the fan says, "So what was
21  your piece yesterday?  What was it about?
22  Was did positive," and I guess this is your
23  response.  "It was the juxtaposition of
24  what happened yesterday.  Brandon Miller
25  had a great game and at the same time,

40 (Pages 154 - 157)

**EXHIBIT 1**

B. WITZ

1                B. WITZ
2    Davis and Miles indictments were being
3    announced."  And you see here, "it is an
4    indictment on you guys, a complete
5    indictment of you guys." "You guys, you
6    mean the media?"  "Yeah."  "In what way?"
7    "Always going to the narrative that you
8    guys want to hear about."  "With all due
9    respect, a woman was killed, a tragedy,
10   right?"  "Big time."  "Question, which has
11   been asked of Oats, is it appropriate for
12   Miller and Bradley to be playing?"  That's
13   where you're asking T-shirt guy Alabama fan
14   whether it's appropriate for Miller and
15   Bradley to be playing, correct?
16       A.   I was asking the Alabama fan
17   the same question that had been asked of
18   Oats, essentially, was if it was, you know,
19   if -- did he think they should be playing.
20       Q.   That's kind of like asking a
21   Trump fan in West Virginia what they think
22   about the presidential debate a few weeks
23   ago.  I mean, if a guy is bold enough to
24   wear a killing our way through the SEC
25   shirt, do you really think he's going to

1                B. WITZ
2    say, you know, on further reflection, maybe
3    Brandon Miller ought not be starring for us
4    in the SEC -- did you honestly think that
5    he was going to give you that?
6        A.   I didn't know -- that's --
7    that's why I ask questions.  I didn't
8    understand -- know, if the -- if the
9    T-shirt was a protest against this of the,
10   you know, somebody that was, you know,
11   there was -- there was some thought that
12   this was a Tennessee fan or a, you know,
13   somebody, you know, it wasn't an Alabama
14   fan that was wearing this, so that's --
15   that's why I wanted to talk to him.
16       Q.   Okay.  Could have been an
17   Auburn fan in disguise, right?
18       A.   Could have.
19       Q.   Now, "haven't even run a few
20   laps," now that's inside of your
21   parenthetical, correct?
22       A.   Yes.
23       Q.   How do you know, when you're
24   talking to this, presumably Alabama fan,
25   the guy with the T-shirt, you don't know

1                B. WITZ
2    whether Brandon Miller or Jaden Bradley had
3    run a few extra laps, do you?
4        A.   No.  Now, what I don't recall
5    at the time or I -- what I don't recall
6    now, is if -- if anybody had been -- if
7    Oats or -- presumably, Oats, if he had been
8    asked at some point, was there any other
9    kind of discipline, and, like, for example,
10   like running laps, and perhaps he said no.
11   I just don't know that, but -- 'cause it's
12   --
13       Q.   And then -- I'm sorry.  I'm
14   sorry, Mr. Witz, finish your answer.
15       A.   No, I think that's -- that's
16   it.
17       Q.   So did you say to this
18   T-shirt-wearing fan, the difference between
19   being legally culpable and doing the right
20   thing?
21       A.   Yeah, I think, I, you know, I
22   think that was one of the things that had
23   been discussed, I think with Brandon Miller
24   is, you know, is just that question.  Is
25   there a difference, I mean, if -- if I

1                B. WITZ
2    remember correctly, I mean he was driving a
3    car that the gun was -- the gun was in, and
4    so there were, you know, there was, you
5    know, questions of whether he should, you
6    know, just like Darius Miles didn't fire
7    the gun that killed Jamea Harris of
8    whether, you know, at the time of whether
9    there should be some, you know -- I don't
10   know, even, you know, if he wasn't -- if he
11   should have not put himself in that place,
12   even if he didn't do anything wrong, I mean
13   these were things that were -- that had
14   been talked about.  I think it's -- that --
15   they had been certainly written about.  I
16   think this is what the South Carolina fans
17   were --
18       Q.   I'll give you the word you're
19   looking for, Mr. Witz, consequences.
20   That's the word that you're looking for
21   there, isn't it?
22          COUNSELOR BOWMAN:  Objection.
23     Witness can answer.
24       Q.   Consequences.  You wanted
25   consequences for Brandon Miller?

EXHIBIT 1

B. WITZ

1
2      A.   I -- I didn't want anything for
3   Brandon Miller.  I mean, I -- so --
4      Q.   You believed there -- in -- in
5   -- this is very telling of your state of
6   mind at the time, as of March the 11th,
7   2023, there's a "difference between being
8   legally culpable and doing the right
9   thing."  Doing the right thing, in your
10  opinion, would have been suspending Brandon
11  Miller or kicking him off the team,
12  correct?
13     A.   No.
14          COUNSELOR BOWMAN:  Objection.
15     You can answer.
16     Q.   What was the right thing?
17  You're saying here, do the right thing,
18  right, do the right thing --
19     A.   Right.
20     Q.   -- even if Brandon Millers's
21  not legally culpable, what's the right
22  thing that The University of Alabama should
23  have done?
24     A.   You know, that's not -- that's
25  not what I'm asking about here.  I'm asking

B. WITZ

1
2   -- I'm asking him to -- is -- is there a
3   difference here between those two things?
4   And if -- I'm just trying to get a sense of
5   how he feels about this.  I don't know, you
6   know, we had probably a five-minute
7   conversation.  I don't know if this is a
8   parody T-shirt.  I don't know if it's a --
9   you know, what kind of statement he's
10  making.  It's clearly a provacative T-shirt
11  and I'm just trying to understand, you
12  know, what prompted him to, you know, what
13  prompted him to make the T-shirt.  That's
14  what I'm kind of trying to get at.  Find
15  out more about it.
16     Q.   And what's his response when
17  you ask him the difference between being
18  legally culpable and doing the right thing?
19  He tells you to F off, doesn't he?
20     A.   Well, I think he was -- no, I
21  think he was saying that that's what the
22  T-shirt says is F that.
23     Q.   And you ask him F what?  And he
24  says F off?
25     A.   Right.

B. WITZ

1
2      Q.   Right?  And he gives you a fake
3   name at that point, right?
4      A.   Yes, I -- I asked for his name
5   and that's what he gave me.
6      Q.   Do you know who Jimmie Johnson
7   is?
8      A.   A football coach.
9      Q.   Well, that's one of them, yes,
10  former coach of Dallas Cowboys.  What about
11  the other famous Jimmie Johnson?
12     A.   Race car driver.
13     Q.   Yes.  One of the greatest of
14  all times, drove for Lowe's Number 48
15  Chevrolet.  And he's tells you he's Jimmie
16  Johnson from Mowville.  And he -- you ask
17  him, did you make the shirts, right?
18     A.   Right.
19     Q.   And he tells you, "I know
20  that's where you want to go and you'll try
21  to cancel them.  I know where this is going
22  enough.  This whole thing is about F it.
23  The media is going to cancel Miller and I
24  don't condone anything about what happened
25  but I know where the media is going to come

B. WITZ

1
2   crashing down and try to ruin this guy's
3   career.  I know that's where the clicks
4   are."  Did I read that correctly?
5      A.   Yes.
6      Q.   Does that refresh your
7   recollection of the question and answers
8   that we were having earlier about even
9   this, presumably, good ol' boy from
10  Alabama, Alabaster, Alabama, telling you
11  the media is going to cancel Miller and I
12  know that's where the clicks are, trying to
13  cancel Brandon Miller's career, right?
14     A.   That's -- that's what's
15  transcribed here from the conversation.
16     Q.   Mine is not an unfair
17  interpretation of your interview with
18  T-shirt fan, is it?
19     A.   Well, you -- what you -- yeah,
20  just reading this, what you read here,
21  that's accurate.
22     Q.   Alright.
23     A.   As I know it.
24          COUNSELOR BOWMAN:  This is 11.
25          COUNSELOR THOMPSON:  Thank you.

42 (Pages 162 - 165)

EXHIBIT 1

Page 166

B. WITZ

1
2    Q.   This is your working file,
3    isn't it?
4    A.   Appears to be, yes.
5    Q.   And this question that we saw
6    from your March 10th article, does that
7    mean that you asked Brandon Miller how do
8    you reconcile not missing any playing time?
9    A.   No.  This appears to be from a
10   press conference so I don't know who asked
11   the question.
12   Q.   Alright.  "JQ put in starting
13   lineup.  JQ:  In the indictment, DM,"
14   Darius Miles "owned a gun that was used to
15   kill somebody.  Do you own a gun?  No."
16   Was that you asking the question of Jahvon?
17   A.   Jahvon Quinerly, I don't -- I
18   don't recall.
19   Q.   Alright.
20       And if we turn to the next
21   page, Bates 1831, that's your transcription
22   of your interview with the T-shirt fan,
23   correct?
24   A.   Yeah.  It appears to be the
25   same thing that we just went over.

Page 167

B. WITZ

1
2    Q.   Alright.
3        Did you tell T-shirt fan you
4    were recording him before you started
5    recording him?
6    A.   I was holding my recorder and
7    my notepad together, so -- or --
8    Q.   So --
9    A.   Yeah, well, yeah, the -- I
10   don't know if I had a digital recorder on
11   my phone or -- but I had them together.
12   Q.   Well, he tells you that's BS if
13   you're recording him, right?
14   A.   That's what it looks like, yes.
15   Q.   Shouldn't you -- doesn't The
16   New York Times standard say that if you're
17   going to record somebody, even if it's a
18   one-party state where you don't need their
19   consent, that you should get their consent,
20   are you familiar with that standard or is
21   that another one you don't know, Mr. Witz?
22       COUNSELOR BOWMAN:  Objection.
23   Argumentative.  Witness can answer.
24       COUNSELOR NEW:  Yup.
25   A.   I'm not -- you know, in -- in

Page 168

B. WITZ

1
2    sport -- I don't know, there's certain --
3    no, it's so, I think, common for sports
4    reporters to record.  Sometimes it's people
5    use their phone to do a digital recording
6    is -- as they're -- as they're talking to
7    somebody.
8    Q.   That's not really my question.
9    My question is, doesn't The New York Times
10   have a standard that says if you're going
11   to record a witness, whether it's a
12   one-party consent state or not, that you
13   should have the consent of the witness
14   before recording them?
15   A.   I don't -- I don't recall.
16   Q.   Okay.  Did you have T-shirt
17   fan's consent before recording him?
18   A.   Well, I was taking notes, so I
19   don't know -- apparent -- apparently he
20   felt -- no.
21   Q.   Okay.  Now, by the time that we
22   get to the bottom of 1831, "Lost to them
23   eight days ago.  Tournament MVP, in front
24   of a lot of friends and family."  Brandon
25   Miller was the SEC tournament MVP in 2023,

Page 169

B. WITZ

1
2    correct?
3    A.   I believe so.
4    Q.   So we know that these notes are
5    coming from March the 12th, correct?
6    A.   Yeah, I believe there's other
7    information that -- yeah.  I think that --
8    yup.  I mean, I don't -- I have no reason
9    to doubt that.
10   Q.   And on the next page, you
11   document the phone conversation that you
12   and I had on March the 16th, correct?
13   A.   Is this on --
14   Q.   1833.
15   A.   Parts of it, yes.
16   Q.   Parts of it.  Why would you
17   leave parts of mine and your conversation
18   out in your working filing, Mr. Witz?
19   A.   Because there were certain
20   things that were said that weren't --
21   didn't strike me as relevant to, you know,
22   or I don't know, or maybe you were speaking
23   too fast or that I didn't get every word
24   down, but I tried to get as much as -- as
25   much as I could.

43 (Pages 166 - 169)

EXHIBIT 1

B. WITZ

1
2    Q.    You did ask me where Kai Spears
3  was.  If he wasn't at the shooting, where
4  was he; do you recall that?
5    A.    Yes.
6        COUNSELOR BOWMAN:  Objection.
7    Witness can answer.
8    Q.    And I told you -- I told you on
9  March the 16th in the afternoon that you
10  screwed the story up, didn't I?
11        COUNSELOR BOWMAN:  Objection.
12    Counselor, are you asking as an
13    attorney or as a witness here?
14        COUNSELOR NEW:  As an attorney.
15        COUNSELOR BOWMAN:  You can
16    answer the question.
17    Q.    These are in your notes, right
18  there it is, it's in your working file, you
19  screwed that up, right?
20    A.    Where -- which part or -- let
21  me -- hold on a second.  Give me a moment
22  to read through this.  You screwed that up,
23  yes.  Yes, that's what you -- that's what
24  you told me.
25    Q.    You can keep your working file

B. WITZ

1
2  handy in case you need to refer to it about
3  anything, Mr. Witz.
4    A.    Okay.
5    Q.    Take a look at Exhibit 12.
6    A.    Yes.
7    Q.    Are you ready.
8    A.    I -- yes.
9    Q.    It is an e-mail from you to
10  Aaron Jordan with the athletic department
11  with The University of Alabama, correct?
12    A.    Yes.
13    Q.    And when did you meet Aaron
14  Jordan?
15    A.    At some point over the weekend.
16    Q.    In Nashville?
17    A.    In Nashville, yes.
18    Q.    And that's your request to
19  interview Nate Oats at some point before
20  Thursday's game, correct?
21    A.    Yes.  This is just sort of
22  following up, Nate Oats had said after the
23  game on Sunday, you know, I asked him if he
24  would be interested in talking with me in
25  the next few days when I would be in

B. WITZ

1
2  Tuscaloosa and he said I would like to do
3  it, but I don't know if they're going to
4  let me and refer me to, you know, to sort
5  of make that request or go -- go through
6  Aaron to see if something could be set up
7  or not.
8    Q.    (Handing).  Let me know when
9  you reviewed Exhibit 13.
10        THE WITNESS:  I'm sorry.  What
11    was -- what was -- what was the time
12    on -- on this, because it says
13    4:06 a.m.
14        COUNSELOR BOWMAN:  This isn't
15    stamped at Eastern time, so it would
16    be the minus four.
17        THE WITNESS:  So just after
18    midnight on Sunday night, the 12th.
19        COUNSELOR BOWMAN:  Minus four,
20    is that 8:00 a.m.?
21        THE WITNESS:  What's that?
22    Q.    I'll show you one, just so the
23  record is clear, and I don't know if this
24  is just some poor West Virginia copying
25  machine that we've got or something, but

B. WITZ

1
2  you're welcome to take a look at NYT
3  (Spears) 0000012 and (Spears) 0000029 that
4  does have the UTC minus 05:00 Eastern time.
5  So I'll let you take a look at these if you
6  have a question about those, Mr. Witz.
7    A.    Okay.
8    Q.    Does that refresh your
9  recollection, Sir?
10    A.    I was just looking at the
11  dates.  That's all.
12    Q.    Okay.  Alright.  So the one
13  that has Nate Oats in the subject Bates
14  stamp number 12 on the bottom, I have as
15  March 13th, 2023, 12:06 a.m.  That's the
16  e-mail sent to Aaron Jordan and Aaron
17  Jordan's response is on March the 14th,
18  2023 at 11:03 p.m. Eastern time, "Billy,
19  thanks for reaching out.  We've got several
20  media obligations here this week to take
21  care of, but if you want to send over a few
22  questions, I'll try to get you responses."
23  That was the University of Alabama's
24  athletic department's response to your
25  request to interview Nate Oats prior to the

## EXHIBIT 1

Page 174

```
           B. WITZ
1
2    start of March Madness, correct?
3       A.   Yes.
4       Q.   Alright.
5           Now let's take a look at
6    Exhibit 13.  What is Exhibit 13?
7       A.   It looks like a text message
8    exchange between myself and Oskar.
9       Q.   Is that a text or is it a
10   WhatsApp message?
11      A.   I think we communicated via
12   text mostly.
13      Q.   Alright.
14          Had you attempted to call Oskar
15   Garcia?
16      A.   It looks like that.
17      Q.   And you tell him, "I'm driving
18   to Tuscaloosa" with the thumbs up, correct?
19      A.   Yes.
20      Q.   So we know that by 11:35 a.m.,
21   March the 14th, you're driving to
22   Tuscaloosa, correct?
23      A.   Yeah, if those time stamps are
24   correct, then yes.
25      Q.   (Handing).  Let me know when
```

Page 175

```
           B. WITZ
1
2    you reviewed this.
3       A.   Okay.
4       Q.   Alright.
5           On Sunday, you e-mail Alain,
6    "Were you able to find anything on this
7    yet?"  And it looks like Monday morning
8    Alain messages you back, e-mails back, "Hi
9    Billy, I'm working on it this morning and
10   into the afternoon if necessary.  Sorry for
11   the delay," correct?
12      A.   Yes.
13      Q.   And then the next day, Tuesday,
14   the 14th, you say, "Hey Alain, I'm in
15   Tuscaloosa now.  Can you send me whatever
16   you have because I only have 24 hours here.
17   Thanks, Billy."  Correct?
18      A.   Yes.  And, again, I -- I just
19   -- I'm assuming these times are -- I don't
20   know.  There's been some issues on these
21   documents with, you know, the time stamps,
22   but, yes, the substance of it, yes.
23      Q.   Right.  I want to make sure
24   that I understand this.  The 24 hours you
25   had in Tuscaloosa, what 24-hour period of
```

Page 176

```
           B. WITZ
1
2    time was that?
3       A.   I guess when I flew down and
4    got there sometime, you know, probably from
5    around noon Tuesday until about noon
6    Wednesday, roughly.
7       Q.   Where were you going after
8    Tuscaloosa?
9       A.   To Birmingham.
10      Q.   So you were plaining on going
11   back to Birmingham at some point on the
12   15th, correct?
13      A.   Fifteen -- on -- on Wednesday,
14   yes.
15      Q.   And I take it that you stayed
16   in Tuscaloosa the night of March 14th?
17      A.   Yes.
18      Q.   Why were you only giving
19   yourself 24 hours in Tuscaloosa to do
20   reporting on this shooting?
21      A.   Because I needed to be back in
22   Birmingham for press conferences for the
23   NCAA tournament on Thursday -- on
24   Wednesday.  Excuse me.
25      Q.   So there were going to be press
```

Page 177

```
           B. WITZ
1
2    opportunities on Wednesday for the games
3    that were starting in Birmingham on
4    Thursday, correct?
5       A.   Yes.
6       Q.   And you did, in fact, drive
7    back to Birmingham on the 15th, correct?
8       A.   Yes.  On Wednesday, yes.
9       Q.   What time did you get back to
10   Birmingham on March the 15th?
11      A.   Some -- some time -- some time
12   around noon-ish.
13      Q.   Alright, so tell me what you
14   did in Tuscaloosa on March the 14th in
15   reporting on this shooting?
16      A.   I -- I went to -- I guess what
17   is it, the courthouse, to see what sort of
18   documents that I might be able to -- to
19   find.
20      Q.   Did you obtain any?
21      A.   Yes.
22      Q.   What documents did you obtain
23   at the courthouse in Tuscaloosa?
24      A.   Well, I should say I was able
25   to -- to review them.  I don't know by
```

45 (Pages 174 - 177)

## EXHIBIT 1

Page 178

B. WITZ

1
2    obtain them, but the -- well there were
3    copies of subpoenas that were to --
4    involved in the case that were public
5    record and I don't know.  I don't recall
6    exactly what else, but I just went through
7    whatever I could, what was available.
8       Q.   Besides reviewing publically
9    available documents at the courthouse, what
10   else did you do in Tuscaloosa from,
11   roughly, noon on March the 14th to noon on
12   March the 15th?
13      A.   I tried to talk to people who
14   would have information about the case, who
15   I -- who I believed would have information
16   about the case.
17      Q.   Such as whom?
18      A.   The police, attorneys on both
19   sides, just anybody that, you know, law --
20   any sort of law enforcement, you know, that
21   I think they're several jurisdictions that
22   are involved there, so that's -- that's
23   yeah, that's where I started.
24      Q.   Who did you speak with at the
25   police?

Page 179

B. WITZ

1
2       COUNSELOR BOWMAN:  Same
3    objection to the extent it includes
4    off-the-record communications.
5    Witness can answer about
6    on-the-record communications.
7       COUNSELOR NEW:  Alright.  I'm
8    going to go ahead and put this on the
9    record as well.  We don't agree with
10   your assertion of that privilege.  We
11   don't believe that off-the-record
12   discussions that don't make their way
13   into his reporting are protected by
14   New York or Alabama reporters
15   privilege, so to the extent that you
16   asserted that in prior sections of
17   the depositions and you're asserting
18   it now and instructing him not to
19   answer my questions.  Today we'll
20   suspend the deposition and we're
21   going to take that up on a motion to
22   compel with the judge.
23      COUNSELOR BOWMAN:  That is the
24   instruction.
25      COUNSELOR NEW:  Okay.  Alright

Page 180

B. WITZ

1
2    and -- and you understand our
3    position?
4       COUNSELOR BOWMAN:  Right.
5       COUNSELOR NEW:  That we're
6    going to challenge your assertion of
7    that about any off-the-record
8    discussions.
9       COUNSELOR BOWMAN:  I understand
10   that you're going to challenge that
11   and you have a right to challenge
12   that, but we have a right to assert
13   the privilege where we believe is
14   appropriate and our suggestion,
15   Counsel, is you make your record and
16   if --
17      COUNSELOR NEW:  We are.  We
18   are.  So that's the purpose of me
19   saying that, I'm making our record
20   and we'll bring on a motion to compel
21   what we believe has been the improper
22   assertion of journalistic privilege.
23      COUNSELOR BOWMAN:  Understood
24   your position.
25      Q.   Alright.

Page 181

B. WITZ

1
2       What else did you do in the
3    24 hours that you had in Tuscaloosa
4    March 14th to March 15th?
5       A.   I tried to -- I tried to reach
6    out to talk to as many people that I could
7    that I thought would have knowledge about
8    the case.
9       Q.   And you understand that none of
10   my questions are asking for the identity of
11   Source A or Source B, you understand that,
12   right?
13      A.   Okay.
14      Q.   Anybody else's identity, I want
15   to know about it?
16      A.   Right.
17      Q.   Okay.
18      A.   Right.
19      Q.   Alright.
20      On March the 14th of 2023, the
21   basketball team, the coaches, presumably
22   members of the athletic department were in
23   Birmingham, correct?
24      A.   I don't -- I don't know.
25      Q.   Alright, they would at least be

Page 182

B. WITZ

1    there by March 15th because you felt like
2    you needed to go back to the Birmingham in
3    order to participate in press activities,
4    correct?
5        A.    Yes.
6        Q.    Anything else you did as part
7    of your reporting in the 24 hours, roughly,
8    that you were in Tuscaloosa?
9        A.    No, not that I recall.  I mean,
10   I was -- I was trying to find out as much
11   as I could about -- about the case.
12       Q.    Did you talk to any local
13   journalists in Tuscaloosa while you were
14   there?
15       A.    I don't recall talking to any
16   other journalists while I was there on
17   March 13th and 14th.
18       Q.    Okay.  Take a look at your
19   working file, Bates number 1813 in the
20   bottom right corner, 1835, I'm sorry.  Do
21   you see that?
22       A.    Yes.
23       Q.    Did you interview journalist
24   Ryan Phillips of patch.com?

Page 183

B. WITZ

1        A.    No.  I -- he and I had never
2    had an interview.  We spoke, but...
3        Q.    Did you tell Ryan Phillips --
4    strike that.  Was this, speaking with Ryan
5    Phillips, recorded?
6        A.    No.
7        Q.    And is this from your notes
8    from your discussion with Ryan Phillips?
9        A.    I don't -- where are -- where
10   are you talking about?  What part are we --
11       Q.    I want to make sure that I
12   understand.  And -- and maybe -- tell me
13   what portion of these pages is from your
14   discussion with Ryan Phillips?
15       A.    (No response.)
16       Q.    Alright, go back to Page 1833,
17   please.
18       A.    Okay.
19       Q.    After the redaction that starts
20   Luisa Reyes colon, who is that speaking?
21       A.    She is somebody who -- who
22   reached out to me.
23       Q.    Who is she?
24       A.    She lives in town.  I believe

Page 184

B. WITZ

1    she's an attorney or was an attorney.
2        Q.    And is what goes on over to
3    1834 in that first paragraph, is that all
4    attributable to Luisa Reyes?
5        A.    I'll have to read all of this.
6        Q.    I'm just asking about the first
7    paragraph.
8        A.    Oh.
9        Q.    On 1834.  From the redaction
10   down to the bottom of the first paragraph
11   on 1834 is that attributable to Luisa
12   Reyes?
13       A.    Yes, I believe so.
14       Q.    Then the next paragraph starts
15   with "Tuscaloosa Patch"; do you see that?
16       A.    Yes.
17       Q.    "He had heard that Kai was in
18   the car, and that he couldn't identify it."
19   So who is telling you that?
20       A.    This -- this would have been
21   Luisa Reyes relaying that to...
22       Q.    So Luisa Reyes is telling you
23   that someone at the Tuscaloosa Patch heard
24   that Kai was in the car, correct?

Page 185

B. WITZ

1        A.    Yes.
2        Q.    And that he, from the
3    Tuscaloosa Patch, couldn't identify it,
4    correct?
5        A.    I -- that -- that could be,
6    yeah.
7        Q.    It was a very strong rumor,
8    right?
9        A.    Yes.
10       Q.    When did Luisa Reyes tell you
11   that Kai's presence in the car was a strong
12   rumor?
13       A.    I don't recall exactly when we
14   -- when we spoke, but it was after the
15   story ran that she reached out to me.
16       Q.    Is everything else on 1834
17   Luisa Reyes?
18       A.    I believe so.
19       Q.    And your discussion with Luisa
20   Reyes is after the publishing of the
21   article on March the 15th, correct?
22       A.    Yes.
23       Q.    Is this when you went back to
24   Tuscaloosa to check up on things?

Page 186

B. WITZ
1
2    A.  I don't -- I don't recall.  We
3  spoke by phone.
4    Q.  Okay.  Now go over to Page 1835
5  because Ryan Phillips' name appears there
6  with a colon and then John Robbins with a
7  colon.  Tell me what I'm looking at there?
8    A.  Well, I think what -- well, I
9  -- I can't be certain, but, you know, I
10  likely called Ryan Phillips, had typed his
11  name in my file and left a message and then
12  the next call that I made was to John
13  Robbins and then what you see here, I
14  believe is, are notes from our
15  conversation.
16    Q.  Okay.  So does this mean that
17  you made a call to Ryan Phillips, but that
18  you didn't reach him?
19    A.  It could.  It could.
20    Q.  How did you get Ryan Phillips
21  information?
22    A.  I don't recall.
23    Q.  Who is Trey?  "Why would TPD
24  clear Kai Spears"?
25    A.  Trey is a reporter.

Page 187

B. WITZ
1
2    Q.  With whom?
3    A.  I believe with FOX Sports.
4    Q.  Where did you speak with Trey
5  from FOX Sports?
6    A.  I don't recall.  We were -- he
7  was -- he was covering the games and so I
8  don't know if it was a conversation that we
9  had in person or over the phone.
10    Q.  Now, let's go to the Ryan
11  Phillips.
12    A.  On Page 1836?
13    Q.  Yes.  When were you speaking
14  with Ryan Phillips where you took this
15  down?
16    A.  I don't -- I don't recall the
17  date, but it was after the story came out.
18    Q.  And Ryan Phillips tells you
19  "Narrative from a booster, Brandon gave Kai
20  a ride to his apartment.  It wasn't like he
21  was riding around with him all night,"
22  correct?
23    A.  That's -- those are the notes
24  that I took, yes.
25    Q.  Did you ask Ryan Phillips who

Page 188

B. WITZ
1
2  the booster was?
3    A.  I don't -- I don't recall.
4    Q.  Turn over to the next page.
5  When did you talk to Severn Sanders?
6    A.  I didn't.  I left a couple of
7  messages for him and did not hear back.
8    COUNSELOR BOWMAN:  Counsel,
9    when you get to a stopping point,
10    we've been going about an hour, take
11    a short comfort break.
12    COUNSELOR NEW:  Yeah, that will
13    be fine.
14    THE VIDEOGRAPHER:  The time on
15    the video monitor is 3:25 p.m.  We
16    are off the record.  This ends
17    Media 4.
18    (Whereupon, a brief recess was
19    taken.)
20    THE VIDEOGRAPHER:  We are back
21    on the record.  The time on the video
22    monitor is 3:38 p.m.  Starts Media
23    Unit 5.
24    COUNSELOR NEW:  Exhibit 15.
25    Q.  Alright, Mr. Witz, I'll --

Page 189

B. WITZ
1
2  NYT000029 is an e-mail.  I don't know that
3  that e-mail has the time adjusted.  So I'll
4  show you mine that has the indication at
5  the top of what Eastern was.
6    A.  Okay.
7    Q.  So the e-mail response from
8  Aaron Jordan came in at 11:03 p.m. on March
9  the 14th, correct?
10    A.  11:03 p.m., yes, correct.
11    Q.  And just to be clear, you were
12  not on any deadline set by The New York
13  Times for publishing any stories about the
14  shooting, correct?
15    A.  Yes.
16    Q.  Yes, I'm correct, that you were
17  not on any deadlines?
18    A.  There was -- it -- at that
19  point, no, there was no deadline.
20    Q.  At any point, were you given a
21  deadline by anybody to whom you report to
22  run this story?
23    A.  Yes, there was -- there was a
24  deadline to publish a story on Alabama
25  basketball.

48 (Pages 186 - 189)

**EXHIBIT 1**

B. WITZ

1
2    Q.   Okay.  And who gave you that
3    deadline?
4        A.   Oskar.
5        Q.   And what was that deadline?
6        A.   It was that we -- I don't
7    recall exactly the -- what the deadline
8    was, but it was to have a -- a story in
9    print on Thursday.  Whatever -- whatever
10    that story was.
11        Q.   Why was that deadline chosen?
12        A.   I don't know.  I didn't choose
13    it.
14        Q.   So I'll have to ask Oskar in a
15    week why the first day of March Madness was
16    chosen to have a story in print about
17    number one overall seed University of
18    Alabama Crimson Tide, correct?
19        A.   Yes.
20        Q.   You told me earlier that your
21    belief was that the main thrust of the
22    story was that the shooting could have been
23    a lot worse, correct?
24        A.   Yes.  When the -- when -- yes,
25    that was the...

B. WITZ

1
2        Q.   And you would agree with me
3    that you didn't have to -- to meet this
4    in-print day one of March Madness, nothing
5    necessitated identifying Brandon Miller's
6    passenger in order to keep the main thrust
7    of that article that this shooting could
8    have been a lot deadlier, you agree with
9    that, right?
10        A.   We -- we named Kai as the
11    passenger in Brandon Miller's car because
12    we believed it was accurate and it was part
13    of the story.
14        Q.   That's not my question.  My
15    question is, if you're given a deadline by
16    Oskar Garcia to have a story about Alabama
17    in the print paper day one of March
18    Madness, you could have done that with this
19    thrust of the story being this shooting
20    could have been a lot deadlier without
21    identifying the passenger in Miller's car
22    at the time of the shooting, correct?
23        A.   We believed that we had
24    information and that was -- that was
25    truthful and -- or I should say that was

B. WITZ

1
2    accurate and it was part of the story.
3        Q.   So you had to put the identity
4    of Miller's passenger in the story that was
5    going to go to print and be in print the
6    first morning of March Madness, correct?
7        A.   No.  We didn't have to --
8        Q.   Okay.  You chose to?
9        A.   We made an editorial decision
10    that we -- that the information was
11    accurate and that led to the decision to
12    publish.
13        Q.   But you agree with me, that you
14    could have, you and Oskar Garcia could have
15    chosen to write a story about how the
16    shooting could have been a lot worse and
17    not yet named Miller's passenger?
18        A.   Well, that's a hypothetical.
19        Q.   No, it's not.  You have two
20    choices.
21        A.   Well --
22        Q.   One, name the passenger.  The
23    other, don't name the passenger.  You chose
24    to name the passenger as part of the story
25    that the shooting could have been a lot

B. WITZ

1
2    worse, right?
3        A.   Because we believed that that
4    was an accurate element of the story.
5        Q.   Your story started at 3:44 in
6    the morning Central time about T-shirt guy,
7    right?
8        A.   I'm not sure what you're
9    referring to.
10        Q.   Alright.  We'll take a look at
11    it.
12            COUNSELOR NEW:  16.
13        Q.   Alright, I'm going to show you
14    the one that's got the correct time,
15    Eastern minus four hours, 11:31 a.m.
16    "Alain, I was running around yesterday and
17    this morning and just found out another
18    player who was a witness that hasn't been
19    reported.  Anything on his family, parents
20    contact, etc., would be great.  His name is
21    Kai Spears, Pittsburgh, PA, Bishop Canevin
22    High School and he's a freshman.  Thanks."
23    Did I read that correct?
24        A.   Yes.
25        Q.   So at 11:31 a.m. Eastern, you

**EXHIBIT 1**

Page 194

B. WITZ

1
2  learned Kai's identity, correct?
3       COUNSELOR BOWMAN: Objection.
4  Witness can answer.
5    A.  Yes. I learned that the
6  identity of the passenger in Brandon
7  Miller's car was Kai Spears.
8    Q.  Alright. And how did you learn
9  that?
10   A.  Through a source.
11   Q.  Source A or Source B?
12   A.  Source -- Source A in an
13 off-the-record conversation.
14   Q.  Who is Source A?
15       COUNSELOR BOWMAN: Objection on
16   the basis of the reporters privilege
17   as defined earlier. Instruct the
18   witness not to answer.
19   Q.  What did Source A show you?
20       COUNSELOR BOWMAN: Objection.
21   On the Reporter Privilege to the
22   extent the answer would provide
23   information that would be source
24   identifying, to the extent the
25   witness can answer the question as

Page 195

B. WITZ

1
2    fully as you can without providing
3    source-identifying information, I
4    instruct the witness to do so.
5    Q.  Did the source show you
6  anything, like a document, a text or
7  anything like that?
8    A.  Yes.
9    Q.  What did the -- what did Source
10 A show you?
11       COUNSELOR BOWMAN: Same
12   objection. Same instruction.
13   A.  Source A, off-the-record,
14 showed me a document and a video,
15 surveillance video.
16   Q.  And I -- when did Source A show
17 you a document and a video?
18       COUNSELOR BOWMAN: Same
19   objection. Same instruction. If the
20   precise time would be source
21   identifying, but you can answer the
22   question as long as it's not
23   providing source identifying
24   information.
25   A.  Source A showed me -- source --

Page 196

B. WITZ

1
2  and this was all off-the-record
3  conversation that Source A showed me
4  documents and surveillance video on
5  March 15th.
6    Q.  Where were you when Source A
7  showed you a document or documents and
8  surveillance video?
9       COUNSELOR BOWMAN: Objection on
10   the basis of the Reporter's
11   Privilege. Instruct the witness not
12   to answer.
13       COUNSELOR NEW: So you're
14   telling him not to answer where he
15   was when he was shown it?
16       COUNSELOR BOWMAN: Yes, to the
17   extent it's source identifying --
18       COUNSELOR NEW: We're going
19   to --
20   Q.  If I ask you where you were,
21 does that reveal your source?
22   A.  It depends how specific.
23   Q.  Generally, I take it that you
24 were in Tuscaloosa, Alabama, correct?
25   A.  Yes.

Page 197

B. WITZ

1
2    Q.  If you get any more specific
3  than the city you were in, does that reveal
4  your source?
5    A.  It could.
6    Q.  That doesn't tell me anything.
7       COUNSELOR NEW: You want to
8    take your time to consult with him
9    because if we come back, I'm going to
10   ask for the costs.
11       COUNSELOR BOWMAN: I
12   understand, Counsel.
13   Q.  And what time in relation to
14 you sending Alain Delaqueriere this
15 11:31 a.m. e-mail on March the 15th?
16   A.  Some time prior to that.
17   Q.  I could have surmised that
18 much. Within 30 minutes prior to that,
19 within an hour prior to that, within two
20 hours of that or five hours prior to that?
21       COUNSELOR BOWMAN: Same
22   objection. Same instruction. You
23   can answer the question if it's not
24   source identifying or if it's
25   narrowing the universe of potential

50 (Pages 194 - 197)

Page 198

```
            B. WITZ
1
2    identification of the source.
3        THE WITNESS:  Yeah.
4        A.   I don't think I can answer that
5    without possibly identifying who the -- who
6    the Source A was.
7        Q.   A time?  So you can't tell me
8    8:30 a.m. East, 7:30 a.m. Central, that it
9    doesn't reveal your source, is that what
10   you're telling me, Mr. Witz?
11       COUNSELOR BOWMAN:  Objection.
12   Asked and answered.  Witness can
13   answer.
14       A.   Yeah, I don't think that I --
15   don't think I can answer that.
16       Q.   That's fine.  That's fine.
17   Maybe a judge tells you you have to answer
18   that.
19       So was it a document or a
20   documents that Source A showed you?
21       A.   Plural.
22       Q.   Documents?
23       A.   Yes.
24       Q.   What were the documents?
25       COUNSELOR BOWMAN:  Same
```

Page 199

```
            B. WITZ
1
2    objection.  Same instruction.
3    Witness can answer.  Without -- if
4    you can do so without revealing
5    source identifying information.
6        A.   Documents related to the case.
7        Q.   No joke.  What documents
8    related to the case?
9        COUNSELOR BOWMAN:  Same
10   objection.  Same instruction.
11       A.   (No response.)
12       Q.   Transcript of the prelim?
13       A.   I'm not sure I can answer that
14   without narrowing the -- the universe.
15       COUNSELOR BOWMAN:  Do you want
16   to consult about that to see if
17   there's anything you can answer?
18       THE WITNESS:  Sure.  Yeah.
19       COUNSELOR BOWMAN:  Let's take a
20   short break.
21       COUNSELOR NEW:  Alright.
22       THE VIDEOGRAPHER:  Time on the
23   video monitor is 3:54 p.m.  We're off
24   the record.
25       (Whereupon, a brief recess was
```

Page 200

```
            B. WITZ
1
2    taken.)
3        THE VIDEOGRAPHER:  We are back
4    on the record.  The time on the video
5    monitor is 4:00 p.m.
6        COUNSELOR BOWMAN:  Counsel,
7    during the break, we conferred about
8    a privilege.  Please go ahead and ask
9    your question again.
10       COUNSELOR NEW:  Yeah.
11       Q.   I believe that question was
12   what time, in relation to the e-mail to
13   Alain Delaqueriere, did you meet with
14   Source A?
15       A.   Yeah, I don't -- I don't think
16   I -- I don't think I can answer that
17   question in conjunction with other
18   information that would -- if I -- if I did,
19   it would -- it would lead to revealing who
20   the source is.
21       Q.   Let's go through the documents
22   because I want to put your alls privilege
23   on the record so we can take this up with
24   the judge at a later time, documents Source
25   A showed you.
```

Page 201

```
            B. WITZ
1
2        COUNSELOR BOWMAN:  Same
3    objection as before and same
4    instruction.  The witness can answer
5    the question as fully as he can
6    without revealing information that
7    could tend to be source identifying.
8        A.   If I answer that question in
9    conjunction with other information, then it
10   would lead to identifying the source.
11       Q.   In conjunction with what other
12   information?
13       COUNSELOR BOWMAN:  Objection.
14   Instruct the witness not to answer.
15       COUNSELOR NEW:  Alright.
16       Q.   You mentioned that Source A
17   showed you surveillance video, correct?
18       A.   Yes.
19       Q.   Surveillance video from where?
20       COUNSELOR BOWMAN:  Same
21   objection.  Same instruction.
22       COUNSELOR NEW:  You're
23   instructing him not to answer
24   surveillance video from where?
25       COUNSELOR BOWMAN:  I'm
```

**EXHIBIT 1**

Page 202

B. WITZ

1
2  instructing him to answer to the full
3  extent he can without revealing
4  information that would identify the
5  source. If a full answer would
6  identify a source, we are asserting
7  Reporter Privilege in response to
8  that question.
9       COUNSELOR NEW: A full answer.
10  You're qualifying that if a full
11  answer? Alright.
12     Q.   Where is the surveillance video
13  from, Mr. Witz?
14       COUNSELOR BOWMAN: Same
15  objection. Same instruction.
16     A.   I'm not -- I'm not -- not
17  certain where the surveillance video came
18  from.
19     Q.   See that wasn't hard, was it?
20     A.   No.
21     Q.   Alright.
22       Source A is not depicted in the
23  surveillance video, correct?
24       COUNSELOR BOWMAN: Objection.
25  Instruct the witness not to answer.

Page 203

B. WITZ

1
2     A.   I'll follow advice of my
3  Counsel, not answer that.
4     Q.   Alright. Kai Spears is not
5  depicted in that surveillance video, is he?
6     A.   I don't believe so.
7     Q.   Alright. If this is
8  duplicative of Exhibit 16, I apologize. I
9  think that was my mistake in putting my
10  outline and exhibits together. At this
11  point, at 11:30 a.m. --
12     A.   Is this the same thing that
13  you'd given us a little while ago?
14     Q.   I believe so.
15     A.   Okay.
16     Q.   At this point, 11:30 a.m.,
17  whatever Source A shows you, tells you,
18  whatever, you tell Alain Delaqueriere that
19  Kai Spears was a witness, correct?
20     A.   Correct. That's what I wrote.
21     Q.   You don't tell Alain that Kai
22  Spears was involved in, correct?
23     A.   Correct.
24     Q.   You don't tell Alain that Kai
25  Spears was the passenger in Brandon

Page 204

B. WITZ

1
2  Miller's car, do you?
3     A.   No. I'm just trying to convey
4  to Alain that this is a person I'm trying
5  to reach out to.
6     Q.   Kai Spears could have been a
7  witness just by virtue of being in that
8  area of The Strip at that time, correct?
9     A.   Yes. As I said, the purpose of
10  this e-mail was to just let Alain know that
11  I had been told the name of -- of a, you
12  know, that I'm just trying to basically
13  reach out -- I'm trying to get in contact
14  with his family or parents.
15     Q.   Was the source telling you that
16  they, of their own knowledge, knew that Kai
17  Spears was Miller's passenger at the time
18  of the shooting?
19     A.   Yes.
20     Q.   So Source A told you that he or
21  she had firsthand personal knowledge that
22  Kai Spears was Miller's passenger, right?
23       COUNSELOR BOWMAN: Objection to
24  the extent that would be source
25  identifying, you can answer if it's

Page 205

B. WITZ

1
2  not.
3     A.   Source A told me that Kai
4  Spears was the passenger in the car.
5     Q.   That's not my question. My
6  question is, did Source A purport to have
7  firsthand knowledge that Kai Spears was the
8  passenger in Miller's car? Do you
9  understand the difference between having
10  firsthand knowledge and having been told
11  that Kai Spears was Brandon Miller's
12  passenger?
13       COUNSELOR BOWMAN: Objection.
14  Compound.
15     Q.   You can answer.
16     A.   Which -- can you restate those
17  two questions?
18     Q.   Yeah, I'll be happy to break it
19  down.
20     A.   Yeah.
21     Q.   My question is, let's ask you
22  first, do you understand the difference
23  between a witness having firsthand, direct
24  knowledge as opposed to having been told
25  something by someone else?

52 (Pages 202 - 205)

**EXHIBIT 1**

B. WITZ
1
2      A.   Yes.
3      Q.   Okay.  You understand that
4   distinction?
5      A.   Yes.
6      Q.   Did Source A purport to tell
7   you that he or she or they had firsthand
8   personal knowledge that Kai Spears was
9   Brandon Miller's passenger?
10         COUNSELOR BOWMAN:  Same
11      privilege objection.  Same
12      instruction.  Answer if you can do so
13      without providing source identifying
14      information.
15      A.   Yeah, I don't think I can.
16         COUNSELOR NEW:  We'll move to
17      compel it.
18         THE WITNESS:  I mean, if I
19      could just say, what I'm trying to do
20      is answer your questions as fully as
21      I can, but also promise two sources
22      confidentiality.  So I can't -- I
23      can't -- it's something that I want
24      to honor and do my best to answer
25      your questions and also honor that

B. WITZ
1
2      agreement that I made with them.
3         COUNSELOR NEW:  That's fine.
4      Q.   When you were in Tuscaloosa,
5   did you see transcripts of videotaped
6   statements of witnesses given to the
7   police?
8      A.   I did not -- I'm sorry.  Say
9   what -- say that again.
10      Q.   Yes.  When you were in
11   Tuscaloosa, were you provided with
12   transcripts of videotaped statements that
13   witnesses had given to the police?
14      A.   I did not receive transcripts
15   of videotaped witness interviews that were
16   given to the police on the record.  I did
17   not see those on the record.
18      Q.   Were you shown those or given
19   those off the record?
20         COUNSELOR BOWMAN:  Same
21      objection.  Same instruction.
22         COUNSELOR NEW:  We'll move to
23      compel it.
24      Q.   Was it Source A or Source B
25   that gave you those materials?

B. WITZ
1
2      A.   I did not get those materials
3   from Source A or Source B on the record.
4         COUNSELOR NEW:  I think you got
5      a problem, but all right.
6      Q.   Ever been to Beckley, West
7   Virginia?
8      A.   (No response.)
9      Q.   You might get a chance to.
10   Alright --
11         COUNSELOR BOWMAN:  What does
12      that mean, Counsel?
13         COUNSELOR NEW:  Yeah, I'm going
14      to ask the judge to have him come to
15      Beckley, West Virginia to my office
16      to testify next time.  I won't come
17      to New York to depose him.  I'm going
18      to ask that you produce him at my
19      office because he just said on the
20      record that neither Source A nor
21      Source B provided him with the stuff
22      on -- on the record and you're now
23      trying to expand the scope of this
24      journalistic privilege.  So the more
25      you dig in, the -- the more that

B. WITZ
1
2   we're going to move to compel this.
3   You can come to my office.
4         COUNSELOR BOWMAN:  Let's take a
5      break.
6         THE VIDEOGRAPHER:  The time on
7      the video monitor is 4:11 p.m.  We
8      are off the record.
9         (Whereupon, a brief recess was
10      taken.)
11         THE VIDEOGRAPHER:  We are back
12      on the record.  The time on the video
13      monitor is 4:21 p.m.
14         COUNSELOR NEW:  Can you read
15      the last question, please.
16         (Whereupon, the referred-to
17      question was read back by the
18      reporter.)
19         COUNSELOR NEW:  And what was
20      his answer?
21         (Whereupon, the referred-to
22      answer was read back by the
23      reporter.)
24      Q.   The follow-up to that question
25   is, were you provided those off the record

53 (Pages 206 - 209)

**EXHIBIT 1**

Page 210

B. WITZ

1
2     from Source A or Source B?
3          COUNSELOR BOWMAN:  Objection on
4     the basis of the Reporter's
5     Privilege, to the extent and answer
6     would provide source identifying
7     information.  If so, instruct the
8     witness not to answer.  If the
9     witness can provide an answer without
10    identifying the source, I would ask
11    the witness to do so.
12    A.    First off, I'm -- because of
13    the break, what were the documents we're
14    talking about or materials?
15    Q.    The documents that you said
16    that you relied upon in identifying Kai
17    Spears as a passenger in Brandon Miller's
18    car at the time of the shooting and the
19    surveillance video?
20         COUNSELOR BOWMAN:  Objection.
21    Misstates.  Witness can answer.
22         COUNSELOR NEW:  Nope.  That's
23    what he said.
24    Q.    Go ahead.
25    A.    I did not receive any documents

Page 211

B. WITZ

1
2     or surveillance video related to the case
3     on the record.
4     Q.    Whether it was on the record or
5     off the record, was it from someone other
6     than Source A or Source B?
7          COUNSELOR BOWMAN:  Same
8     objection.  Same instruction.
9     A.    I don't -- I don't think I can
10    answer that without...
11         COUNSELOR NEW:  Alright, we'll
12    move to compel it.
13    Q.    Your drafts of your article
14    tell us that you have watched a video of
15    the shooting and have read transcripts of
16    the videotaped statements that witnesses
17    gave to the police, do you believe that
18    that's accurate or inaccurate?
19    A.    Can I see in my notes where --
20    Q.    You have your working file
21    there in front of you.  We'll take a look
22    at some of them.  Let's go through the rest
23    of the exhibits then.  See if that helps
24    you.  (Handing).  Sorry, the numbers are a
25    little out of order there.  224 comes

Page 212

B. WITZ

1
2     before 223, but... Alright, you ready?
3     A.    Yes.
4     Q.    That portion under the first
5     paragraph, "Video of the shooting showed
6     Brandon Miller a star player from the
7     Crimson Tide in a car amid crossfire along
8     with a passenger who was identified in
9     witness transcripts as," blank, correct?
10    A.    That's what it reads, yes.
11         COUNSELOR BOWMAN:  Objection to
12    the extent this is a partial
13    document.
14         COUNSELOR NEW:  It's not a
15    partial document.  It's two pages you
16    all provided us.
17    Q.    And on the second page, which
18    is actually 223, "Changes by Oskar Garcia,
19    Wednesday, March 25th" -- sorry, "March
20    15th, 2023 1:06 p.m. Eastern Daylight
21    Time."  Who is revising this article at
22    that time?
23    A.    I can't say for sure, but Oskar
24    Garcia and I would have been in the file
25    together.  I'm not sure if anybody else

Page 213

B. WITZ

1
2     was.  And if I could just say, these --
3     this is -- at this point, you know, this is
4     a draft of a story, so it's -- it's common
5     for, you know, there to be stuff added,
6     stuff taken out, moved around, reworked.
7     Q.    I understand that.  I know what
8     a draft is.
9     A.    Good.
10    Q.    So let's talk about some
11    things.  What program are you and Oskar
12    drafting what would go on to become the
13    article in?
14    A.    It's either -- it's either
15    Scoop or Oak I think.
16    Q.    And is that something
17    particular to New York Times?
18    A.    I'm not -- I'm not sure if it
19    -- if other newspapers have had this system
20    or not.  It wouldn't surprise me if it did.
21    I don't -- I don't know.
22    Q.    So the name of the program used
23    to draft and edit this article is called,
24    it's either Scoop or Oak?
25    A.    Correct.

54 (Pages 210 - 213)

## EXHIBIT 1

B. WITZ

1
2    Q.   Now, the typewritten notes that
3 are in Exhibit 11, your working file?
4    A.   This (indicating).
5    Q.   No.  That's Exhibit 18.  That's
6 the draft.  I'm talking -- yes, that.
7    A.   Okay.
8    Q.   What kind of program is used to
9 type notes that are in your working file?
10    A.   This would have been Word.
11    Q.   Okay.
12        COUNSELOR NEW:  Counsel, we're
13    going to reiterate our requests --
14    Q.   I assume it's a doc?
15    A.   I'm not sure what that exactly
16 means.  I mean, I click on Word and start a
17 new document and name it and...
18        COUNSELOR NEW:  We're going to
19    reiterate our request that those be
20    provided in native format.  We've had
21    that discussion since the inception
22    of the case and I want the Word
23    document with the metadata of the
24    notes in his working file that he
25    just testified, under oath, are in

B. WITZ

1
2 Word format.  We've been given it in
3 PDF.  We're entitled to it in native
4 format with the metadata.
5        COUNSELOR BOWMAN:  Happy to
6    have that discussion.
7        COUNSELOR NEW:  I've already
8    had that discussion, and I'm
9    reiterating that request and if that
10    needs to be part of the motion to
11    compel, we'll make it.
12    Q.   Alright, why was the
13 passenger's name blank at the point of that
14 draft of the article?
15    A.   This one (indicating)?
16    Q.   Yes.
17    A.   I don't know.
18    Q.   At that time at 1:35 on March
19 the 15th, you're -- you either had gone
20 back to Alabama or Birmingham or you're in
21 route, correct?
22    A.   Yeah.  I believe Central time.
23 Yeah, then I think Central time I would
24 have been -- yeah, around that time, I -- I
25 would have likely had been in route or --

B. WITZ

1
2 or already back.
3        COUNSELOR NEW:  19, yes.
4    Q.   Do you recognize this document?
5        COUNSELOR BOWMAN:  Same
6    objection.  Partial document without
7    time stamps.  Witness can answer.
8    A.   It -- it looks like either
9 before or after -- well, hold on a second.
10 I'll -- I'll read this a little bit more.
11    Q.   Alright.  When was this draft
12 in this format where Kai Spears is named?
13    A.   I don't know where this came
14 from.
15    Q.   Your lawyers produced it.
16    A.   Right, but --
17        COUNSELOR BOWMAN:  Same
18    objection.  Witness can answer.
19    A.   I'm sorry.  When you asked
20 what, are you talking about whether it's in
21 Scoop slash Oak or --
22    Q.   No.  I want to know what the
23 timeframe this draft of the article exists?
24 About 2:30 in the afternoon Central?
25        COUNSELOR BOWMAN:  Objection.

B. WITZ

1
2 The complete document would answer
3 that question.
4        COUNSELOR NEW:  I'm asking the
5    -- just put a good nonspeaking
6    objection on the record.  I don't
7    need any speaking objections here.
8    You know they're improper.
9    Q.   Do you know when this draft
10 came about?
11    A.   Well, it was some time after I
12 spoke with -- with Kai in the locker room.
13    Q.   Okay.  If I tell you it was
14 about 2:32 Alabama time, do you have any
15 reason to dispute that?
16    A.   I don't know.  It would be,
17 yeah, whatever the -- would be whenever the
18 open locker room was, which I believe is a
19 half an hour.
20    Q.   So let's go through this draft.
21 Are you and Oskar Garcia both working on
22 this at that point?
23    A.   We would have both been in the
24 file.  I don't know -- I can't say who was
25 writing exactly what.

55 (Pages 214 - 217)

**EXHIBIT 1**

Page 218

B. WITZ
1
2    Q.   Alright.  Going with the
3   paragraph beginning "Kai Spears a freshman
4   walk-on," did you put that in or did Oskar?
5    A.   I don't -- I don't --
6        COUNSELOR BOWMAN:  Objection.
7    Witness can answer.
8    A.   I don't recall.
9    Q.   Next paragraph, did you put
10   that in or did Oskar?
11        COUNSELOR BOWMAN:  Objection.
12    Witness can answer.
13    A.   I don't recall.
14    Q.   The next paragraph beginning
15   with "The presence of Spears," did you put
16   that in or did Oskar?
17        COUNSELOR BOWMAN:  Objection.
18    Witness can answer.
19    A.   I don't recall.
20    Q.   Let's just go ahead and short
21   circuit this.  If I ask you that question,
22   whether you put a paragraph in this or
23   whether Oskar inserted, drafted and
24   inserted a paragraph into this, do you know
25   which parts of this draft article you

Page 219

B. WITZ
1
2   drafted as opposed to which portions Oskar
3   drafted?
4    A.   Yeah.  I think -- I think the
5   graphs describing what happened, Jaden
6   Bradley, a freshman guard, because that
7   would have been things that I saw and he
8   wouldn't have been able to describe them
9   like I would have.  And so, I -- I think
10   that, the paragraph, "Davis approached the
11   jeep," the quote from Spears.
12    Q.   What about "Miller also
13   declined to comment"?
14    A.   Yes.  Sorry.  I meant each of
15   those three graphs, I likely would have
16   been the one writing.
17    Q.   Alright.  Well, let's go on
18   then.  "In the aftermath of the shooting,
19   the school sought to distance itself from
20   the crime," did you draft and insert that
21   or did Oskar?
22    A.   I don't recall.
23    Q.   "The focus changed, though, on
24   February 21," did you insert that or did
25   Oskar?

Page 220

B. WITZ
1
2    A.   I'm -- I guess part -- I'm
3   likely to have written the last sentence of
4   that.  I don't know about the first two --
5   the sentence that says "A person familiar
6   with the case identified that person as
7   Spears."
8    Q.   And you don't say in this draft
9   that sentence that the person is personally
10   knowledgeable about Spears being the
11   passenger in Miller's car, correct?
12    A.   Sorry.  Can you -- I was
13   reading.  Can you repeat that, please.
14    Q.   Yeah.  Your sentence says "A
15   person familiar with the case identified
16   that person as Spears."  You -- you don't
17   state in this draft of the article that
18   that person who identified the person as
19   Spears, the unidentified passenger in
20   Miller's car, that that anonymous source
21   has personal knowledge?
22    A.   That's right.  In this draft of
23   the story, that's not in there.
24    Q.   And you're not telling your
25   reader that the source has firsthand

Page 221

B. WITZ
1
2   knowledge, as opposed to having been told
3   that by someone else that Spears was the
4   previously unidentified passenger in
5   Miller's car, correct?
6    A.   This is -- this is a draft.
7   This is far from a finished story.
8    Q.   We'll get there in a moment,
9   but, yes, I understand.
10        What did you do to ascertain
11   the voracity of the statement that Kai
12   Spears was a -- was the passenger in
13   Brandon Miller's car at the time of the
14   shooting by whomever said it about Kai
15   Spears; did you do anything?
16    A.   Sorry.  Can you --
17    Q.   Yes.  What, if anything, did
18   you do to determine the voracity of the
19   person saying Kai Spears was the passenger
20   in Miller's car at the time of the
21   shooting?
22    A.   The person that told me that
23   Kai Spears was the person in Brandon
24   Miller's car at the time of the shooting
25   was in a position to know details about the

56 (Pages 218 - 221)

**EXHIBIT 1**

Page 222

B. WITZ

1    case.
2
3        Q.    Not my question.  How did you
4    determine whether that person was credible,
5    believable or not?
6        A.    Because that person was in
7    position to know key details about the
8    case.
9        Q.    You didn't do anything to find
10   out whether the person that said Kai Spears
11   was the passenger in Miller's car at the
12   time of the shooting was a believable,
13   credible source, did you?
14           COUNSELOR BOWMAN:  Objection.
15       Witness can answer.
16       A.    I'm sorry.  Can you?
17       Q.    Yes.  You didn't do anything to
18   determine that the person putting Kai
19   Spears in the passenger seat of Brandon
20   Miller's car at the time of the shooting
21   was a believable source of information?
22           COUNSELOR BOWMAN:  Objection.
23       Witness can answer.
24       A.    Yeah, like I said, I -- it was
25   my professional assessment as a reporter at

Page 223

B. WITZ

1
2    The New York Times that -- this was a
3    person in position to know key details
4    about the case.
5        Q.    And that's it, nothing else?
6    Their position or whatever allowed them to
7    know key details about the case, you didn't
8    do anything, other than assuming the person
9    knew what it was that they were talking
10   about, you didn't do another single thing
11   to determine whether the source of the
12   information was credible, truthful,
13   believable, right?
14           COUNSELOR BOWMAN:  Objection.
15       Witness can answer.
16       A.    There's a lot of, you know,
17   there's a number of things that go into
18   that assessment.  It's information that
19   that person tells you.  It's what their,
20   you know, their, you know, loosely their
21   position in what -- that might allow them
22   to have access to certain information and
23   that goes into a reporter's assessment of
24   whether somebody is credible.
25       Q.    Alright.  So we know, even

Page 224

B. WITZ

1
2    though you're not going to tell me the time
3    that the source told you, we know that by
4    11:31 a.m. you've been told by the source
5    because you e-mail Alain Delaqueriere,
6    correct?
7        A.    Correct.
8        Q.    Alright.  And I'll represent to
9    you that that draft that I just handed you
10   was drafted at about 2:32 Alabama time,
11   that's about three hours.  What, if
12   anything, had you done in those three hours
13   to confirm that the information that you --
14   you had been relayed about Kai Spears being
15   the passenger, what -- what did you do in
16   that three hours, if anything, to confirm
17   that information?
18       A.    I don't recall.
19           THE WITNESS:  Bless you.
20       A.    I know a good portion of that
21   was driving back to -- to Birmingham from
22   Tuscaloosa and some of it was spending time
23   talking to Kai and -- and I believe asking
24   Brandon Miller.
25       Q.    Anything else?

Page 225

B. WITZ

1
2        A.    And I think asking Alain for
3    more information on people in Kai's family
4    that I might be able to contact.
5        Q.    Anything else?
6        A.    Not that I recall.
7        Q.    By the time of the 2:32 p.m.
8    draft, you had spoken with Kai Spears,
9    correct?
10       A.    It -- yes, it appears to be so
11   since he's quoted in here.
12       Q.    And you had spoken or attempted
13   to speak with Brandon Miller, correct?
14       A.    Correct.
15       Q.    Did you speak to Jaden Bradley
16   or any of his family members?
17       A.    Not on the record, that I
18   recall.
19       Q.    You had spoken to them off the
20   record?
21           COUNSELOR BOWMAN:  Objection on
22       the basis of the Reporter's
23       Privilege, I instruct the witness not
24       to answer.
25           COUNSELOR NEW:  Alright.  We'll

**EXHIBIT 1**

Page 226

B. WITZ

1
2    move to compel it.
3        Q.    Had you talked to Darius Miles
4    or any of his family members as of the 2:32
5    draft on March the 15th?
6        A.    I did not speak with Darius
7    Miles or any of his family members on the
8    record at 2:30 -- by 2:30 on March 15th.
9        Q.    Had you talked to Michael Davis
10   or any of his family members as of the 2:32
11   draft on March 15th?
12       A.    I did not speak with Michael
13   Davis or any of his family members on the
14   record before March 15th at 2:30.
15       Q.    So let's talk about your
16   interview of Kai Spears. Do I take it, do
17   I understand your testimony to be that
18   around noon on March the 15th, you head to
19   Birmingham because there's going to be some
20   press events in Birmingham?
21       A.    Yes, around that time.
22       Q.    And you know that you're going
23   to get a chance to see, possibly speak to
24   Kai Spears, correct?
25       A.    Yes.

Page 227

B. WITZ

1
2        Q.    Are there any standards about
3    how journalists are suppose to question
4    witnesses?
5            COUNSELOR BOWMAN: Objection.
6        Vague. Witness can answer.
7        A.    No. I mean, reporter's
8    interview subjects, not necessarily -- I
9    mean, a witness can be a -- would be a
10   subject. I wouldn't make a -- necessarily
11   make a distinction between a witness and a
12   subject.
13       Q.    So Kai was going to be the
14   subject of your March 15th article,
15   correct?
16       A.    He was a person -- he was a
17   subject.
18       Q.    Not the subject, correct?
19       A.    Yes.
20       Q.    Can you hear that, Mr. Witz?
21       A.    Yes.
22           (Whereupon, a video is played.)
23       "Kai, hey. I'm Billy Witz with
24   The New York Times. Nice to meet
25   you."

Page 228

B. WITZ

1
2        Q.    Is that your voice?
3        A.    Yes.
4            (Whereupon, a video is played.)
5        "I know this is a touchy
6    subject, but I understand you were in
7    the car with Brandon on the night of
8    the shooting."
9        Q.    You say, "Hey, I know this is a
10   touchy subject, but I understand you were
11   in the car with Brandon on the night of the
12   shooting," that's what you just said,
13   correct?
14       A.    Yes.
15       Q.    You did not tell Kai Spears you
16   were in the car with Brandon Miller at the
17   time of the shooting, you say on the night
18   of the shooting, correct?
19       A.    Yes.
20           (Whereupon, a video is played.)
21       "And if -- I could only imagine
22   -- I saw the video of it, I mean, I
23   could only imagine, like, how
24   terrifying that must have been. Can
25   you just describe kind of, like,

Page 229

B. WITZ

1
2    what" (inaudible) --
3        Q.    Kai says, I'm sorry, I'm not
4    going to be able to speak on that matter
5    right now, correct?
6        A.    Close to that, yeah.
7        Q.    Well, I can rewind it. Would
8    you like me to rewind it?
9        A.    If would you like.
10           (Whereupon, a video is played.)
11       "Kai? Hey, I'm Billy Witz with
12   The New York Times."
13       "Nice to meet you."
14       "Hey, I know this is a touchy
15   subject, but I understand you were in
16   the car with Brandon on the night of
17   the shooting and I could only
18   imagine, I saw the video of it, I
19   mean, I could only imagine, like, how
20   terrifying that must have been -- I
21   mean. Can you just describe, like,
22   kind of what" --
23       "I'm sorry. I'm not going to
24   be able to speak on that matter."
25       "Okay. Okay. Okay. Like,

58 (Pages 226 - 229)

## EXHIBIT 1

Page 230

B. WITZ

1       anything?  Or -- okay, alright.
2       Okay.  Sorry.  Thanks.  Okay."
3       Q.   That's the audio provided to us
4   by The New York Times.  Anything
5   inaccurate, incomplete about that audio?
6       A.   No.
7       Q.   And just so that we're clear,
8   nowhere in your speaking to Kai Spears do
9   you ask him whether he was the passenger in
10  Brandon Miller's car, correct?
11           COUNSELOR BOWMAN:  Objection.
12       Witness can answer.
13      A.   Yes.  That's true.  I took -- I
14  believe -- I believed that he was and so I
15  was most interested in asking him about his
16  reaction or his, you know, as I alluded to,
17  I saw the video, and it was terrifying, I
18  think as a parent to watch that and knowing
19  that, you know, alright, not even as a
20  parent, just as a human being, as we talked
21  about before, how much, you know, how much
22  worse that could have been and I just
23  wanted to, you know, that's really what I
24  wanted to ask him about.  Gosh, that must

Page 231

B. WITZ

1   have been incredibly terrifying.  You know,
2   would you mind telling me about what that
3   was like.
4       Q.   You're about to tell the world
5   that that young man was in a car that
6   delivered a murder weapon and you don't
7   think you owed it to him to tell him that?
8           COUNSELOR BOWMAN:  Objection.
9       Argumentative.  Witness can answer.
10      Q.   You think you owed it to Kai
11  Spears at that time to say someone has told
12  me that you were in Brandon Miller's car at
13  the time of the shooting, we're going to go
14  to press with this because I'm on a
15  deadline to get something in paper out by
16  the morning of March the 16th.  This is
17  your chance, young Mr. Spears, to tell me
18  anything you want to tell me about that.
19  You didn't ask an artful question like
20  that, did you, Mr. Witz?
21          COUNSELOR BOWMAN:  Objection.
22      Witness can answer.
23      A.   That was the first question
24  that I -- that I asked and it, you know,

Page 232

B. WITZ

1   became clear that he didn't want to talk at
2   all about this, so rather than, you know,
3   belabored it, I think I just said thank you
4   and went to talk to somebody else.
5       Q.   And my question for you is you
6   never tell the interviewee here, Kai
7   Spears, that what you're about to go to
8   press with is him being present in the car
9   that delivered the murder weapon on the
10  night of the shooting, you never tell him
11  that, do you?
12          COUNSELOR BOWMAN:  Objection.
13      Witness can answer.
14      A.   What I -- the first question I
15  wanted to ask him about was about how --
16  how terrifying, like, as I mentioned
17  before, that was the overlying or
18  underlying theme, if you will, about the
19  story, was how much worse this could have
20  been and so, that was the first question
21  that I wanted to ask him.
22      Q.   Right.  And you're skipping
23  over about five or six other questions to
24  get there, aren't you?  You're assuming Kai

Page 233

B. WITZ

1   is the passenger in Brandon Miller's car at
2   the time of the shooting, aren't you,
3   Mr. Wits?
4           COUNSELOR BOWMAN:  Objection.
5       Witness can answer.
6       Q.   You're assuming about how
7   terrifying it was.  You're assuming that
8   Kai Spears was the passenger in Miller's
9   car at the time of the shooting, aren't
10  you?
11          COUNSELOR BOWMAN:  Objection.
12      Witness can answer.
13      A.   I'm not -- I'm making an
14  assessment that the information that I had
15  was accurate and the first question I
16  wanted to ask him was just as I -- as I
17  said was, you know, on the -- on the tape
18  was that must have been, you know, unholy
19  terrifying to be probably under the
20  dashboard as bullets are flying.
21      Q.   You assumed he was in the car
22  at the time of the shooting and you didn't
23  ask him whether he even was --
24          COUNSELOR BOWMAN:  Objection.

59 (Pages 230 - 233)

**EXHIBIT 1**

Page 234

B. WITZ

1
2    Q.    -- right?
3         COUNSELOR BOWMAN:  Objection.
4    Witness can answer.
5    A.    That was not -- that was not
6    the first question that I chose to ask.
7    Q.    You didn't ask him anywhere in
8    that audio, were you in Brandon Miller's
9    car at the time of the shooting,
10   Mr. Spears?  You don't give the young man
11   an opportunity to meet that question, do
12   you?
13        COUNSELOR BOWMAN:  Objection.
14   Witness can answer.
15   A.    Because of how -- again, how
16   terrifying and possibly traumatic that this
17   may have -- that this may have been, I
18   didn't want to badger him and so he said --
19   he said very -- I feel like we had a nice,
20   respectful conversation, clearly that comes
21   across, and, you know, he's -- he said
22   something to the effect that I'm not going
23   to be able to speak about that and so, you
24   know, I didn't want to, you know -- he's --
25   I just didn't want to, you know, I guess

Page 235

B. WITZ

1
2    badger him on what could have been a, you
3    know, very traumatic experience.
4    Q.    One that he wasn't even apart
5    of, right?
6    A.    Well, I know that now.
7         COUNSELOR BOWMAN:  Objection.
8    Q.    You know that now.  And maybe
9    if you would have asked an artful question,
10   like, I'm giving you a chance to tell me
11   whether you were the passenger in Brandon
12   Miller's car instead of bumbling,
13   stumbling, fumbling through as we heard,
14   you might have gotten a good answer; is
15   that fair?
16        COUNSELOR BOWMAN:  Objection.
17   Argumentative.  Counselor, lower the
18   volume.
19   Q.    Is that fair?
20   A.    It's hard to say what would
21   have happened.
22   Q.    You would have gone to press
23   that Kai Spears was the passenger in
24   Brandon Miller's car regardless of anything
25   that Kai Spears told you on the afternoon

Page 236

B. WITZ

1
2    of March 15th, wouldn't you, Mr. Witz?
3         COUNSELOR BOWMAN:  Objection.
4    Witness can answer.
5    A.    No.
6    Q.    If he told you that -- that
7    wasn't me, wasn't me, what would you have
8    done?
9         COUNSELOR BOWMAN:  Objection.
10   Witness can answer.
11   A.    I don't think we would have run
12   the story.
13   Q.    So if you had asked him, were
14   you the passenger in Miller's car and Kai
15   Spears said, wasn't me, you wouldn't have
16   run the story?
17        COUNSELOR BOWMAN:  Objection.
18   Witness can answer.
19   A.    I don't know.  It's hard to say
20   what would have happened.
21   Q.    Do you believe that's artful
22   questioning by a New York Times journalist
23   that we just listened to, Mr. Witz?
24        COUNSELOR BOWMAN:  Objection.
25   Argumentative.  Witness can answer.

Page 237

B. WITZ

1
2    A.    What do you mean by "artful".
3    Q.    Okay.  I'll play it again.
4         (Whereupon, a video was
5    played.)
6         "Kai?  Hey, I'm Billy Witz with
7    The New York Times."
8         "Nice to meet you."
9         "Hey, I know this is a touchy
10   subject, but I understand you were in
11   the car with Brandon on the night of
12   the shooting and I could only
13   imagine, I saw the video of it, I
14   mean, I could only imagine, like, how
15   terrifying that must have been -- I
16   mean.  Can you just describe, like,
17   kind of what" --
18        "I'm sorry.  I'm not going to
19   be able to speak on that matter."
20        "Okay.  Okay.  Okay.  Like,
21   anything?  Or -- okay, alright.
22   Okay.  Sorry.  Thanks.  Okay."
23   Q.    Artful questioning there, Mr.
24   Witz?
25        COUNSELOR BOWMAN:  Objection.

EXHIBIT 1

Page 238

B. WITZ

1         B. WITZ
2    Witness can answer.
3    Q.   Were you saying things like,
4  like, kind of, what, how's -- how's
5  somebody you're interviewing supposed to
6  possibly know what you're trying to get at
7  when you're saying like, like kind of,
8  what?
9        COUNSELOR BOWMAN:  Objection.
10    Witness can answer.
11    A.  I don't know.  I think the
12  substance of what I was asking was pretty
13  straightforward.
14    Q.  Alright.
15        COUNSELOR NEW:  20.
16    Q.  Kai was polite and respectful
17  to you, correct?
18    A.  Yes.
19    Q.  And I'm going to play this one
20  more time really because I like it so much,
21  but I'm going to play this one more time
22  for you.  I would like for you to identify
23  in the recording a question.
24    (Whereupon, a video was
25    played.)

Page 239

B. WITZ

1         B. WITZ
2    "Okay.  Okay.  Okay.  Like
3  anything?  Or okay, alright.  Okay.
4  Sorry.  Thanks.  Okay."
5    "Kai?  Hey, I'm Billy Witz with
6  The New York Times."
7    "Nice to meet you."
8    "Hey, I know this is a touchy
9  subject, but I understand you were in
10  the car with Brandon on the night of
11  the shooting and I could only
12  imagine, I saw the video of it, I
13  mean, I could only imagine, like, how
14  terrifying that must have been -- I
15  mean.  Can you just describe, like,
16  kind of what" --
17    "I'm sorry.  I'm not going to
18  be able to speak on that matter."
19    "Okay.  Okay.  Okay.  Like,
20  anything?  Or -- okay, alright.
21  Okay.  Sorry.  Thanks.  Okay."
22    Q.  Can you identify any question
23  in that that you actually ask Kai Spears on
24  the afternoon of March 15th, Mr. Witz?
25    A.  Yeah.  Can you describe what it

Page 240

B. WITZ

1  was like, I don't think I got the last word
2  out, but...
3    Q.  Okay.  And your 2:32 draft, you
4  quote Kai Spears as saying "I'm sorry, I'm
5  not going to be able to speak about that,"
6  but you don't list the question that you
7  asked of him, can you just describe the
8  like, the what, the um, that we heard in
9  your draft, do you?
10        COUNSELOR BOWMAN:  Objection.
11    Witness can answer.
12    A.  Which -- is this the one
13  (indicating)?
14    Q.  Yes.
15        COUNSELOR BOWMAN:  Referring to
16    Exhibit 19, Counsel?
17        COUNSELOR NEW:  Yup.
18    A.  The preceding paragraph
19  describes what -- what I saw on the
20  surveillance video.
21    Q.  Not my question.  My question
22  is you don't tell the New York Times
23  readers that your question was, can you
24  just describe kind of like, what it was

Page 241

B. WITZ

1  like -- you don't give the reader the
2  context of -- if you say that's a question,
3  I'll -- I'll buy it, but you don't tell the
4  reader that that, that we just heard was
5  the question that you asked of Kai Spears,
6  do you?
7        COUNSELOR BOWMAN:  Objection.
8    Form.  Witness can answer.
9    A.  No, every story we write isn't
10  a straight Q and A through it.  We don't
11  always preface a quote with the question.
12  It's...
13    Q.  And that was at the open
14  practice that day, correct?
15    A.  It was in the -- when the
16  locker rooms were open that day before or
17  after the team's practice.  Depending on
18  the -- the schedules of how that would work
19  out.
20    Q.  Look at the schedule I just
21  gave you, Exhibit 20, and see if that
22  refreshes your recollection in about when
23  your brief encounter with Mr. Spears was?
24    A.  So, yeah, so the press

61 (Pages 238 - 241)

## EXHIBIT 1

Page 242

B. WITZ

1  B. WITZ
2  conferences and then -- yes, okay, the
3  press conference, yeah, I see on here when
4  the press conferences were for the players
5  and for the coaches and I'm not seeing in
6  here.  I don't know -- is this -- is there
7  another page to this?  Typically, during
8  that period when players and coaches are up
9  at the podium, that's the open locker room
10  period.
11    Q.    Alright.
12    A.    So if that is the case, then it
13  would have been from -- Alabama's would
14  have been open from 12:35 to 1:05.
15    Q.    Alright next Exhibit, 21.  Do
16  you have that?
17    A.    Yes.
18    Q.    Ends in Bates 49, do you see
19  that?
20    A.    Yes.
21    Q.    "We are writing to request
22  comment about the presence of men's
23  basketball player Kai Spears at the
24  January 15th shooting."  This e-mail from
25  Oskar Garcia presumes incorrectly the

Page 243

1  B. WITZ
2  accuracy of that assertion, doesn't it?
3    A.    I'm sorry.  I -- I was reading.
4    Q.    That first sentence in that
5  e-mail presumes inaccurately the accuracy
6  of the information of the presence of Kai
7  Spears at the January 15th shooting,
8  correct?
9    A.    Yes, I know that now.
10    Q.    "We have a few questions about
11  the circumstances," and then there's what,
12  four dashes or bullets beside that,
13  correct?
14    A.    Yes.
15    Q.    That fourth bullet is pretty
16  telling, isn't it, "Since the shooting, the
17  team has downplayed the involvement of
18  players in what happened and did not
19  acknowledge the presence of Brandon Miller
20  until an investigator testified in court
21  about it.  Why has the University been less
22  than transparent about the involvement of
23  players in the situation?"  This is from
24  Garcia, not from you, correct?
25      COUNSELOR BOWMAN:  Objection.

Page 244

1  B. WITZ
2      Compound.  Witness can answer.
3    A.    Yes.  It's a draft of an
4  e-mail.
5    Q.    But do you share Garcia's
6  belief, as we see through that fourth
7  bullet, that The University of Alabama had
8  been less than transparent about the
9  involvement of players which now, at the
10  time of this e-mail, included Kai Spears?
11    A.    Yeah.  I mean, I think, you
12  know, in -- I mean, I don't know how, you
13  know, that there's, you know, it was a
14  month afterward, close to -- like, close to
15  a month after the shooting, it came out
16  that Brandon Miller and Jaden Bradley were
17  at the scene of the shooting and so I don't
18  -- I don't know how, you know, in the
19  aftermath of this that anyone can say that
20  Alabama has been was fully transparent
21  about any involvement of its -- of its
22  players.
23    Q.    You like full transparency,
24  right?
25    A.    Yes.

Page 245

1  B. WITZ
2    Q.    So you and Oskar Garcia and the
3  New York Times would have The University of
4  Alabama comment on a pending murder
5  investigation to satisfy your journalistic
6  desires to violate FERPA to be fully
7  transparent, right, do I understand that,
8  Mr. Witz?
9      COUNSELOR BOWMAN:  Objection.
10  Compound.  Objection.  Seeks legal
11  conclusion.
12      COUNSELOR NEW:  Yeah.
13    A.    Those are not necessarily
14  mutually exclusive.  You can be transparent
15  without or -- in some cases, I suppose.
16    Q.    You're going to hide behind
17  journalist -- you understand the irony and
18  how funny it is that you and The New York
19  Times are going to hide behind journalistic
20  privilege in this case, that you believe
21  The University of Alabama should have been
22  transparent about student athletes in a
23  pending murder investigation, don't you
24  find that ironic, Mr. Witz?
25      COUNSELOR BOWMAN:  Objection.

Page 246

```
1              B. WITZ
2       Argumentative.  Witness can answer.
3       A.   I don't think -- no, I don't
4   think that's ironic.
5       Q.   Alright, I do.
6          Alright, take a look at this.
7          COUNSELOR BOWMAN:  This is 22?
8          COUNSELOR NEW:  Yup.
9       Q.   Once again, just like with Kai
10  Spears, you're assuming and sending this
11  e-mail to The University of Alabama, the
12  correctness of the information that you've
13  learned about Kai Spears, aren't you?
14      A.   We believed the information we
15  -- we had about Kai being a passenger in
16  Brandon Miller's car was -- was accurate.
17      Q.   Why not just send Aaron Jordan
18  that says -- let me redraft this e-mail for
19  you, Mr. Witz, and tell me if there's
20  anything wrong with it.  Why not just send
21  Aaron Jordan an e-mail on the afternoon of
22  March the 15th that says, an anonymous
23  source has told me that Kai Spears was the
24  passenger in Brandon Miller's car at the
25  time of the shooting, can the University
```

Page 247

```
1              B. WITZ
2   confirm or deny this for me?  Is there
3   anything unreasonable about what I just
4   said?
5       A.   I don't know if -- that's not
6   how we did this.
7       Q.   Well, that's obvious.
8       A.   Yeah.
9       Q.   That's not my question, though.
10  Is there anything unreasonable about the
11  way in which I just asked the question of
12  The University of Alabama's athletic
13  department, an anonymous source has
14  informed the New York Times that Kai Spears
15  was the previously unidentified passenger
16  in Brandon Miller's car and we would like
17  the University to comment, to confirm or
18  deny that.  We go to press at 8:15 East
19  tonight.  Anything unreasonable about what
20  I just said?
21      A.   No, there's a lot of ways you
22  can craft a -- a request for comment.
23      Q.   Sure.  Like artful, appropriate
24  in accordance with The New York Times
25  standard, right?
```

Page 248

```
1              B. WITZ
2          COUNSELOR BOWMAN:  Objection.
3       Argumentative.  Witness can answer.
4       Q.   Right?
5       A.   As I said, there's a lot of
6   ways you can --
7       Q.   Does this e-mail that you sent
8   to Aaron Jordan comply with The New York
9   Times standards?
10      A.   I'm not aware of any.
11  Standards for what?
12      Q.   Asking for comment?
13      A.   I'm not sure that such a thing
14  exists.
15      Q.   Alright.  That's a rather
16  accusatory e-mail you sent The University
17  of Alabama, is it not?
18          COUNSELOR BOWMAN:  Objection.
19       Witness can answer.
20      A.   Not in my opinion.
21      Q.   You don't tell The University
22  of Alabama that you're going to go to press
23  by a certain time, do you?
24      A.   No.
25      Q.   Again, I apologize for the
```

Page 249

```
1              B. WITZ
2   times, New York Times 69, the time on your
3   e-mail on the adjusted is 6:28 p.m.  You
4   had gotten in touch with Stephanie Taylor
5   at Tuscaloosa Police Department, correct?
6       A.   Yes.
7       Q.   And --
8       A.   At some point, yes.
9       Q.   How did she have your e-mail
10  address for 4:54 p.m. on March 15th?
11      A.   I'm not sure if I left a
12  voicemail or if I had gone by the station,
13  but somehow I had -- I had left a message
14  with her.
15      Q.   And you state in your response
16  e-mail that begins, "Thanks, Stephanie.  I
17  wanted to ask if Kai Spears, who was a
18  passenger in Brandon Miller's car, has been
19  interviewed by the police."  Once again,
20  stating it as fact, correct?
21      A.   Yes.  We believed that he was
22  in the car.
23      Q.   Wrongly so, right?
24      A.   Now we know that.
25      Q.   Little more digging you could
```

## EXHIBIT 1

Page 250

B. WITZ

1  have known it on March 15th, 16th or 17th;
2  is that a fair statement?
3       COUNSELOR BOWMAN:  Objection.
4    Witness can answer.
5    A.   It's possible.
6    Q.   It's likely, isn't it?
7       COUNSELOR BOWMAN:  Objection.
8    Witness could answer.
9    A.   I wouldn't say that.
10   Q.   I would.
11       (Handing).  Do you recognize
12  this e-mail?
13   A.   From Jack Kennedy to me.
14   Q.   Yup.  New York Times 71 on the
15  adjusted times.  You appear to e-mail Jack
16  Kennedy at 5:44 p.m. and you say "Stephanie
17  Taylor referred me to you in the VCU."  You
18  give Jack your cell number, correct?
19   A.   Yes.
20   Q.   And Jack responds an hour and
21  four minutes later at 6:48 p.m., "As this
22  case has been referred to the DA's Office
23  for prosecution and testimony has been
24  proffered in court, I can no longer comment

Page 251

B. WITZ

1  on any specifics of this case.  I would
2  refer you to the District Attorney's
3  Office," correct?
4    A.   That's what it says.
5    Q.   You reckon the District
6  Attorney's Office was open on the morning
7  of March the 16th?
8    A.   There's a -- yes, I would think
9  so.
10   Q.   You and The New York Times
11  didn't wait -- couldn't wait until March
12  the 16th to talk to anybody in the DA's
13  Office about whether Kai Spears was present
14  in Brandon Miller's car at the time of the
15  shooting; do I understand correctly?
16       COUNSELOR BOWMAN:  Objection.
17    The witness can answer.
18   A.   No.
19   Q.   No, you couldn't wait?
20   A.   No, you said we couldn't wait
21  and --
22       THE WITNESS:  Is this something
23    I can talk to you about?
24       COUNSELOR NEW:  Not

Page 252

B. WITZ

1  mid-question, not mid-answer.
2       COUNSELOR BOWMAN:  Is there a
3    privilege issue you want to discuss?
4       THE WITNESS:  Yes.  Yeah.
5       COUNSELOR BOWMAN:  We've been
6  going an hour any way.  Let's take a
7  break.
8       THE VIDEOGRAPHER:  The time on
9  the video monitor is 5:19 p.m.  We
10  are off the record and this ends
11  Media Unit 5.
12       (Whereupon, a brief recess was
13  taken.)
14       THE VIDEOGRAPHER:  We are back
15  on the record.  The time on the video
16  monitor is 5:47 p.m.  This is Media
17  Video 6.
18       COUNSELOR BOWMAN:  So we're
19  looking at 25A and 25B.
20       COUNSELOR NEW:  Yes.
21   Q.   Mr. Witz, can you take a look
22  at those two exhibits, please.
23   A.   Okay.
24   Q.   Now this is first either a text

Page 253

B. WITZ

1  or a WhatsApp message with someone, 740
2  number Grant Traylor?
3    A.   This one, right?
4    Q.   Yes.  Grant Traylor,
5  (304) 417-5222.
6       COUNSELOR BOWMAN:  Counsel, if
7    it's okay, just for the record, when
8    you said "this one," he's referring
9    to 25A?
10       COUNSELOR NEW:  Yup.
11       COUNSELOR BOWMAN:  Your's
12    aren't marked.  I'm just making sure
13    that it's clear for the record.
14   Q.   And you ask at 5:54, you have
15  his cell, and whoever is responding to you
16  tells you that that is Grant Traylor's
17  cell, correct?
18   A.   Why.
19   Q.   And then on the next, we see
20  what's looks like a screen capture from
21  your phone, "Grant, This is Billy Witz with
22  the New York Times.  Apologies for not
23  leaving messages.  I thought this was an
24  office line.  Can you call me?"  So I take

Veritext Legal Solutions

877-373-3660                                                        800.808.4958

EXHIBIT 1

Page 254

B. WITZ

1    B. WITZ
2    it, you had reached out to Marshall
3    University with an attempt to reach
4    Christian Spears?
5        A.   Yes.
6        Q.   And did you communicate to
7    either Christian Spears or anyone at
8    Marshall University that The New York Times
9    was going to publish an article placing Kai
10   in Brandon Miller's car at the time of the
11   shooting?
12       A.   I believe I left a message
13   mentioning that I needed to speak with
14   Christian about Kai and the shooting at
15   Alabama.
16       Q.   Did you specifically state in
17   your messages to either Christian or
18   Marshal that Kai -- that The New York Times
19   was going to run with a story that Kai was
20   a passenger in Brandon Miller's car and
21   that that was the reason why you needed to
22   speak with Christian?
23       A.   I don't recall the exact
24   wording of the messages, but I know I had
25   conveyed on at least one occasion that I

Page 255

1    B. WITZ
2    was trying to reach Christian about Kai and
3    the shooting at Alabama.
4        Q.   Alright, so before we get to
5    the article, you and Oskar Garcia published
6    this article at 8:10 p.m. East on March
7    the 15th, correct?
8        A.   That's -- yes, that's
9    approximately, yeah.
10       Q.   Having not gotten a response
11   from The University of Alabama to the
12   e-mail that you sent to Aaron Jordan a
13   couple of hours earlier, correct?
14       A.   Yes.
15       Q.   Having gotten no response from
16   Christian Spears --
17       A.   I did follow-up with -- with
18   Aaron Jordan.
19       Q.   Before the publishing of the
20   article?
21       A.   Yes.
22       Q.   And what did Aaron Jordan tell
23   you?
24       A.   There was no response.
25       Q.   So you pinged him, but there

Page 256

1    B. WITZ
2    was no response, right?
3        A.   I don't recall if it was an
4    e-mail or a phone call, but either way, I
5    just left a message that I was following
6    up.
7        Q.   And at 8:10 p.m. East, you had
8    not directly asked Kai whether he was the
9    passenger in Brandon Miller's car at the
10   time of the shooting, correct?
11           COUNSELOR BOWMAN:  Objection.
12       Witness can answer.
13       A.   Yes, I believe that from --
14   that the sources' information were correct.
15       Q.   And having been referred to the
16   DA's Office by the Tuscaloosa Police
17   Department, you had not spoken to the DA's
18   Office as of the time of the publishing of
19   the article the evening of March 15th,
20   correct?
21       A.   I had not spoken with the DA's
22   Office on the record at the time the story
23   was published.
24       Q.   You had spoken to the DA's
25   Office off the record?

Page 257

1    B. WITZ
2           COUNSELOR BOWMAN:  Same
3       Reporter's Privilege objection.  Same
4       instruction not to answer.
5           COUNSELOR NEW:  Alright, we're
6       going to move to compel it.
7        Q.   (Handing).  This is your
8    original article.  Just to be clear, Source
9    A and Source B, you didn't do anything to
10   check the credibility of either of those
11   anonymous sources?  You assumed by virtue
12   of their position or access to information
13   that those were reliable sources, correct?
14          COUNSELOR BOWMAN:  Objection.
15      Witness can answer.
16      A.   I assessed their credibility
17   based in part on their position and access
18   to certain information about the case.
19      Q.   And you went no further to
20   verify that information, correct?
21          COUNSELOR BOWMAN:  Objection.
22      Witness can answer.
23      A.   What do you mean by "went no
24   further"?
25      Q.   You assumed the accuracy of the

65 (Pages 254 - 257)

Page 258

B. WITZ

1  information and did nothing more to
2  corroborate it?
4      A.   No, I don't think that's
5  accurate.
6      Q.   What else did you do to
7  corroborate it?
8      A.   I reached out to Christian
9  Spears through several people at Marshall.
10 I reached out to The University of Alabama
11 and I believe there were others that I
12 reached out to to try to confirm details of
13 what we were going to report.
14     Q.   Having not heard back from
15 Alabama, having not heard back from
16 Christian Spears, having not asked Kai
17 Spears a coherent question and having not
18 been able to interview Coach Nate Oats,
19 wouldn't it have been prudent to have
20 waited till March 16th or 17th to publish
21 this article?
22         COUNSELOR BOWMAN:  Objection.
23     Witness can answer.
24     A.   We believed that the
25 information that we had at the time of

Page 259

B. WITZ

1
2  publication was accurate.
3      Q.   This was a self-imposed
4  deadline of being in the paper the morning
5  of March 16th, wasn't it?
6      A.   You know, I don't -- I don't
7  mean to be flip, but -- but I -- I mean,
8  aren't -- is there a deadline that isn't
9  self-imposed?
10     Q.   Well, our deadlines for lawyers
11 are court imposed.
12     A.   Right.
13     Q.   But I'm talking about for The
14 New York Times.  Maybe in The New York
15 Times you all set all of your deadlines.
16 You told me earlier that The New York Times
17 wanted a story about Alabama in the paper
18 the morning of March Madness, right?
19     A.   That's what Oskar had -- had
20 mentioned to me, that we wanted to have a
21 story in on the first, I guess it was --
22 would have been that first -- first day of
23 the tournament, I believe.
24     Q.   And you think it was acceptable
25 to not wait to hear back from Alabama,

Page 260

B. WITZ

1
2  Christian Spears, maybe ask Kai Spears a
3  coherent question, speak to someone in the
4  DA's Office or speak to Nate Oats?
5          COUNSELOR BOWMAN:  Objection.
6      Witness can answer.
7      A.   We believed we had information
8  that was -- that was accurate and we made
9  attempts to contact other people.
10     Q.   And you didn't tell any of
11 those, we're going to press at 8:10 tonight
12 if we don't hear back from you all?
13     A.   We did not tell anybody that we
14 would be going to press at 8:10.
15     Q.   And that's because you were
16 afraid that if you told somebody you were
17 going to press, you wouldn't get the answer
18 that you wanted, which was "Fourth Alabama
19 Player Was at a Deadly Shooting, in a Car
20 Hit by Bullets," right?
21         COUNSELOR BOWMAN:  Objection.
22     Witness can answer.
23     A.   No.
24     Q.   Alright.  That's the headline
25 of the March 15th article, right?

Page 261

B. WITZ

1
2      A.   It says "A Fourth Alabama
3  Player Was at a Deadly Shooting, in a Car
4  Hit by Bullets."
5      Q.   And the subheading, "The
6  presence of a fourth Crimson Tide player at
7  the deadly shooting in January has come to
8  light as the team begins its run as the top
9  overall seed in the NCAA men's tournament."
10 Alright, first sentence, "A fatal January
11 shooting that involved members of the
12 top-ranked Alabama team."  Tell us what you
13 mean by the word "involved" there,
14 Mr. Witz?
15     A.   Well, at the time of this
16 writing, Darius Miles was in jail indicted
17 on murder charges related to the shooting.
18     Q.   What involvement -- now that's
19 his involvement.  What involvement did
20 Jaden Bradley, Brandon Miller and Kai
21 Spears have?
22     A.   They -- they were in -- in the
23 case of Kai Spears, we believed they were
24 at the scene of the shooting.
25     Q.   There were all kinds of people

EXHIBIT 1

Page 262

B. WITZ

1  at the scene of the shooting, right?
2  A.  Yes.
3  Q.  Does that make them involved in
4  it?
5  A.  If they're -- it -- it depends
6  where they were.  If they were in a car
7  that was being shot at, then I think it's
8  more reasonable to say that they were
9  involved then if they were a hundred feet
10 away.
11 Q.  You don't think the use of the
12 word "involved" or "involvement" is
13 reckless?
14 COUNSELOR BOWMAN:  Objection.
15 Witness can answer.
16 A.  No.
17 Q.  At the scene is a lot different
18 than being involved, isn't it?
19 A.  Yes.
20 Q.  Now, you would agree with me
21 that as of this date, July the 10th, 2024,
22 no criminal charges had been brought
23 against Brandon Miller, Jaden Bradley or
24 Miller's passenger, who we now know to be

Page 263

B. WITZ

1  Cooper Lee, you understand that, right?
2  A.  Yes.
3  Q.  Your article, written in the
4  manner in which it is, makes Brandon
5  Miller, Jaden Bradley and Kai Spears
6  accessories before the fact of murder,
7  doesn't it?
8  COUNSELOR BOWMAN:  Objection.
9  Calls for legal conclusion.  Witness
10 can answer.
11 Q.  You can answer.
12 A.  What was that legal term,
13 accessory --
14 Q.  Yup, accessory before the fact
15 of murder.
16 A.  I'm not sure what that entails.
17 Q.  Alright.  You understand that
18 Brandon Miller drove a gun that was used in
19 the alleged murder in the killing of Jamea
20 Harris, correct?
21 A.  Yes.
22 Q.  Now, you don't know enough
23 about the law to know whether that could
24 potentially result in criminal charges

Page 264

B. WITZ

1  against the person that drove the gun to
2  the scene; is that right?  You don't
3  understand enough about the law to know --
4  A.  Yeah, I -- I think that's -- I
5  think that's fair.
6  Q.  Did you consider when drafting
7  this article along with Oskar Garcia that
8  suggesting the involvement of additional
9  basketball players that you were accusing
10 them of either conspiring to commit murder
11 or being accessories before the fact or
12 after the fact of murder?
13 COUNSELOR BOWMAN:  Objection.
14 Q.  Did that ever cross your mind?
15 COUNSELOR BOWMAN:  Objection.
16 Witness can answer.
17 A.  No, as I said -- as I said
18 before, I think going back to the first
19 paragraph of the story, that this could
20 have been even more deadly.  That this
21 tragedy could have been far worse.  That
22 was the overarching theme of the story.
23 Q.  Well, the big headline there
24 says "Fourth Alabama Player Was at a Deadly

Page 265

B. WITZ

1  Shooting, in a Car Hit by Bullets," and the
2  first line of it says, a fatal shooting
3  that involved members of the top ranked
4  Alabama basketball team, right?
5  A.  Correct, because -- well,
6  correct.  Darius Miles was indicted on
7  murder charges.
8  Q.  You don't say Darius Miles in
9  that first sentence.  You say "involved
10 members," members plural, right?
11 A.  Right.
12 Q.  And in the second paragraph,
13 stated as a matter of fact, "In another car
14 that was struck were Brandon Miller, a star
15 player for the Crimson Tide, and Kai
16 Spears, a freshman walk-on whose presence
17 at the scene had not been previously
18 reported."
19 A.  Yes.
20 Q.  The reason why it hadn't been
21 previously reported is because it didn't
22 happen, right, Mr. Witz?
23 COUNSELOR BOWMAN:  Objection.
24 Witness could answer.

67 (Pages 262 - 265)

**EXHIBIT 1**

Page 266

B. WITZ

1
2   A.   We know that now.
3   Q.   And you could have known that
4  on March 16th or March 17th if you would
5  have just done a little more reporting and
6  digging, right?
7        COUNSELOR BOWMAN:  Objection.
8    Witness can answer.
9   A.   We believed we had accurate
10 information that Kai Spears was the
11 passenger in Brandon Miller's car.
12  Q.   And you were wrong, right?
13  A.   I can say that now, yes.
14  Q.   And you could have said it
15 March 17th if you would have waited to get
16 calls back from Christian Spears, The
17 University of Alabama, the DA's Office,
18 right?
19        COUNSELOR BOWMAN:  Objection.
20    Witness can answer.
21  A.   (No response.)
22  Q.   But you and Oskar Garcia had a
23 deadline that you had to meet, put -- put
24 an article about Alabama in the paper in
25 the morning of March Madness, right?

Page 267

B. WITZ

1
2        COUNSELOR BOWMAN:  Objection.
3   A.   We published the story because
4  the information we had in the story we
5  believed was accurate and we reached out to
6  people and did not hear back.
7   Q.   Of all the people, you
8  understood from reading the Al.com article
9  a week or so before, that Brendan Culpepper
10 was the investigator that testified at the
11 prelim?
12  A.   Yes.  What about that story?
13  Q.   Did you talk to Brendan
14 Culpepper?
15  A.   I did not speak with Brandon
16 Culpepper on the record.
17  Q.   You spoke to him
18 off the record?
19        COUNSELOR BOWMAN:  Objection.
20    On the basis of the Reporter
21    Privilege as previously articulated
22    and instruct the witness not to
23    answer.
24        COUNSELOR NEW:  We'll move to
25    compel it.

Page 268

B. WITZ

1
2   Q.   There was nothing in
3  Culpepper's testimony that implicated Kai
4  Spears, was there?
5   A.   I don't believe so.
6   Q.   Did you ask Brandon Miller
7  pointblank whether Kai Spears was his
8  passenger?
9   A.   I don't recall.
10  Q.   Do you have recordings of you
11 speaking to Brandon Miller?
12  A.   I -- I don't recall.
13        COUNSELOR NEW:  Alright,
14    Counsel, if there are recordings of
15    him questioning Brandon Miller, we
16    want it if we haven't gotten it.
17        COUNSELOR BOWMAN:  Noted.  I
18    don't think there are, but we'll
19    confirm.
20  Q.   And you didn't ask Nate Oats or
21 anyone else associated with the University
22 of Alabama's athletic department pointblank
23 whether Kai Spears was the previously
24 unidentified passenger in Brandon Miller's
25 car at the time of the shooting, correct?

Page 269

B. WITZ

1
2        COUNSELOR BOWMAN:  Objection.
3    Misstates.  Witness can answer.
4   A.   I attempted to speak with Nate
5  Oats, but was prevented from doing it, but
6  I believe it was an Alabama official.  It
7  may have been a security official.
8   Q.   Is that when you threatened to
9  ask it in a public press conference?
10        COUNSELOR BOWMAN:  Objection.
11    Witness can answer.
12  A.   It was after -- it was -- I
13 believe it was when they were -- I believe
14 it was when they were going out to
15 practice, after the -- the locker rooms had
16 closed up.
17  Q.   Did you ask Jaden Bradley who
18 was there, whether Spears was the passenger
19 in Miller's car at the time of the
20 shooting?
21  A.   Are you talking about in the
22 open locker room?
23  Q.   At any point in time?
24  A.   I don't -- I don't -- no, I
25 don't believe I talked with him on the

Page 270

```
1              B. WITZ
2    record about -- about whether Kai was in
3    the car at the time.
4        Q.   Did you talk to him
5    off the record?
6          COUNSELOR BOWMAN:  Same
7        Reporter's Privilege objection.  Same
8        instruction not to answer.
9          COUNSELOR NEW:  We're going to
10       move to compel.  We're up to about 29
11       anonymous sources now, litigated this
12       case to believe that there were two.
13       We'll be bringing it in on in a
14       motion to compel.
15       Q.   Did you or Oskar add the word
16   "involved" in that first sentence of the
17   article?
18       A.   I don't recall.
19       Q.   Do you want to look at the
20   previous 2:32 draft?
21       A.   Sure.  Which exhibit was that?
22   Are these the two that you're referring to?
23       Q.   Yup.
24       A.   Are these the same?
25       Q.   Nope.  If you'll find the one
```

Page 271

```
1              B. WITZ
2    that has Spears' name for the first time
3    ending NYT227.
4          COUNSELOR BOWMAN:  For the
5        record, that's 19; is that right,
6        Counsel?
7          COUNSELOR NEW:  I'll take your
8        word for it.
9          THE WITNESS:  Sorry 227?
10         COUNSELOR NEW:  Yes.
11       Q.   In the draft it says "The fatal
12   shooting that has defined top-ranked
13   Alabama basketball team's season could have
14   been more consequential based on witness
15   transcripts and surveillance video reviewed
16   by The New York Times."  You compare that,
17   "A fatal shooting that involved members of
18   the top-ranked Alabama men's basketball
19   team," the -- the lead-in sentence of the
20   article changes from 2:23 to the time that
21   this is published at 8:10 Eastern.  I want
22   to know who changed from "could have been
23   more consequential," to "involved members
24   of the top-ranked Alabama basketball team,"
25   was that you or was that Oskar?
```

Page 272

```
1              B. WITZ
2        A.   I -- I don't recall.
3        Q.   Alright.
4        A.   Like I said this was -- we --
5    we were both in the file and --
6        Q.   Could have been either of you,
7    right?
8        A.   It could have, yes.
9        Q.   Go down to the seventh
10   paragraph in the article that begins --
11       A.   Which, the -- the --
12       Q.   The published one.
13         COUNSELOR BOWMAN:  So now we're
14       looking at 26, Exhibit 26?
15         COUNSELOR NEW:  If you say so.
16       A.   On Page 2?
17       Q.   Yes.
18       A.   Which -- which -- which -- how
19   does the graph start?
20       Q.   "I'm sorry, I'm not going to be
21   able to speak about that."
22       A.   Okay.
23       Q.   Do you see that paragraph?
24       A.   Yes.
25       Q.   That goes straight from, "two
```

Page 273

```
1              B. WITZ
2    bullets struck the windshield of Miller's
3    car, neither struck Miller or Spears," do
4    you see that?
5        A.   Yes.
6        Q.   And then it goes straight into
7    Kai's "no comment," correct.
8        A.   Yes.
9        Q.   Nothing about that question
10   that you had asked, right, you -- you
11   mislead your readers here trying to act
12   like Kai is no-commenting a question about
13   two bullets striking the windshield of
14   Miller's car, neither striking Miller nor
15   Spears, right?
16       A.   No.
17       Q.   And you also state in the next
18   paragraph, "the school has sought to
19   distance itself from the shooting.  Miles
20   was dismissed from the team and kicked out
21   of school within hours of his arrest, and
22   the involvement of other players - of which
23   the school was aware - was kept quiet as
24   the Crimson Tide established themselves as
25   the toast of the Southeastern Conference
```

69 (Pages 270 - 273)

**EXHIBIT 1**

B. WITZ

1    and one of the best teams in the country."
2    Here again, "the involvement of other
3    players," that is a significant word in an
4    article talking about a capital murder
5    case, is it not?
6        COUNSELOR BOWMAN: Objection.
7    Witness can answer.
8        A.   I think that's a matter of
9    opinion.
10       Q.   Well, what's yours?  Is the --
11   is the word involvement in a capital murder
12   case a significant word?
13       A.   I think it depends whether you
14   think being in cars -- well, I guess, if I
15   remember correctly, Jaden Bradley didn't
16   have his car, wasn't hit, but it was
17   certainly in the vicinity where bullets
18   were flying.  I mean, basically, yeah, if
19   you're in the crossfire, I mean, I think in
20   -- involvement in a -- in a shooting does
21   not strike me as inaccurate.
22       Q.   I didn't ask you whether it was
23   inaccurate.  I asked whether or not it
24   carries significant weight.  That word

B. WITZ

1    carries significant weight, doesn't it?
2        COUNSELOR BOWMAN: Objection.
3    Witness can answer.
4        A.   I think it carries significant
5    weight in describing what could have been a
6    deadly situation.  As I -- as I said, I
7    mean, these were players that were, you
8    know, in the crossfire of the shooting
9    where, you know, bullets are flying all
10   over the place.
11       Q.   Don't you believe that if The
12   University of Alabama had thought that Kai
13   Spears, Cooper Lee, Jaden Bradley or
14   Brandon Miller had done something
15   inappropriate that night, that they would
16   have been disciplined in some manner?
17       A.   I don't know the answer to
18   that.
19       Q.   Well, you accused The
20   University of Alabama in an e-mail you sent
21   to Aaron Jordan of being less than
22   transparent, right?
23       A.   Can I -- where is the -- let me
24   check that e-mail.

B. WITZ

1        COUNSELOR BOWMAN:  Which
2    document is that, Counsel?
3        COUNSELOR NEW:  I think -- is
4    this 59 -- alright, it's the one with
5    the four bullets that Oskar Garcia
6    had sent you to send to The
7    University of Alabama.  59, that's
8    right.
9        COUNSELOR BOWMAN:  That's
10   Exhibit 22.
11       A.   Yeah, I think, I mean part of
12   this says since the shooting, you know, the
13   team did not acknowledge the presence of
14   Brandon Miller until an investigator
15   testified in court about it.
16       Q.   And you thought that The
17   University of Alabama was likewise
18   suppressing Kai Spears involvement in this
19   shooting, correct?
20       A.   That was -- yeah, that was a
21   possibility, I would say.
22       Q.   Alright.  Now look at Spears 3,
23   the attribution of the anonymous source
24   identifying Kai Spears as the passenger in

B. WITZ

1    Miller's car at the time of the shooting is
2    11 paragraphs into the article, correct?
3        A.   I'm sorry, which --
4        Q.   Top of the page, Spears
5    underscore three.
6        A.   Okay.  "The detective also" --
7        Q.   Yes.  You want to count
8    paragraphs with me?
9        A.   No, I think I'm at the right
10   spot.
11       Q.   Right.  That's 11 paragraphs
12   into the article.
13       A.   Mm-hmm.
14       Q.   Right.
15       A.   Yes.
16       Q.   That placement of the anonymous
17   source, that attribution violates The New
18   York Times journalistic standards, doesn't
19   it?
20       A.   How?
21       Q.   I'm asking you.  I get to ask
22   you questions today.
23       A.   Fair enough, but...
24       Q.   Do -- if you --

70 (Pages 274 - 277)

EXHIBIT 1

Page 278

1          B. WITZ
2      A.   I would have to see --
3      Q.   I'll -- I'll do my best defense
4  lawyer impression.  If you know?
5      A.   I would have to see the --
6          COUNSELOR BOWMAN:  Objection.
7      Argumentative.  Witness can answer.
8      A.   Sorry.  Can you ask that again?
9      Q.   Yeah.  Does that placement of
10  the anonymous source 11 paragraphs into the
11  story violate The New York Times standards
12  on attribution, if you know?
13      A.   I would have to look through
14  the -- through those standards to -- to see
15  if it does.
16      Q.   Alright.  Your article was
17  re-reported by a lot of other news
18  agencies, you understand that?
19      A.   I'm not aware of which ones.
20      Q.   Got a lot of clicks, a lot of
21  shares at the time, right?
22          COUNSELOR BOWMAN:  Objection.
23      Witness can answer.
24      A.   I'm not aware of that.
25      Q.   Is there anything in that

Page 279

1          B. WITZ
2  article in the five pages of it that allows
3  the reader to judge the credibility of your
4  anonymous source?
5      A.   Well, I would have to go
6  through the entire article.  Well, I can --
7      yeah.
8          THE WITNESS:  Can I have a pen
9      to write down things that --
10      referring to his -- I mean, I'm going
11      through the story, so I don't forget.
12          COUNSELOR BOWMAN:  Put marks --
13          THE WITNESS:  Yeah, sure.
14          COUNSELOR BOWMAN:  Would you
15      rather he do that to the official --
16          COUNSELOR NEW:  To the official
17      one, if he's going to mark it --
18          COUNSELOR BOWMAN:  Here's the
19      record --
20      Q.   If you want to mark that for
21  what you think tells your readers that the
22  source is credible?
23      A.   That's fine.  Sorry.  Can you?
24      Q.   Yeah.  What in that article
25  tells your reader that your anonymous

Page 280

1          B. WITZ
2  source has credibility?
3      A.   That it's a person who is
4  familiar with the case.
5      Q.   Is that it?
6      A.   Yeah, I think so.
7          (Whereupon, a Photograph was
8      marked as Plaintiff's Exhibit 27 for
9      identification as of this date by the
10      reporter.)
11      Q.   Do you recall how this came
12  about?
13      A.   I believe this was -- you mean
14  how -- how I got this photo?
15      Q.   Yeah.  The --
16      A.   Yeah, I -- it was -- I had been
17  sent this press release from -- from your
18  office and I think some -- another reporter
19  had asked me, you know, if I had seen it
20  and I hadn't, so...
21      Q.   Who was the other reporter that
22  asked if you had seen it?
23      A.   I don't recall.  Somebody --
24  somebody at this would have been, what?
25  The day of -- the day after on March 16th,

Page 281

1          B. WITZ
2  so that would have been the first day of
3  the tournament, so it would have been
4  somebody at the arena, you know, who was
5  covering the regional.
6      Q.   And by that point in time,
7  Alabama issued a denial, Jessica Pare
8  saying your story is inaccurate, right?
9      A.   Yes.
10      Q.   And you all left out that part
11  in the follow-up articles on March 16th,
12  didn't you?
13          COUNSELOR BOWMAN:  Objection.
14      Witness can answer.
15      A.   (No response.)
16      Q.   You left out that first
17  sentence from Jessica Pare that says your
18  story is inaccurate?
19      A.   I would have to see the whole
20  --
21      Q.   Alright.
22      A.   -- release.
23      Q.   Now, Page 4 of the original
24  article, you talk about Miller receiving
25  anonymous e-mail --

71 (Pages 278 - 281)

**EXHIBIT 1**

Page 282

B. WITZ

1
2     A.   I'm sorry, are we going on on
3  that or no, or --
4     Q.   On what?
5     A.   What you asked me about,
6  Jessica Pare --
7     Q.   Not -- we'll get there.  I'm
8  asking a question about Spears underscore 4
9  in the original article.  Do you see the
10  Bates on the bottom, it says Spears
11  underscore 4?
12     A.   Okay.
13     Q.   I think fourth paragraph down,
14  "'If you guys saw some of what I've
15  seen' -- 'what I've seen sent his way, I
16  think you would understand why that's the
17  case,' said Oats, who indicated that Miller
18  had received anonymous e-mail threats, but
19  declined to elaborate."  You understand
20  Miller got heckled and threatened and
21  needed security?  Would it be reasonable to
22  think that after your paper identified Kai
23  Spears that he would, likewise, get
24  threats?
25        COUNSELOR BOWMAN:  Objection.

Page 283

B. WITZ

1
2     Witness can answer.
3     Q.   That's reasonable, isn't it?
4        COUNSELOR BOWMAN:  Objection.
5     Witness can answer.
6     A.   I don't think these are
7  necessarily the -- the same cases.  They're
8  -- our story indicated that Kai Spears was
9  a passenger in Brandon Miller's car.
10  Brandon Miller, a few weeks earlier, was
11  identified in the preliminary hearing by
12  Detective Culpepper as having transported
13  the gun that was used in the killing.
14     Q.   If Brandon Miller transported
15  the gun and Kai Spears was his passenger,
16  Kai Spears also transported the gun, right?
17        COUNSELOR BOWMAN:  Objection.
18     Witness can answer.
19     A.   I'm not -- I'm not sure, like,
20  legally how that -- that works.  If one,
21  you know, if one person was a driver and
22  the other was a passenger.
23     Q.   Okay.
24     A.   Levels of, I guess,
25  responsibility or knowledge.

Page 284

B. WITZ

1
2        COUNSELOR BOWMAN:  This wasn't
3  marked yet.
4        COUNSELOR NEW:  28.
5        (Whereupon, Text Messages were
6     marked as Plaintiff's Exhibit 28 for
7     identification as of this date by the
8     reporter.)
9     Q.   Who is Andrew Das?
10     A.   He's an -- he was an editor at
11  the time in the sports department.
12     Q.   And he's WhatsApp messaging
13  you, "You feel OK on the Alabama stuff?
14  Been thinking about you.  It never feels
15  great when they turn on reporting, but if
16  you're confident you're right, then that's
17  all that matters.  Have a good weekend
18  onward."  Did I read that correctly?
19     A.   Yes.
20     Q.   And you say, "Yeah, it's been
21  weird.  Alabama hasn't engaged me beyond
22  making statements that they make public."
23  What do you think Alabama should have been
24  doing?
25     A.   It would have been nice if they

Page 285

B. WITZ

1
2  responded to -- you know, I just wanted to
3  have a conversation with Jessica Pare to
4  get an understanding of what in the story
5  was wrong.
6     Q.   She told you it was inaccurate.
7  What more did Jessica Pare or anybody else
8  at The University of Alabama need to tell
9  you except that your story was wrong and
10  that you and The New York Times kept saying
11  we stand by our reporting?  What more did
12  anybody need to say to you?
13        COUNSELOR BOWMAN:  Objection.
14     Witness can answer.
15     A.   It's a pretty -- it's a rather
16  common -- listen, we're all -- I mean, as
17  reporters, nobody is perfect, and in times
18  when you write something that's incorrect
19  or -- sometimes it's not even a, you know,
20  sometimes it's just a, you know, dispute
21  about the tone of a story, rather than a
22  factual thing.  You -- you know, you get on
23  the phone and you call people and you learn
24  more about what was wrong and that was my
25  intention in responding to her a couple of

**EXHIBIT 1**

Page 286

B. WITZ

1
2  times that night.  It was like, please call
3  me.  It's kind of, you know, frankly, it's
4  kind of standard practice.
5      Q.   So --
6      A.   It's a standard.  It's a
7  standard of how these things generally
8  work --
9      Q.   So --
10     A.   -- in my experience.
11     Q.   So you and Oskar Garcia rush a
12  story out the door, but it's Jessica Pare's
13  and the University of Alabama's fault that
14  you got it wrong?
15          COUNSELOR BOWMAN:  Objection.
16     Q.   Is that what you're going to
17  tell a jury in this case, Mr. Witz?
18     A.   No.
19          COUNSELOR BOWMAN:  Objection.
20     Q.   It's their fault they didn't
21  answer your questions timely?  The
22  University of Alabama didn't immediately
23  respond to requests for comment, that's
24  what your article says, emphasis on the
25  word "immediately," right?

Page 287

B. WITZ

1
2          COUNSELOR BOWMAN:  Objection.
3  Witness can answer.
4      A.   Right.
5      Q.   Right.
6      A.   Well -- hold up.  Can you
7  repeat that?
8      Q.   Yes.  You --
9      A.   Yeah.
10     Q.   In your article, you say The
11  University of Alabama didn't immediately
12  respond to inquiry?
13     A.   Right.
14     Q.   Or to questions?
15     A.   Right.  And the reason -- the
16  reason that -- for that phrasing is when
17  you reach out to somebody, you know,
18  especially -- I was going to say especially
19  in the Internet age, but, you know, maybe
20  not -- not even, I guess this would apply
21  to print, too, is somebody may not have --
22  somebody may be in the process of
23  responding to you, but they haven't at the
24  time of publication, so that's why you say
25  did not, you know, did not immediately or,

Page 288

B. WITZ

1
2  you know, I guess if it's -- it could be --
3  it's got to be interchangeable with, you
4  know, at the time of publication, had --
5  you know, so and so had not responded, so
6  that's why that wording is the way it is.
7      Q.   You bring up a good point
8  there, print.
9      A.   Mm-hmm.
10     Q.   This article went on the
11  Internet at 8:51 East.  When did the
12  article start getting printed out on the
13  printing presses that The New York Times
14  sends out?
15     A.   I don't know.
16     Q.   Let's go back to the WhatsApp
17  messages.  "Won't answer questions about
18  the statement which I think are full of
19  semantics games."  What was it about the
20  University of Alabama's statement that you
21  think is full of semantics games?
22     A.   I would have to go back to the
23  statement.  Do you know which one that is?
24     Q.   We'll get there.  But you
25  thought The University of Alabama was

Page 289

B. WITZ

1
2  playing word games with you in the
3  statements they released to the public,
4  right?
5      A.   I thought that was a
6  possibility.
7      Q.   "And it's curious to me that
8  nobody has asked for retraction."
9          (Whereupon, a Four-Page
10         Document was marked as Plaintiff's
11         Exhibit 29 for identification as of
12         this date by the reporter.)
13     Q.   This is an e-mail from me to
14  Diane Brayton.  Do you see the word
15  "retraction" at the bottom of it?
16     A.   Yes.
17     Q.   March 15th, 11:56, p.m.  Turn
18  over to the next page, Mr. Witz.  You see
19  the word "retraction" in the last paragraph
20  of the March 20th e-mail to Diane Brayton?
21     A.   Yes.
22     Q.   And I know that that's after
23  your hillbilly ambulance chaser WhatsApp
24  message, right?  That's two days after?
25     A.   Two -- was this on --

73 (Pages 286 - 289)

Page 290

B. WITZ

1
2    Q.    Yeah, March 18th.
3    A.    So that's Saturday and this is
4    Monday, okay.
5    Q.    Alright.  And then you see
6    David McCraw's response to me and he like
7    you, "rather than discussing with our
8    reporters on the record Mr. Spears'
9    activities that night"?
10    A.    Sorry.  Where --
11    Q.    In the bottom paragraph.  "We
12    are disappointed that you felt the need to
13    designate your letter confidential under
14    Rule 408 -- it remains unclear why you
15    would need to hide what you purport are the
16    facts - rather than discussing with our
17    reporters Mr. Spears's activities that
18    night."  That was the same take that you
19    had, right?  Give us an interview with Kai
20    Spears and we'll do the retraction you're
21    asking for?  That's what you and The New
22    York Times wanted, wasn't it, was a full
23    blown interview with Kai Spears in exchange
24    for a retraction?
25    COUNSELOR BOWMAN:  Objection.

Page 291

B. WITZ

1
2    Witness can answer.
3    A.    No.
4    Q.    No?  Okay.
5    Now, "The hillbilly ambulance
6    chaser who represents the dad hasn't
7    contacted our legal which he's told" -- so
8    the hillbilly ambulance chaser is me,
9    right?
10    A.    Yes.
11    Q.    What's a hillbilly, Mr. Witz?
12    A.    Well, first off, I would like
13    to apologize.  That was a failed attempt at
14    humor and I'm sorry for it.
15    Q.    I really don't care.
16    A.    Okay.
17    Q.    What's a hillbilly?
18    A.    (No response.)
19    Q.    Somebody from West Virginia?
20    Like me and Nick Saban and Jimbo Fisher and
21    Mike Florio and Matthew Glover, right?
22    COUNSELOR BOWMAN:  Objection.
23    Witness can answer.
24    Q.    Say it.  Own it.
25    A.    Not necessarily.

Page 292

B. WITZ

1
2    Q.    They could be from Alabama,
3    too, like T-shirt guy, right?
4    COUNSELOR BOWMAN:  Objection.
5    Witness can answer.
6    A.    I don't know.  How would I
7    describe that?  Be of the same -- probably
8    the same way that Larry Bird was described
9    as the "Hick From French Lick," kind of,
10    probably, you know, more rural.
11    Q.    "Zeke the Beak From Cabin
12    Creek," ever heard of him?
13    A.    Jerry West.
14    Q.    Who was hillbilly, too, right?
15    A.    (No response.)
16    Q.    "My source has been steadfast,
17    but there's some equivocation about how the
18    source knew."  Tell me what you mean by
19    that?
20    A.    Well, the source had been
21    steadfast, solid, but -- but there was some
22    -- when I asked the source how they knew
23    this information, there were some things
24    that -- there -- there were some things
25    that the source told me that they couldn't

Page 293

B. WITZ

1
2    tell me about where or how they -- how they
3    knew.
4    Q.    Told you that your story was
5    wrong?
6    A.    No.  On the contrary, this was
7    just in questions about how the source
8    knew.
9    Q.    Who was equivocating, your
10    source?
11    A.    The source was -- the source
12    said that there were some restrictions --
13    not -- maybe not or maybe constraints about
14    what the source could tell me about how
15    they knew.
16    Q.    And your message goes on,
17    "Another source told me yesterday I'm
18    likely wrong but won't elaborate or go on
19    the record."  The source that told you
20    you're likely wrong, was that Source A or
21    Source B or some other source?
22    A.    That was Source B.
23    Q.    So Source B tells you you're
24    likely wrong, right?
25    A.    Yes.

**EXHIBIT 1**

Page 294

B. WITZ

1
2    Q.   In none of the changes to the
3   article after March the 15th, and there
4   were a number of them, did The New York
5   Times ever report that one of its two
6   anonymous sources told you as of between
7   March the 15th and the March the 18th that
8   you were likely wrong?
9    A.   I'm sorry. Can you --
10    Q.   Yeah. Yeah. In your
11   subsequent reporting and changes to the
12   article, did you ever tell your readers
13   that one of your two anonymous sources had
14   told you between March 15th and March 18th
15   that you were likely wrong?
16    A.   No, I think as I indicated in
17   here, this was -- this was the information
18   that I was -- I was trying to confirm and
19   and follow-up.
20    Q.   Not really my question. That
21   fact, Source B telling you you were likely
22   wrong as you knew by the morning of
23   March 18th never made it into any
24   subsequent reporting at any point, did it?
25    A.   No.

Page 295

B. WITZ

1
2    Q.   Alright. Did anything that
3   Source B revealed to you ever show up in
4   the actual articles? We know you didn't
5   report that Source B told you you were
6   likely wrong, anything Source B tell you
7   make it into the article, because you cite
8   to one anonymous source, a person familiar
9   with the case and that's Source A?
10    A.   Source B provided partial
11   confirmation of what Source A had said
12   before publication.
13        COUNSELOR NEW: 30.
14        (Whereupon, an E-mail was
15        marked as Plaintiff's Exhibit 30 for
16        identification as of this date by the
17        reporter.)
18    A.   Off the record.
19    Q.   Okay.
20        Take a look at Exhibit 30,
21   please. New York Times 1816. It's a
22   March 16th e-mail from Phil Corbett to
23   Randy Archibald and Susan Wessling. Who is
24   Susan Wessling?
25    A.   She's an employee of the New

Page 296

B. WITZ

1
2   York Times. I'm not sure of her position.
3    Q.   Okay. "Hi, Randy. Taking most
4   others off this thread. Are we hanging
5   this fact on the one anonymous source we
6   cite way down in the story? To state the
7   painfully obvious, I hope we're right on
8   this. Also, I hope we did our usual level
9   of due diligence in handling this anonymous
10   sourcing. Even assuming we are confident
11   and correct - I'm not sure it was a good
12   idea to give the ID as an unequivocal fact
13   at the top, with no attribution at all, if
14   our basis was one anonymous source. Seems
15   as though we should at least have
16   attributed it from the get-go. Let us know
17   if we should talk me." Do you see that?
18    A.   Yes.
19    Q.   How does that e-mail make you
20   feel as a professional journalist of
21   30-something years, Mr. Witz, to have your
22   standards editor write that about one of
23   your stories?
24    A.   Yeah, I mean, I don't -- I
25   don't have any disagreement with this.

Page 297

B. WITZ

1
2    Q.   That's your standards editor
3   asking your sports editor whether your
4   paper is hanging this fact entirely on the
5   one anonymous source we cite way down in
6   the story; do you see that?
7        COUNSELOR BOWMAN: Objection.
8        Document speaks for itself.
9    A.   Yes, I can read that.
10    Q.   Alright. "To state the
11   painfully obvious, I hope we're right on
12   this." You weren't, were you?
13    A.   No, we were not right.
14    Q.   And yet despite knowing that
15   you were wrong, you and The New York Times
16   continued to state, we stand by our
17   reporting, right?
18        COUNSELOR BOWMAN: Objection.
19        Misstates. Witness can answer.
20    A.   We -- we learned on June 1st or
21   June 2nd that we -- when we learned the
22   existence of Cooper Lee's affidavit, that
23   he was in the car instead of -- instead of
24   Kai.
25    Q.   Didn't you have an obligation

EXHIBIT 1

Page 298

B. WITZ

1
2  to continue reporting between March
3  the 16th and June the 2nd?
4      A.   I -- I believe we continued --
5  yeah, we continued to report.
6      Q.   You continued to say we stand
7  by our erroneous reporting because you were
8  told by me, you were told by Christian
9  Spears, you were told by Jessica Pare, you
10  were told by everybody except Santa Claus
11  that your article was wrong and you and
12  The New York Times continued to say we
13  stand by our reporting, right?
14          COUNSELOR BOWMAN:  Objection.
15      Witness can answer.
16      A.   Yeah, I think when -- when
17  you're in a situation like this where
18  you've reported some information that comes
19  into question, whether it's accurate --
20  accurate or not, there's something else
21  that comes with that is the responsibility
22  to explain to the readers how -- what you
23  got wrong, how you got it -- got it wrong
24  and what the correct information should --
25  should be in a story and, yes, we did have

Page 299

B. WITZ

1
2  a number of people telling us we were
3  wrong, but we were working to find out more
4  details about the case and include that in
5  our reporting if in -- if indeed we were
6  wrong.
7      Q.   Who all, between March
8  the 16th, when you were told by me,
9  Christian Spears, Jessica Pare, The
10  University of Alabama your story was wrong,
11  who else did you talk to before the
12  lawsuit?
13      A.   Well, I think when we -- you
14  and I -- when I called you up and one of
15  the things that, you know, I -- I -- I
16  think I expressed my interest, like that I
17  want -- if we got it wrong, I want to know
18  how and you mentioned that I should talk to
19  Severn Sanders.
20      Q.   Yes.
21      A.   And --
22      Q.   Did you?
23      A.   I was not able to speak with
24  him on the record.
25      Q.   Did he tell you that the

Page 300

B. WITZ

1
2  Tuscaloosa Police Department had cleared
3  Kai Spears of any wrongdoing or being
4  present in the car that night?
5      A.   He did not tell me that on the
6  record.
7      Q.   Did he tell you that
8  off the record?
9          COUNSELOR BOWMAN:  Same
10      objection.  Based on the Reporter
11      Privilege, instruct the witness not
12      to answer.
13      Q.   If Severn Sanders told you that
14  off the record, you could have published an
15  article and said an anonymous source told
16  us that Kai Spears was not present that
17  night, right?
18      A.   It's possible.  What else it's
19  -- it's possible depending on what else.
20      Q.   What stopped you from citing to
21  an anonymous source like you did in the
22  original article that put him there to say
23  that he wasn't there?
24      A.   Wait.  Say that --
25      Q.   Yeah.  What -- was there

Page 301

B. WITZ

1
2  anything to stop you from citing to an
3  anonymous source to say that Kai Spears was
4  not present or in Brandon Miller's car at
5  the time of the shooting?  Wasn't anything
6  that stopped you from doing that, was
7  there?
8          COUNSELOR BOWMAN:  Objection.
9      Witness can answer.
10      A.   I'm sorry.  I'm not following
11  the question.  I apologize.
12      Q.   My question is, if you have an
13  anonymous source telling you Kai wasn't in
14  Brandon Miller's car at the time of the
15  shooting after March the 16th, is there
16  anything that stopped The New York Times
17  from publishing such an article and citing
18  to an anonymous source?  Maybe in a
19  headline, anonymous source says Kai Spears
20  wasn't in the car at the time of the
21  shooting?
22          COUNSELOR BOWMAN:  Objection.
23      Misstates.  Witness can answer.
24      A.   It all depends on what
25  information was shared to me.  If it was

Veritext Legal Solutions
877-373-3660                                                                    800.808.4958

**EXHIBIT 1**

Page 302

B. WITZ

1 something that showed me, you know,
2 definitely that he wasn't there, like the
3 -- like Coopers Lee -- Lee's statement, and
4 our interview with him, then that's
5 possible.
6 COUNSELOR NEW: Alright, let's
7 take a break.
8 THE VIDEOGRAPHER: The time on
9 the video monitor is 6:54 p.m. We
10 are off the record. This ends Video
11 6.
12 (Whereupon, a brief recess was
13 taken.)
14 THE VIDEOGRAPHER: We are back
15 on the record. The time on the video
16 monitor is 7:13 p.m. This is Media
17 7.
18 Q. Mr. Witz, when Source B
19 revealed to you that you were likely wrong,
20 was there any discussion at The New York
21 Times about running that?
22 A. I don't -- I don't -- I don't
23 recall. I -- I likely had conversations
24 with -- with Oskar just to let, you know, I

Page 303

B. WITZ

1 -- I was keeping him up-to-date on new
2 developments and we talked pretty regularly
3 or -- and, but no, I don't -- I -- yeah, I
4 don't recall -- wait, I'm sorry. What was
5 the question?
6 Q. The question was, was there any
7 discussion at The New York Times about once
8 Source B tells you, as we see in the
9 WhatsApp message, that you're likely wrong,
10 telling your readers that one of your
11 source's partial information on March
12 the 15th have told you that you're likely
13 wrong, was there any discussion at The
14 Times about running that?
15 A. I don't recall.
16 Q. Alright.
17 Take a look at your working
18 file there. I've gone ahead and opened it
19 up for you. Page Bates number 1855; do you
20 see that?
21 A. Mm-hmm.
22 COUNSELOR BOWMAN: Counselor,
23 what exhibit are we on? Is that 11?
24 COUNSELOR NEW: I'll take your

Page 304

B. WITZ

1 word for it.
2 COUNSELOR BOWMAN: Alright.
3 For the record, we're on Exhibit 11.
4 COUNSELOR NEW: Page 1855.
5 THE WITNESS: Are you ready,
6 Chad?
7 COUNSELOR BOWMAN: Yes. Thank
8 you.
9 Q. After the redaction, you see
10 "Police Sergeant Sanders Severn interviewed
11 Kai. Not on scene. Had returned to the
12 Bryant Hall. Been out on Strip. Factual
13 error, yes or no." Can you explain that
14 note?
15 A. Yeah. I think that, if I
16 recall, and you'll correct me if I'm wrong.
17 We had a couple of different -- we didn't
18 just have one conversation. I think there
19 was something with, I don't know if there
20 was a connection or you had another call or
21 something like that, but -- so I think this
22 is just notes from -- from our
23 conversations that you had mentioned it was
24 Sanders Severn and who was a police

Page 305

B. WITZ

1 sergeant who, you know, if I talked to him,
2 he would be able to tell me where Kai was.
3 Q. And I also informed The New
4 York Times lawyers on March the 20th that
5 Sanders Severn had interviewed Kai and that
6 he was not on the scene, had returned to
7 Bryant Hall, correct?
8 COUNSELOR BOWMAN: Objection.
9 Foundation. Witness can answer.
10 Q. Find my e-mails there?
11 A. I don't know which -- is it --
12 Q. Yes, this -- this one
13 (indicating).
14 COUNSELOR BOWMAN: Counsel,
15 which exhibit is it?
16 COUNSELOR NEW: I'm not sure.
17 It's one that started with the
18 e-mail --
19 COUNSELOR THOMPSON: 29.
20 COUNSELOR BOWMAN: Got it.
21 Thank you.
22 Q. So you see me telling Diane
23 Brayton there from The New York Times that
24 Sanders Severn had interviewed Kai, Kai

77 (Pages 302 - 305)

**EXHIBIT 1**

Page 306

B. WITZ

1
2  wasn't on the scene, that he returned to
3  Bryant Hall, do you see all that in that
4  e-mail?
5      A.   Well, I'm just seeing the
6  sentence here, "Tuscaloosa Deputy Police
7  Chief Sanders Severn interviewed Kai along
8  with other members of The University of
9  Alabama basketball team.  Chief Sanders was
10  able to determine that Kai was not on the
11  scene nor in a car as your article
12  asserts."
13      Q.   Okay.
14      A.   Yes.
15      Q.   So The New York Times knew that
16  information by March 20th by virtue, if
17  nothing else, my e-mail to Diane Brayton,
18  correct?
19          COUNSELOR BOWMAN:  Objection.
20      Witness can answer.
21      A.   Well, we knew what you were
22  telling us and I reached out to -- it's
23  Severn Sanders, right?
24      Q.   I don't know.  I may have the
25  names backwards.

Page 307

B. WITZ

1
2      A.   But I reached out to him to
3  attempt to confirm what you had told me --
4  told me, which I think essentially is what
5  you're writing here.
6      Q.   Okay.
7          COUNSELOR BOWMAN:  Is this a
8      new exhibit?
9          COUNSELOR NEW:  It's a new
10      exhibit.
11          (Whereupon, an E-mail was
12      marked as Plaintiff's Exhibit 31 for
13      identification as of this date by the
14      reporter.)
15      Q.   If you can take a look at that
16  one, please.  Let me know when you reviewed
17  that.
18      A.   Okay.
19      Q.   So that's a link to The
20  Washington Post article dated May 31st,
21  2023, Alabama shooting, New York Times, Kai
22  Spears, and Steve Kenny says, "The Post,
23  which seems to delight in taking shots at
24  us when it can, alerted its very long story
25  about an Alabama basketball player who is

Page 308

B. WITZ

1
2  suing us and Billy about his reporting on a
3  fatal shooting."  What does it mean for a
4  newspaper like The New York Times or The
5  Washington Post to alert a story, Mr. Witz?
6          COUNSELOR BOWMAN:  Objection.
7      Foundation.  Witness can answer.
8      A.   I believe alerting it is a term
9  that -- I don't know, like I guess like on,
10  either social media or people who -- I -- I
11  think, like for subscribers at a newspaper,
12  you can sign up for news alerts and you can
13  either sign up or decline, you don't want
14  to be cluttered with them, so I think
15  that's what that was probably -- that may
16  have been one of the things that an alert
17  could mean.  I think another could be on,
18  you know, on social media.
19      Q.   But The Washington Post alerted
20  its readers that The New York Time story
21  written by you is wrong and resulted in a
22  lawsuit against The Times, correct?
23          COUNSELOR BOWMAN:  Objection.
24      Foundation.  Witness can answer.
25      Q.   Is that how you interpret that

Page 309

B. WITZ

1
2  e-mail?
3      A.   That The Post alerted us a
4  story on the -- on the lawsuit that was --
5  was filed over our reporting on this story.
6      Q.   Alright.  Take a look at the
7  last exhibit I'll give you today.
8          COUNSELOR BOWMAN:  Mark 32,
9      please.
10          (Whereupon, an E-mail was
11      marked as Plaintiff's Exhibit 32 for
12      identification as of this date by the
13      reporter.)
14          COUNSELOR NEW:  1718.
15      Q.   Do you see that it's an e-mail
16  from Carolyn Ryan to Joe Kahn dated June
17  the 2nd, 7:42 p.m., update for you dot dot
18  dot as the subject, do you see that.
19      A.   Yes, I do.
20      Q.   "Better to discuss details by
21  phone, but we had Steve Eder do further
22  reporting on the story, with Dean Murphy's
23  guidance."  Dean Murphy is one of those
24  upper echelon editors that we talked about
25  earlier, correct?

78 (Pages 306 - 309)

**EXHIBIT 1**

Page 310

B. WITZ

1
2    A.   I don't know his position.  I
3  know he used to be the business editor.
4    Q.   "Eder determined that the
5  previous story by Billy Witz was wrong."
6  That's what the e-mail says, right?
7    A.   Yes.
8    Q.   "Kai Spears was not in the
9  car."  That's what the e-mail from Carolyn
10  Ryan says, right?
11    A.   Yes.
12    Q.   "We're going to affix an
13  editor's note to the story explaining that
14  and Danielle," and Danielle is Danielle
15  Hock (phonetic) right?
16    A.   I believe so.
17    Q.   "Danielle is going to provide a
18  response to Eder telling him we're doing
19  so.  It's pretty straightforward, but I
20  wanted you to be aware before we publish
21  it."  That's from Carolyn Ryan to Joe Khan.
22  Even before the lawsuit, was there anybody
23  at The New York Times who thought, given
24  everything that we know, we need to retract
25  this story?

Page 311

B. WITZ

1
2    COUNSELOR BOWMAN:  Objection to
3    form.  Witness can answer.
4    A.   I'm sorry, I don't understand
5  the question.
6    Q.   Yeah.  The New York Times never
7  retracted the original story, did it?
8    A.   What do you mean by retraction?
9  I mean I think it was corrected, I believe.
10    Q.   Corrected.  The New York Times
11  regrets its error is what it said, right?
12    A.   I don't know.  I would have to
13  see the -- see the story to -- to say it.
14    Q.   Who is car -- managing editor
15  of the New York Times, that sounds like an
16  important position to me?
17    A.   Yes, it is.
18    Q.   You've seen Phil Corbett,
19  you've seen Carolyn Ryan, is Joe Khan above
20  Carolyn Ryan?
21    A.   It -- yeah, I'm not sure at the
22  time.  I think -- well, now Joe Khan is the
23  executive editor of the paper.  I'm not
24  sure if he was at that time.
25    Q.   The e-mail that we looked at

Page 312

B. WITZ

1
2  from Phil Corbett a moment ago told us that
3  there were problems with your article,
4  didn't it?
5    COUNSELOR BOWMAN:  Objection.
6    Misstates.  Witness can answer.
7    A.   Which was the one from Phil
8  Corbett?  I have one from Steve Kenny and
9  Carolyn Ryan.
10    Q.   Did you ever have any
11  discussions with Phil Corbett about your
12  article and which standards of The New York
13  Times it violated, Mr. Witz?
14    A.   Not that I recall.
15    COUNSELOR BOWMAN:  Counsel, you
16    almost ready to wrap up?
17    COUNSELOR NEW:  Yup.
18    Matt anything else?
19    Q.   Did you ever have any
20  discussions with Carolyn Ryan about which
21  standards of The New York Times that your
22  article violated?
23    A.   No, not that I recall.
24    COUNSELOR NEW:  Mr. Witz,
25    appreciate your patience today.

Page 313

B. WITZ

1
2  Thank you.
3    COUNSELOR BOWMAN:  Let's take
4  two minutes off the record and decide
5  whether we have any questions.
6    THE VIDEOGRAPHER:  The time on
7  the video monitor is 7:25 p.m.  We're
8  off the record.
9    (Whereupon, a brief recess was
10  taken.)
11    THE VIDEOGRAPHER:  We are back
12  on the record.  The time on the video
13  monitor is 7:28 p.m.
14    COUNSELOR BOWMAN:  Housekeeping
15  matters, Counsel?
16    COUNSELOR NEW:  I have one
17  additional exhibit to attach as the
18  thumb drive containing the audio
19  file.  And I know that there are some
20  exhibits that are stamped
21  confidential, I believe that we
22  probably need to take -- or that we
23  probably need to place any portion of
24  testimony that references a
25  confidential exhibit and also place

79 (Pages 310 - 313)

**EXHIBIT 1**

B. WITZ

1
2 that under the same protective order.
3     COUNSELOR BOWMAN:  I think
4 that's probably right.  We can meet
5 and confer whether any of that can be
6 unsealed, but I think that's right as
7 an initial matter.
8     COUNSELOR NEW:  As an initial
9 matter, I think we need to treat the
10 deposition that way.  There may be
11 things that -- that we want to ask
12 witnesses next week about Mr. Witz'
13 testimony.  Matt and I will try to
14 meet and confer just as soon as you
15 can, but that concludes my questions
16 against Mr. Witz.  Thank you for your
17 patience today.
18     COUNSELOR BOWMAN:  I have no
19 cross.  Witness will read and sign.
20     COUNSELOR NEW:  Okay.  Very
21 well.
22     (Whereupon, a Flash Drive was
23 marked as Plaintiff's Exhibit 33 for
24 identification as of this date by the
25 reporter.)

B. WITZ

1
2     THE VIDEOGRAPHER:  Sorry, we
3 are going off the record at 7:29 p.m.
4 This concludes today's testimony
5 given by Billy Witz.  Media units
6 used was 7 and will be retained by
7 Veritext Legal Solutions.  Thank you
8 both.  We are now off the record.
9     (Whereupon, at 7:29 P.M., the
10 Examination of this witness was
11 concluded.)
12
13        ∘      ∘      ∘      ∘
14
15
16
17
18
19
20
21
22
23
24
25

B. WITZ

1
2     D E C L A R A T I O N
3
4     I hereby certify that having been
5 first duly sworn to testify to the truth, I
6 gave the above testimony.
7
8     I FURTHER CERTIFY that the foregoing
9 transcript is a true and correct transcript
10 of the testimony given by me at the time
11 and place specified hereinbefore.
12
13
14
     _____
15     BILLY WITZ
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20___.
20
21
     _____
22     NOTARY PUBLIC
23
24
25

B. WITZ

1
2     E X H I B I T S
3
4 PLAINTIFF EXHIBITS:
5
6 EXHIBIT   EXHIBIT                PAGE
7 NUMBER   DESCRIPTION
8 Exhibit 1   Article           4
9 Exhibit 2   Photocopy of Article     4
10 Exhibit 3   Social Media Post Segment 4
11 Exhibit 4A   Article          4
12 Exhibit 4B   Article          4
13 Exhibit 4C   Article          4
14 Exhibit 4D   Article          5
15 Exhibit 5   Guidelines on Integrity   5
16 Exhibit 6   E-mail           75
17 Exhibit 7   E-mail           110
18 Exhibit 8   E-mail Communication     129
19 Exhibit 9   Article          131
20 Exhibit 10  E-mail            149
21 Exhibit 11  Working File       150
22 Exhibit 12  E-mail           150
23
24 (Index continued on following page.)
25

**EXHIBIT 1**

Page 318

B. WITZ

1
2  PLAINTIFF EXHIBITS:
3
4  EXHIBIT   EXHIBIT              PAGE
5  NUMBER    DESCRIPTION
6  Exhibit 13   Text Messages        150
7  Exhibit 14   E-mail Communications   150
8  Exhibit 15   E-mail Communications   150
9  Exhibit 16   E-mail Communications   150-151
10 Exhibit 17   E-mail Communications   151
11 Exhibit 18   Draft Notes          151
12 Exhibit 19   Draft Notes          151
13 Exhibit 20   Media Schedule
14        Information              151
15 Exhibit 21   E-mail               151
16 Exhibit 22   E-mail Communication    152
17 Exhibit 23   E-mail Communication    152
18 Exhibit 24   E-mail Communication    152
19 Exhibit 25A  Text Message          152
20 Exhibit 25B  Text Messages         152
21 Exhibit 26   Article              153
22 Exhibit 27   Photograph           280
23
24 (Index continued on following page.)
25

Page 320

B. WITZ

1
2     INFORMATION AND/OR DOCUMENTS REQUESTED
3  INFORMATION AND/OR DOCUMENTS      PAGE
4  Text or E-mail communications with
5  John Robbins            134-135
6  Audio of interview with T-Shirt fan 155
7  Word document with metadata of
8  notes in working file in native
9  format                214
10 Recordings of witness questioning
11 Brandon Miller            268
12
13
14    QUESTIONS MARKED FOR RULINGS
15 PAGE LINE QUESTION
16 206  6  Did Source A purport to tell you
17       that he or she or they had
18       firsthand personal knowledge
19       that Kai Spears was Brandon
20       Miller's passenger?
21 207  18  Were you shown those or given
22       those off the record?
23
24 (Index continued on following page.)
25

Page 319

B. WITZ

1
2  PLAINTIFF EXHIBITS:
3
4  EXHIBIT   EXHIBIT              PAGE
5  NUMBER    DESCRIPTION
6  Exhibit 28   Text Messages        284
7  Exhibit 29   Four-Page Document     289
8  Exhibit 30   E-mail               295
9  Exhibit 31   E-mail               307
10 Exhibit 32   E-mail               309
11
12 Exhibit 33   Flash Drive          314
13
14   (Exhibits retained by Court Reporter.)
15
16        I N D E X
17
18 EXAMINATION BY            PAGE
19 COUNSELOR NEW             6
20
21
22 (Index continued on following page.)
23
24
25

Page 321

B. WITZ

1
2    QUESTIONS MARKED FOR RULINGS
3  PAGE LINE QUESTION
4  211  4  Whether it was on the record or
5       off the record, was it from
6       someone other than Source A or
7       Source B?
8  225  19  You had spoken to them off the
9       record?
10 256  24  You had spoken to the DA's
11       Office off the record?
12 270  4  Did you talk to him off the
13       record?
14 267  17  You spoke to him off the record?
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT 1**

Page 322

1          B. WITZ
2       C E R T I F I C A T E
3
4  STATE OF NEW YORK    )
             : SS.:
5  COUNTY OF RICHMOND    )
6
7      I, AMANDA TARTAGLIA, a Notary Public
8  for and within the State of New York, do
9  hereby certify:
10     That the witness whose examination is
11 hereinbefore set forth was duly sworn and
12 that such examination is a true record of
13 the testimony given by that witness.
14     I further certify that I am not
15 related to any of the parties to this
16 action by blood or by marriage and that I
17 am in no way interested in the outcome of
18 this matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 13th day of July 2024.
21
22
23       _Amanda Larrea_
       AMANDA TARTAGLIA
24
25

Page 323

1  To: CHAD BOWMAN, ESQ.
2  Re: Signature of Deponent Billy Witz
3  Date Errata due back at our offices: 30 days
4
5  Greetings:
6  This deposition has been requested for read and sign by
   the deponent.  It is the deponent's responsibility to
7  review the transcript, noting any changes or corrections
   on the attached PDF Errata.  The deponent may fill
8  out the Errata electronically or print and fill out
   manually.
9
10 Once the Errata is signed by the deponent and notarized,
   please mail it to the offices of Veritext (below).
11
12 When the signed Errata is returned to us, we will seal
   and forward to the taking attorney to file with the
13 original transcript.  We will also send copies of the
   Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please Email the completed errata/witness cert page
   to CS-SOUTHEAST@VERITEXT.COM
19 or mail to
20 Veritext Production Facility
21 2000A Southbridge Parkway, Suite 400
22 Birmingham, AL 35209
23 800-808-4958
24
25

Page 324

1  ERRATA for ASSIGNMENT #6746989
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7  (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24
25

Page 325

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16
17
18       _____
       DEPONENT'S SIGNATURE
19
   Sworn to and subscribed before me this ___ day of
20
     _____, _____.
21
22 _____
23 NOTARY PUBLIC / My Commission Expires:_____
24
25

**[& - 17]**                                                    Page 326

**&**

**&**   2:4 3:17

**0**

**0000012**   173:3
**0000029**   173:3
**00692**   1:6
**05:00**   173:4

**1**

**1**   3:17 4:3 5:16
   11:10 23:16,22
   51:23 63:23,24
   105:23 317:8
**10**   1:11 88:6
   116:23 121:2
   149:24 153:10
   317:20
**10018**   7:8
**10019**   1:21
**10:35**   51:22
**10:48**   52:4
**10th**   5:15 112:8
   117:6 119:5
   121:8,24 122:9
   123:17 124:12
   131:13 132:3,16
   132:21 133:4
   136:15 139:6
   140:20 143:5
   145:15 148:9
   166:6 262:22
**11**   150:4 165:24
   214:3 277:3,12
   278:10 303:24
   304:4 317:21

**110**   317:17
**113th**   11:10
   15:11
**11:03**   173:18
   189:8,10
**11:30**   203:11,16
**11:31**   193:15,25
   197:15 224:4
**11:35**   174:20
**11:56**   289:17
**11th**   112:9
   116:23 117:6
   119:5 121:8,25
   122:9 123:17
   124:12 153:17
   155:12 162:6
**12**   108:8 150:8
   171:5 173:14
   317:22
**129**   317:18
**12:03**   102:8
**12:06**   173:15
**12:30**   10:7
**12:35**   242:14
**12th**   2:14 30:20
   112:8,9,11
   116:23 117:7
   119:5 120:19
   121:9,25 122:10
   123:18 124:12
   145:3 169:5
   172:18
**13**   14:7 150:12
   172:9 174:6,6
   318:6

**131**   317:19
**134-135**   320:5
**13th**   31:24
   113:17 173:15
   182:18 322:20
**14**   10:21 41:19
   150:17 318:7
**149**   317:20
**14th**   173:17
   174:21 175:14
   176:16 177:14
   178:11 181:4,20
   182:18 189:9
**15**   150:22
   188:24 318:8
**150**   317:21,22
   318:6,7,8
**150-151**   318:9
**151**   318:10,11
   318:12,14,15
**152**   318:16,17
   318:18,19,20
**153**   318:21
**155**   11:7 320:6
**15th**   30:10
   44:25 47:8
   48:12 55:10
   56:12 58:14
   64:6 65:8,25
   66:15,19 67:17
   69:4,6,14 71:20
   77:22 81:17
   86:12 87:15
   92:14,23 93:20
   94:10 99:9

**100:4,18 101:11**
   102:16 118:4
   176:12 177:7,10
   178:12 181:4
   182:2 185:22
   196:5 197:15
   212:20 215:19
   226:5,8,11,14
   226:18 227:14
   236:2 239:24
   242:24 243:7
   246:22 249:10
   250:2 255:7
   256:19 260:25
   289:17 294:3,7
   294:14 303:13
**16**   47:11 151:3
   193:12 203:8
   318:9
**1675**   1:20
**16th**   30:21
   92:24 94:11
   95:2,16 96:23
   97:5 169:12
   170:9 231:17
   250:2 251:8,13
   258:20 259:5
   266:4 280:25
   281:11 295:22
   298:3 299:8
   301:15
**17**   42:12 43:3,8
   151:8 318:10
   321:14

**[1718 - 2nd]**                                                   Page 327

**1718** 309:14

**17th** 92:25
94:11 95:3,16
96:23 97:6
250:2 258:20
266:4,15

**18** 11:20 151:12
214:5 318:11
320:21

**1813** 182:20

**1816** 295:21

**1831** 166:21
168:22

**1833** 169:14
183:17

**1834** 184:4,10
184:12 185:17

**1835** 182:21
186:4

**1836** 187:12

**1855** 303:20
304:5

**18th** 290:2
294:7,14,23

**19** 137:12
146:13 151:16
216:3 240:17
271:5 318:12
321:8

**1909** 2:14

**1912** 11:11

**1962** 10:21

**1981** 17:24

**1982** 27:21
29:10

**1984** 17:20 40:5

**1994** 17:13

**19th** 1:21

**1:05** 242:14

**1:06** 212:20

**1:13** 102:14

**1:35** 215:18

**1st** 115:20
297:20

**2**

**2** 4:8 11:10 27:9
52:5 102:10
132:21 133:4
272:16 317:9

**20** 15:10 137:12
151:21 238:15
241:22 316:19
318:13

**20006-1157**
2:15

**2000a** 323:21

**2008** 14:18

**2010** 14:25

**2011** 33:7

**2015** 15:10
16:11 84:2

**2016** 55:10,12
57:7 65:11 76:3
76:5,10

**2017** 324:7

**2018** 15:10

**2019** 26:7

**2021** 14:7 31:24
75:8,19 76:11

**2022** 65:12
76:11

**2023** 71:20
76:10 78:18
81:17 84:5,7
85:2 87:7
100:19 102:17
102:17 111:6,24
153:18 162:7
168:25 173:15
173:18 181:20
212:20 307:21

**2024** 1:11 5:15
262:22 322:20

**206** 320:16

**207** 320:21

**20th** 289:20
305:5 306:16

**21** 137:12
151:24 219:24
242:15 318:15

**211** 321:4

**214** 320:9

**21st** 81:16

**22** 152:5 246:7
276:11 318:16

**222-5603** 13:4

**223** 212:2,18

**224** 211:25

**225** 321:8

**227** 271:9

**23** 15:10 91:13
152:10 318:17

**24** 152:15
175:16,24,25

176:19 181:3
182:8 318:18
321:10

**24464** 322:23

**250** 147:17

**253** 11:10

**256** 321:10

**25801** 2:6

**25a** 152:19
252:20 253:10
318:19

**25b** 152:23
252:20 318:20

**25th** 212:19

**26** 153:3 272:14
272:14 318:21

**267** 321:14

**268** 320:11

**27** 280:8 318:22

**270** 321:12

**28** 284:4,6 319:6

**280** 318:22

**284** 319:6

**289** 319:7

**29** 270:10
289:11 305:20
319:7

**295** 319:8

**2:17** 149:18

**2:23** 271:20

**2:29** 153:8

**2:30** 216:24
226:8,8,14

**2nd** 48:9,10,13
297:21 298:3

**[2nd - 9th]**

309:17

**3**

**3**  4:12 31:18
35:8 54:5 57:12
102:15 149:20
276:23 317:10
**30**  3:16 197:18
295:13,15,20
296:21 319:8
323:3 324:6,7
**304**  253:6
**307**  319:9
**309**  319:10
**31**  41:19 307:12
319:9
**310**  13:7
**314**  319:12
**31st**  307:20
**32**  309:8,11
319:10
**33**  314:23
319:12
**35209**  323:22
**35406**  2:10
**355-6544**  12:19
**37**  73:2,16
**3991**  10:23
**3:25**  188:15
**3:38**  188:22
**3:44**  193:5
**3:54**  199:23

**4**

**4**  54:9,10 57:22
72:25 73:16

153:9 188:17
281:23 282:8,11
317:8,9,10,11
317:12,13 321:4
321:12
**40**  137:19
**400**  323:21
**408**  290:14
**417-5222**  253:6
**424**  13:4
**430**  2:5
**434-6705**  12:22
**46**  48:2
**470-6441**  13:7
**48**  164:14
**49**  242:18
**4:00**  200:5
**4:06**  172:13
**4:11**  209:7
**4:21**  209:13
**4:43**  111:6
**4:54**  249:10
**4a**  4:16 34:7,8
317:11
**4b**  4:20 34:10
317:12
**4c**  4:24 40:7
317:13
**4d**  5:4 43:6,7
317:14
**4th**  133:12

**5**

**5**  5:9 40:15 43:8
63:23 65:14
188:23 252:12

317:14,15,15
**5-30**  324:6
**562**  12:19,22
**59**  276:5,8
**5:19**  252:10
**5:44**  250:17
**5:47**  252:17
**5:54**  253:15

**6**

**6**  54:5,9 57:12
57:23 63:23
65:14 74:25
75:3 252:18
302:12 317:16
319:19 320:16
**620**  7:7
**6746989**  324:1
**69**  249:2
**6:00**  120:20
**6:28**  249:3
**6:48**  250:22
**6:54**  302:10

**7**

**7**  40:15 110:23
302:18 315:6
317:17
**7,000**  29:5
**70**  46:20
**701**  2:10
**71**  250:15
**740**  253:2
**75**  317:16
**77**  48:2

**78**  48:2,19 49:19
**79**  48:2,19 49:19
**7:00**  120:21
**7:13**  302:17
**7:23**  1:6
**7:25**  313:7
**7:28**  313:13
**7:29**  315:3,9
**7:30**  198:8
**7:42**  309:17

**8**

**8**  129:24 317:18
**800-808-4958**
323:23
**8:00**  172:20
**8:10**  255:6
256:7 260:11,14
271:21
**8:15**  247:18
**8:17**  153:18
**8:30**  198:8
**8:51**  288:11
**8th**  7:7 75:8
112:7

**9**

**9**  111:6 131:10
317:19
**9:32**  1:12 5:14
**9th**  102:17
111:24 118:24
120:8 130:21

**EXHIBIT 1**

**[a&m - agree]**                                                              Page 329

| a |
| --- |

**a&m** 38:6
**a.m.** 1:12 5:14
  51:22 52:4
  172:13,20
  173:15 174:20
  193:15,25
  197:15 198:8,8
  203:11,16 224:4
**aaron** 171:10,13
  172:6 173:16,16
  189:8 246:17,21
  248:8 255:12,18
  255:22 275:22
**able** 50:8,10
  60:14 85:24
  140:7,12,17,22
  144:18,23,25
  175:6 177:18,24
  219:8 225:4
  229:4,24 234:23
  237:19 239:18
  240:6 258:18
  272:21 299:23
  305:3 306:10
**above** 44:4
  84:24 85:11,12
  89:11 311:19
  316:6 323:15
**abuse** 79:5
**acceptable**
  259:24
**accepted** 15:18
**access** 22:9
  223:22 257:12

257:17
**accessories**
  263:7 264:12
**accessory**
  148:22 263:14
  263:15
**accomplice**
  149:3
**accomplishme...**
  147:14
**accordance**
  19:22 247:24
**accuracy** 32:10
  32:20 33:17,24
  243:2,5 257:25
**accurate** 62:3
  95:5,11,15,24
  96:5,11,17 98:8
  136:9 138:12
  165:21 191:12
  192:2,11 193:4
  211:18 233:16
  246:16 258:5
  259:2 260:8
  266:9 267:5
  298:19,20
**accusatory**
  248:16
**accused** 275:20
**accusing** 129:15
  264:10
**acknowledge**
  38:15 97:15,20
  97:25 243:19
  276:14

**acknowledged**
  46:25
**acknowledges**
  63:3
**act** 146:6,17,21
  273:11
**acting** 134:16
  146:25
**action** 322:16
**activities** 182:4
  290:9,17
**activity** 53:23
**actual** 53:24
  99:18,18,19
  123:7 156:20
  295:4
**actually** 67:15
  102:25 212:18
  239:23
**adam** 33:6
  39:15
**add** 66:21
  270:15
**added** 33:8 34:3
  66:22 213:5
**additional** 24:4
  264:9 313:17
  324:9
**address** 7:6 11:2
  15:9,11 76:23
  143:22 249:10
**addressed** 111:8
**adds** 62:25
**adhere** 75:22

**adjusted** 189:3
  249:3 250:16
**administer** 3:11
**adult** 11:14,18
**advance** 83:4
  87:16
**advice** 203:2
**affidavit** 47:3
  49:24,25 50:4,7
  297:22
**affix** 310:12
**afraid** 260:16
**aftermath**
  219:18 244:19
**afternoon** 98:25
  120:19 170:9
  175:10 216:24
  235:25 239:24
  246:21
**afterward** 36:4
  244:14
**age** 11:19
  287:19
**agencies** 278:18
**ago** 35:24
  137:19 158:23
  168:23 203:13
  312:2
**agree** 25:8
  26:24 53:8,13
  57:20,21 58:6
  58:10,22 59:12
  59:18 62:24
  63:13 73:12
  75:23 77:12,13

**[agree - alright]**

77:19,25 78:8,9
80:2 92:25 97:8
101:19 179:9
191:2,8 192:13
262:21

**agreed**  3:5,20

**agreement**
207:2

**ahead**  9:13,22
10:11 34:9
101:24 179:8
200:8 210:24
218:20 303:19

**al**  323:22

**al.com**  133:19
134:2 267:8

**ala**  324:6

**alabama**  1:2
2:10 5:22 34:23
35:9,18 36:5
37:9,12 38:25
39:6 44:3,14,18
44:19 45:8 46:7
64:17 70:25
71:8 78:18
79:14 95:3
103:11 104:22
105:16 106:22
109:5,8,18,18
111:6,25 112:3
112:8,16 113:16
114:19 115:19
116:20 121:14
124:15 126:6,9
127:10,17,24

128:22,23
131:19,25 132:3
133:8,10 135:15
136:2 140:20
145:6,12,21
148:11,15
154:15 156:9
157:8 158:13,16
159:13,24
162:22 165:10
165:10 171:11
179:14 189:24
190:18 191:16
196:24 215:20
217:14 224:10
244:7,20 245:4
245:21 246:11
248:17,22
254:15 255:3,11
258:10,15
259:17,25
260:18 261:2,12
264:25 265:5
266:17,24 269:6
271:13,18,24
275:13,21 276:8
276:18 281:7
284:13,21,23
285:8 286:22
287:11 288:25
292:2 299:10
306:9 307:21,25

**alabama's**
104:12 106:11
107:7 112:13

130:23 135:7
136:10 173:23
242:13 247:12
268:22 286:13
288:20

**alabaster**
127:16 165:10

**alain**  130:3,4,7
131:6,6 132:11
132:12 175:5,8
175:14 193:16
197:14 200:13
203:18,21,24
204:4,10 224:5
225:2

**alarming**  39:18

**alert**  308:5,16

**alerted**  307:24
308:19 309:3

**alerting**  308:8

**alerts**  308:12

**alison**  39:23
83:5,16,24
85:21 87:18

**alleged**  82:11,25
263:20

**allen**  33:5,6

**allow**  8:8 62:13
99:10 124:25
223:21

**allowed**  127:22
223:6

**allows**  279:2

**alls**  200:22

**alluded**  230:17

**alright**  7:9,17
8:7 9:7,17 15:15
16:25 24:11,13
27:19 28:19
44:23 46:14
47:7,8 52:6 53:3
54:13 55:9
56:12 63:20,22
65:13 72:14
75:6 80:5 83:12
83:25 91:18
100:15 109:15
110:21 111:4
113:10 120:12
123:12 125:15
132:9,15 136:25
139:4,10 149:13
153:13 154:8,21
165:22 166:12
166:19 167:2
173:12 174:4,13
175:4 177:13
179:7,25 180:25
181:19,25
183:17 188:25
193:10,13 194:8
199:21 201:15
202:11,21 203:4
203:7 208:10
211:11 212:2
215:12 216:11
218:2 219:17
223:25 224:8
225:25 230:2,20

[alright - answer]                                                    Page 331

| | | | |
|---|---|---|---|
| 237:21 238:14 | 56:24 57:15 | 64:23 65:6 | 205:15 206:12 |
| 239:3,20 242:11 | 60:15 61:20,24 | 66:17 67:21 | 206:20,24 |
| 242:15 246:5,6 | 63:4 65:21 | 68:14 70:11 | 209:20,22 210:5 |
| 248:15 255:4 | 66:14,24 67:6 | 71:22 75:14 | 210:8,9,21 |
| 257:5 260:24 | 67:15,19 68:18 | 78:21 80:11 | 211:10 216:7,18 |
| 261:10 263:18 | 75:22 76:14 | 83:7 87:24 | 217:2 218:7,12 |
| 268:13 272:3 | 77:9,17 78:6 | 89:15 90:7 91:3 | 218:18 222:15 |
| 276:5,23 278:16 | 80:8,19 81:12 | 92:16 93:3 | 222:23 223:15 |
| 281:21 290:5 | 81:23 82:5,14 | 94:13,18 95:8 | 225:24 227:6 |
| 295:2 297:10 | 83:2 84:22 | 95:20 96:9 | 230:13 231:10 |
| 302:7 303:17 | 85:17 88:16 | 97:18 98:3 99:4 | 231:23 232:14 |
| 304:3 309:6 | 90:23 91:25 | 99:15 100:6 | 233:6,13 234:4 |
| **amanda**  1:22 | 92:4 220:20 | 110:19 115:23 | 234:14 235:14 |
| 6:2 322:7,23 | 246:22 247:13 | 119:20 125:12 | 236:4,10,18,25 |
| **ambulance** | 257:11 270:11 | 128:25 129:19 | 238:2,10 240:12 |
| 289:23 291:5,8 | 276:24 277:17 | 135:19 136:7 | 241:9 244:2 |
| **amended**  39:4 | 278:10 279:4,25 | 137:25 140:11 | 246:2 248:3,19 |
| 57:10 | 281:25 282:18 | 140:25 141:15 | 250:5,9 251:18 |
| **amendment** | 294:6,13 295:8 | 141:16 142:18 | 252:2 256:12 |
| 115:20 | 296:5,9,14 | 143:9,16,25 | 257:4,15,22 |
| **amid**  212:7 | 297:5 300:15,21 | 146:9,19 148:3 | 258:23 260:6,17 |
| **amount**  133:23 | 301:3,13,18,19 | 149:7,11 157:12 | 260:22 262:16 |
| **andrew**  284:9 | **answer**  7:20 8:4 | 160:14 161:23 | 263:11,12 |
| **angeles**  11:12 | 8:8,12,23 9:11 | 162:15 167:23 | 264:17 265:25 |
| 11:16 12:7 18:3 | 9:13 17:7 22:19 | 170:7,16 179:5 | 266:8,20 267:23 |
| 20:4,5,15 50:24 | 25:19 26:18 | 179:19 194:4,18 | 269:3,11 270:8 |
| **angels**  69:25 | 30:23 31:11 | 194:22,25 | 274:8 275:4,18 |
| 70:5 | 32:12 33:14,20 | 195:21 196:12 | 278:7,23 281:14 |
| **announced** | 36:13 38:12 | 196:14 197:23 | 283:2,5,18 |
| 158:3 | 39:13,21 45:5 | 198:4,13,15,17 | 285:14 286:21 |
| **anonymity**  54:6 | 45:16 46:18 | 199:3,13,17 | 287:3 288:17 |
| 57:25 60:7,21 | 48:6,25 49:9,21 | 200:16 201:4,8 | 291:2,23 292:5 |
| 80:2,15 81:6 | 56:16 57:5 59:7 | 201:14,23 202:2 | 297:19 298:15 |
| **anonymous** | 60:18 61:6,22 | 202:5,9,11,25 | 300:12 301:9,23 |
| 55:12 56:14,19 | 62:8 63:7,16 | 203:3 204:25 | 305:10 306:20 |

**EXHIBIT 1**

308:7,24 311:3
312:6

**answered** 47:23
101:7 198:12

**answers** 8:21
143:19 165:7

**anticipate** 8:10

**anybody** 9:2
33:10 70:12
93:12 100:22
101:3 118:6
133:19 160:6
178:19 181:14
189:21 212:25
251:13 260:13
285:7,12 310:22

**anyway** 122:22
155:6

**apart** 235:4

**apartment**
11:10 187:20

**apologies**
253:23

**apologize**
135:11 203:8
248:25 291:13
301:11

**apologized**
138:13

**apology** 138:11

**app** 35:8,9
36:17 39:9

**apparent** 53:24
168:19

**apparently**
127:13 168:19

**appear** 128:21
137:7 250:16

**appearances** 6:5

**appears** 75:18
166:4,9,24
186:5 225:10

**applied** 58:9
65:7

**applies** 125:9

**apply** 58:13
65:12 71:18
73:9 79:24
81:17 82:8
287:20

**appreciate**
312:25

**approached**
144:15 219:10

**appropriate**
33:22,23 88:10
158:11,14
180:14 247:23

**appropriately**
67:18

**approval** 87:19
88:15 89:12

**approve** 32:6,17

**approved** 65:19
65:23 88:21

**approximately**
255:9

**april** 15:10
27:20 47:14

**archibald** 85:5
85:15 87:6
295:23

**area** 204:8

**arena** 147:11
281:4

**argumentative**
80:11 137:23,25
167:23 231:10
235:17 236:25
246:2 248:3
278:7

**arlington** 23:11
23:14,15

**arm** 105:24

**arms** 137:5

**arrest** 133:11
273:21

**arrives** 131:20

**artful** 231:20
235:9 236:21
237:2,23 247:23

**article** 4:2,7,15
4:19,23 5:3
19:18 22:10
27:12 30:10
32:10 34:4,11
34:15,19 38:14
42:12 43:11
44:11 48:4
56:13 57:3,13
58:14 64:6,16
65:25 66:15,19
67:17 69:4,7,14
71:20 77:22

80:6 81:17
85:16 89:9,11
89:23 94:9 95:5
95:16 96:5,19
96:21 97:23
99:18 100:2,19
101:11 131:9,14
132:4,16,22
133:5 138:5
145:15 148:9
153:2 166:6
185:22 191:7
211:13 212:21
213:13,23
215:14 216:23
218:25 220:17
227:14 254:9
255:5,6,20
256:19 257:8
258:21 260:25
263:4 264:8
266:24 267:8
270:17 271:20
272:10 274:5
277:3,13 278:16
279:2,6,24
281:24 282:9
286:24 287:10
288:10,12 294:3
294:12 295:7
298:11 300:15
300:22 301:17
306:11 307:20
312:3,12,22
317:8,9,11,12

**[article - audio]** Page 333

317:13,14,19
318:21
**articles** 19:21
43:18 51:9
281:11 295:4
**articulated**
267:21
**ascertain**
221:10
**asked** 36:21
47:23 66:3
101:7 113:4,8
119:16 123:22
125:20 130:9
132:10,17
139:11,18,22
140:8,13,21
141:10,20,24
142:11 156:20
158:11,17 160:8
164:4 166:7,10
171:23 198:12
216:19 231:25
235:9 236:13
240:8 241:6
247:11 256:8
258:16 273:10
274:24 280:19
280:22 282:5
289:8 292:22
**asking** 8:24 9:12
17:15 33:7
35:12,13 42:22
59:22 63:12,13
83:14 87:14

89:20 90:9,15
90:18,19 93:17
93:18 114:9
117:18 120:6
121:20,21 128:4
130:12 141:19
155:17 158:13
158:16,20
162:25,25 163:2
166:16 170:12
181:10 184:7
217:4 224:23
225:2 230:16
238:12 248:12
277:22 282:8
290:21 297:3
**asks** 140:2
**aspects** 30:9
**assert** 180:12
**asserted** 179:16
**asserting**
179:17 202:6
**assertion** 35:7
179:10 180:6,22
243:2
**asserts** 306:12
**assess** 59:17
60:4
**assessed** 257:16
**assessment**
26:22 41:16
61:15 222:25
223:18,23
233:15

**assessments**
60:11
**asset** 57:19
77:11
**assigned** 104:21
**assignment**
105:3 324:1
**assist** 130:8
131:7 132:12
324:8
**assistant** 2:22
**associated**
268:21
**associates** 2:4
125:3
**association**
62:18,22
**assume** 214:14
**assumed** 233:22
257:11,25
**assuming**
175:19 223:8
232:25 233:7,8
246:10 296:10
**athletes** 26:3,11
126:6 245:22
**athletic** 39:7
171:10 173:24
181:22 247:12
268:22
**athletics** 25:3,16
26:2 37:13
**attach** 313:17
324:9

**attached** 323:7
**attempt** 254:3
291:13 307:3
**attempted**
174:14 225:12
269:4
**attempts** 260:9
**attention**
121:15 138:9
154:19
**attorney** 2:18
2:18 40:19
134:22 170:13
170:14 184:2,2
323:12
**attorney's** 251:3
251:7
**attorneys** 2:4,9
2:13 122:13
178:18
**attributable**
184:5,12
**attributed**
67:18,24 296:16
**attributing**
133:18
**attribution**
62:24 66:14
276:24 277:18
278:12 296:13
**auburn** 127:9
127:11 159:17
**audience** 63:2
**audio** 155:19,22
156:2,19 230:4

[audio - b]                                                                    Page 334

| | | | |
|---|---|---|---|
| 230:6 234:8 | 66:1 67:1 68:1 | 147:1 148:1 | 216:1 217:1 |
| 313:18 320:6 | 69:1,3 70:1 71:1 | 149:1 150:1 | 218:1 219:1 |
| **authority** 53:5 | 72:1 73:1 74:1 | 151:1 152:1 | 220:1 221:1 |
| **authorized** 3:11 | 75:1 76:1 77:1 | 153:1 154:1 | 222:1 223:1 |
| **available** 21:22 | 78:1 79:1 80:1 | 155:1 156:1 | 224:1 225:1 |
| 113:8 117:9,10 | 81:1 82:1,20 | 157:1 158:1 | 226:1 227:1 |
| 178:7,9 | 83:1 84:1 85:1 | 159:1 160:1 | 228:1 229:1 |
| **avenue** 7:7 11:7 | 86:1 87:1 88:1 | 161:1 162:1 | 230:1 231:1 |
| 11:12 | 89:1 90:1 91:1 | 163:1 164:1 | 232:1 233:1 |
| **avoiding** 53:23 | 92:1 93:1 94:1 | 165:1 166:1 | 234:1 235:1 |
| **aware** 20:2 21:9 | 95:1 96:1 97:1 | 167:1 168:1 | 236:1 237:1 |
| 38:25 248:10 | 98:1 99:1 100:1 | 169:1 170:1 | 238:1 239:1 |
| 273:23 278:19 | 101:1 102:1 | 171:1 172:1 | 240:1 241:1 |
| 278:24 310:20 | 103:1 104:1 | 173:1 174:1 | 242:1 243:1 |
| | 105:1 106:1 | 175:1 176:1 | 244:1 245:1 |
| **b** | 107:1 108:1 | 177:1 178:1 | 246:1 247:1 |
| **b** 6:20 7:1 8:1 | 109:1 110:1 | 179:1 180:1 | 248:1 249:1 |
| 9:1 10:1 11:1 | 111:1 112:1 | 181:1,11 182:1 | 250:1 251:1 |
| 12:1 13:1 14:1 | 113:1 114:1 | 183:1 184:1 | 252:1 253:1 |
| 15:1 16:1 17:1 | 115:1 116:1 | 185:1 186:1 | 254:1 255:1 |
| 18:1 19:1 20:1 | 117:1 118:1 | 187:1 188:1 | 256:1 257:1,9 |
| 21:1 22:1 23:1 | 119:1 120:1 | 189:1 190:1 | 258:1 259:1 |
| 24:1 25:1 26:1 | 121:1 122:1 | 191:1 192:1 | 260:1 261:1 |
| 27:1 28:1 29:1 | 123:1 124:1 | 193:1 194:1,11 | 262:1 263:1 |
| 30:1 31:1 32:1 | 125:1 126:1 | 195:1 196:1 | 264:1 265:1 |
| 33:1 34:1 35:1 | 127:1 128:1 | 197:1 198:1 | 266:1 267:1 |
| 36:1 37:1 38:1 | 129:1 130:1 | 199:1 200:1 | 268:1 269:1 |
| 39:1 40:1 41:1 | 131:1 132:1 | 201:1 202:1 | 270:1 271:1 |
| 42:1 43:1 44:1 | 133:1 134:1 | 203:1 204:1 | 272:1 273:1 |
| 45:1 46:1 47:1 | 135:1 136:1 | 205:1 206:1 | 274:1 275:1 |
| 48:1 49:1 50:1 | 137:1 138:1 | 207:1,24 208:1 | 276:1 277:1 |
| 51:1 52:1 53:1 | 139:1 140:1 | 208:3,21 209:1 | 278:1 279:1 |
| 54:1 55:1 56:1 | 141:1 142:1 | 210:1,2 211:1,6 | 280:1 281:1 |
| 57:1 58:1 59:1 | 143:1 144:1 | 212:1 213:1 | 282:1 283:1 |
| 60:1 61:1 62:1 | 145:1 146:1 | 214:1 215:1 | 284:1 285:1 |
| 63:1 64:1 65:1 | | | |

**[b - believe]**                                                    Page 335

286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1,21
293:22,23 294:1
294:21 295:1,3
295:5,6,10
296:1 297:1
298:1 299:1
300:1 301:1
302:1,19 303:1
303:9 304:1
305:1 306:1
307:1 308:1
309:1 310:1
311:1 312:1
313:1 314:1
315:1 316:1
317:1,2 318:1
319:1 320:1
321:1,7 322:1
**bachelor's**  17:4
17:8,11
**back**  29:12 31:3
52:2 70:8 76:3
102:12 104:18
113:19 115:13
120:15 122:2,10
153:6 175:8,8
176:11,21 177:7
177:9 182:3
183:17 185:24
188:7,20 197:9
200:3 209:11,17
209:22 215:20

216:2 224:21
252:15 258:14
258:15 259:25
260:12 264:19
266:16 267:6
288:16,22
302:15 313:11
323:3
**backwards**
306:25
**bad**  134:17
147:24
**badger**  234:18
235:2
**ballard**  1:20
2:13 6:13
**banned**  127:17
**baquet**  55:25
83:17
**bar**  133:13
**based**  51:8
82:13,17 143:5
257:17 271:14
300:10
**basic**  57:23
80:13 81:5
**basically**  204:12
274:19
**basis**  9:12 32:7
52:18 115:18
194:16 196:10
210:4 225:22
267:20 296:14
**basketball**  23:5
71:2,12,14

79:13 97:3
111:7 116:20
129:6 135:24
143:14 181:21
189:25 242:23
264:10 265:5
271:13,18,24
306:9 307:25
**bate**  129:11
**bates**  105:21
166:21 173:13
182:20 242:18
282:10 303:20
**bathroom**
149:15
**beach**  11:7,16
12:6 15:8 19:10
23:4 50:23
**beak**  292:11
**beat**  25:12 26:9
26:15
**beckley**  2:6
208:6,15
**beg**  130:7
**begged**  157:17
**beginning**  133:7
218:3,14
**begins**  249:16
261:8 272:10
**behalf**  6:7,9,13
**belabored**  232:4
**belief**  190:21
244:6
**believability**
67:13

**believable**  222:5
222:12,21
223:13
**believe**  9:25
21:18 22:13
23:13,14 35:16
37:24 39:23
47:4 48:7,14
50:24 53:19
64:11,13,17,18
64:25 65:24
66:12 67:17,23
68:18 70:18
74:5 84:12 85:4
85:6 90:5
101:10 104:19
107:5,9 109:3,7
113:24 114:2
116:25 119:7
122:12,15
124:16 126:6
127:19 132:5,24
133:17,24
138:10,10,22
148:9,14 156:3
169:3,6 179:11
180:13,21
183:25 184:14
185:19 186:14
187:3 200:11
203:6,14 211:17
215:22 217:18
224:23 230:15
236:21 245:20
254:12 256:13

258:11 259:23
268:5 269:6,13
269:13,25
270:12 275:12
280:13 298:4
308:8 310:16
311:9 313:21
**believed**  68:12
71:4 95:9 96:16
162:4 178:15
191:12,23 193:3
230:15 246:14
249:21 258:24
260:7 261:23
266:9 267:5
**benefit**  132:16
**best**  8:7 42:8
76:2 141:12
154:15 206:24
274:2 278:3
**better**  26:4
309:20
**beyond**  53:12
54:3 284:21
**big**  25:5 26:9
39:25 40:2 44:4
121:2 158:10
264:24
**bigger**  126:18
**billy**  1:17 5:17
7:4 25:10
173:18 175:9,17
227:23 229:11
237:6 239:5
253:22 308:2

310:5 315:5
316:15 323:2
**bird**  292:8
**birmingham**
110:2 113:25
114:5 134:18
176:9,11,22
177:3,7,10
181:23 182:3
215:20 224:21
226:19,20
323:22
**birth**  10:20
**bishop**  193:21
**bit**  115:13
121:15 138:9
144:18 216:10
**blank**  212:9
215:13
**blanket**  60:7
**bless**  224:19
**blood**  322:16
**blow**  77:18,24
**blown**  290:23
**board**  29:3
**boat**  129:11
**bold**  158:23
**bone**  118:20
**booklet**  7:23
**books**  40:4
**booster**  187:19
188:2
**bothered**  42:5
**bottom**  57:13
74:14 168:22

173:14 182:21
184:11 282:10
289:15 290:11
**bounce**  105:6
107:3
**bowman**  2:15
6:12,12 9:25
10:5 17:6 22:18
23:17,21,24
24:9 25:18
26:17 27:11,14
30:22 31:5,10
32:11 33:13,19
34:6 36:12
38:11 39:12,20
40:10,18,25
41:5 42:14,24
43:7 45:4,15
46:17 47:22
48:5,24 49:8,13
49:20 51:14,19
54:14,19 56:15
57:4 59:5 60:17
61:5,21 62:7
63:6,15 64:20
64:22 66:16
67:8,20 68:13
68:22 70:10
71:21 73:3
74:22 75:9,13
78:20 80:10,22
83:6 84:4 87:23
89:14 90:6 91:2
92:15 93:2
94:12,17 95:7

95:19 96:8
97:14,17 98:2
99:2,14 100:5
101:6 102:2,4
110:18 111:10
115:17 116:5
125:7,11 128:24
129:18 135:18
136:6 137:15,22
140:24 142:17
143:15 146:8,18
148:2 149:6,10
153:24 154:7
156:5 157:11
161:22 162:14
165:24 167:22
170:6,11,15
172:14,19 179:2
179:23 180:4,9
180:23 188:8
194:3,15,20
195:11,18 196:9
196:16 197:11
197:21 198:11
198:25 199:9,15
199:19 200:6
201:2,13,20,25
202:14,24
204:23 205:13
206:10 207:20
208:11 209:4
210:3,20 211:7
212:11 215:5
216:5,17,25
218:6,11,17

| | | | |
|---|---|---|---|
| 222:14,22 | 304:3,8 305:9 | 135:16 139:11 | 320:19 |
| 223:14 225:21 | 305:15,21 | 139:11,15,18,22 | **brayton** 289:14 |
| 227:5 230:12 | 306:19 307:7 | 140:6,9,13 | 289:20 305:24 |
| 231:9,22 232:13 | 308:6,23 309:8 | 141:21 142:14 | 306:17 |
| 233:5,12,25 | 311:2 312:5,15 | 143:6,13 145:16 | **break** 8:19,25 |
| 234:3,13 235:7 | 313:3,14 314:3 | 145:24 147:22 | 9:17,19,20 10:4 |
| 235:16 236:3,9 | 314:18 323:1 | 148:10 157:24 | 10:6 51:13 |
| 236:17,24 | **boy** 128:23 | 159:3 160:2,23 | 101:25 115:12 |
| 237:25 238:9 | 129:2 165:9 | 161:25 162:3,10 | 143:6 149:15 |
| 240:11,16 241:8 | **bradley** 110:9 | 162:20 165:13 | 188:11 199:20 |
| 243:25 245:9,25 | 110:12,13 | 166:7 168:24 | 200:7 205:18 |
| 246:7 248:2,18 | 112:22 114:19 | 187:19 191:5,11 | 209:5 210:13 |
| 250:4,8 251:17 | 116:12,17,19,22 | 194:6 203:25 | 252:8 302:8 |
| 252:3,6,19 | 117:5,20 133:14 | 205:11 206:9 | **breaking** 86:25 |
| 253:7,12 256:11 | 135:6,8,16 | 210:17 212:6 | **brendan** 267:9 |
| 257:2,14,21 | 136:11 148:14 | 221:13,23 | 267:13,15 |
| 258:22 260:5,21 | 157:3,9 158:12 | 222:19 224:24 | **brief** 51:24 |
| 262:15 263:9 | 158:15 160:2 | 225:13 228:7,11 | 143:23 149:21 |
| 264:14,16 | 219:6 225:15 | 228:16 229:16 | 188:18 199:25 |
| 265:24 266:7,19 | 244:16 261:20 | 230:11 231:13 | 209:9 241:24 |
| 267:2,19 268:17 | 262:24 263:6 | 233:2 234:8 | 252:13 302:13 |
| 269:2,10 270:6 | 269:17 274:16 | 235:11,24 | 313:9 |
| 271:4 272:13 | 275:14 | 237:11 239:10 | **bring** 180:20 |
| 274:7 275:3 | **bradley's** | 243:19 244:16 | 288:7 |
| 276:2,10 278:6 | 117:23,24 | 246:16,24 | **bringing** 270:13 |
| 278:22 279:12 | **brain** 23:12 | 247:16 249:18 | **broadly** 79:8 |
| 279:14,18 | **brandon** 30:16 | 251:15 254:10 | 134:6 136:20 |
| 281:13 282:25 | 31:14 45:2 47:2 | 254:20 256:9 | **broadway** 1:20 |
| 283:4,17 284:2 | 50:5 56:21 64:7 | 261:20 262:24 | **brother** 40:2,2 |
| 285:13 286:15 | 69:16 70:2 | 263:5,19 265:15 | **brought** 93:24 |
| 286:19 287:2 | 82:12,25 110:6 | 266:11 268:6,11 | 103:9 117:14 |
| 290:25 291:22 | 110:14 112:21 | 268:15,24 | 262:23 |
| 292:4 297:7,18 | 114:18 117:19 | 275:15 276:15 | **bruce** 33:5 |
| 298:14 300:9 | 119:2,3,7,16 | 283:9,10,14 | **bryant** 304:13 |
| 301:8,22 303:23 | 128:8 131:24 | 301:4,14 320:11 | 305:8 306:3 |

**bs** 167:12
**bubble** 147:12
**buck** 2:18 6:8,8
**built** 41:22
**bullet** 243:15
  244:7
**bullets** 70:14
  233:21 243:12
  260:20 261:4
  265:2 273:2,13
  274:18 275:10
  276:6
**bumbling**
  235:12
**bunch** 144:12
**burner** 14:3,5
**business** 7:6
  107:18,21 310:3
**butcher** 130:6
**buy** 241:4
**byline** 44:10

**c**

**c** 2:2 316:2
  322:2,2
**cab** 114:8
**cabin** 292:11
**california** 11:8
  11:16 12:7
  23:15
**call** 39:19
  117:24 174:14
  186:12,17
  253:25 256:4
  285:23 286:2
  304:21

**called** 6:20 7:23
  28:12,24 41:24
  88:7 148:22
  186:10 213:23
  299:14
**calling** 91:22
**calls** 263:10
  266:16
**campuses**
  126:21
**cancel** 128:8
  164:21,23
  165:11,13
**canevin** 193:21
**capital** 79:17
  103:15 274:5,12
**capture** 253:21
**car** 30:16 31:14
  45:2 47:2,5 50:5
  50:12 56:22
  64:7 71:2 78:16
  82:12,25 97:12
  98:17 114:3,7
  161:3 164:12
  184:19,25
  185:12 191:11
  191:21 194:7
  204:2 205:4,8
  210:18 212:7
  220:11,20 221:5
  221:13,20,24
  222:11,20 228:7
  228:11,16
  229:16 230:11
  231:6,13 232:9

  233:2,10,22
  234:9 235:12,24
  236:14 237:11
  239:10 246:16
  246:24 247:16
  249:18,22
  251:15 254:10
  254:20 256:9
  260:19 261:3
  262:7 265:2,14
  266:11 268:25
  269:19 270:3
  273:3,14 274:17
  277:2 283:9
  297:23 300:4
  301:4,14,20
  306:11 310:9
  311:14
**care** 65:5
  115:15 145:20
  146:11 147:2
  173:21 291:15
**career** 13:14
  31:25 165:3,13
**careful** 92:11
  93:25
**carefully** 73:8
**carolina** 138:8
  138:20 161:16
**carolyn** 309:16
  310:9,21 311:19
  311:20 312:9,20
**carries** 274:25
  275:2,5

**cars** 71:3 274:15
**case** 5:20 68:2,3
  68:5,17 87:5
  89:8 94:8 98:9
  114:12 118:12
  122:13,17 126:7
  132:2 138:17
  141:13 144:22
  171:2 178:4,14
  178:16 181:8
  182:12 199:6,8
  211:2 214:22
  220:6,15 222:2
  222:8 223:4,7
  242:12 245:20
  250:23 251:2
  257:18 261:23
  270:12 274:6,13
  280:4 282:17
  286:17 295:9
  299:4
**cases** 62:9,11,13
  77:16 245:15
  283:7
**categorize**
  138:15
**caught** 109:3
**cause** 160:11
**cell** 250:19
  253:16,18
**central** 103:16
  193:6 198:8
  215:22,23
  216:24

**[cert - college]**                                                  Page 339

cert  323:18
certain  32:4,19
   168:2 169:19
   186:9 202:17
   223:22 248:23
   257:18
certainly  138:22
   142:8 161:15
   274:18
certification  3:8
certify  316:4,8
   322:9,14 324:2
chad  2:15 6:12
   153:20 304:7
   323:1
chain  66:7
   83:13 84:2
   88:25 89:24
   91:9 94:5
challenge  180:6
   180:10,11
championship
   79:16 112:10
   120:17 124:16
   124:21 131:19
chance  103:12
   208:9 226:23
   231:18 235:10
change  14:21
   26:2 324:11,13
   324:14,16,17,19
   324:20,22,23
   325:1,3,4,6,7,9
   325:10,12,13,15

changed  15:2,9
   33:8 34:3
   219:23 271:22
changes  212:18
   271:20 294:2,11
   323:7 324:4,5,7
changing  26:10
chanting  138:8
characterized
   135:12
charges  79:18
   103:15 147:19
   261:17 262:23
   263:25 265:8
chart  85:9
chaser  289:23
   291:6,8
chasing  124:20
check  22:7 32:4
   33:23 54:20
   105:20 125:2
   185:25 257:10
   275:25
checking  32:19
   33:16
chevrolet
   164:15
chief  306:7,9
choices  192:20
choose  190:12
chose  44:3
   192:8,23 234:6
chosen  44:21
   190:11,16
   192:15

christian  45:20
   254:4,7,14,17
   254:22 255:2,16
   258:8,16 260:2
   266:16 298:8
   299:9
circuit  218:21
circumstances
   243:11
cite  295:7 296:6
   297:5
citing  300:20
   301:2,17
city  108:25
   197:3
civil  1:19 324:6
clarified  155:9
clarify  53:18
clarksburg  33:2
class  18:14,17
   18:20 19:4
classes  18:16
claus  298:10
clear  8:2 111:15
   141:19 145:5
   172:23 186:24
   189:11 230:8
   232:2 253:14
   257:8
cleared  300:2
clearly  157:8
   163:10 234:20
clerk  18:4,5
click  214:16

clicks  128:17
   129:17 165:3,12
   278:20
clippers  23:9
close  140:2
   229:6 244:14,14
closed  28:23
   58:5 269:16
closer  103:4
cloud  147:23
cluttered  308:14
coach  36:9,16
   38:5 40:17
   41:23 124:15
   135:10 145:2
   164:8,10 258:18
coaches  107:5
   121:12 124:11
   124:11 125:5
   181:21 242:5,8
code  62:18
   63:10 72:12
   324:6
coherent  258:17
   260:3
collaborative
   105:5,5
collaboratively
   106:7
collectives  44:5
   44:8
college  11:25
   25:3,15,21 26:2
   26:3,9,15 35:19
   43:15 79:9,12

84:17 136:22,24
**colon**  183:21
186:6,7
**colors**  44:16
**columnists**
138:23
**combined**  72:18
**come**  34:19
95:14 122:2,10
164:25 197:9
208:14,16 209:3
261:7
**comes**  211:25
234:20 298:18
298:21
**comfort**  188:11
**comfortable**
8:20 143:7
**comfortably**
41:20
**coming**  60:13
169:5
**command**  66:7
83:14 84:2 91:9
94:5
**comment**
123:25 124:4,9
124:9 128:14
134:23 138:3,19
219:13 242:22
245:4 247:17,22
248:12 250:25
273:7 286:23
**commented**
119:18

**commenting**
273:12
**comments**  23:8
**commission**
325:23
**commissioner**
126:19
**commit**  264:11
**committed**
148:10,15,19
**common**  168:3
213:4 285:16
**communicate**
254:6
**communicated**
174:11
**communication**
8:2 129:23
317:18 318:16
318:17,18
**communicatio...**
18:22 150:16,21
151:2,7 152:4,9
152:14 179:4,6
318:7,8,9,10
320:4
**company**  1:8,16
2:14,23 5:20
**compare**  271:16
**compel**  179:22
180:20 206:17
207:23 209:2
211:12 215:11
226:2 257:6
267:25 270:10

270:14
**compensation**
44:8 51:8
**complaint**
114:14
**complete**  8:4,20
158:4 217:2
**completed**
323:18
**complicated**
108:11
**complied**  66:13
**complies**  131:16
**compliment**
27:8
**comply**  248:8
**compound**
32:12 205:14
244:2 245:10
**computer**  16:18
**concerned**  63:5
**concluded**
315:11
**concludes**
314:15 315:4
**conclusion**
245:11 263:10
**condo**  11:3
**condone**  164:24
**confer**  314:5,14
**conference**
22:24 25:24
37:16 107:4,24
108:3,24 112:10
119:8 121:13

125:16,17,21
126:19,22
127:18,20
131:24 139:7,21
139:25 146:15
166:10 242:3
269:9 273:25
**conferences**
26:10 108:19
117:15 119:12
121:12 176:22
242:2,4
**conferred**  200:7
**confidence**
61:25
**confident**
284:16 296:10
**confidential**
125:9 290:13
313:21,25
**confidentiality**
59:16 60:3
206:22
**confirm**  50:8,10
89:21 224:13,16
247:2,17 258:12
268:19 294:18
307:3
**confirmation**
295:11
**confirming**
134:12
**conflict**  53:24
**conjunction**
200:17 201:9,11

**connection**
304:21
**connotation**
39:10
**connote**  104:18
**consent**  167:19
167:19 168:12
168:13,17
**consequences**
161:19,24,25
**consequential**
271:14,23
**consider**  264:7
**considering**
82:9
**considers**  58:4
80:18 81:10
**conspirator**
149:8
**conspiring**
264:11
**constituted**
31:25
**constraints**
293:13
**consult**  74:15
197:8 199:16
**consulted**  86:7
**contact**  114:16
117:18 120:6
193:20 204:13
225:4 260:9
**contacted**  46:24
291:7

**contacts**  115:24
**containing**
313:18
**content**  63:2
**context**  53:19
115:21 241:3
**continually**
135:9
**continue**  25:12
298:2
**continued**  110:6
110:13,14 135:5
137:3 297:16
298:4,5,6,12
317:24 318:24
319:22 320:24
**continuing**
143:13
**contrary**  74:11
103:20 293:6
**contribute**  63:3
**conversation**
7:19 55:15 89:4
163:7 165:15
169:11,17
186:15 187:8
194:13 196:3
234:20 285:3
304:19
**conversations**
302:24 304:24
**convey**  204:3
**conveyed**
254:25

**cooper**  46:25,25
49:23,25 50:10
70:2 263:2
275:14 297:22
**coopers**  302:4
**copies**  22:4 24:4
178:3 323:13
**copy**  3:14,17
30:5 54:15
65:19 75:7,10
**copying**  172:24
**corbett**  56:3
77:4,5 86:2
295:22 311:18
312:2,8,11
**corner**  182:21
**correct**  10:14,23
11:12 12:7,10
12:13,19 14:7
20:21,22 21:11
21:12 22:17,25
23:6,7,9 24:25
25:2 26:16
27:21,24 28:4
28:13 29:7,14
35:11,15,20
36:10,11 38:18
38:22 45:3,13
45:23 46:7,11
46:16,16,20,22
47:12,14,17,21
48:3,4,19 49:7
50:3,6 51:3
55:20 56:6,7,14
57:3 60:16

61:14 62:6 64:8
66:10,11 67:6,7
68:5,12,20 69:4
69:17 74:12,20
75:19 80:21
82:15 83:5
86:13,16 89:24
96:15,23 99:13
101:4 103:2
106:7,12,17
108:9 109:2,6,9
110:7,11 111:20
112:4,17 113:6
113:17 114:14
116:13,14,18
117:7,20 119:6
119:25 127:24
130:9,24 131:7
132:19,25
134:20 137:9
139:7,19 140:14
140:17,23 145:6
145:13,25
153:15,18
154:10,16,23
155:12,15
156:10 158:15
159:21 162:12
166:23 169:2,5
169:12 171:11
171:20 174:2,18
174:22,24
175:11,17
176:12 177:4,7
181:23 182:5

| | | | |
|---|---|---|---|
| 184:25 185:5,22 | correction | 27:11,13,14,16 | 125:7,11 128:24 |
| 187:22 189:9,10 | 38:16 | 30:22 31:5,10 | 129:18 134:24 |
| 189:14,16 | corrections | 32:11 33:13,19 | 135:18 136:6 |
| 190:18,23 | 323:7 324:9 | 34:6,8 36:12 | 137:15,22,24 |
| 191:22 192:6 | correctly 50:9 | 38:11 39:12,20 | 140:24 142:17 |
| 193:14,23 194:2 | 70:21 107:11 | 40:7,10,18,22 | 143:15 146:8,18 |
| 196:24 201:17 | 156:22 161:2 | 40:25 41:5 | 148:2 149:6,10 |
| 202:23 203:19 | 165:4 251:16 | 42:14,17,24 | 149:16 153:22 |
| 203:20,22,23 | 274:16 284:18 | 43:2,5,7 45:4,15 | 153:24 154:4,5 |
| 204:8 212:9 | correctness | 46:17 47:22 | 154:7,8 155:25 |
| 213:25 215:21 | 246:12 | 48:5,24 49:8,13 | 156:5,7 157:11 |
| 220:11 221:5 | corroborate | 49:20 51:14,19 | 161:22 162:14 |
| 224:6,7 225:9 | 258:3,7 | 54:14,19 56:15 | 165:24,25 |
| 225:13,14 | costs 197:10 | 57:4 59:5 60:17 | 167:22,24 170:6 |
| 226:24 227:15 | counsel 2:23 3:6 | 61:5,21 62:7 | 170:11,12,14,15 |
| 227:18 228:13 | 3:17 5:17 6:4 | 63:6,15 64:20 | 172:14,19 179:2 |
| 228:18 229:5 | 24:3,10 27:11 | 64:22 66:16 | 179:7,23,25 |
| 230:11 238:17 | 39:20 42:21 | 67:8,20 68:13 | 180:4,5,9,17,23 |
| 241:15 243:8,13 | 84:7 99:2 | 68:22 70:10 | 188:8,12,24 |
| 243:24 249:5,20 | 134:24 153:23 | 71:21 73:3,6 | 193:12 194:3,15 |
| 250:19 251:4 | 155:25 180:15 | 74:22,24 75:9 | 194:20 195:11 |
| 253:18 255:7,13 | 188:8 197:12 | 75:12,13 78:20 | 195:18 196:9,13 |
| 256:10,14,20 | 200:6 203:3 | 80:10,22 81:2 | 196:16,18 197:7 |
| 257:13,20 | 208:12 214:12 | 83:6 84:4,6 | 197:11,21 |
| 263:21 265:6,7 | 240:17 253:7 | 87:23 89:14 | 198:11,25 199:9 |
| 268:25 273:7 | 268:14 271:6 | 90:6 91:2 92:15 | 199:15,19,21 |
| 276:20 277:3 | 276:3 305:15 | 93:2 94:12,17 | 200:6,10 201:2 |
| 296:11 298:24 | 312:15 313:15 | 95:7,19 96:8 | 201:13,15,20,22 |
| 304:17 305:8 | counselor 6:6,8 | 97:14,17 98:2 | 201:25 202:9,14 |
| 306:18 308:22 | 6:10,12,15,25 | 99:2,14 100:5 | 202:24 204:23 |
| 309:25 316:9 | 7:9 9:22,25 10:3 | 101:6,23,23 | 205:13 206:10 |
| corrected 34:11 | 10:5,8 17:6 | 102:2,3,4 | 206:16 207:3,20 |
| 35:7,14 46:23 | 22:18 23:17,19 | 110:18 111:10 | 207:22 208:4,11 |
| 46:24 47:20 | 23:21,24 24:5,9 | 111:10,16 | 208:13 209:4,14 |
| 48:16 311:9,10 | 25:18 26:17 | 115:17 116:5 | 209:19 210:3,20 |

**[counselor - cultural]** Page 343

210:22 211:7,11
212:11,14
214:12,18 215:5
215:7 216:3,5
216:17,25 217:4
218:6,11,17
222:14,22
223:14 225:21
225:25 227:5
230:12 231:9,22
232:13 233:5,12
233:25 234:3,13
235:7,16,17
236:3,9,17,24
237:25 238:9,15
240:11,16,18
241:8 243:25
245:9,12,25
246:7,8 248:2
248:18 250:4,8
251:17,25 252:3
252:6,19,21
253:7,11,12
256:11 257:2,5
257:14,21
258:22 260:5,21
262:15 263:9
264:14,16
265:24 266:7,19
267:2,19,24
268:13,17 269:2
269:10 270:6,9
271:4,7,10
272:13,15 274:7
275:3 276:2,4

276:10 278:6,22
279:12,14,16,18
281:13 282:25
283:4,17 284:2
284:4 285:13
286:15,19 287:2
290:25 291:22
292:4 295:13
297:7,18 298:14
300:9 301:8,22
302:7 303:23,23
303:25 304:3,5
304:8 305:9,15
305:17,20,21
306:19 307:7,9
308:6,23 309:8
309:14 311:2
312:5,15,17,24
313:3,14,16
314:3,8,18,20
319:19
**count** 47:7
277:8
**country** 79:11
79:15 274:2
**county** 47:25
322:5
**couple** 10:6 72:6
103:21 105:12
122:12 188:6
255:13 285:25
304:18
**course** 82:7 93:5
**court** 1:2 3:13
5:21,25 23:18

122:21 243:20
250:25 259:11
276:16 319:14
323:16
**courthouse**
177:17,23 178:9
**courtside**
145:17
**cover** 24:22
34:22 104:21
108:6,21,24
109:4
**coverage** 63:4
**covered** 22:23
23:11 74:19
**covering** 26:9
102:25 104:3,11
105:16 106:10
130:23 187:7
281:5
**covers** 25:10
**cowboys** 164:10
**cracking** 55:11
**craft** 247:22
**crashing** 165:2
**created** 35:8,9
**credibility**
58:22 59:3,17
60:4,16 62:5
67:13 77:19,24
257:10,16 279:3
280:2
**credible** 61:12
68:19 222:4,13
223:12,24

279:22
**credit** 133:24
134:2
**creek** 292:12
**crime** 148:10,15
219:20
**crimes** 148:19
**criminal** 114:14
262:23 263:25
**crimson** 34:15
105:16 131:21
135:9 138:18
143:14 190:18
212:7 261:6
265:16 273:24
**criteria** 57:24
**critical** 40:23
41:8,13 61:11
142:13,21,21
**cross** 264:15
314:19
**crossfire** 212:7
274:20 275:9
**crucial** 57:16
75:21
**cs** 323:18
**culpable** 160:19
162:8,21 163:18
**culpepper** 267:9
267:14,16
283:12
**culpepper's**
268:3
**cultural** 25:4
79:11 97:2

[cup - delay]

**cup** 36:24
**curious** 289:7
**current** 7:5
**cut** 54:11 73:4
**cv** 1:6

**d**

**d** 3:2 316:2
　319:16
**da's** 250:23
　251:13 256:16
　256:17,21,24
　260:4 266:17
　321:10
**dad** 117:23,25
　291:6
**daily** 20:4,5,15
　50:24 53:12
　54:3
**dallas** 164:10
**damages** 59:3
**dana** 2:22
**danielle** 310:14
　310:14,14,17
**darius** 114:18
　117:19 119:22
　119:23 126:8
　131:21 161:6
　166:14 226:3,6
　261:16 265:7,9
**dark** 147:23
**darren** 31:23
**das** 284:9
**dashboard**
　233:21

**dashes** 243:12
**date** 1:11 4:4,9
　4:13,17,21,25
　5:5,10 10:19
　75:4 93:20
　110:24 112:6,15
　113:2 129:25
　131:2,11 149:25
　150:5,9,13,18
　150:23 151:4,9
　151:13,17,22,25
　152:6,11,16,20
　152:24 153:4
　187:17 262:22
　280:9 284:7
　289:12 295:16
　303:2 307:13
　309:12 314:24
　323:3
**dated** 75:18
　153:17 307:20
　309:16
**dates** 105:20
　173:11
**david** 290:6
**davis** 114:20
　115:10 116:4,8
　116:9 131:22
　134:14,16 158:2
　219:10 226:9,13
**day** 9:18 45:23
　49:12,17 95:6
　97:10,21 112:13
　113:23 121:3
　132:6,18 144:11

155:2 156:12
　175:13 190:15
　191:4,17 241:15
　241:17 259:22
　280:25,25 281:2
　316:19 322:20
　325:19
**daylight** 212:20
**days** 3:16 46:20
　47:8,11,14,16
　47:19 48:2,8,19
　49:19 96:5,20
　116:17 117:15
　119:9 127:22
　168:23 171:25
　289:24 323:3
**dc** 2:15
**deadlier** 191:8
　191:20
**deadline** 189:12
　189:19,21,24
　190:3,5,7,11
　191:15 231:16
　259:4,8 266:23
**deadlines**
　189:17 259:10
　259:15
**deadly** 260:19
　261:3,7 264:21
　264:25 275:7
**deals** 26:12
**dean** 55:24 83:5
　83:10,15,17
　85:20 87:17
　309:22,23

**death** 112:3,17
**debate** 158:22
**december** 15:10
**decide** 313:4
**decided** 41:11
　106:15 130:8
**decision** 95:25
　95:25 109:21
　134:17 135:7
　136:10 142:22
　143:8,20 147:24
　192:9,11
**decisionmaking**
　142:24 143:12
**decline** 308:13
**declined** 219:13
　282:19
**defendant** 1:8
　1:15 2:13 6:14
**defense** 134:16
　278:3
**define** 11:18
**defined** 194:17
　271:12
**definitively**
　302:3
**degree** 17:2,8,15
　61:25 62:10
**delaqueriere**
　130:3 131:6
　132:12,18
　197:14 200:13
　203:18 224:5
**delay** 97:10
　175:11

**EXHIBIT 1**

**[delicate - disciplined]**                                    Page 345

**delicate** 57:18
**delight** 307:23
**delivered** 28:9
    231:7 232:10
**demeanor**
    146:22
**demonstratively**
    46:2
**denial** 281:7
**deny** 247:2,18
**department**
    15:21 16:3,6
    18:22 26:20,23
    27:24 37:13
    39:7 65:23 77:7
    83:4 84:15 85:4
    85:5,11 87:7,10
    87:17 91:12,17
    91:21 111:18
    113:5,9 114:10
    120:4 130:5,15
    130:15 132:11
    171:10 181:22
    247:13 249:5
    256:17 268:22
    284:11 300:2
**department's**
    173:24
**depending**
    86:21 109:17
    241:18 300:19
**depends** 196:22
    262:6 274:14
    301:24

**depicted** 29:11
    29:13 202:22
    203:5
**deponent** 323:2
    323:6,7,10,16
**deponent's**
    323:6 325:18
**depose** 208:17
**deposed** 7:18
**deposition** 1:15
    3:8,9,14 5:16
    7:14,15 8:16
    179:20 314:10
    323:6 324:8
**depositions**
    179:17
**deputy** 56:2
    65:23 84:13
    306:6
**deputy's** 84:16
**describe** 20:12
    219:8 228:25
    229:21 237:16
    239:15,25 240:8
    240:25 292:7
**described** 57:14
    292:8
**describes**
    240:20
**describing**
    146:22 219:5
    275:6
**description**
    317:7 318:5
    319:5

**designate**
    290:13
**desire** 324:7
**desires** 245:6
**desk** 24:16,19
    26:21 85:25
    86:5 88:9
    130:15
**despite** 110:4
    297:14
**detail** 86:18
**detailing** 138:7
**details** 41:14
    46:4 68:3 105:8
    109:13 118:20
    134:4 221:25
    222:7 223:3,7
    258:12 299:4
    309:20
**detective** 277:7
    283:12
**determine** 22:10
    221:18 222:4,18
    223:11 306:10
**determined**
    310:4
**development**
    112:20 122:17
**developments**
    303:3
**deverell** 2:20
    5:23
**devices** 13:24
    54:6

**diane** 289:14,20
    305:23 306:17
**died** 70:16
**difference** 48:11
    123:6 160:18,25
    162:7 163:3,17
    205:9,22
**different** 32:19
    107:3,3 126:10
    262:18 304:18
**differently** 31:9
**dig** 208:25
**digging** 249:25
    266:6
**digital** 62:18,21
    167:10 168:5
**digits** 10:22
**diligence** 296:9
**dilute** 53:7
**direct** 16:4,8
    84:8 205:23
**directly** 256:8
**disagree** 33:11
    55:7 57:20 64:3
    69:13 73:19
    74:7 77:12
**disagreement**
    296:25
**disappointed**
    290:12
**discipline** 135:8
    135:15,23 136:2
    136:11 160:9
**disciplined**
    100:17 110:11

[disciplined - e]                                                    Page 346

135:20 275:17
**disciplining**
148:16
**discuss** 103:7
252:4 309:20
**discussed**
104:13,17
160:23
**discussing**
290:7,16
**discussion**
106:19 183:9,15
185:20 214:21
215:6,8 302:21
303:8,14
**discussions**
179:12 180:8
312:11,20
**disguise** 159:17
**dished** 136:3
**dislike** 37:8,18
39:5
**dismissed**
273:20
**dispute** 217:15
285:20
**distance** 219:19
273:19
**distasteful**
127:14 154:14
**distinction**
123:5,8 206:4
227:11
**distorted**
101:10,18

**distributed**
52:24
**district** 1:2,2
5:21,22 251:3,6
**division** 1:3
5:23 105:23
**dm** 166:13
**doc** 214:14
**dock** 129:12
**doctor** 129:9
**document** 24:2
40:12 43:3 59:6
67:9 73:8 74:20
80:25 86:21
169:11 195:6,14
195:17 196:7
198:19 212:13
212:15 214:17
214:23 216:4,6
217:2 276:3
289:10 297:8
319:7 320:7
**documentation**
114:12
**documents** 23:6
113:8 175:21
177:18,22 178:9
196:4,7 198:20
198:22,24 199:6
199:7 200:21,24
210:13,15,25
320:2,3
**doing** 26:4
103:19 106:17
107:22 118:9,15

128:16 138:6
160:19 162:8,9
163:18 269:5
284:24 301:6
310:18
**dollar** 44:4
**donor** 44:5
**donors** 43:14
**door** 18:21
286:12
**dorchester** 11:3
**dorm** 70:8
**dot** 309:17,17
309:18
**doubt** 169:9
**doubts** 74:18
**downplayed**
243:17
**draft** 105:13
146:4 151:11,15
213:4,8,23
214:6 215:14
216:11,23 217:9
217:20 218:25
219:20 220:8,17
220:22 221:6
224:9 225:8
226:5,11 240:4
240:10 244:3
270:20 271:11
318:11,12
**drafted** 43:19
218:23 219:2,3
224:10

**drafting** 213:12
264:7
**drafts** 211:13
**drawing** 41:9
123:6
**drawn** 79:13
**drive** 2:5 113:15
177:6 313:18
314:22 319:12
**driver** 164:12
283:21
**driving** 41:23
114:4 161:2
174:17,21
224:21
**drove** 164:14
263:19 264:2
**due** 158:8 296:9
323:3
**duly** 6:21 316:5
322:11
**duplicative**
203:8
**duties** 73:10
**dylan** 70:6

e

**e** 2:2,2 3:2,2
45:9 46:12
52:23 55:19,21
55:23 56:5
57:14 74:25
75:2,7,11 76:12
76:16 80:20
81:16 104:10
110:22 111:5,8

111:19 112:13
113:14 116:16
122:13 129:22
130:11 131:6
132:13 134:23
135:3 149:23
150:7,15,20,25
151:6,23 152:3
152:8,13 153:13
153:14 156:8
171:9 173:16
175:5,8 189:2,3
189:7 197:15
200:12 204:10
224:5 242:24
243:5 244:4,10
246:11,18,21
248:7,16 249:3
249:9,16 250:13
250:16 255:12
256:4 275:21,25
281:25 282:18
289:13,20
295:14,22
296:19 305:11
305:19 306:4,17
307:11 309:2,10
309:15 310:6,9
311:25 316:2
317:2,16,17,18
317:20,22 318:7
318:8,9,10,15
318:16,17,18
319:8,9,10,16
320:4 322:2,2

324:6,7
**earlier** 56:6
  165:8 190:20
  194:17 255:13
  259:16 283:10
  309:25
**early** 36:11
  107:12 113:25
**east** 198:8
  247:18 255:6
  256:7 288:11
**eastern** 111:14
  153:22 154:2,3
  172:15 173:4,18
  189:5 193:15,25
  212:20 271:21
**eat** 9:23
**echelon** 309:24
**eder** 48:22 49:6
  49:17,22 309:21
  310:4,18
**edit** 213:23
**editor** 27:19
  28:22 29:18
  43:22,23 55:25
  56:2,3 66:3
  67:11 74:16,17
  74:18 77:8
  83:11,18 84:13
  86:24 87:3 91:6
  94:2 284:10
  296:22 297:2,3
  310:3 311:14,23
**editor's** 310:13

**editorial** 73:25
  89:12 90:24
  92:5 192:9
**editors** 19:17
  27:6 55:16 57:2
  60:10 65:19,20
  67:5 83:21
  99:10,19 103:7
  103:25 309:24
**education** 18:11
  18:23 25:6
**effect** 3:12,15
  128:12 145:8
  154:24 234:22
**eight** 88:6
  168:23
**either** 11:15
  71:9 87:17
  104:6 116:23
  119:3 122:8
  129:14 135:8
  136:11 138:13
  140:3 155:8
  213:14,14,24
  215:19 216:8
  252:25 254:7,17
  256:4 257:10
  264:11 272:6
  308:10,13
**elaborate**
  282:19 293:18
**electronic** 39:16
**electronically**
  323:8

**element** 69:13
  69:20 70:19
  71:4 193:4
**elements** 32:20
  52:20 123:10
**else's** 181:14
**email** 323:18
**emails** 33:5
**emerged** 137:4
**emmanuel**
  105:23
**emoni** 105:21
**emphasis** 52:22
  286:24
**employee**
  295:25
**employees**
  21:22
**encompasses**
  115:21
**encounter**
  241:24
**ended** 113:19
  157:15
**endorsement**
  26:11
**ends** 51:23
  102:9 149:19
  188:16 242:18
  252:11 302:11
**enforcement**
  178:20
**engaged** 51:10
  284:21

**EXHIBIT 1**

**[enhance - exists]**                                                    Page 348

| | | | |
|---|---|---|---|
| **enhance** 53:8 | **essence** 32:6 | **examination** | 151:12,16,21,24 |
| **entails** 263:17 | 145:7 | 6:24 315:10 | 152:5,10,15,19 |
| **entered** 324:8 | **essential** 62:25 | 319:18 322:10 | 152:23 153:3,10 |
| **enterprise** 25:14 | **essentially** | 322:12 | 171:5 172:9 |
| 25:15 | 158:18 307:4 | **examined** 6:23 | 174:6,6 188:24 |
| **entire** 23:25 | **established** | **examiner** 18:4 | 203:8 214:3,5 |
| 25:13,15 34:2 | 273:24 | **example** 53:2 | 240:17 241:22 |
| 42:12 279:6 | **ethical** 53:25 | 108:18 141:13 | 242:15 270:21 |
| **entirely** 82:13 | 72:19 74:2 | 160:9 | 272:14 276:11 |
| 297:4 | **ethics** 16:14,20 | **except** 3:21 | 280:8 284:6 |
| **entirety** 43:2 | 19:12 20:24 | 285:9 298:10 | 289:11 295:15 |
| **entitled** 34:15 | 62:19 72:12 | **exchange** 174:8 | 295:20 303:24 |
| 156:4 215:3 | **evaluate** 63:2 | 290:23 | 304:4 305:16 |
| **entrusted** | 78:12 80:7 | **exchanged** | 307:8,10,12 |
| 157:18 | **evening** 92:13 | 104:11 | 309:7,11 313:17 |
| **entry** 57:25 | 92:23,24,24 | **exclusive** | 313:25 314:23 |
| 80:15 81:7 | 100:4 113:20 | 245:14 | 317:6,6,8,9,10 |
| **equivocating** | 120:21 256:19 | **exclusively** | 317:11,12,13,14 |
| 293:9 | **event** 79:11 | 106:18 | 317:15,16,17,18 |
| **equivocation** | **events** 226:20 | **excuse** 74:10 | 317:19,20,21,22 |
| 292:17 | **everybody** | 176:24 | 318:4,4,6,7,8,9 |
| **errata** 323:3,7,8 | 298:10 | **excused** 110:10 | 318:10,11,12,13 |
| 323:10,12,13,15 | **everyday** 79:18 | **executive** 55:25 | 318:15,16,17,18 |
| 323:18 324:1 | **ex** 14:10 | 56:2 83:18 | 318:19,20,21,22 |
| **erroneous** 298:7 | **exact** 62:4 85:8 | 311:23 | 319:4,4,6,7,8,9 |
| **error** 38:16 | 119:19 128:11 | **exhibit** 4:3,8,12 | 319:10,12 |
| 304:14 311:11 | 254:23 | 4:16,20,24 5:4,9 | **exhibits** 23:18 |
| **esai** 70:7 | **exactly** 38:23 | 23:16,22 27:9 | 203:10 211:23 |
| **especially** | 51:6 87:4 103:3 | 31:18 34:7 | 252:23 313:20 |
| 109:23 141:5 | 106:4 125:23 | 54:16 72:19 | 317:4 318:2 |
| 287:18,18 | 129:4 130:25 | 74:25 75:3 | 319:2,14 |
| **espn** 33:10 | 149:12 157:14 | 110:23 129:24 | **existence** 297:22 |
| 145:17 | 178:6 185:14 | 131:10 149:24 | **exists** 52:12 |
| **esq** 2:6,11,15 | 190:7 214:15 | 150:4,8,12,17 | 156:3 216:23 |
| 323:1 | 217:25 | 150:22 151:3,8 | 248:14 |

[expand - file]                                                    Page 349

| | | | |
|---|---|---|---|
| **expand**  208:23 | **f** | 295:8 | **fast**  169:23 |
| **expanding**  76:2 | **f**  3:2 163:19,22 | **familiarity**  74:9 | **fastidious**  91:5 |
| **expect**  74:15 | 163:23,24 | **family**  114:18 | **fatal**  139:13 |
| **expected**  73:7 | 164:22 322:2 | 114:21,23 115:9 | 140:10 141:22 |
| 134:15 | **facility**  323:20 | 115:13 116:2,7 | 261:10 265:3 |
| **experience**  60:9 | **fact**  32:4 33:23 | 117:19 119:4,23 | 271:11,17 308:3 |
| 235:3 286:10 | 35:13 69:23 | 168:24 193:19 | **father**  13:12 |
| **expertise**  25:11 | 86:15 89:3 | 204:14 225:3,16 | **fault**  286:13,20 |
| **expires**  325:23 | 103:19 148:23 | 226:4,7,10,13 | **feature**  86:22 |
| **explain**  15:15 | 177:6 249:20 | **famous**  164:11 | **february**  103:5 |
| 19:15 28:5 | 263:7,15 264:12 | **fan**  121:14 | 105:25 219:24 |
| 62:14 70:23 | 264:13 265:14 | 127:24 154:9,13 | **federal**  1:18 |
| 94:9 298:22 | 294:21 296:5,12 | 155:20 156:2,24 | **feel**  8:18 234:19 |
| 304:14 | 297:4 | 157:8,20 158:13 | 284:13 296:20 |
| **explained**  62:5 | **facts**  101:11,15 | 158:16,21 | **feels**  90:9 93:6 |
| **explaining** | 290:16 | 159:12,14,17,24 | 163:5 284:14 |
| 310:13 | **factual**  285:22 | 160:18 165:18 | **feet**  262:10 |
| **explanation** | 304:13 | 166:22 167:3 | **felt**  92:18 93:7 |
| 87:18 | **failed**  291:13 | 320:6 | 94:14 95:21,22 |
| **explanatory** | **fair**  22:12 62:3 | **fan's**  168:17 | 98:8 103:3 |
| 111:20,23 | 89:13 136:5,17 | **fanmaker**  35:8 | 128:15 168:20 |
| **explicitly**  92:8 | 235:15,19 250:3 | 36:2 38:20 39:2 | 182:2 290:12 |
| **express**  103:18 | 264:6 277:24 | **fans**  36:22 44:3 | **ferpa**  136:18,19 |
| **expressed** | **fake**  164:2 | 44:14 79:13 | 245:6 |
| 299:16 | **fall**  43:11 | 121:16 126:25 | **fifteen**  176:13 |
| **extent**  115:20 | **false**  46:3,16 | 127:2,9 138:8 | **figure**  37:3 |
| 125:8 179:3,15 | 48:4 127:15 | 138:20,22 | 105:15 121:6 |
| 194:22,24 | **familiar**  19:6,11 | 145:19 147:16 | **file**  117:2 124:4 |
| 196:17 202:3 | 19:14 20:8,14 | 161:16 | 150:3 166:2 |
| 204:24 210:5 | 20:23 21:5 52:7 | **far**  65:3 70:17 | 170:18,25 |
| 212:12 | 52:10 62:17 | 70:17,25 98:19 | 182:20 186:11 |
| **extra**  160:3 | 68:2,2,5,17 69:8 | 98:19 101:20 | 211:20 212:24 |
| **eye**  107:9 109:4 | 69:12 72:11 | 221:7 264:22 | 214:3,9,24 |
| | 90:17 167:20 | **fascinating** | 217:24 272:5 |
| | 220:5,15 280:4 | 25:12 35:3 | 303:19 313:19 |

**[file - freelance]**                                                              Page 350

317:21 320:8
323:12
**filed**  5:20 309:5
323:15
**filing**  3:7 169:18
**fill**  323:7,8
**find**  134:25
163:14 175:6
177:19 182:11
222:9 245:24
270:25 299:3
305:11
**fine**  9:10 24:9
27:16 42:22
44:23 81:2
188:13 198:16
198:16 207:3
279:23
**finish**  8:8 39:21
39:22 99:3
160:14
**finished**  221:7
**finishing**  86:23
**fire**  161:6
**first**  6:21 14:16
14:17 17:23
18:6 25:7,22
53:10,15 56:8
64:13,25 76:8
98:5 107:8
109:24 112:13
130:6 132:6,7
137:2 142:11
146:3,14 156:18
184:4,7,11

190:15 192:6
205:22 210:12
212:4 220:4
231:24 232:15
232:21 233:16
234:6 243:4
252:25 259:21
259:22,22
261:10 264:19
265:3,10 270:16
271:2 281:2,16
291:12 316:5
**firsthand**  94:7
204:21 205:7,10
205:23 206:7
220:25 320:18
**fisher**  38:3
291:20
**five**  13:19 163:6
197:20 232:24
279:2
**flair**  22:17 23:4
26:8,15 27:4
**flash**  314:22
319:12
**flat**  37:4
**flew**  113:24
176:3
**flip**  259:7
**floor**  1:21 2:14
**florida**  44:16
**florio**  32:22,24
291:21
**fly**  113:15

**flying**  70:15
233:21 274:19
275:10
**focus**  219:23
**focussed**  42:3
**follow**  79:8,9
106:21 144:6,12
145:4 156:6
203:2 209:24
255:17 281:11
294:19
**followed**  122:20
**following**  45:23
127:22 171:22
256:5 301:10
317:24 318:24
319:22 320:24
324:5
**follows**  6:23
**food**  88:25
**football**  23:12
126:9,12 164:8
**force**  3:15
**forced**  135:11
**foregoing**  316:8
**foreign**  23:6
**forget**  279:11
**forging**  23:5
**forgot**  98:13
**form**  3:21 63:7
241:9 311:3
324:7,9
**formal**  18:10,23
20:10,12 117:17

**format**  214:20
215:2,4 216:12
320:9
**former**  131:21
144:10 147:17
164:10
**formulated**
36:20
**forth**  104:18
322:11
**forward**  323:12
**found**  29:3
38:20 193:17
**foundation**
39:17 305:10
308:7,24
**four**  10:22
81:25 154:6,7
172:16,19
193:15 243:12
250:22 276:6
289:9 319:7
**fourth**  57:23
64:17 243:15
244:6 260:18
261:2,6 264:25
282:13
**fox**  20:20,25
187:3,5
**franklin**  6:16
**frankly**  286:3
**fraud**  79:5
**free**  8:18 130:17
**freelance**  14:20

**EXHIBIT 1**

[freelancer - go]                                              Page 351

**freelancer** 51:5
**french** 10:18
  292:9
**freshman**
  133:14 137:6
  193:22 218:3
  219:6 265:17
**friday** 107:12
  109:8 122:15
  132:7 139:8
  155:8,11
**friend** 131:22
  147:18,24
**friends** 168:24
**front** 39:16,17
  64:10 67:23
  68:7 168:23
  211:21
**frontier** 39:17
**full** 8:4,11,20
  10:13 15:3 26:6
  57:14 202:2,5,9
  202:10 244:23
  288:18,21
  290:22
**fully** 195:2
  201:5 206:20
  244:20 245:6
**fumbling**
  235:13
**function** 50:18
**funny** 245:18
**furnish** 324:9
**further** 3:20
  89:23 144:8

159:2 257:19,24
309:21 316:8
322:14
**future** 25:13,15

**g**

**game** 35:2 41:10
  41:14,17 44:18
  44:19 107:8
  109:5,24 111:25
  112:14 117:15
  119:8,11,17
  120:17,24 121:2
  121:3 122:15
  124:16 129:6
  132:3,7 135:21
  137:2 139:9
  144:16 145:15
  146:7,14,23
  156:9,15 157:25
  171:20,23
**games** 34:17
  70:9 108:12
  109:12,14 177:2
  187:7 288:19,21
  289:2
**garcia** 49:18
  66:9 84:9,20
  86:13,15 89:11
  89:24 90:25
  93:10,21 104:4
  106:7,14 153:15
  174:15 191:16
  192:14 212:18
  212:24 217:21
  242:25 243:24

245:2 255:5
264:8 266:22
276:6 286:11
**garcia's** 244:5
**gathering**
  118:11
**gay** 29:11
  137:18
**general** 2:23
**generally** 25:9
  59:22 83:22
  118:13 134:8
  149:5 196:23
  286:7
**georgia** 126:12
  126:15
**getting** 58:19
  103:4 105:24
  141:10 142:22
  154:18 288:12
**give** 8:4 11:2
  32:5,16 34:9
  60:6 90:20
  104:19 159:5
  161:18 170:21
  234:10 241:2
  250:19 290:19
  296:12 309:7
**given** 7:14 78:5
  80:23 90:4,21
  124:4 139:12
  141:13,21 142:2
  189:20 191:15
  203:13 207:6,13
  207:16,18 215:2

310:23 315:5
316:10 320:21
322:13 324:8
**gives** 164:2
**giving** 8:20
  16:17 61:17
  138:16 176:18
  235:10
**glad** 155:9
**glover** 2:8,11
  6:10,10 154:5
  291:21
**go** 7:18 9:13,22
  10:11 22:9 34:9
  40:9 43:20
  57:12,22 80:5
  83:13 85:15,24
  88:12,23 96:18
  96:19 99:10
  101:14,24
  109:17 132:21
  133:4 164:20
  172:5,5 179:8
  182:3 183:17
  186:4 187:10
  192:5 200:8,21
  210:24 211:22
  213:12 217:20
  218:20 219:17
  223:17 231:14
  232:8 247:18
  248:22 272:9
  279:5 288:16,22
  293:18 296:16

**[goes - handy]**                                          Page 352

**goes**  56:4 58:8
  92:9 130:13
  184:3 223:23
  272:25 273:6
  293:16
**going**  5:12,13
  8:10,25 9:18
  32:17 34:24
  40:16 42:24
  64:15 91:21
  96:18,19,23
  98:24 99:5,7
  103:13,17,22
  107:7 109:18,19
  112:2,16 113:19
  113:19,20
  119:24 124:19
  124:20,25 125:4
  130:22 134:25
  140:7,12,17,22
  140:22 141:4,9
  141:15,16 145:9
  158:7,25 159:5
  164:21,23,25
  165:11 167:17
  168:10 172:3
  176:7,10,25
  179:8,21 180:6
  180:10 188:10
  192:5 193:13
  196:18 197:9
  208:13,17 209:2
  214:13,18 218:2
  224:2 226:19,22
  227:13 229:4,23

231:14 234:22
  237:18 238:19
  238:21 239:17
  240:6 245:16,19
  248:22 252:7
  254:9,19 257:6
  258:13 260:11
  260:14,17
  264:19 269:14
  270:9 272:20
  279:10,17 282:2
  286:16 287:18
  310:12,17 315:3
**good**  7:11 9:8
  35:4 42:19 87:8
  92:21 103:12
  128:23 129:2
  165:9 213:9
  217:5 224:20
  235:14 284:17
  288:7 296:11
**gosh**  230:25
**gotten**  75:6
  101:2 132:24
  235:14 249:4
  255:10,15
  268:16
**governmental**
  79:5
**grace**  75:7
  76:12 81:16
**graduate**  39:24
**grand**  131:23
**grant**  253:3,5
  253:17,22

**granted**  60:21
**graph**  272:19
**graphs**  219:5,15
**great**  23:21 26:2
  77:10 86:18
  157:25 193:20
  284:15
**greatest**  53:4
  164:13
**green**  2:22
**greetings**  323:5
**greg**  125:20
**grew**  37:24
**ground**  7:19
**group**  103:6,25
**guard**  219:6
**guess**  27:2 45:7
  59:10 87:3
  93:14 118:24
  122:24 127:9
  134:5 138:15
  156:12 157:22
  176:3 177:16
  220:2 234:25
  259:21 274:15
  283:24 287:20
  288:2 308:9
**guessing**  127:7
**guidance**  76:3
  76:13 86:10
  309:23
**guideline**  80:14
  81:6
**guidelines**  5:7
  53:3 317:15

**guild**  50:14
**gun**  161:3,3,7
  166:14,15
  263:19 264:2
  283:13,15,16
**guns**  126:4
**guy**  127:15
  134:17 155:10
  158:13,23
  159:25 193:6
  292:3
**guy's**  165:2
**guys**  158:4,5,5,8
  282:14

**h**

**h**  317:2
**half**  217:19
**hall**  304:13
  305:8 306:3
**hand**  54:14
  140:4 322:20
**handbook**  19:20
  21:14
**handed**  224:9
**handful**  88:19
**handily**  109:11
**handing**  86:24
  172:8 174:25
  211:24 250:12
  257:7
**handling**  296:9
**hands**  145:18
  147:15
**handy**  171:2

**hanging** 296:4
297:4
**hangs** 91:25
**hansel** 105:22
**happen** 125:4
265:23
**happened** 38:24
87:5 90:11 91:7
126:15 157:24
164:24 219:5
235:21 236:20
243:18
**happy** 9:20
205:18 215:5
**hard** 21:24
41:23 123:4
129:5 157:16
202:19 235:20
236:19
**hardcover** 22:4
**harm** 94:24
95:4,14 96:3,6
96:11 97:9,11
97:21,22
**harmed** 98:14
**harper** 2:5
**harris** 102:19
110:5 114:22,24
115:7,14 161:7
263:21
**harris's** 116:2
**harsh** 100:21
101:3
**hayes** 2:8

**head** 16:4,6
65:23 77:6 83:4
85:6 86:4 87:7
87:17 91:12,17
91:21 147:23
226:18
**headed** 70:8
120:15
**headline** 43:16
131:19 260:24
264:24 301:19
**heads** 26:21
**hear** 158:8
188:7 227:20
259:25 260:12
267:6
**heard** 91:19
92:3,6 136:18
140:11 148:24
184:18,24
235:13 240:9
241:5 258:14,15
292:12
**hearing** 92:7
112:24,25 113:6
114:13 137:3
142:9 283:11
**heckled** 282:20
**held** 1:19 99:10
107:25
**helluva** 28:24
29:2,18 30:3,6
**help** 34:25
59:16 60:4
130:12

**helped** 86:15
**helpful** 63:17
125:24
**helps** 63:2
126:23 211:23
**herald** 18:3
**hereinbefore**
316:11 322:11
**hereunto**
322:19
**hesitant** 10:25
**hey** 19:20 52:25
86:8 103:11
117:25 175:14
227:23 228:9
229:11,14 237:6
237:9 239:5,8
**hi** 175:8 296:3
**hick** 292:9
**hide** 245:16,19
290:15
**high** 23:4,12,15
126:11 136:24
193:22
**higher** 25:5
90:24
**hillbilly** 37:20
38:3,10 289:23
291:5,8,11,17
292:14
**hinges** 83:2
**hired** 15:13,16
22:14,21
**hit** 260:20 261:4
265:2 274:17

**hmm** 47:10 55:5
56:11 84:3
87:15 133:9
277:14 288:9
303:22
**hock** 310:15
**hold** 29:23
51:19 56:7
170:21 216:9
287:6
**holding** 167:6
**holds** 108:3
**home** 137:2
**homework**
118:17
**honest** 8:4,21
**honestly** 159:4
**honor** 206:24,25
**hope** 144:17
296:7,8 297:11
**horrible** 69:22
**hot** 100:3,9,11
100:13
**hour** 175:25
188:10 197:19
217:19 250:21
252:7
**hours** 10:6,10
44:24 45:6
46:10 154:7
175:16,24
176:19 181:3
182:8 193:15
197:20,20
224:11,12,16

255:13 273:21
**housekeeping**
313:14
**how's** 238:4,4
**hullabaloo**
28:13
**human** 230:21
**humor** 291:14
**hundred** 262:10
**hypothetical**
61:9 99:16
192:18

**i**

**idea** 296:12
**ideas** 105:6
**identification**
4:4,8,13,17,21
4:25 5:5,10 75:4
110:24 129:25
131:11 149:25
150:5,9,13,18
150:23 151:4,9
151:13,17,21,25
152:6,11,16,20
152:24 153:4
198:2 280:9
284:7 289:11
295:16 307:13
309:12 314:24
**identified** 31:13
66:23 212:8
220:6,15,18
282:22 283:11
**identify** 184:19
185:4 202:4,6

238:22 239:22
**identifying**
62:15 191:5,21
194:24 195:3,21
195:23 196:17
197:24 198:5
199:5 201:7,10
204:25 206:13
210:6,10,16
276:25
**identities** 25:5
**identity** 181:10
181:14 192:3
194:2,6
**imagine** 228:21
228:23 229:18
229:19 237:13
237:14 239:12
239:13
**immediately**
286:22,25
287:11,25
**impacted**
124:22
**implicated**
268:3
**important** 7:25
53:18 60:12
61:20,24 62:25
311:16
**imposed** 259:3,9
259:11
**impression**
32:16 278:4

**improper** 33:17
180:21 217:8
**inaccuracy**
38:21
**inaccurate** 45:3
45:10,13,22
46:11,22 96:14
98:15 211:18
230:6 274:22,24
281:8,18 285:6
**inaccurately**
243:5
**inappropriate**
29:4 33:25
138:24 275:16
**inaudible** 229:2
**incarcerated**
116:10,13
**inception**
214:21
**incident** 114:11
126:12
**incidents** 126:4
126:6
**include** 33:5
106:23 299:4
**included** 75:16
244:10
**includes** 21:10
179:3
**including** 82:10
**incomplete**
230:6
**incorrect** 46:13
94:21 113:14

285:18
**incorrectly**
242:25
**incredibly**
231:2
**index** 1:6
317:24 318:24
319:22 320:24
**indicate** 65:18
**indicated** 45:12
282:17 283:8
294:16
**indicating** 40:21
43:9 65:22
72:23 214:4
215:15 240:14
305:14
**indication** 44:17
98:22 189:4
**indicted** 131:23
144:11 147:18
261:16 265:7
**indictment**
122:19 131:20
134:15 147:8
158:4,5 166:13
**indictments**
158:2
**industry** 20:2
**infer** 68:11
**informal** 20:13
**information**
30:12 46:21
48:17 49:22
50:7 56:19,20

**EXHIBIT 1**

**[information - involved]**                                      Page 355

| | | | |
|---|---|---|---|
| 56:23 58:4 | 320:2,3 | **instruction** | **interview** |
| 60:24 61:4,11 | **informative** | 68:23 76:13 | 118:15 145:17 |
| 61:16 62:25 | 124:9 | 116:6 179:24 | 155:2,20 156:2 |
| 67:14,24 68:11 | **informed** 39:3 | 195:12,19 | 165:17 166:22 |
| 69:3,6 77:17 | 46:12 66:25 | 197:22 199:2,10 | 171:19 173:25 |
| 78:2,3 80:18 | 118:23 247:14 | 201:4,21 202:15 | 182:24 183:3 |
| 81:10 82:14,18 | 305:4 | 206:12 207:21 | 226:16 227:8 |
| 83:2 92:18 | **informing** 67:5 | 211:8 257:4 | 258:18 290:19 |
| 94:21 95:6,10 | **inhouse** 86:10 | 270:8 | 290:23 302:5 |
| 95:23 96:16 | **initial** 314:7,8 | **integrity** 5:8 | 320:6 |
| 98:9 114:17 | **initially** 135:12 | 53:4 317:15 | **interviewed** |
| 117:18 118:11 | **injured** 141:11 | **intend** 9:23 | 125:18 127:23 |
| 120:4,7,11 | **injuries** 141:6,9 | **intended** 113:14 | 132:2 147:14 |
| 132:10,17 143:5 | **inquiry** 80:23 | **intention** 58:18 | 155:10 249:19 |
| 151:20 169:7 | 287:12 | 285:25 | 304:11 305:6,25 |
| 178:14,15 | **insert** 219:20,24 | **interaction** | 306:7 |
| 186:21 191:24 | **inserted** 218:23 | 154:13 | **interviewee** |
| 192:10 194:23 | 218:24 | **interactions** | 232:7 |
| 195:3,24 199:5 | **inside** 22:11 | 127:6 | **interviewing** |
| 200:18 201:6,9 | 79:3 159:20 | **interchangeable** | 238:5 |
| 201:12 202:4 | **insider** 78:24 | 288:3 | **interviews** |
| 206:14 210:7 | **instagram** 45:12 | **interest** 53:24 | 207:15 |
| 222:21 223:12 | 45:18 | 102:24 103:19 | **introductions** |
| 223:18,22 | **instance** 55:14 | 299:16 | 137:5 |
| 224:13,17 225:3 | 140:5 | **interested** | **investigation** |
| 233:15 243:6 | **instances** | 124:17,23 145:5 | 123:7 144:10 |
| 246:12,14 | 138:16 | 171:24 230:16 | 245:5,23 |
| 256:14 257:12 | **instruct** 194:17 | 322:17 | **investigative** |
| 257:18,20 258:2 | 195:4 196:11 | **interject** 111:11 | 95:2,17 121:7 |
| 258:25 260:7 | 201:14 202:25 | **internet** 287:19 | 121:22 122:25 |
| 266:10 267:4 | 210:7 225:23 | 288:11 | **investigator** |
| 292:23 294:17 | 267:22 300:11 | **interpret** 308:25 | 243:20 267:10 |
| 298:18,24 | **instructing** | **interpretation** | 276:15 |
| 301:25 303:12 | 179:18 201:23 | 113:13 165:17 | **involved** 43:23 |
| 306:16 318:14 | 202:2 | | 78:16 93:13 |

[involved - june]                                                    Page 356

97:13,24 178:4
178:22 203:22
261:11,13 262:4
262:10,13,19
265:4,10 270:16
271:17,23
**involvement**
49:3 87:3 99:6
135:7,13 139:12
140:10 141:22
243:17,22 244:9
244:21 261:18
261:19,19
262:13 264:9
273:22 274:3,12
274:21 276:19
**involving** 126:4
126:8
**ironic** 245:24
246:4
**irony** 245:17
**ish** 177:12
**isidore** 39:24
**issue** 28:23 29:6
29:10 36:21
60:25 76:22
84:21 86:8
126:14 252:4
**issued** 28:22
45:25 281:7
**issues** 29:5
106:10 126:10
175:20

**j**

**j.t.** 6:15
**jack** 250:14,16
250:19,21
**jaden** 110:9,12
110:13 112:22
114:19 116:12
116:17,19,22
117:5,20,23,24
135:16 148:14
160:2 219:5
225:15 244:16
261:20 262:24
263:6 269:17
274:16 275:14
**jaden's** 117:25
**jahvon** 166:16
166:17
**jail** 79:17
103:15 261:16
**jamea** 102:19
110:5 114:21,23
115:14 116:2
161:7 263:20
**january** 78:18
102:16 112:4
118:4 133:12
242:24 243:7
261:7,10
**jason** 16:6
**jay** 16:9
**jeep** 219:11
**jerry** 292:13
**jersey** 11:17
12:9

**jessica** 46:9
281:7,17 282:6
285:3,7 286:12
298:9 299:9
**jimbo** 38:3
291:20
**jimmie** 164:6,11
164:15
**job** 15:3,17
17:23,25 18:25
19:2 50:20,22
**joe** 83:5,15,19
83:19 85:20
87:18 309:16
310:21 311:19
311:22
**john** 134:18,19
186:6,12 320:5
**johnson** 164:6
164:11,16
**joined** 14:12
16:10 25:16
51:2,4
**joke** 28:23 29:5
29:10 199:7
**jonae** 114:21,23
115:14 116:2
**jordan** 171:10
171:14 173:16
189:8 246:17,21
248:8 255:12,18
255:22 275:22
**jordan's** 173:17
**journal** 18:19

**journalism**
13:15 18:11,19
18:24 27:24
53:11 54:3 69:9
72:20 74:2 95:2
95:18 121:22
**journalist** 17:22
19:25 21:4
50:17 51:2
182:24 236:22
245:17 296:20
**journalistic**
16:13,19 19:11
20:5,6,14,24
21:6,9 22:8
31:25 33:18
57:17 180:22
208:24 245:5,19
277:19
**journalists** 19:7
21:16 72:9
78:12 182:14,17
227:3
**jq** 166:12,13
**judge** 3:13 9:2
60:15 179:22
198:17 200:24
208:14 279:3
**judiciously**
77:14
**july** 1:11 5:15
262:22 322:20
**june** 47:20 48:9
48:10,13 297:20
297:21 298:3

309:16
**jurisdictions**
178:21
**jury**  9:2 131:23
286:17
**juxtaposition**
157:23

**k**

**k**  2:14
**kahn**  309:16
**kai**  1:4 2:5,9,19
5:18 30:10,15
31:13 44:25
45:11 46:22
47:4 56:13,20
58:14 64:6
69:14 70:6,20
71:6 77:23 78:3
78:15 81:18
82:11,24 87:16
92:13 97:11,22
98:12,17 100:2
170:2 184:18,25
186:24 187:19
191:10 193:21
194:7 203:4,19
203:21,24 204:6
204:16,22 205:3
205:7,11 206:8
210:16 216:12
217:12 218:3
221:11,14,19,23
222:10,18
224:14,23 225:8
226:16,24

227:13,23
228:15 229:3,11
230:9 231:11
232:7,25 233:9
235:23,25
236:14 237:6
238:16 239:5,23
240:5 241:6
242:23 243:6
244:10 246:9,13
246:15,23
247:14 249:17
251:14 254:9,14
254:18,19 255:2
256:8 258:16
260:2 261:20,23
263:6 265:16
266:10 268:3,7
268:23 270:2
273:12 275:13
276:19,25
282:22 283:8,15
283:16 290:19
290:23 297:24
300:3,16 301:3
301:13,19
304:12 305:3,6
305:25,25 306:7
306:10 307:21
310:8 320:19
**kai's**  185:12
194:2 225:3
273:7
**keep**  34:16,25
131:3 141:10

170:25 191:6
**keeping**  36:22
41:25 303:2
**kennedy**  250:14
250:17
**kenny**  307:22
312:8
**kept**  273:23
285:10
**key**  222:7 223:3
223:7
**khan**  83:20
310:21 311:19
311:22
**kicked**  133:10
273:20
**kicking**  162:11
**kid**  146:13
**kill**  166:15
**killed**  158:9
161:7
**killing**  154:22
158:24 263:20
283:13
**kind**  17:2 39:25
86:9,19,20
88:11 92:8
126:17 130:13
157:15 158:20
160:9 163:9,14
214:8 228:25
229:22 237:17
238:4,7 239:16
240:25 286:3,4
292:9

**kinds**  135:25
261:25
**knack**  22:15
26:7,14 27:3
**knew**  103:22
110:3 133:11
140:19 148:13
148:17 204:16
223:9 292:18,22
293:3,8,15
294:22 306:15
306:21
**know**  9:19
10:25 16:24
21:21 22:22
26:22 30:7,19
31:19 32:21,25
33:3 34:5 35:22
36:19 37:22
38:4,7,7,17
40:19 41:17,21
41:21,22,23
42:2,4 43:24
44:2,9 49:2,4,10
49:23,24 51:6
51:11 52:11,11
52:21,23 53:2
54:12 55:15
60:7,11,12,20
60:24 61:7,11
61:16 62:12,16
63:12,23 65:2,5
66:2,2,3,4,6
67:25 68:6
70:15 71:18

72:21 73:12,20
76:19,21,21,24
76:25 78:10,13
79:8,10,10,19
79:20 83:8,9
84:15 85:8,24
86:6,9,19,21,23
86:25,25 87:8
87:20 88:2,2,3,4
88:5,6,6,11,12
88:18,21,22,24
89:3,4,5,17,18
89:21 90:2,8
91:6,6 92:10
93:4,22,23,24
93:24 94:2,3,22
98:7,10,12,16
98:18,20,21,22
99:21,23 102:18
104:6,18 105:7
105:25 106:3,4
107:13,13
108:15,16
117:12 118:14
118:18,20,21
120:2,3,6
122:18,21
124:20 125:2
126:17,21,22
127:8,21 128:10
129:2,4,8
130:17 131:4,14
133:15 134:5,8
134:10,11
135:14 136:4,19

138:12,17,17,22
139:10,24 140:3
141:2,2,3,6,7,8
141:15 142:10
142:24,25
143:18,22
144:16,20,22,23
145:9 147:7,13
147:14,16,16
148:20 149:3,8
153:11 155:4
156:19 157:15
157:16 158:18
159:2,6,8,10,10
159:12,13,23,25
160:11,21,24
161:4,5,6,8,9,10
161:10 162:24
163:5,6,7,8,9,12
163:12 164:6,19
164:21,25 165:3
165:12,23
166:10 167:10
167:21,25 168:2
168:19 169:4,21
169:22 171:23
172:3,4,8,23
174:20,25
175:20,21 176:4
177:25 178:5,19
178:20 181:15
181:24 186:9
187:8 189:2
190:12 204:10
204:12 213:3,5

213:7,21 215:17
216:13,22 217:8
217:9,16,24
218:24 220:4
221:25 222:7
223:3,7,16,20
223:20,25 224:3
224:20 226:22
228:5,9 229:14
230:17,20,22,24
231:2,25 232:3
233:18,19
234:21,24,24,25
235:3,6,8
236:19 237:9
238:6,11 239:8
242:6 243:9
244:12,12,13,13
244:18,18 247:5
249:24 254:24
259:6 262:25
263:23,24 264:4
266:2 271:22
275:9,10,18
276:13 278:4,12
280:19 281:4
283:21 285:2,19
285:20,22 286:3
287:17,19,25
288:2,4,5,15,23
289:22 292:6,10
295:4 296:16
299:15,17 302:2
302:25 304:20
305:2,12 306:24

307:16 308:9,18
310:2,3,24
311:12 313:19
**knowing**  30:18
61:3 71:16
230:19 297:14
**knowledge**
89:22 94:7
136:4 181:7
204:16,21 205:7
205:10,24 206:8
220:21 221:2
283:25 320:18
**knowledgeable**
220:10
**known**  97:2
130:20 250:2
266:3
**knows**  67:15
68:19

l

**l**  3:2,2 6:20,20
316:2
**l.a.**  23:8
**lack**  74:9 78:16
**landed**  105:15
**landline**  12:24
13:2
**laps**  159:20
160:3,10
**larrea**  6:2
**larry**  292:8
**las**  107:10,17,20
**late**  41:9 105:25
105:25

[latest - look]                                                Page 359

latest  113:11
law  2:18 115:19
    148:22 178:19
    178:20 263:24
    264:4
lawsuit  46:15
    47:4 299:12
    308:22 309:4
    310:22
lawyer  9:8
    39:16 122:22
    134:14,18 278:4
lawyers  114:17
    121:23 122:8
    135:3 216:15
    259:10 305:5
lead  64:5,19
    80:6 200:19
    201:10 271:19
leaders  76:22
leading  96:20
leads  68:17
learn  38:15
    118:12,19 194:8
    285:23
learned  44:24
    45:6 194:2,5
    246:13 297:20
    297:21
leave  120:14
    169:17
leaving  36:10
    253:24
lecuyer  10:14
    10:15,16

led  192:11
lee  46:25,25
    49:25 50:11
    70:3 263:2
    275:14 302:4
lee's  49:23
    297:22 302:4
left  87:9 121:9
    121:25 122:10
    145:17 186:11
    188:6 249:11,13
    254:12 256:5
    281:10,16
legal  2:21 5:24
    6:2 122:18
    245:10 263:10
    263:13 291:7
    315:7
legally  25:23
    160:19 162:8,21
    163:18 283:20
lengthy  103:21
    105:12
letter  290:13
letting  155:3
level  99:19
    139:12 140:10
    141:22 296:8
levels  283:24
lick  292:9
life  11:14,18
light  261:8
lightfoot  6:16
liked  51:10
    144:5

likely  75:15
    109:23 110:2
    186:10 215:25
    219:15 220:3
    250:7 293:18,20
    293:24 294:8,15
    294:21 295:6
    302:20,24
    303:10,13
likewise  276:18
    282:23
line  8:2 73:5
    253:25 265:3
    320:15 321:3
    324:11,14,17,20
    324:23 325:1,4
    325:7,10,13
lines  8:3
lineup  166:13
link  307:19
list  240:7
listed  65:7
listen  285:16
listened  236:23
litigated  270:11
little  7:22 26:4
    35:16 42:4
    95:17 108:10
    115:13 118:22
    203:13 211:25
    216:10 249:25
    266:5
live  11:3
lived  11:6,9
    12:3,6,9,12,15

lives  183:25
llp  1:20 2:13
local  182:13
located  21:19
locations  34:16
    35:10
lock  138:8
locked  42:3
locker  117:12
    145:18 217:12
    217:18 241:17
    242:9 269:15,22
lockout  33:7
lodge  27:14
lodged  9:15
logistics  102:6
long  9:18 11:7
    11:16 12:6 15:8
    19:9 23:4 49:6
    49:11 50:3,16
    50:23 102:3
    195:22 307:24
longer  12:23
    250:25
longstanding
    57:24 80:14
    81:5
look  23:16,22
    24:7 26:6 27:9
    31:18 34:4
    41:12 54:5
    65:14 68:8
    71:25 72:18
    122:24 131:13
    134:25 145:14

**EXHIBIT 1**

**[look - managing]**                                                     Page 360

153:10 171:5
173:2,5 174:5
182:19 193:10
211:21 241:21
246:6 252:22
270:19 276:23
278:13 295:20
303:18 307:15
309:6
**looked**  41:16
98:12 132:9
311:25
**looking**  114:16
161:19,20
173:10 186:7
252:20 272:14
**looks**  44:15
54:11 167:14
174:7,16 175:7
216:8 253:21
**loose**  43:14
**loosely**  223:20
**los**  11:12,16
12:7 18:3 20:4,4
20:15 50:24
**losing**  58:20
**lost**  107:13
168:22
**lot**  25:23 51:18
64:16 154:18
168:24 190:23
191:8,20 192:16
192:25 223:16
247:21 248:5
262:18 278:17

278:20,20
**loud**  101:20
**louisiana**  11:15
**lowe's**  164:14
**lower**  235:17
**loyalty**  35:19
**loyola**  18:20
19:5
**lsc**  1:6
**lsu**  44:14
**luisa**  183:21
184:5,12,22,23
185:11,18,20
**lunch**  9:24 10:4
98:25 99:7
101:24 102:11

**m**

**machine**  172:25
**made**  20:8,14,23
21:5 95:25 96:2
105:3 109:21
128:14 143:8
147:24 156:17
186:12,17 192:9
207:2 260:8
294:23
**madness**  97:4,5
106:16 174:2
190:15 191:4,18
192:6 259:18
266:25
**mail**  45:9 46:12
55:21,23 57:14
74:25 75:2,7,11
76:12 80:20

81:16 110:22
111:5,8,19
112:13 113:14
116:16 122:13
129:22 131:6
134:23 149:23
150:7,15,20,25
151:6,23 152:3
152:8,13 153:13
153:14 156:8
171:9 173:16
175:5 189:2,3,7
197:15 200:12
204:10 224:5
242:24 243:5
244:4,10 246:11
246:18,21 248:7
248:16 249:3,9
249:16 250:13
250:16 255:12
256:4 275:21,25
281:25 282:18
289:13,20
295:14,22
296:19 305:19
306:4,17 307:11
309:2,10,15
310:6,9 311:25
317:16,17,18,20
317:22 318:7,8
318:9,10,15,16
318:17,18 319:8
319:9,10 320:4
323:10,19

**mails**  52:23
55:19 56:5
76:16 104:10
130:11 132:13
135:3 175:8
305:11
**main**  190:21
191:6
**make**  8:17
19:21 26:11
36:8 41:6 49:7
60:10 111:15
157:2 163:13
164:17 172:5
175:23 179:12
180:15 183:12
215:11 227:10
227:11 262:4
284:22 295:7
296:19 324:7
**makes**  74:11
142:22 263:5
**making**  21:8
61:14 137:7
163:10 180:19
233:14 253:13
284:22 324:8,8
**man**  231:6
234:10
**management**
88:5,8,15
**manager**  71:12
**managers**  141:7
**managing**  74:17
311:14

| | | | |
|---|---|---|---|
| **manner**  110:11 | 123:17,17,17 | 301:15 303:12 | 85:20 87:18 |
| 143:23 263:5 | 124:12 130:20 | 305:5 306:16 | 312:18 314:13 |
| 275:17 | 131:13 132:3,16 | **mark**  23:18 | **matter**  5:18 |
| **manual**  52:7 | 132:21 133:4 | 279:17,20 309:8 | 29:19 78:14,18 |
| **manually**  323:8 | 136:15 139:6 | **marked**  54:16 | 78:22,24 79:2,4 |
| **manuals**  16:18 | 140:19 143:5 | 75:3 110:23 | 93:5 229:4,24 |
| 21:14 | 145:3,15 148:9 | 129:23 131:10 | 237:19 239:18 |
| **march**  10:21 | 153:17 155:12 | 149:24 150:4,8 | 265:14 274:9 |
| 30:10,20,21 | 162:6 166:6 | 150:12,16,21 | 314:7,9 322:18 |
| 44:25 47:8,12 | 169:5,12 170:9 | 151:2,7,12,16 | **matters**  78:8 |
| 48:12 55:10 | 173:15,17 174:2 | 151:20,24 152:4 | 79:21 284:17 |
| 56:12 57:7 | 174:21 176:16 | 152:9,14,19,23 | 313:15 |
| 58:14 64:6 65:8 | 177:10,14 | 153:3 253:13 | **matthew**  291:21 |
| 65:25 66:15,19 | 178:11,12 181:4 | 280:8 284:3,6 | **mccraw's**  290:6 |
| 67:17 69:4,6,14 | 181:4,20 182:2 | 289:10 295:15 | **mean**  15:16 |
| 71:20 77:22 | 182:18 185:22 | 307:12 309:11 | 16:3 17:10,10 |
| 81:17 84:2,5,7 | 189:8 190:15 | 314:23 320:14 | 18:25 19:14,16 |
| 85:2 86:12 87:7 | 191:4,17 192:6 | 321:2 | 27:2,4 30:14 |
| 87:15 91:12 | 196:5 197:15 | **marks**  279:12 | 32:13 33:21 |
| 92:14,23,24,25 | 212:19,19 | **marriage** | 36:18 44:17 |
| 93:20 94:10 | 215:18 226:5,8 | 322:16 | 52:15 61:8 62:9 |
| 95:2,16,16 | 226:11,14,18 | **married**  14:6 | 62:10,11 63:9 |
| 96:23 97:3,5,5 | 227:14 231:17 | **marshal**  254:18 | 66:23 68:6 |
| 99:9 100:4,18 | 236:2 239:24 | **marshall**  17:12 | 76:17 79:7 83:9 |
| 101:11 102:17 | 246:22 249:10 | 45:21 254:2,8 | 84:4 86:5 88:2 |
| 106:15 108:2 | 250:2 251:8,12 | 258:9 | 89:17 90:11 |
| 111:6,24 112:7 | 255:6 256:19 | **masthead**  83:23 | 93:16,23 94:19 |
| 112:8,8,9,9,11 | 258:20 259:5,18 | 88:8 91:23 | 100:10 101:15 |
| 113:17 116:23 | 260:25 266:4,4 | **materials** | 105:19 108:17 |
| 116:23,23 117:6 | 266:15,25 | 207:25 208:2 | 111:21,22 |
| 117:6,7 118:24 | 280:25 281:11 | 210:14 | 112:19 114:4 |
| 119:4,5,5 120:8 | 289:17,20 290:2 | **math**  48:2 | 118:13 120:7 |
| 120:19 121:8,8 | 294:3,7,7,14,14 | **matt**  2:11 6:10 | 123:3,10 126:2 |
| 121:9,24,24,25 | 294:23 295:22 | 55:25 77:3,7 | 127:8 128:20 |
| 122:9,9,9 | 298:2 299:7 | 83:5,15,23 | 133:24 134:7 |

141:4,13,17,18
142:4,19 143:17
144:7,16 146:21
157:19 158:6,23
160:25 161:2,12
162:3 166:7
169:8 182:10
186:16 206:18
208:12 214:16
227:7,9 228:22
229:19,21 237:2
237:14,16
239:13,15
244:11,12
257:23 259:7,7
261:13 274:19
274:20 275:8
276:12 279:10
280:13 285:16
292:18 296:24
308:3,17 311:8
311:9
**meaning**  58:25
113:12 149:2
**means**  53:11,22
54:2 129:5
214:16
**meant**  128:5
156:25 157:7
219:14
**media**  4:10 5:15
21:3 29:3 51:23
52:4 102:9,14
128:7,16 129:15
142:7 149:19

151:19 158:6
164:23,25
165:11 173:20
188:17,22
252:12,17
302:17 308:10
308:18 315:5
317:10 318:13
**meet**  103:7
171:13 191:3
200:13 227:24
229:13 234:11
237:8 239:7
266:23 314:4,14
**member**  50:13
71:10,14 72:8
73:7 83:20
**members**  53:22
74:15 114:18,21
114:23 115:10
115:13,25 116:8
117:19 119:4,23
181:22 225:16
226:4,7,10,13
261:11 265:4,11
265:11 271:17
271:23 306:8
**men's**  242:22
261:9 271:18
**mentioned**
82:10 94:6
104:16 105:12
125:16 126:25
201:16 232:17
259:20 299:18

304:24
**mentioning**
254:13
**message**  134:15
157:14 174:7,10
186:11 249:13
253:2 254:12
256:5 289:24
293:16 303:10
318:19
**messages**
150:11 152:18
152:22 175:8
188:7 253:24
254:17,24 284:5
288:17 318:6,20
319:6
**messaging**
284:12
**met**  104:2
144:14
**metadata**
214:23 215:4
320:7
**meted**  135:24
**michael**  114:20
115:10 116:3,8
116:9 131:22
226:9,12
**microphone**
51:15
**mid**  103:5
105:25 252:2,2
**middle**  10:17
97:5 103:20

144:9
**midnight**
172:18
**midway**  53:15
**mike**  32:21,24
85:7,15 291:21
**miles**  114:18
117:19 119:22
119:23 126:8
131:21,22
133:11 134:22
147:17 158:2
161:6 166:14
226:3,7 261:16
265:7,9 273:19
**miller**  70:2
110:6,14 112:21
114:19 117:20
119:2,3,7,17
128:8 131:25
133:13 135:5,16
137:3 138:20
139:11,15,19,23
140:6,9 142:14
143:13 145:16
145:24 147:22
148:10 157:3,9
157:24 158:12
158:14 159:3
160:2,23 161:25
162:3,11 164:23
165:11 166:7
168:25 212:6
219:12 224:24
225:13 228:16

**EXHIBIT 1**

**[miller - mvp]**                                                      Page 363

| | | | |
|---|---|---|---|
| 243:19 244:16 | **millers's** 162:20 | **mm** 47:10 55:5 | 251:7 259:4,18 |
| 261:20 262:24 | **mind** 139:24 | 56:11 84:3 | 266:25 294:22 |
| 263:6,19 265:15 | 162:6 231:3 | 87:15 133:9 | **morse** 70:7 |
| 268:6,11,15 | 264:15 | 277:14 288:9 | **mother** 13:12 |
| 273:3,14 275:15 | **mine** 2:10 73:3 | 303:22 | **motion** 179:21 |
| 276:15 281:24 | 106:5 154:5 | **mobile** 12:18 | 180:20 215:10 |
| 282:17,20 | 165:16 169:17 | 13:21,23,25 | 270:14 |
| 283:10,14 | 189:4 | **modules** 16:18 | **mountain** 108:7 |
| 320:11 | **mingo** 47:25 | 21:15 | **move** 63:22 72:2 |
| **miller's** 30:16 | **minus** 172:16 | **mom** 117:23,24 | 206:16 207:22 |
| 31:14 45:2 47:2 | 172:19 173:4 | **moment** 25:13 | 209:2 211:12 |
| 50:5 56:22 64:7 | 193:15 | 25:25 31:17 | 226:2 257:6 |
| 69:16 82:12,25 | **minute** 163:6 | 144:13 147:13 | 267:24 270:10 |
| 135:6,12 165:13 | **minutes** 51:13 | 170:21 221:8 | **moved** 213:6 |
| 191:5,11,21 | 197:18 250:22 | 312:2 | **moving** 26:23 |
| 192:4,17 194:7 | 313:4 | **monday** 113:11 | **mowville** |
| 204:2,17,22 | **miracle** 69:23 | 113:17 175:7 | 164:16 |
| 205:8,11 206:9 | **mislead** 273:11 | 290:4 | **murder** 79:17 |
| 210:17 220:11 | **missing** 135:21 | **money** 25:5 | 103:15 131:20 |
| 220:20 221:5,13 | 136:12 139:14 | **monitor** 51:22 | 144:9 147:8,19 |
| 221:20,24 | 141:23 166:8 | 52:4 102:8,14 | 148:23 231:7 |
| 222:11,20 | **mission** 57:17 | 149:18 153:8 | 232:10 245:4,23 |
| 230:11 231:13 | **mississippi** 36:6 | 188:15,22 | 261:17 263:7,16 |
| 233:2,9 234:8 | 39:3 132:8 | 199:23 200:5 | 263:20 264:11 |
| 235:12,24 | 139:9 | 209:7,13 252:10 | 264:13 265:8 |
| 236:14 246:16 | **missouri** 156:9 | 252:17 302:10 | 274:5,12 |
| 246:24 247:16 | **misstates** 33:20 | 302:17 313:7,13 | **murphy** 309:23 |
| 249:18 251:15 | 210:21 269:3 | **monogah** 38:2 | **murphy's** |
| 254:10,20 256:9 | 297:19 301:23 | **month** 135:10 | 309:22 |
| 262:25 266:11 | 312:6 | 138:18 244:14 | **mutually** |
| 268:24 269:19 | **mistake** 38:15 | 244:15 | 245:14 |
| 273:2,14 277:2 | 203:9 | **morning** 7:11 | **mvp** 168:23,25 |
| 283:9 301:4,14 | **mistaken** 40:3 | 55:24 113:25 | |
| 320:20 | **mitchell** 83:24 | 175:7,9 192:6 | |
| | | 193:6,17 231:17 | |

**n**

**n**  2:2,10 3:2
  316:2 319:16
**name**  5:23 7:2
  7:12 10:13,17
  32:23 124:11
  125:18 127:16
  142:9 164:3,4
  186:5,11 192:22
  192:23,24
  193:20 204:11
  213:22 214:17
  215:13 271:2
**named**  97:23
  191:10 192:17
  216:12
**names**  306:25
**narrative**  158:7
  187:19
**narrowing**
  197:25 199:14
**nashville**  109:4
  113:15 116:17
  117:5 118:2,2
  119:4 120:14
  121:9 156:10
  171:16,17
**nate**  124:14
  125:5 135:10
  138:10 142:13
  143:3,11,25
  147:20 171:19
  171:22 173:13
  173:25 258:18
  260:4 268:20

269:4
**national**  24:15
  24:15,16,21
  25:17 26:21
  78:19,23 79:16
  124:20
**native**  214:20
  215:3 320:8
**natural**  10:6
**nature**  90:4,21
**nazi**  29:14
  137:17
**nba**  146:4
**nbc**  33:10
**nca**  79:10 103:4
  117:13
**ncaa**  22:25 44:7
  96:22 97:3
  104:3,12 105:17
  106:11 130:23
  176:23 261:9
**ncaa's**  26:10
**necessarily**
  79:12 108:14
  126:20 141:18
  227:8,10 245:13
  283:7 291:25
**necessary**
  175:10 324:9
**necessitated**
  191:5
**need**  8:3,11 9:17
  9:19,21 19:21
  27:10 42:11
  60:14 61:10

92:12 103:22
  167:18 171:2
  217:7 285:8,12
  290:12,15
  310:24 313:22
  313:23 314:9
**needed**  50:4
  90:17 94:10
  176:21 182:3
  254:13,21
  282:21
**needing**  100:3
**needs**  215:10
**neither**  208:20
  273:3,14
**never**  7:17 60:5
  60:6 91:16
  98:11,21,22
  183:2 232:7,11
  284:14 294:23
  311:6
**new**  1:8,16,21
  1:21,23 2:4,6,14
  2:23 5:19 6:6,6
  6:17,22,25 7:7,7
  7:9,12 9:22 10:3
  10:8 11:4,11,15
  11:16,17,22,24
  12:3,9,12 14:12
  14:16,18 15:12
  15:13,16 16:2
  16:10,12,17
  19:5 21:10,13
  22:14 23:19
  24:5,17 25:17

26:13,23 27:13
  27:16 34:8
  38:18,22 40:7
  40:22 42:17
  43:2 44:2 46:15
  46:19 47:20
  48:3 50:13 51:2
  52:7 55:11 59:3
  66:13 67:11
  68:10 71:4
  72:19 73:6
  74:24 75:12
  77:8,24 81:2
  82:8 84:6 90:12
  93:11,12 94:25
  95:14 96:4,6
  97:9,21 99:12
  99:20 100:17,22
  101:3,20,23
  102:3 111:16
  113:19 115:19
  120:15 121:10
  122:2,11 134:10
  134:24 137:24
  149:16 153:22
  154:4,8 155:25
  156:7 167:16,24
  168:9 170:14
  179:7,14,25
  180:5,17 188:12
  188:24 189:12
  193:12 196:13
  196:18 197:7
  199:21 200:10
  201:15,22 202:9

**[new - nytimes.com.]**                                                  Page 365

206:16 207:3,22
208:4,13,17
209:14,19
210:22 211:11
212:14 213:17
214:12,17,18
215:7 216:3
217:4 223:2
225:25 227:24
229:12 230:5
236:22 237:7
238:15 239:6
240:18,23 245:3
245:12,18 246:8
247:14,24 248:8
249:2 250:15
251:11,25
252:21 253:11
253:23 254:8,18
257:5 259:14,14
259:16 267:24
268:13 270:9
271:7,10,16
272:15 276:4
277:18 278:11
279:16 284:4
285:10 288:13
290:21 294:4
295:13,21,25
297:15 298:12
301:16 302:7,21
303:2,8,25
304:5 305:4,17
305:24 306:15
307:8,9,9,21

308:4,20 309:14
310:23 311:6,10
311:15 312:12
312:17,21,24
313:16 314:8,20
319:19 322:4,8
**news** 20:4,5,15
29:6 50:24
58:19 62:18,21
69:13,20 70:19
87:2 100:3,9,11
100:13 117:15
123:4 125:21
278:17 308:12
**newspaper**
27:20 28:3,6
137:18 308:4,11
**newspaper's**
53:25
**newspapers**
213:19
**newsroom** 18:5
52:24 55:16,24
57:15 75:16
76:22 85:13
87:12
**newsworthy**
58:5 80:18
81:10
**nice** 147:13
227:24 229:13
234:19 237:8
239:7 284:25
**nick** 37:18,20,22
40:24 41:8

291:20
**night** 147:25
172:18 176:16
187:21 228:7,11
228:17 229:16
232:11 237:11
239:10 275:16
286:2 290:9,18
300:4,17
**nonspeaking**
9:9 42:19 217:5
**noon** 176:5,5
177:12 178:11
178:11 226:18
**nope** 27:13
210:22 270:25
**northern** 1:2
5:22
**notarized**
323:10
**notary** 1:22
6:21 316:22
322:7 325:23
**note** 26:23
65:17,22 111:12
304:15 310:13
**noted** 268:17
324:4,5
**notepad** 167:7
**notes** 117:2
151:11,15
168:18 169:4
170:17 183:8
186:14 187:23
211:19 214:2,9

214:24 304:23
318:11,12 320:8
**notice** 1:18
34:21
**noting** 323:7
**november** 14:7
**nude** 29:12
**number** 12:18
12:21,22,24
13:5,8,10,11,25
63:23,24 65:13
79:14 85:19
107:24 109:25
117:22 120:3
145:21 146:16
164:14 173:14
182:20 190:17
223:17 250:19
253:3 294:4
299:2 303:20
317:7 318:5
319:5
**numbers** 13:14
13:20,24 51:8
118:7 120:5
131:3 211:24
**nw** 2:14
**nyhq** 75:16
**nyt** 173:2
**nyt000029**
189:2
**nyt227** 271:3
**nytimes.com.**
38:17

| | | | |
|---|---|---|---|
| **nytnews** 38:17 | 68:23 70:10 | 227:5 230:12 | **obtain** 177:20 |
| **o** | 71:21 75:9 | 231:9,22 232:13 | 177:22 178:2 |
| **o** 3:2 316:2 | 78:20 80:22 | 233:5,12,25 | **obvious** 247:7 |
| **oak** 213:15,24 | 83:6 87:23 | 234:3,13 235:7 | 296:7 297:11 |
| 216:21 | 89:14 90:6 91:2 | 235:16 236:3,9 | **obviously** 84:25 |
| **oath** 3:12 7:20 | 92:15 93:3 | 236:17,24 | 108:16,21 |
| 68:25 89:10 | 94:12,17 95:7 | 237:25 238:9 | **occasion** 254:25 |
| 214:25 | 95:19 96:8 | 240:11 241:8 | **occasional** |
| **oats** 124:15 | 97:14,17 98:2 | 243:25 245:9,10 | 58:21 |
| 125:6 135:11 | 99:14 100:5 | 245:25 248:2,18 | **occurred** 118:4 |
| 138:10,19 | 101:6 110:18 | 250:4,8 251:17 | **october** 31:24 |
| 142:13 143:3,12 | 115:17 116:6 | 256:11 257:3,14 | **offensive** 29:4 |
| 143:25 145:2 | 125:8 128:24 | 257:21 258:22 | **offered** 15:17 |
| 147:20 158:11 | 129:18 135:18 | 260:5,21 262:15 | **offering** 44:8 |
| 158:18 160:7,7 | 136:6 137:15,22 | 263:9 264:14,16 | **office** 208:15,19 |
| 171:19,22 | 140:24 142:17 | 265:24 266:7,19 | 209:3 250:23 |
| 173:13,25 | 143:15 146:8,19 | 267:2,19 269:2 | 251:4,7,14 |
| 258:18 260:4 | 148:2 149:6,10 | 269:10 270:7 | 253:25 256:16 |
| 268:20 269:5 | 157:11 161:22 | 274:7 275:3 | 256:18,22,25 |
| 282:17 | 162:14 167:22 | 278:6,22 281:13 | 260:4 266:17 |
| **objection** 9:9,14 | 170:6,11 179:3 | 282:25 283:4,17 | 280:18 321:11 |
| 17:6 22:18 | 194:3,15,20 | 285:13 286:15 | **officer** 137:8 |
| 25:18 26:17 | 195:12,19 196:9 | 286:19 287:2 | **offices** 323:3,10 |
| 27:15 30:22 | 197:22 198:11 | 290:25 291:22 | **official** 54:15 |
| 31:6,10 32:11 | 199:2,10 201:3 | 292:4 297:7,18 | 269:6,7 279:15 |
| 33:13,19 36:12 | 201:13,21 | 298:14 300:10 | 279:16 |
| 38:11 39:12 | 202:15,24 | 301:8,22 305:9 | **officials** 41:10 |
| 45:4,15 46:17 | 204:23 205:13 | 306:19 308:6,23 | 45:8 121:13 |
| 47:22 48:5,24 | 206:11 207:21 | 311:2 312:5 | 125:17,17 133:8 |
| 49:8,14,20 | 210:3,20 211:8 | **objections** 3:21 | 133:10 145:6 |
| 56:15 57:4 59:5 | 212:11 216:6,18 | 42:20 217:7 | **oh** 36:5 51:17 |
| 60:17 61:5,21 | 216:25 217:6 | **obligation** 71:18 | 53:17 98:24 |
| 62:7 63:6,16 | 218:6,11,17 | 297:25 | 184:9 |
| 64:20 66:16 | 222:14,22 | **obligations** | **ok** 284:13 |
| 67:8,20 68:13 | 223:14 225:21 | 173:20 | |

**EXHIBIT 1**

**[okay - overlap]**                                                     Page 367

| | | | |
|---|---|---|---|
| **okay** 8:5,13,14 | 283:23 290:4 | **opportunity** | 89:11,24 90:24 |
| 8:21 9:5,6,9,15 | 291:4,16 295:19 | 74:19 117:4 | 91:5,14 93:9,21 |
| 9:16 10:3,11,19 | 296:3 306:13 | 119:2,22 234:11 | 93:25 104:4 |
| 11:21 17:14 | 307:6,18 314:20 | **opposed** 92:23 | 105:4 106:7,14 |
| 21:25 22:23 | **ol** 128:23 129:2 | 94:11 205:24 | 153:15 154:12 |
| 40:14 48:21 | 165:9 | 219:2 221:2 | 155:3,12 156:22 |
| 54:22 63:25 | **old** 137:12 | **order** 58:21 | 174:8,14 190:4 |
| 65:16 68:9 | 146:13 | 182:4 191:6 | 190:14 191:16 |
| 73:23 74:3 82:3 | **once** 28:10 | 211:25 314:2 | 192:14 212:18 |
| 102:2 112:12 | 109:23 246:9 | **ordered** 29:4 | 212:23 213:11 |
| 113:22 120:18 | 249:19 303:8 | **ordering** 323:13 | 217:21 218:4,10 |
| 123:15 128:14 | 323:10 | **organization** | 218:16,23 219:2 |
| 133:6 134:13 | **one's** 153:25 | 28:16,20 62:20 | 219:21,25 |
| 136:12 145:11 | **ones** 61:19 | **organization's** | 242:25 245:2 |
| 148:5 153:12 | 103:9 123:24 | 63:10 | 255:5 259:19 |
| 155:5,24 159:16 | 278:19 | **organizational** | 264:8 266:22 |
| 168:16,21 171:4 | **ongoing** 144:22 | 85:9 | 270:15 271:25 |
| 173:7,12 175:3 | **online** 21:15 | **original** 3:9,17 | 276:6 286:11 |
| 179:25 181:13 | **onward** 284:18 | 24:7 257:8 | 302:25 |
| 181:17 182:19 | **open** 117:12 | 281:23 282:9 | **ought** 159:3 |
| 183:19 186:4,16 | 157:15 217:18 | 300:22 311:7 | **outcome** 322:17 |
| 189:6 190:2 | 241:14,17 242:9 | 323:13,15 | **outlet** 134:12 |
| 192:8 203:15 | 242:14 251:7 | **originals** 24:6 | **outlets** 21:3 |
| 206:3 214:7,11 | 269:22 | **orleans** 11:15 | 34:22 |
| 217:13 229:25 | **opened** 303:19 | 11:22,24 12:3 | **outline** 203:10 |
| 229:25,25 230:2 | **opinion** 29:20 | 19:5 | **outlined** 104:2 |
| 230:3,3 237:3 | 29:23 32:8 | **orwell's** 40:4 | **outside** 22:11 |
| 237:20,20,20,21 | 33:25 74:17,17 | **orwellabama** | 133:13 |
| 237:22,22 239:2 | 90:20 110:20 | 34:15 | **overall** 190:17 |
| 239:2,2,3,3,4,19 | 138:23,25 | **orwellian** 39:9 | 261:9 |
| 239:19,19,20,21 | 162:10 248:20 | 39:19 | **overarching** |
| 239:21 240:4 | 274:10 | **oskar** 49:18 | 69:21 70:23 |
| 242:2 252:24 | **opinions** 128:3 | 66:9,25 67:3 | 147:6 264:23 |
| 253:8 272:22 | **opportunities** | 84:9,19,20 | **overlap** 108:12 |
| 277:7 282:12 | 177:2 | 86:13 88:20 | |

**overlying** 232:18

**oversees** 126:22

**overtly** 21:8

**owed** 231:8,11

**own** 166:15
204:16 291:24

**owned** 166:14

**owner** 23:9

**p**

**p** 2:2,2 3:2

**p.m.** 102:8,14
111:6 149:18
153:8,18 173:18
188:15,22 189:8
189:10 199:23
200:5 209:7,13
212:20 225:7
249:3,10 250:17
250:22 252:10
252:17 255:6
256:7 289:17
302:10,17
309:17 313:7,13
315:3,9

**pa** 193:21

**pac** 108:8

**package** 51:8

**page** 23:23
29:12 35:8
40:15,20 42:12
43:3,8,9 54:5,8
54:9,10,10 56:9
57:12,22,22
63:23 65:14

72:25 73:16
132:21 133:4
137:2 139:5
166:21 169:10
183:17 186:4
187:12 188:4
212:17 242:7
272:16 277:5
281:23 289:9,18
303:20 304:5
317:6,24 318:4
318:24 319:4,7
319:18,22 320:3
320:15,24 321:3
323:18 324:11
324:14,17,20,23
325:1,4,7,10,13

**pages** 72:7
183:14 212:15
279:2 324:9

**paid** 25:22

**painfully** 296:7
297:11

**paper** 19:18
28:9,22 83:21
93:16 191:17
231:16 259:4,17
266:24 282:22
297:4 311:23

**paragraph** 26:7
53:10,16 55:23
56:10 57:23
65:2 73:11,15
76:8 77:9,16
79:24 133:7

134:13 136:25
145:14 184:4,8
184:11,15 212:5
218:3,9,14,22
218:24 219:10
240:19 264:20
265:13 272:10
272:23 273:18
282:13 289:19
290:11

**paragraphs**
138:16 277:3,9
277:12 278:10

**parallel** 108:23

**paraphrase**
155:17

**paraphrasing**
156:21

**pardon** 130:7

**pare** 46:9 281:7
281:17 282:6
285:3,7 298:9
299:9

**pare's** 286:12

**parent** 230:19
230:21

**parenthesis**
156:18

**parenthetical**
157:3 159:21

**parentheticals**
155:14

**parents** 193:19
204:14

**park** 2:5

**parkway** 323:21

**parody** 163:8

**part** 51:7 56:4
64:2 73:18 76:5
80:24 82:21
86:16 91:24
95:18 98:5
106:25 170:20
182:7 183:11
191:12 192:2,24
215:10 220:2
257:17 276:12
281:10

**partial** 75:10
212:12,15 216:6
295:10 303:12

**participate**
182:4

**particular**
37:12 43:21
55:13 60:23
74:19 85:17
89:6 127:6
213:17

**particulars** 89:7

**parties** 3:7
322:15 323:13

**parts** 169:15,16
169:17 218:25

**party** 167:18
168:12

**pass** 24:7

**passed** 133:23

**EXHIBIT 1**

**[passenger - places]**                                                    Page 369

**passenger** 30:15
  31:13 50:5
  56:21 69:15
  78:4 191:6,11
  191:21 192:4,17
  192:22,23,24
  194:6 203:25
  204:17,22 205:4
  205:8,12 206:9
  210:17 212:8
  220:11,19 221:4
  221:12,19
  222:11,19
  224:15 230:10
  233:2,9 235:11
  235:23 236:14
  246:15,24
  247:15 249:18
  254:20 256:9
  262:25 266:11
  268:8,24 269:18
  276:25 283:9,15
  283:22 320:20
**passenger's**
  215:13
**pat** 138:21
  139:2,2
**patch** 133:19
  184:16,24 185:4
**patch.com**
  182:25
**path** 143:2
**patience** 312:25
  314:17

**patted** 137:6
  138:4
**pay** 58:20
**payments** 44:5
**pdf** 215:3 323:7
**peasant** 93:18
**peeved** 36:10
**pen** 279:8
**penalty** 41:9
**pending** 245:4
  245:23
**people** 28:8
  39:15 44:18
  79:8,12 83:10
  85:10,19 88:7
  91:22 96:6
  104:8 120:6
  137:11,18,19
  145:11 154:20
  168:4 178:13
  181:6 225:3
  258:9 260:9
  261:25 267:6,7
  285:23 299:2
  308:10
**perfect** 285:17
**perfectly** 33:22
**period** 11:11
  175:25 242:8,10
**perpetrator**
  98:23
**person** 50:11
  61:16 67:25
  68:5,16 70:16
  88:11 128:22

  131:5 187:9
  204:4 220:5,6,9
  220:15,16,18,18
  221:19,22,23
  222:4,6,10,18
  223:3,8,19
  227:16 264:2
  280:3 283:21
  295:8
**persona** 42:2
**personal** 107:19
  204:21 206:8
  220:21 320:18
**personally**
  32:23 220:9
**persons** 88:11
**phenomenon**
  97:2
**phil** 77:3,5 86:2
  295:22 311:18
  312:2,7,11
**philip** 56:2
**phillips** 182:25
  183:4,6,9,15
  186:5,10,17,20
  187:11,14,18,25
**phone** 12:18,21
  12:22 13:5,11
  117:22 118:6
  167:11 168:5
  169:11 186:3
  187:9 253:22
  256:4 285:23
  309:21

**phones** 14:3,5
**phonetic** 310:15
**photo** 43:22,23
  44:21 280:14
**photocopy** 4:6
  317:9
**photograph**
  280:7 318:22
**photographs**
  43:19 137:16,17
**phrase** 40:3
  53:20
**phrasing** 287:16
**pick** 146:4
**picture** 42:18
  43:4 44:10
  126:18
**pictures** 44:3
**piece** 157:21
**pieces** 138:23
**pinged** 255:25
**piqued** 102:25
**pittsburgh**
  193:21
**place** 42:19 57:9
  99:20,22 133:25
  142:3 147:7
  155:2 161:11
  275:11 313:23
  313:25 316:11
**placed** 97:12
**placement**
  277:17 278:9
**places** 12:16
  21:8 78:7

**[placing - possible]**                                          Page 370

**placing**  44:25
254:9
**plaining**  176:10
**plaintiff**  1:5,17
2:4,9,18 5:18
6:7,9,11 317:4
318:2 319:2
**plaintiff's**  4:3,7
4:12,16,20,24
5:4,9 75:3
110:23 129:24
131:10 149:24
150:4,8,12,17
150:22 151:3,8
151:12,16,20,24
152:5,10,15,19
152:23 153:3
280:8 284:6
289:10 295:15
307:12 309:11
314:23
**plan**  26:11
**planning**  109:17
112:2,16
**plans**  103:8
104:2
**play**  70:8
109:18 110:6,14
135:5 237:3
238:19,21
**played**  111:25
112:8 132:3
227:22 228:4,20
229:10 237:5
238:25

**player**  64:17
71:2,9 105:23
124:4 131:21
141:11 144:10
147:12 193:18
212:6 242:23
260:19 261:3,6
264:25 265:16
307:25
**players**  25:21
44:6 79:17
103:15 107:4
112:21 114:19
117:9,14 121:12
123:21 126:9,12
140:21 242:4,8
243:18,23 244:9
244:22 264:10
273:22 274:4
275:8
**playing**  108:20
139:14 141:24
157:4,10 158:12
158:15,19 166:8
289:2
**plays**  121:2,5
**please**  6:19 7:2
7:5 30:25 38:16
51:16 55:4
59:24 72:7 73:2
73:4 133:5
183:18 200:8
209:15 220:13
252:23 286:2
295:21 307:16

309:9 323:10,18
324:9,9
**pledged**  138:13
**plural**  198:21
265:11
**podium**  242:9
**point**  10:10
14:22 28:21
34:23 38:24
43:24 69:21
70:24 91:25
102:24 104:25
105:2 118:11,19
134:5 160:8
164:3 171:15,19
176:11 188:9
189:19,20
203:11,16 213:3
215:13 217:22
249:8 269:23
281:6 288:7
294:24
**pointblank**
268:7,22
**points**  35:19
52:21 92:9
**poison**  41:24
**police**  114:11,17
121:23 122:8
178:18,25 207:7
207:13,16
211:17 249:5,19
256:16 300:2
304:11,25 306:6

**policy**  21:14
38:18 57:9,14
59:11,13 63:18
126:23 143:6,7
**polite**  238:16
**political**  17:12
**pool**  130:14
**poor**  172:24
**pope**  29:13
**portal**  21:21
22:8
**portion**  55:6,10
120:13 183:14
212:4 224:20
313:23
**portions**  219:2
**pose**  53:23
**position**  14:14
14:19 15:19,20
18:4 84:11
87:12 146:20
180:3,24 221:25
222:7 223:3,6
223:21 257:12
257:17 296:2
310:2 311:16
**positive**  39:10
157:22
**possess**  108:22
**possibility**
103:10 113:18
276:22 289:6
**possible**  16:22
53:7 59:15 60:2
104:16 250:6

[possible - probably]                                      Page 371

300:18,19 302:6
**possibly** 104:3
  117:3 198:5
  226:23 234:16
  238:6
**post** 4:10 45:12
  117:15 119:8,11
  119:17 307:20
  307:22 308:5,19
  309:3 317:10
**postgame** 139:6
  139:18,21
**potential** 105:14
  123:18 197:25
**potentially**
  263:25
**practice** 33:11
  33:18 53:12
  54:3 241:15,18
  269:15 286:4
**practices** 76:2
**praise** 41:24
**preceding**
  240:19
**precious** 58:22
**precise** 195:20
**precisely** 43:24
  49:4
**preface** 241:12
**pregame** 137:3
  138:4 139:2
**prelim** 199:12
  267:11
**preliminary**
  112:24,25 113:6

114:13 142:9
  283:11
**premarked** 4:3
  4:7,11,16,20,24
  5:4,8 74:23
**prepare** 118:17
**prepared** 58:20
  141:14
**presence** 64:6
  70:20 78:15
  82:11,25 185:12
  218:15 242:22
  243:6,19 261:6
  265:17 276:14
**present** 2:17
  97:23 142:16
  232:9 251:14
  300:4,16 301:4
**presented** 83:3
  86:12 87:16
**president** 2:22
**presidential**
  158:22
**press** 19:10
  45:25 50:23
  119:8,11 121:12
  139:6,21,25
  143:4 166:10
  176:22,25 182:4
  226:20 231:15
  232:9 235:22
  241:25 242:3,4
  247:18 248:22
  260:11,14,17
  269:9 280:17

**presser** 139:18
  154:16 156:13
**presses** 288:13
**pressing** 58:25
**presumably**
  43:22 117:23
  159:24 160:7
  165:9 181:21
**presume** 155:23
**presumed** 9:2
**presumes**
  242:25 243:5
**pretty** 86:7
  109:11,23
  111:19,23
  156:25 238:12
  243:15 285:15
  303:3 310:19
**prev** 7:13
**prevented** 269:5
**previous** 53:21
  270:20 310:5
**previously** 7:13
  11:6 69:15
  221:4 247:15
  265:18,22
  267:21 268:23
**price** 58:20
**primarily** 56:13
  56:18
**primary** 69:13
  70:19
**prince** 2:8
**principle** 63:14

**print** 190:9,16
  191:4,17 192:5
  192:5 287:21
  288:8 323:8
**printed** 74:4
  100:3 288:12
**printer** 28:10,10
**printing** 288:13
**prior** 16:11
  88:14 107:17
  110:3 132:18
  173:25 179:16
  197:16,18,19,20
**privacy** 136:22
**private** 28:15
**privilege** 9:13
  115:18 179:10
  179:15 180:13
  180:22 194:16
  194:21 196:11
  200:8,22 202:7
  206:11 208:24
  210:5 225:23
  245:20 252:4
  257:3 267:21
  270:7 300:11
**probably** 30:4
  52:19 86:22
  88:6 103:5
  105:24 120:18
  144:21 163:6
  176:4 233:20
  292:7,10 308:15
  313:22,23 314:4

**EXHIBIT 1**

[problem - question]                                          Page 372

| | | | |
|---|---|---|---|
| **problem** 37:11 37:15 39:7 208:5 | 213:11,22 214:8 | **providing** 195:2 195:23 206:13 | 255:19 256:18 301:17 |
| **problems** 106:10 312:3 | **prohibit** 44:7 | **provisions** 74:9 | **pull** 113:9 |
| **procedure** 1:19 324:6 | **prohibits** 118:8 | **prudent** 258:19 | **purdy** 55:25 77:3,7 83:23 |
| **proceedings** 4:1 5:1 6:1 | **projected** 146:3 | **public** 1:22 6:22 178:4 269:9 | **purport** 205:6 206:6 290:15 320:16 |
| **process** 86:10 90:24 91:20,24 92:5 143:12 287:22 | **promise** 59:16 60:3 99:7 206:21 | 284:22 289:3 316:22 322:7 325:23 | **purpose** 180:18 204:9 |
| **processes** 99:11 | **prompted** 163:12,13 | **publically** 113:8 136:10,13 178:8 | **pursuant** 1:18 324:6 |
| **procure** 120:11 | **proper** 9:8 | **publication** 259:2 287:24 | **push** 131:20 |
| **produce** 208:18 | **prosecution** 250:24 | 288:4 295:12 | **put** 9:8 44:3 48:22 49:4 |
| **produced** 111:13 216:15 | **prosecutors** 114:17 121:23 122:8 | **publish** 58:4 65:20 80:17 81:9 92:19 93:8 | 127:20 137:16 138:13 140:3 161:11 166:12 |
| **producers** 65:20 | **prosser** 11:12 | 94:15 96:2 189:24 192:12 | 179:8 192:3 200:22 217:5 |
| **production** 323:20 | **protect** 58:21 136:20 | 254:9 258:20 310:20 | 218:4,9,15,22 266:23,23 |
| **professional** 72:9 128:21 222:25 296:20 | **protected** 179:13 | **published** 28:7 28:10 45:7 | 279:12 300:22 |
| **proffered** 250:25 | **protective** 314:2 | 48:13 77:16 87:13 92:17,22 | **puts** 57:17 77:10 |
| **profile** 105:21 105:22 123:4 126:11 | **protest** 159:9 | 93:7,20 94:10 95:5,11,15 96:4 | **putting** 203:9 222:18 |
| **profiles** 103:21 105:13 | **provacative** 154:17 156:25 163:10 | 96:13 98:7 255:5 256:23 | |
| **profootballtalk** 32:21 | **provide** 16:12 61:24 194:22 210:6,9 310:17 | 267:3 271:21 272:12 300:14 | **q** |
| **program** 18:19 23:5 35:19 | **provided** 69:3,5 128:2 133:2 207:11 208:21 209:25 212:16 214:20 230:4 295:10 | **publishes** 93:5 **publishing** 30:9 82:9 96:11,20 185:21 189:13 | **qualifying** 202:10 **queries** 122:13 **question** 7:20 8:3,9,11,12,16 8:23 9:11,14 20:3 30:25 31:3 |

36:20 42:18
43:4 85:16 87:9
92:20,21 95:13
95:13 98:10
115:21 116:3
118:25 119:11
119:20,21
124:10 125:21
126:16 138:2
139:15,22,24
140:9 141:19,20
141:25 142:20
143:10 156:20
157:5 158:10,17
160:24 165:7
166:5,11,16
168:8,9 170:16
173:6 191:14,15
194:25 195:22
197:23 200:9,11
200:17 201:5,8
202:8 205:5,6
205:21 209:15
209:17,24 217:3
218:21 222:3
227:3 231:20,24
232:6,15,21
233:16 234:6,11
235:9 238:23
239:22 240:7,22
240:22,24 241:3
241:6,12 247:9
247:11 252:2
258:17 260:3
273:9,12 282:8

294:20 298:19
301:11,12 303:6
303:7 311:5
320:15 321:3
**questioned**
142:23
**questioning**
236:22 237:23
268:15 320:10
**questions** 8:21
78:12 79:20
115:23 116:21
117:5 135:6
139:6 141:10
143:20 159:7
161:5 173:22
179:19 181:10
205:17 206:20
206:25 232:24
243:10 277:23
286:21 287:14
288:17 293:7
313:5 314:15
320:14 321:2
**quickly** 35:17
72:2 130:18
133:12
**quiet** 273:23
**quincy** 11:7
**quinerly** 166:17
**quite** 35:23
121:15 138:9
**quote** 28:23,23
29:5 33:23 58:2
58:5 68:4 81:8

81:11 219:11
240:5 241:12
**quoted** 29:19
225:11

**r**

**r** 2:2 3:2 316:2
322:2
**race** 164:12
**racist** 23:8
**radio** 62:17,21
**ran** 44:21
185:16
**rand** 85:14
**randy** 85:5 87:6
295:23 296:3
**ranked** 79:15
146:16 261:12
265:4 271:12,18
271:24
**ranting** 41:10
**rapid** 44:4
**rat** 41:24
**ratay** 14:6
**rather** 20:17
41:20 232:3
248:15 279:15
285:15,21 290:7
290:16
**reach** 181:5
186:18 204:5,13
254:3 255:2
287:17
**reached** 38:21
183:23 185:16
254:2 258:8,10

258:12 267:5
306:22 307:2
**reaching** 101:21
173:19
**reaction** 230:17
**read** 23:25
27:10 31:3 32:5
34:21 40:8
42:11 51:20
55:3 56:8 61:19
63:18,24 73:7
73:11,15 90:16
102:20 111:3
165:4,20 170:22
184:6 193:23
209:14,17,22
211:15 216:10
284:18 297:9
314:19 323:6
324:2
**readable** 54:17
**reader** 62:6,14
68:18 220:25
241:2,5 279:3
279:25
**readers** 27:5
51:10 57:19
58:19 59:14
60:2,14 61:25
67:4,5,12 68:10
77:11 240:24
273:11 279:21
294:12 298:22
303:11 308:20

**[reading - record]**

**reading** 59:19
59:21 62:2 63:8
165:20 220:13
243:3 267:8
**reads** 9:3
212:10
**ready** 24:11
27:17 31:19
34:12 40:19
41:2,3 93:6,7
94:15 111:2
131:17 153:11
171:7 212:2
304:6 312:16
**realignment**
25:24
**realignments**
22:24
**realize** 26:12
70:14
**realizing** 24:24
**really** 35:3 78:7
78:14 79:21
103:12 158:25
168:8 230:24
238:20 291:15
294:20
**reason** 8:15
62:4 92:21
105:11 136:4
169:8 217:15
254:21 265:21
287:15,16
324:13,16,19,22
325:3,6,9,12,15

**reasonable**
48:14 108:18
141:14 262:9
282:21 283:3
**reasons** 324:8
**recall** 13:6,7,18
16:15,16,21
19:3,8,23 20:16
21:2,7 29:8,15
31:21 34:14
35:21 36:19
41:14 43:11
46:3,4 50:9
55:11,13,14
73:23 82:23
85:3 86:17 87:4
87:9 89:7 92:7
100:14 104:5,8
104:15 105:8
106:3 107:11
109:13,20 113:3
116:11,24
117:11,14
119:13,14,19
120:22,23
123:20,23 124:2
125:23 126:13
126:16 127:5
128:9,17 129:15
129:20 130:25
134:3 139:16,21
140:5 160:4,5
166:18 168:15
170:4 178:5
182:10,16

185:14 186:2,22
187:6,16 188:3
190:7 218:8,13
218:19 219:22
224:18 225:6,18
254:23 256:3
268:9,12 270:18
272:2 280:11,23
302:24 303:5,16
304:17 312:14
312:23
**receive** 207:14
210:25
**received** 282:18
**receiving**
281:24
**recently** 112:20
**recess** 51:24
149:21 188:18
199:25 209:9
252:13 302:13
313:9
**reckless** 262:14
**reckon** 251:6
**recognize** 216:4
250:12
**recognized**
28:16,18
**recollection**
165:7 173:9
241:23
**reconcile** 139:13
141:23 166:8
**record** 5:13,14
7:3 9:9 11:3

34:7 42:20
51:23 52:3
102:5,9,13
115:4,5,8,11,15
115:16,22,24
116:2,8 122:6
125:12,14
149:19 153:7
167:17 168:4,11
172:23 178:5
179:4,6,9,11
180:7,15,19
188:16,21
194:13 195:13
196:2 199:24
200:4,23 207:16
207:17,19 208:3
208:20,22 209:8
209:12,25 211:3
211:4,5 217:6
225:17,20 226:8
226:14 252:11
252:16 253:8,14
256:22,25
267:16,18 270:2
270:5 271:5
279:19 290:8
293:19 295:18
299:24 300:6,8
300:14 302:11
302:16 304:4
313:4,8,12
315:3,8 320:22
321:4,5,9,11,13
321:14 322:12

**EXHIBIT 1**

**[recorded - reporter]**                                         Page 375

**recorded** 5:16
183:6
**recorder** 167:6
167:10
**recording** 167:4
167:5,13 168:5
168:14,17
238:23
**recordings**
268:10,14
320:10
**recovered** 76:3
**recruited** 44:6
**recruitment**
44:9
**red** 107:9 109:4
**redaction**
183:20 184:10
304:10
**redraft** 246:18
**reducing** 58:18
**refer** 21:16
52:16 93:20
171:2 172:4
251:3
**refereeing** 42:5
**reference** 36:9
**referenced**
81:15
**references**
313:24
**referencing**
39:8
**referred** 31:2
83:22 209:16,21

250:18,23
256:15
**referring** 55:22
56:6 57:7 81:21
93:15 94:20
112:23 131:4
193:9 240:16
253:9 270:22
279:10
**refers** 39:14
53:20 83:19
**reflection** 159:2
**refresh** 165:6
173:8
**refreshes**
241:23
**regard** 65:25
94:4
**regarding** 61:23
123:18 125:19
**regardless**
69:11 140:8
235:24
**regional** 25:4
281:5
**regret** 30:14
98:11 137:13,21
**regrets** 29:17
30:8 311:11
**regular** 52:18
**regularly** 86:7
303:3
**reiterate** 214:13
214:19

**reiterating**
215:9
**related** 13:14
114:12 199:6,8
211:2 261:17
322:15
**relation** 197:13
200:12
**relationship**
105:6
**relative** 97:2
**relayed** 224:14
**relaying** 184:22
**release** 45:25
280:17 281:22
**released** 45:21
289:3
**relevant** 61:2,4
83:4 169:21
**reliable** 58:5
61:13 80:19
81:11 257:13
**reliance** 90:22
**relied** 56:13,23
210:16
**religious** 39:24
**rely** 56:18
**relying** 60:8,9
60:10
**remain** 57:24
**remains** 80:14
81:6 290:14
**remember**
16:23 35:25
89:3 132:13

161:2 274:16
**remind** 23:24
**reminder** 52:25
75:25
**reminding**
40:11
**remotely** 104:8
**removed** 29:6
**renee** 14:6
**rent** 114:3
**rented** 114:7
**repeat** 30:25
59:23 68:15
97:19 220:13
287:7
**repeatedly**
134:7
**rephrase** 8:19
8:25
**report** 15:25
16:8 80:2 84:8
84:21 105:9
112:3,16 121:20
134:12 189:21
258:13 294:5
295:5 298:5
**reported** 30:15
84:18 133:17,22
134:3,4,6
140:16 193:19
265:19,22
278:17 298:18
**reporter** 4:5,9
4:14,18,22 5:2,6
5:11,25 6:19

**EXHIBIT 1**

14:20 23:18
31:4 60:8 75:5
84:17,18 99:18
110:25 130:2
131:12 150:2,6
150:10,14,19,24
151:5,10,14,18
151:22 152:2,7
152:12,17,21,25
153:5 186:25
194:21 202:7
209:18,23
222:25 267:20
280:10,18,21
284:8 289:12
295:17 300:10
307:14 309:13
314:25 319:14
**reporter's**
115:18 196:10
210:4 223:23
225:22 227:7
257:3 270:7
**reporters** 84:16
103:7,25 168:4
179:14 194:16
285:17 290:8,17
**reporting** 45:9
45:13 50:10
98:15 107:5
121:7,18,21
122:25 123:2,2
123:3,9,13
128:17 129:16
129:16 176:20

177:15 179:13
182:8 266:5
284:15 285:11
294:11,24
297:17 298:2,7
298:13 299:5
308:2 309:5,22
**reports** 114:11
134:9
**represent** 224:8
**representing**
5:24
**represents**
291:6
**reprimanded**
100:16 101:9
**reproach** 53:12
54:4
**reproduced**
153:25
**reputation**
41:22 53:5
**request** 120:8
171:18 172:5
173:25 214:19
215:9 242:21
247:22
**requested** 320:2
323:6
**requests** 214:13
286:23
**required** 56:25
**requires** 92:4
**research** 111:17
113:4,9 114:9

120:4 130:5,9
130:12,14,15
132:11
**reserve** 78:6
**reserved** 3:22
**resided** 11:15
**residential** 11:2
12:25
**resort** 58:2
80:16,21 81:8
81:13 82:6
**respect** 20:3
118:25 119:21
124:10 158:9
**respectful**
234:20 238:16
**respectfully**
140:7,12
**respective** 3:6
**respond** 130:18
286:23 287:12
**responded**
285:2 288:5
**responding**
253:16 285:25
287:23
**responds**
250:21
**response** 29:25
73:14 132:25
137:14 157:23
163:16 173:17
173:24 183:16
189:7 199:11
202:7 208:8

249:15 255:10
255:15,24 256:2
266:21 281:15
290:6 291:18
292:15 310:18
**responses**
173:22
**responsibility**
283:25 298:21
323:6
**rest** 27:12 80:24
107:14 143:4
211:22
**restate** 8:18,24
63:19 205:16
**restrictions**
293:12
**result** 98:14
100:18 263:25
**resulted** 308:21
**retained** 315:6
319:14
**retired** 83:18
**retract** 310:24
**retracted** 311:7
**retraction** 289:8
289:15,19
290:20,24 311:8
**return** 134:23
**returned** 304:12
305:7 306:2
323:12,15
**reveal** 196:21
197:3 198:9

**[revealed - running]**                                    Page 377

**revealed**  295:3
302:20
**revealing**  60:20
199:4 200:19
201:6 202:3
**review**  32:10
40:12 57:2
89:12 92:5
177:25 323:7
**reviewed**  19:18
34:5 131:14
172:9 175:2
271:15 307:16
**reviewing**  178:8
**revising**  212:21
**rewind**  229:7,8
**reworked**  213:6
**reyes**  183:21
184:5,13,22,23
185:11,18,21
**rice**  2:10
**rich**  43:14
**richard**  29:13
**richmond**  322:5
**ride**  187:20
**riding**  187:21
**right**  11:25 12:5
12:5 33:12 37:2
37:4,5,6,7 38:7
40:6,12 42:15
43:16 44:4
49:12,15,19
59:4,12 60:5,23
60:25 64:21
65:4 70:3,9 71:7

71:13 76:7,9
77:20 80:9
81:13 87:10,14
93:13,21 96:7
97:4 100:23,25
101:4 105:18
108:19 119:18
120:20 121:4,11
123:8 125:10
127:10,18 128:8
129:10,12
133:20 136:14
136:16,23 143:3
143:8,14 144:6
144:12 145:22
146:4 153:21
156:14,15 157:5
158:10 159:17
160:19 162:8,9
162:16,17,18,18
162:19,21
163:18,25 164:2
164:3,17,18
165:13 167:13
170:17,19
175:23 180:4,11
180:12 181:12
181:16,18
182:21 185:9
191:9 193:2,7
204:22 208:5
216:16 220:22
223:13 229:5
232:23 234:2
235:5 244:24

245:7 247:25
248:4 249:23
253:4 256:2
259:12,18
260:20,25 262:2
263:2 264:3
265:5,11,12,23
266:6,12,18,25
271:5 272:7
273:10,15
275:23 276:9
277:10,12,15
278:21 281:8
283:16 284:16
286:25 287:4,5
287:13,15 289:4
289:24 290:19
291:9,21 292:3
292:14 293:24
296:7 297:11,13
297:17 298:13
300:17 306:23
310:6,10,15
311:11 314:4,6
**rigorously**
58:10,13
**rise**  44:4
**road**  2:10
**robbins**  134:18
134:19 186:6,13
320:5
**room**  104:7
145:18 217:12
217:18 242:9
269:22

**rooms**  117:12
241:17 269:15
**roughly**  103:6
176:6 178:11
182:8
**round**  146:3
**route**  215:21,25
**routine**  137:4
138:4
**routs**  36:11
**rovell**  31:23
**royal**  93:15,17
103:24
**ruin**  165:2
**rule**  71:19
117:13,17
290:14 324:6,7
**rules**  1:19 7:19
43:14 44:7
61:18,23 65:7
72:2 76:2 81:15
81:21 117:11
147:21,22
**rulings**  320:14
321:2
**rumor**  185:8,13
**run**  104:12
105:16 106:11
130:23 159:19
160:3 189:22
236:11,16
254:19 261:8
**running**  160:10
193:16 302:22
303:15

[rural - see]                                                                                          Page 378

**rural** 292:10
**rush** 92:12
  286:11
**rushed** 59:2
**ryan** 182:25
  183:4,5,9,15
  186:5,10,17,20
  187:10,14,18,25
  309:16 310:10
  310:21 311:19
  311:20 312:9,20

**s**

**s** 2:2 3:2,2 317:2
**saban** 36:9,16
  37:18,20,22
  40:17,24 41:8
  291:20
**salesman**
  129:11
**sanders** 188:5
  299:19 300:13
  304:11,25 305:6
  305:25 306:7,9
  306:23
**sandra** 14:9
**sankey** 125:20
  126:16
**santa** 298:10
**satisfied** 143:24
  144:4
**satisfy** 245:5
**saturday** 109:9
  155:8,12 290:3
**savvy** 25:11

**saw** 34:21 70:13
  166:5 219:7
  228:22 229:18
  230:18 237:13
  239:12 240:20
  282:14
**saying** 26:13
  29:19 34:23
  45:22 46:2
  68:16 92:9
  93:14 127:20
  146:24 147:4
  162:17 163:21
  180:19 221:19
  238:3,7 240:5
  281:8 285:10
**says** 33:10 36:24
  53:4,21 57:13
  58:2 73:5 74:8
  74:13,14,21
  75:15,21 78:5
  80:13,16 81:3,5
  81:7 120:7
  131:6 140:6
  146:10 156:13
  157:20 163:22
  163:24 168:10
  172:12 220:5,14
  229:3 246:18,22
  251:5 261:2
  264:25 265:3
  271:11 276:13
  281:17 282:10
  286:24 301:19
  307:22 310:6,10

**scene** 69:17
  70:13 110:5
  112:21 133:15
  138:21 244:17
  261:24 262:2,18
  264:3 265:18
  304:12 305:7
  306:2,11
**schedule** 151:19
  241:21 318:13
**schedules**
  108:12 241:19
**schefter** 33:6
**school** 23:5,12
  23:15 133:11
  136:24 143:6
  147:21 193:22
  219:19 273:18
  273:21,23
**schools** 25:24
  121:16 127:2,3
**schreiber** 16:9
**schwartz** 39:15
**science** 17:12
**scoop** 58:21
  213:15,24
  216:21
**scope** 208:23
**scorch** 28:24
  29:2,18 30:3,6
**screen** 253:21
**screwed** 170:10
  170:19,22
**scrutiny** 69:9,12
  71:17,19,24

  79:25 80:7 92:3
  99:11
**seal** 323:12
**sealing** 3:7
**searching** 137:8
**season** 271:13
**seat** 56:21 78:4
  222:19
**sec** 106:23 107:8
  107:18 109:5
  110:4 111:25
  112:6,10 116:22
  117:11,17
  119:24 120:17
  121:5 125:17
  130:21 145:21
  146:14 154:22
  158:24 159:4
  168:25
**second** 23:23
  55:23 56:8,10
  74:8 170:21
  212:17 216:9
  265:13
**secret** 29:14
**section** 80:23,24
**sections** 179:16
**security** 78:19
  78:23 137:8
  269:7 282:21
**see** 25:6 29:21
  36:23 44:13,14
  45:18 72:21
  76:4,5 96:10
  101:13 121:16

125:3 141:6
158:3 172:6
177:17 182:22
184:16 186:13
199:16 202:19
207:5,17 211:19
211:23 226:23
241:22 242:3,18
244:6 253:20
272:23 273:4
278:2,5,14
281:19 282:9
289:14,18 290:5
296:17 297:6
303:9,21 304:10
305:23 306:3
309:15,18
311:13,13
**seed** 103:13
109:25 145:21
190:17 261:9
**seeing** 73:23
242:5 306:5
**seeking** 134:23
**seeks** 245:10
**seem** 29:8,15
35:25 126:13
**seemed** 109:23
145:4,19 146:11
**seems** 104:17
130:13 296:14
307:23
**seen** 45:14,17
280:19,22
282:15,15

311:18,19
**segment** 317:10
**segments** 4:11
**selection** 112:11
120:20 121:5
**selects** 43:19
**self** 111:20,23
134:16 259:3,9
**semantics**
288:19,21
**seminar** 76:18
**send** 130:11
173:21 175:15
246:17,20 276:7
323:13
**sending** 33:6
197:14 246:10
**sends** 288:14
**sense** 8:17 163:4
**sent** 57:15
112:12 120:8
122:12 156:8
173:16 248:7,16
255:12 275:21
276:7 280:17
282:15
**sentence** 25:7
53:21 64:13
74:8 77:15
79:23 135:4
220:3,5,9,14
243:4 261:10
265:10 270:16
271:19 281:17
306:6

**sentences** 58:17
**separate** 24:18
**september** 75:8
75:19 76:11
81:16
**sequential**
88:23
**serafini** 70:7
**sergeant** 304:11
305:2
**serious** 77:18,23
**seriously** 58:9
58:13
**seriousness**
90:22
**service** 3:16
29:14
**session** 7:21
**set** 110:16
126:23 172:6
189:12 259:15
322:11,20
**seven** 37:4
142:8
**seventh** 272:9
**several** 29:11
126:5 145:19
173:19 178:21
258:9
**severn** 188:5
299:19 300:13
304:11,25 305:6
305:25 306:7,23
**shakeups** 22:25

**share** 32:2,3
244:5
**shared** 51:9
301:25
**shares** 278:21
**shift** 130:16
**shirt** 44:15,15
121:14 127:15
127:17 128:5
129:7 154:14,18
154:21,22
155:10 156:17
156:25 157:13
157:14 158:13
158:25 159:9,25
160:18 163:8,10
163:13,22
165:18 166:22
167:3 168:16
193:6 292:3
320:6
**shirts** 164:17
**shooter** 114:20
115:10
**shooting** 45:3
56:22 64:8,11
65:9 69:17
78:17 82:13
97:13,13,24
102:18 110:5,15
111:7 112:3,17
118:3 119:18
121:24 123:19
123:22 124:5,13
124:21 125:19

**[shooting - sorry]**                                                      Page 380

127:3 128:3
129:17 133:12
134:20 139:13
140:11,21
141:23 142:8,15
170:3 176:20
177:15 189:14
190:22 191:7,19
191:22 192:16
192:25 204:18
210:18 211:15
212:5 219:18
221:14,21,24
222:12,20 228:8
228:12,17,18
229:17 231:14
232:11 233:3,10
233:23 234:9
237:12 239:11
242:24 243:7,16
244:15,17
246:25 251:16
254:11,14 255:3
256:10 260:19
261:3,7,11,17
261:24 262:2
265:2,3 268:25
269:20 271:12
271:17 273:19
274:21 275:9
276:13,20 277:2
301:5,15,21
307:21 308:3
**short**  120:16
188:11 199:20

218:20
**shortly**  116:15
120:16
**shot**  71:3 115:7
262:8
**shots**  307:23
**show**  64:24
172:22 189:4
193:13 194:19
195:5,10,16
295:3
**showed**  29:12
195:14,25 196:3
196:7 198:20
200:25 201:17
212:5 302:2
**shown**  196:15
207:18 320:21
**shows**  120:20
203:17
**shrouded**  135:9
138:18
**sides**  178:19
**sign**  57:2 308:12
308:13 314:19
323:6
**signature**
322:23 323:2,16
325:18
**signed**  3:10,12
3:15 89:2,5
323:10,12,15
**significant**
101:16 274:4,13
274:25 275:2,5

**simultaneous**
147:8
**single**  79:25
223:10
**sir**  173:9
**sit**  89:9,21 93:19
102:22 144:18
**situation**  74:19
243:23 275:7
298:17
**situations**  58:3
80:16 81:8
**six**  57:8 96:20
142:7 232:24
**skepticism**
79:24 80:7
**skipping**  232:23
**slapping**  145:18
147:15
**slash**  216:21
**slot**  65:19
**slow**  91:24 92:5
**snag**  37:4
**social**  4:10
10:22 308:10,18
317:10
**society**  72:8
**sociology**  17:17
17:18
**solid**  292:21
**solo**  135:4
**solutions**  2:21
5:25 6:3 315:7
**somebody**  26:19
27:6 41:16 42:2

44:15 60:6,12
84:24 85:24
118:16 119:14
129:6 130:14
134:9 140:2
141:4 142:22
146:21 159:10
159:13 166:15
167:17 168:7
183:22 223:24
232:5 238:5
260:16 280:23
280:24 281:4
287:17,21,22
291:19
**somewhat**  86:23
**soon**  314:14
**sorry**  11:21 15:5
21:24 34:9
35:12 45:16
53:14 55:21
59:19,23 63:8
63:21 66:21
72:4 73:20 76:9
81:19 84:6
100:7 136:9
160:13,14
172:10 175:10
182:21 207:8
211:24 212:19
216:19 219:14
220:12 221:16
222:16 229:3,23
230:3 237:18,22
239:4,17,21

240:5 243:3
271:9 272:20
277:4 278:8
279:23 282:2
290:10 291:14
294:9 301:10
303:5 311:4
315:2
**sort** 41:21,25
88:22 102:5
122:16 125:2
126:17 147:5
171:21 172:4
177:17 178:20
**sorts** 86:10
**sought** 87:19
219:19 273:18
**sounds** 91:23
113:12 311:15
**source** 32:3,9,17
33:16,24 56:14
56:20 60:22,24
61:3,10,13
62:16 66:4 67:6
67:13,15,19
68:19 69:2,3
82:5,14,19,20
88:16 181:11,11
194:10,11,11,12
194:12,14,19,23
195:3,5,9,13,16
195:20,23,25,25
196:3,6,17,21
197:4,24 198:2
198:6,9,20

199:5 200:14,20
200:24 201:7,10
201:16 202:5,6
202:22 203:17
204:15,20,24
205:3,6 206:6
206:13 207:24
207:24 208:3,3
208:20,21 210:2
210:2,6,10
211:6,6 220:20
220:25 222:13
222:21 223:11
224:3,4 246:23
247:13 257:8,9
276:24 277:18
278:10 279:4,22
280:2 292:16,18
292:20,22,25
293:7,10,11,11
293:14,17,19,20
293:21,21,22,23
294:21 295:3,5
295:6,8,9,10,11
296:5,14 297:5
300:15,21 301:3
301:13,18,19
302:19 303:9
320:16 321:6,7
**source's** 303:12
**sources** 55:2,12
56:24 57:16
59:17 60:4,15
61:20,24 62:5
63:4 66:5,15,23

69:2 77:17 80:8
80:19 81:12,23
83:3 84:22
90:23 92:4
125:9 206:21
256:14 257:11
257:13 270:11
294:6,13
**sourcing** 65:18
65:21,24 66:24
75:23 76:14
77:10 78:7
85:17 88:21
92:2 94:4
296:10
**south** 138:7,20
161:16
**southbridge**
323:21
**southeast**
323:18
**southeastern**
37:16 131:24
273:25
**spahr** 1:20 2:13
**speak** 66:8
114:22 115:2,6
115:9,16,25
116:7 118:3
119:3,8,23
121:22 122:4,7
124:14 178:24
187:4 225:13,15
226:6,12,23
229:4,24 234:23

237:19 239:18
240:6 254:13,22
260:3,4 267:15
269:4 272:21
299:23
**speaking** 36:2
100:22 101:3
169:22 183:5,21
187:13 217:7
230:9 268:11
**speaks** 59:6
67:9 297:8
**spears** 1:4 2:5,9
2:19 5:19 30:10
31:13 44:25
45:11,20 46:22
56:13,20 58:15
64:6 69:14 70:6
70:20 71:6
77:23 78:3,15
81:18 82:11,24
87:16 92:13
97:11,22 100:2
170:2 173:3,3
186:24 193:21
194:7 203:4,19
203:22,25 204:6
204:17,22 205:4
205:7,11 206:8
210:17 216:12
218:3,15 219:11
220:7,10,16,19
221:3,12,15,19
221:23 222:10
222:19 224:14

[spears - started]                                        Page 382

225:8 226:16,24
228:15 230:9
231:12,18 232:8
233:9 234:10
235:23,25
236:15 239:23
240:5 241:6,24
242:23 243:7
244:10 246:10
246:13,23
247:14 249:17
251:14 254:4,7
255:16 258:9,16
258:17 260:2,2
261:21,23 263:6
265:17 266:10
266:16 268:4,7
268:23 269:18
271:2 273:3,15
275:14 276:19
276:23,25 277:5
282:8,10,23
283:8,15,16
290:8,20,23
298:9 299:9
300:3,16 301:3
301:19 307:22
310:8 320:19
**spears's** 290:17
**special** 65:7
69:9,12 71:16
71:19,23 81:15
81:20 92:2
99:11

**specific** 20:17
84:16 119:10
196:22 197:2
**specifically**
19:24 22:15
40:16 89:9
119:17 254:16
**specifics** 251:2
**specified** 316:11
**speculate** 20:18
90:9,15,18
**speeding** 126:13
**spend** 64:16
116:16
**spending**
224:22
**sphar** 6:13
**spitballing**
108:7
**spoke** 7:12
36:18,19 121:13
121:15 123:24
124:12 125:18
154:19 183:3
185:15 186:3
217:12 267:17
321:14
**spoken** 94:8
142:7 225:8,12
225:19 256:17
256:21,24 321:8
321:10
**sport** 168:2
**sports** 15:22
20:20,25 24:19

24:22 25:4,21
26:9,15 33:10
43:15 79:9
84:13,15,17
85:4 141:5
168:3 187:3,5
284:11 297:3
**spot** 38:16
135:13 138:19
277:11
**spotting** 22:16
26:8,14 27:3
**spread** 137:6
**ss** 322:4
**staff** 14:14
15:19,20 51:4
53:22 73:6
74:15
**stake** 25:14,16
60:25
**stakes** 78:5
**stallman** 16:7
**stamp** 173:14
**stamped** 154:2
172:15 313:20
**stamps** 174:23
175:21 216:7
**stand** 102:21
285:11 297:16
298:6,13
**standard** 19:19
22:8,11 32:8,14
58:8,12 59:10
59:11 90:16
167:16,20

168:10 247:25
286:4,6,7
**standard's**
85:25
**standards** 16:13
16:19 19:6,11
19:20 20:2,6,14
20:24 21:6,9,14
56:3 60:9 66:13
67:4 74:2,16
75:22 77:7 86:4
86:5 88:9 90:13
99:12 227:2
248:9,11 277:19
278:11,14
296:22 297:2
312:12,21
**standing** 54:2
**stands** 29:6 35:2
**star** 145:24
146:16 147:12
212:6 265:15
**starred** 131:25
**starring** 159:3
**start** 8:9 14:16
18:6 107:12
110:3 143:13
153:14 174:2
214:16 272:19
288:12
**started** 10:12
14:17 167:4
178:23 193:5
305:18

## [starting - strip]

**starting**  135:22
153:8 166:12
177:3
**starts**  54:23
64:18 183:20
184:15 188:22
**state**  1:23 6:5,22
7:2,5 36:6 39:3
132:8 139:9
162:5 167:18
168:12 220:17
249:15 254:16
273:17 296:6
297:10,16 322:4
322:8
**stated**  29:16
47:4 265:14
**statement**  22:12
45:21 46:5 63:9
89:13 127:20
136:5 163:9
221:11 250:3
288:18,20,23
302:4 324:8
**statements**
207:6,12 211:16
284:22 289:3
**states**  1:2 5:21
38:14 324:7
**stating**  19:24
41:15 249:20
**station**  249:12
**stayed**  107:14
176:15

**steadfast**  292:16
292:21
**stephanie**  249:4
249:16 250:17
**stephen**  2:4,6
6:6 7:12
**stern**  101:2
**steve**  48:22 49:6
49:17,22 50:8
73:3 307:22
309:21 312:8
**stipulated**  3:5
3:20
**stood**  137:5
**stop**  37:4 138:13
141:17,18 301:2
**stopped**  300:20
301:6,16
**stopping**  188:9
**stories**  18:7
22:16,17,24
23:3 26:8,9,14
27:3 52:17 86:8
88:13,19 93:6
93:25 102:20
103:11 105:14
105:18,19
142:19 189:13
296:23
**story**  21:17 22:6
32:3,5,20 33:7
33:17 34:2,22
35:6,14 36:15
38:21 39:4,15
43:22 44:22,25

45:7,22 46:2,10
46:16,20,24
47:9,21 48:12
48:16,22 49:5,7
50:3 56:17,18
64:5,10,11,14
64:19,25 65:8
65:17,21 66:25
67:23,24 69:20
69:21 70:19,24
79:7,7,14,18
82:8 83:3 86:9
86:13,19,22
87:2,13,16 89:6
90:21 91:25
92:6,13,17,22
94:15,20 95:24
96:11 97:10
98:7,21 99:9
101:13 102:25
103:10,17 105:6
105:10 106:5
123:4,11,18
124:18 130:12
133:25 134:11
136:15 147:6
170:10 185:16
187:17 189:22
189:24 190:8,10
190:16,22
191:13,16,19
192:2,4,15,24
193:4,5 213:4
220:23 221:7
232:20 236:12

236:16 241:10
254:19 256:22
259:17,21
264:20,23 267:3
267:4,12 278:11
279:11 281:8,18
283:8 285:4,9
285:21 286:12
293:4 296:6
297:6 298:25
299:10 307:24
308:5,20 309:4
309:5,22 310:5
310:13,25 311:7
311:13
**straight**  131:4
241:11 272:25
273:6
**straightforward**
238:13 310:19
**strain**  57:18
77:10
**street**  2:14
11:10 15:11
78:25 79:3
**strength**  53:4
**strengthened**
57:11
**strike**  169:21
183:5 274:22
**striking**  273:13
273:14
**strip**  78:17
97:24 118:4
127:3 204:8

**[strip - t]**                                                    Page 384

304:13
**strong**  185:8,12
**struck**  41:25
  147:10 265:15
  273:2,3
**student**  27:20
  28:2,6,15,20
  29:13 39:23,24
  245:22
**students**  23:6
  29:11 34:16,25
  35:11 36:10
  39:9 136:22,23
**studies**  39:25
**stuff**  88:12
  208:21 213:5,6
  284:13
**stumbling**
  235:13
**style**  52:8
**stylebook**  57:25
  80:15 81:7
**subhead**  36:15
**subheading**
  36:9 261:5
**subject**  65:25
  71:20 111:6
  154:9 173:13
  227:10,12,14,17
  227:18 228:6,10
  229:15 237:10
  239:9 309:18
**subjects**  227:8
**submit**  33:25

**subpoenas**
  178:3
**subscribed**
  316:18 325:19
**subscribers**
  308:11
**subsequent**
  294:11,24
**substance**
  175:22 238:12
  324:7
**sued**  46:15
**suggest**  137:17
**suggesting**
  264:9
**suggestion**
  180:14
**suicide**  31:25
**suing**  308:2
**suite**  323:21
**summer**  17:24
  34:23
**sunday**  109:9
  112:10,11
  113:20 120:19
  121:6 171:23
  172:18 175:5
**superficial**
  143:17
**supernatural**
  108:22
**supervisor**
  15:23
**supervisors**
  74:16

**suppose**  16:11
  227:3 245:15
**supposed**  238:5
**suppressing**
  276:19
**sure**  13:22
  19:21 21:20
  22:3 34:13
  38:23 41:6 42:7
  42:8 43:21
  44:19,20 49:7
  51:14 57:6,9
  65:10,11 66:5,6
  71:23 77:5
  83:10,19 85:7
  87:11 88:10,17
  104:25 108:13
  111:15 117:8
  118:10 120:9,10
  122:14,17,20
  124:24 138:11
  142:6 148:7
  149:16,16
  154:25 175:23
  183:12 193:8
  199:13,18
  212:23,25
  213:18 214:15
  247:23 248:13
  249:11 253:13
  263:17 270:21
  279:13 283:19
  296:2,11 305:17
  311:21,24

**surmised**
  197:17
**surprise**  91:8
  213:20
**surveillance**
  195:15 196:4,8
  201:17,19,24
  202:12,17,23
  203:5 210:19
  211:2 240:21
  271:15
**susan**  295:23,24
**suspect**  148:18
**suspend**  179:20
**suspending**
  142:14 162:10
**swear**  6:19
**sworn**  3:10 6:21
  316:5,18 322:11
  325:19
**system**  213:19

**t**

**t**  3:2,2 6:20
  44:15 121:14
  127:15,17 128:5
  129:7 154:14,18
  154:21,22
  155:10 156:17
  158:13 159:9,25
  160:18 163:8,10
  163:13,22
  165:18 166:22
  167:3 168:16
  193:6 292:3
  316:2 317:2

**EXHIBIT 1**

**[t - telling]**                                            Page 385

320:6 322:2,2
**take**   7:14 9:20
18:15 23:16,22
24:6 27:9,9
31:18 33:9 34:4
49:6 51:12 54:5
58:12 65:13
68:8 71:17,25
72:18 76:22
88:25 91:9
99:22 101:24
104:19 118:22
118:22 120:13
131:13 143:2
149:14 153:10
171:5 173:2,5
173:20 174:5
176:15 179:21
182:19 188:10
193:10 196:23
197:8 199:19
200:23 209:4
211:21 226:16
246:6 252:7,22
253:25 271:7
290:18 295:20
302:8 303:18,25
307:15 309:6
313:3,22
**taken**   1:17 5:17
7:24 18:14 28:8
50:2 51:25 58:9
102:11 107:9
149:22 155:2
188:19 200:2

209:10 213:6
252:14 302:14
313:10
**talk**   48:21 67:4
83:25 91:11
107:4 124:25
141:7,9 144:8
144:18,23,25
157:18 159:15
178:13 181:6
182:13 188:5
213:10 226:15
232:2,5 251:13
251:24 267:13
270:4 281:24
296:17 299:11
299:18 321:12
**talked**   13:25
36:21 91:20
98:18 161:14
226:3,9 230:21
269:25 303:3
305:2 309:24
**talking**   55:19
67:2,3,10,11,16
68:20 81:24
89:8 96:6
117:16 124:23
145:3 148:12
159:24 168:6
171:24 182:16
183:11 210:14
214:6 216:20
223:9 224:23
259:13 269:21

274:5
**talks**   81:22
**tape**   233:18
**tartaglia**   1:22
322:7,23
**taunting**   138:20
**taylor**   249:4
250:18
**tea**   36:25
**team**   71:11,15
79:15 110:10
116:20 124:19
124:19 135:24
143:7,14 145:25
146:16 147:21
162:11 181:21
243:17 261:8,12
265:5 271:19,24
273:20 276:14
306:9
**team's**   135:10
241:18 271:13
**teammate**
147:17
**teammates**
147:9
**teams**   274:2
**technology**
34:24
**telegram**   19:10
50:23
**telephone**   13:14
**television**   62:18
62:21

**tell**   9:5 18:13
24:21 59:14,25
66:20 73:4
83:15 88:23
105:20 113:13
123:21 124:11
125:22 129:5
157:16 167:3
174:17 177:13
183:4,13 185:11
186:7 197:6
198:7 203:18,21
203:24 206:6
211:14 217:13
224:2 228:15
231:5,8,18,19
232:7,11 235:10
240:23 241:4
246:19 248:21
255:22 260:10
260:13 261:12
285:8 286:17
292:18 293:2,14
294:12 295:6
299:25 300:5,7
305:3 320:16
**telling**   67:2,3,10
67:12 137:11
143:4,11 144:2
154:12 162:5
165:10 184:20
184:23 196:14
198:10 204:15
220:24 231:3
243:16 294:21

[telling - think]                                                    Page 386

| | | | |
|---|---|---|---|
| 299:2 301:13 | **testimony** 7:15 | **thereof** 78:16 | 76:17 78:10 |
| 303:11 305:23 | 68:25 147:3 | **therewith** 19:22 | 79:19,21 83:9 |
| 306:22 310:18 | 226:17 250:24 | **thing** 32:19 35:4 | 86:6 88:19 92:8 |
| **tells** 9:11 32:9 | 268:3 313:24 | 52:20 72:17,20 | 106:18,20,20 |
| 132:12 156:24 | 314:13 315:4 | 118:5 126:18 | 107:6 118:13,14 |
| 163:19 164:15 | 316:6,10 322:13 | 148:22 160:20 | 118:19 120:25 |
| 164:19 167:12 | 324:2,7 | 162:9,9,16,17 | 126:8,15 136:8 |
| 187:18 198:17 | **texas** 23:12,14 | 162:18,22 | 138:12 141:5 |
| 203:17 223:19 | 38:5 | 163:18 164:22 | 142:2,5 143:18 |
| 253:17 279:21 | **text** 117:24 | 166:25 203:12 | 143:19 144:7,14 |
| 279:25 293:23 | 134:14 150:11 | 223:10 248:13 | 144:15 147:10 |
| 303:9 | 152:18,22 174:7 | 285:22 | 147:18 154:14 |
| **tend** 201:7 | 174:9,12 195:6 | **things** 32:4 | 154:25 157:2,9 |
| **tennessee** | 252:25 284:5 | 76:16 82:3 | 158:19,21,25 |
| 113:15 117:6 | 318:6,19,20 | 86:11 94:3 98:4 | 159:4 160:15,21 |
| 159:12 | 319:6 320:4 | 126:2,23 134:9 | 160:22,23 |
| **term** 69:12 | **texted** 134:19 | 137:13 138:7 | 161:14,16 |
| 100:13 128:11 | **texts** 135:2 | 144:21,24 | 163:20,21 168:3 |
| 148:24 263:13 | **thank** 7:9 24:10 | 160:22 161:13 | 169:7 174:11 |
| 308:8 | 41:7 84:7 | 163:3 169:20 | 178:21 186:8 |
| **terms** 69:8 | 111:16 155:7 | 185:25 213:11 | 198:4,14,15 |
| 96:25 122:4,7 | 156:7 165:25 | 219:7 223:17 | 200:15,16 203:9 |
| 127:14 135:21 | 232:4 304:8 | 238:3 279:9 | 206:15 208:4 |
| **terrifying** | 305:22 313:2 | 286:7 292:23,24 | 211:9 213:15 |
| 228:24 229:20 | 314:16 315:7 | 299:15 308:16 | 215:23 219:4,4 |
| 230:18 231:2 | **thanks** 51:17 | 314:11 | 219:9 225:2 |
| 232:17 233:8,20 | 173:19 175:17 | **think** 19:25 | 230:19 231:8,11 |
| 234:16 237:15 | 193:22 230:3 | 25:20 27:7 | 232:4 236:11 |
| 239:14 | 237:22 239:4,21 | 29:19 31:12,16 | 238:11 240:2 |
| **testified** 6:23 | 249:16 | 32:13 35:23 | 244:11 246:3,4 |
| 214:25 243:20 | **theme** 232:19 | 36:2,4 39:14 | 251:9 258:4 |
| 267:10 276:16 | 264:23 | 40:2 41:13,15 | 259:24 262:8,12 |
| **testify** 208:16 | **themes** 147:6 | 50:2,8 53:17 | 264:5,6,19 |
| 316:5 | **thenewyorkti...** | 64:9 65:5,6 | 268:18 274:9,14 |
| | 73:25 | 70:12 73:8 | 274:15,20 275:5 |

**EXHIBIT 1**

[think - times]                                                                 Page 387

| | | | |
|---|---|---|---|
| 276:4,12 277:10 | 109:11 116:16 | 95:10,22,23 | 216:7 217:11,14 |
| 279:21 280:6,18 | 138:16,16 | 96:15 97:12 | 221:13,20,24 |
| 282:13,16,22 | 219:15 224:11 | 102:7,13 103:22 | 222:12,20 224:2 |
| 283:6 284:23 | 224:12,16 277:6 | 104:5,23,24 | 224:10,22 225:7 |
| 288:18,21 | **thrust**  190:21 | 105:13 106:15 | 226:21 228:17 |
| 294:16 298:16 | 191:6,19 | 107:2 108:9,16 | 231:12,14 233:3 |
| 299:13,16 | **thumb**  313:18 | 108:21 109:16 | 233:10,23 234:9 |
| 304:16,19,22 | **thumbs**  174:18 | 111:12,13,14 | 238:20,21 |
| 307:4 308:11,14 | **thursday** | 116:10 118:22 | 244:10 246:25 |
| 308:17 311:9,22 | 176:23 177:4 | 120:14,16,23,24 | 248:23 249:2 |
| 314:3,6,9 | 190:9 | 126:3 130:17 | 251:15 252:9,16 |
| **thinking**  79:22 | **thursday's** | 131:2 133:23 | 254:10 256:10 |
| 126:3 284:14 | 171:20 | 135:14,21 | 256:18,22 |
| **thinks**  27:6,7 | **tide**  34:16 | 138:19 139:14 | 258:25 261:15 |
| **third**  77:9 131:5 | 131:21 135:9 | 141:24 142:3,11 | 268:25 269:19 |
| 133:7 | 138:18 143:14 | 148:8 149:17 | 269:23 270:3 |
| **thirty**  47:14,16 | 190:18 212:7 | 153:7,21 154:2 | 271:2,20 277:2 |
| **thompson**  6:15 | 261:6 265:16 | 154:3 157:25 | 278:21 281:6 |
| 6:16 43:5 | 273:24 | 158:10 160:5 | 284:11 287:24 |
| 165:25 305:20 | **tide's**  105:16 | 161:8 162:6 | 288:4 301:5,14 |
| **thought**  35:3,4 | **till**  258:20 | 166:8 168:21 | 301:20 302:9,16 |
| 36:23 121:17 | **time**  1:12 3:22 | 172:11,15 173:4 | 308:20 311:22 |
| 128:7 144:24 | 6:4 7:13 9:7,7 | 173:18 174:23 | 311:24 313:6,12 |
| 159:11 181:7 | 10:4 11:11 15:3 | 175:21 176:2 | 316:10 323:15 |
| 253:24 275:13 | 18:8,9,22 20:21 | 177:9,11,11 | **timeframe** |
| 276:17 288:25 | 25:21,22 27:10 | 188:14,21 189:3 | 216:23 |
| 289:5 310:23 | 28:21 29:16 | 191:22 193:6,14 | **timeliness**  96:25 |
| **thread**  296:4 | 45:2 51:21 52:3 | 195:20 197:8,13 | **timely**  286:21 |
| **threaten**  53:25 | 52:22,22 55:16 | 197:16 198:7 | **times**  1:8,16 |
| **threatened** | 55:17 56:22 | 199:22 200:4,12 | 2:14,23 5:19 |
| 269:8 282:20 | 64:7,16 69:16 | 200:24 204:8,17 | 6:17 14:12,16 |
| **threats**  282:18 | 76:20,20,23 | 208:16 209:6,12 | 14:18 15:12,14 |
| 282:24 | 82:12 83:11 | 210:18 212:21 | 15:16 16:2,11 |
| **three**  10:9 57:2 | 84:10,14 85:6 | 212:22 215:18 | 16:12,17 21:11 |
| 81:25 108:19 | 86:4 87:10,13 | 215:22,23,24 | 21:13 22:14 |

**[times - transcript]**

| | | | |
|---|---|---|---|
| 24:17 25:17 | 302:22 303:8,15 | 299:8 300:13,15 | 105:17 106:11 |
| 26:13 38:18,22 | 305:5,24 306:15 | 303:13 307:3,4 | 106:22,24 107:8 |
| 44:3 46:15,19 | 307:21 308:4,22 | 312:2 | 107:18 109:5,22 |
| 47:20 48:3 | 310:23 311:6,10 | **tone** 285:21 | 110:4 112:2,6 |
| 50:14 51:3,9 | 311:15 312:13 | **tonight** 247:19 | 116:22 117:11 |
| 52:7 53:5 55:11 | 312:21 | 260:11 | 117:13 119:24 |
| 58:3 59:3 66:13 | **tip** 122:16 | **took** 15:3 18:17 | 127:18 130:22 |
| 67:12 68:10,11 | **title** 84:12 | 18:19 19:4 | 130:24 131:24 |
| 72:19 77:8,24 | **toast** 273:25 | 46:14 48:3 | 145:22 146:15 |
| 80:17 81:9 82:9 | **today** 7:22 9:8 | 49:11 143:2 | 168:23,25 |
| 90:12 93:5,11 | 9:19 29:24 | 187:14,24 | 176:23 259:23 |
| 93:13 94:25 | 42:20 69:2 | 230:14 | 261:9 281:3 |
| 95:14 96:4,7 | 89:10,22 93:19 | **tool** 44:9 | **tournaments** |
| 97:10,21 99:12 | 102:22 179:19 | **top** 54:10 57:2 | 107:4,25 108:4 |
| 99:20 100:18,23 | 277:23 309:7 | 73:2,5,11,15 | **towers** 11:3 |
| 101:4,20 164:14 | 312:25 314:17 | 77:8 83:21 | **town** 183:25 |
| 167:16 168:9 | **today's** 315:4 | 103:13 154:2 | **tpd** 186:23 |
| 175:19 189:13 | **together** 167:7 | 189:5 261:8,12 | **track** 34:16 |
| 213:17 223:2 | 167:11 203:10 | 265:4 271:12,18 | **tracking** 39:9 |
| 227:24 229:12 | 212:25 | 271:24 277:5 | **tracks** 35:10 |
| 230:5 236:22 | **told** 45:8 46:9 | 296:13 | **trading** 78:25 |
| 237:7 239:6 | 46:21 124:17,22 | **topic** 104:11 | 79:3 |
| 240:23 245:3,19 | 128:6 145:2 | **topless** 137:16 | **tragedy** 65:3 |
| 247:14,24 248:9 | 170:8,8,24 | **torso** 29:12 | 69:22 70:16 |
| 249:2,2 250:15 | 190:20 204:11 | **total** 25:11 | 158:9 264:22 |
| 250:16 251:11 | 204:20 205:3,10 | **touch** 249:4 | **tragic** 64:12 |
| 253:23 254:8,18 | 205:24 221:2,22 | **touchy** 228:5,10 | **trained** 16:23 |
| 259:14,15,16 | 224:3,4 231:12 | 229:14 237:9 | 21:5 |
| 271:16 277:19 | 235:25 236:6 | 239:8 | **training** 16:13 |
| 278:11 285:10 | 246:23 259:16 | **tough** 75:22 | 18:24 76:13,16 |
| 285:17 286:2 | 260:16 285:6 | 79:25 80:7 | **transcribed** |
| 288:13 290:22 | 291:7 292:25 | **tournament** | 165:15 |
| 294:5 295:21 | 293:4,17,19 | 79:10 96:22 | **transcript** 7:23 |
| 296:2 297:15 | 294:6,14 295:5 | 97:3 103:5,8,13 | 9:3 199:12 |
| 298:12 301:16 | 298:8,8,9,10 | 103:17 104:3,12 | 316:9,9 323:7 |

[transcript - under]                                           Page 389

323:13,15 324:2
**transcription**
 166:21
**transcripts**
 113:5 207:5,12
 207:14 211:15
 212:9 271:15
**transforming**
 43:15 44:6
**transmitting**
 155:11
**transparency**
 244:23
**transparent**
 243:22 244:8,20
 245:7,14,22
 275:23
**transported**
 283:12,14,16
**trauma** 23:12
**traumatic**
 234:16 235:3
**traylor** 253:3,5
**traylor's** 253:17
**treat** 314:9
**tremendous**
 97:11,22
**trey** 186:23,25
 187:4
**trial** 3:22
**tried** 48:20
 169:24 178:13
 181:5,5
**true** 68:12
 230:14 316:9

322:12
**trump** 158:21
**trust** 57:19
 77:11
**truth** 316:5
**truthful** 191:25
 223:12
**try** 8:7 164:20
 165:2 173:22
 258:12 314:13
**trying** 37:3
 73:21 79:15
 103:14 105:14
 118:12,19 121:6
 128:7 138:14
 157:6 163:4,11
 163:14 165:12
 182:11 204:3,4
 204:12,13
 206:19 208:23
 238:6 255:2
 273:11 294:18
**tuesday** 55:24
 113:21,24 114:2
 175:13 176:5
**tulane** 11:25
 12:4 17:3,16
 18:18 27:20,23
 28:6,16,18
 29:11,13
**tulane's** 29:3
**turbulent** 25:21
**turmoil** 25:23
**turn** 23:23 43:8
 55:9 56:9 72:6

72:14,17,25
 166:20 188:4
 284:15 289:17
**turned** 26:7
 77:18
**tuscaloosa** 2:10
 78:17 113:11,16
 113:21,22 114:2
 114:5 127:4
 133:13 172:2
 174:18,22
 175:15,25 176:8
 176:16,19
 177:14,23
 178:10 181:3
 182:9,14 184:16
 184:24 185:4,25
 196:24 207:4,11
 224:22 249:5
 256:16 300:2
 306:6
**tv** 147:15
**tweaked** 33:9
 34:3
**two** 18:14 26:20
 44:13 47:19
 49:12,17 56:23
 58:17 65:13
 69:2 81:25 83:2
 85:10 95:6 96:5
 97:10,22 98:4
 108:19 112:20
 123:10 163:3
 192:19 197:19
 205:17 206:21

212:15 220:4
 252:23 270:12
 270:22 272:25
 273:13 289:24
 289:25 294:5,13
 313:4
**type** 39:9 52:19
 89:12 128:23
 214:9
**typed** 7:22,25
 156:21 186:10
**types** 16:17 56:5
 60:11 126:10
**typewritten**
 214:2
**typical** 130:10
**typically** 107:2
 130:18 133:21
 242:7

| u |
|---|

**u** 3:2 154:3
**uber** 114:8
**ucla** 18:17
**um** 240:9
**unaware** 108:23
**unchanged**
 57:24 80:14
 81:6
**unclear** 290:14
**uncomfort**
 41:16
**under** 7:20
 68:25 85:6
 89:10 99:12
 115:19 134:13

**EXHIBIT 1**

**[under - veritext]**                                               Page 390

212:4 214:25
233:20 290:13
314:2
**underlying**
232:19
**undermine** 53:6
**underscore**
277:6 282:8,11
**undersigned**
324:2
**understand**
8:17 63:11
70:20 73:21
75:12 95:12
118:15 123:8
148:21,25
156:22 157:7
159:8 163:11
175:24 180:2,9
181:9,11 183:13
197:12 205:9,22
206:3 213:7
221:9 226:17
228:6,10 229:15
237:10 239:9
245:7,17 251:16
263:2,18 264:4
278:18 282:16
282:19 311:4
**understanding**
22:3 88:24
144:19 285:4
**understood** 9:4
32:14 180:23
267:8

**unequivocal**
296:12
**unfair** 165:16
**unfolded** 106:21
**unholy** 233:19
**unidentified**
54:25 69:15
220:19 221:4
247:15 268:24
**uniform** 29:14
**union** 50:16,20
50:22,25
**unit** 5:15 52:5
102:10,15
149:20 153:8
188:23 252:12
**united** 1:2 5:21
**units** 315:5
**universal**
111:13
**universe** 197:25
199:14
**university** 17:12
17:16 18:21
19:5 28:17 37:8
37:12 39:6
45:21 46:6
111:24 124:24
135:15 136:2
145:12,20
148:11 162:22
171:11 173:23
190:17 243:21
244:7 245:3,21
246:11,25

247:12,17
248:16,21 254:3
254:8 255:11
258:10 266:17
268:21 275:13
275:21 276:8,18
285:8 286:13,22
287:11 288:20
288:25 299:10
306:8
**unpublished**
33:6
**unreasonable**
247:3,10,19
**unsatisfied**
144:4
**unsealed** 314:6
**unsigned** 3:14
**unsportsmanli...**
41:9
**unsure** 22:7
**update** 309:17
**updated** 72:3
**upper** 55:16
88:5,8,15 99:10
99:19 309:24
**urgency** 58:18
**usage** 52:8
**use** 34:24 54:23
54:25 55:12
57:15 61:19,23
76:14 78:6
79:25 80:8
84:22 88:15
92:4 99:6

154:15 168:5
262:12 324:9
**used** 3:14 13:13
13:20 77:13
80:20 81:12
82:5 98:13
100:13 128:11
166:14 213:22
214:8 263:19
283:13 310:3
315:6
**useful** 124:8
**user** 55:15
**using** 35:19 39:2
103:24
**usual** 296:8
**usually** 121:2
**utc** 154:4 173:4

**v**

**vague** 227:6
**vaguely** 31:22
**valuable** 57:18
77:11
**vcu** 250:18
**vegas** 107:10,17
107:20,23,25
108:4,9,20
109:4
**vehicle** 69:16
115:7
**verify** 257:20
**veritext** 2:21
5:24 6:2 315:7
323:10,20

**EXHIBIT 1**

**veritext.com**
  323:18
**version**  54:16
**versus**  5:19
**vice**  2:22
**vicinity**  274:18
**victim**  114:21
  114:23 115:14
**video**  5:16 9:4
  51:20,22 52:3
  70:8,13 102:8
  102:13 149:18
  153:7 188:15,21
  195:14,15,17
  196:4,8 199:23
  200:4 201:17,19
  201:24 202:12
  202:17,23 203:5
  209:7,12 210:19
  211:2,14 212:5
  227:22 228:4,20
  228:22 229:10
  229:18 230:18
  237:4,13 238:24
  239:12 240:21
  252:10,16,18
  271:15 302:10
  302:11,16 313:7
  313:12
**videographer**
  2:20 5:12 6:18
  51:15,21 52:2
  102:7,12 149:17
  153:6 188:14,20
  199:22 200:3

  209:6,11 252:9
  252:15 302:9,15
  313:6,11 315:2
**videotaped**
  207:5,12,15
  211:16
**vigilant**  53:22
**violate**  147:21
  245:6 278:11
**violated**  312:13
  312:22
**violates**  19:19
  277:18
**violating**  59:15
  60:3,20 62:15
**violation**  74:10
  74:11
**virginia**  2:6,18
  6:8 33:3 37:25
  38:3,9 48:2
  158:21 172:24
  208:7,15 291:19
**virtue**  204:7
  257:11 306:16
**visa**  23:5
**voice**  101:19
  228:2
**voicemail**
  249:12
**volume**  235:18
**voracity**  221:11
  221:18

**w**

**w**  6:20
**wait**  36:5
  251:12,12,20,21
  259:25 300:24
  303:5
**waited**  258:20
  266:15
**waiting**  97:21
**waived**  3:9
**wake**  142:15
**walk**  137:6
  218:4 265:17
**walking**  147:22
**wall**  78:25 79:3
**want**  10:4 22:7
  22:10 24:6 40:8
  41:5 51:6,20
  60:6 63:19
  64:24 65:4
  72:16 89:21
  92:10,11 111:11
  111:11,14
  113:13 118:14
  118:16,16,17
  139:25 141:7
  142:23 143:18
  144:12 158:8
  162:2 164:20
  173:21 175:23
  181:14 183:12
  197:7 199:15
  200:22 206:23
  214:22 216:22
  231:19 232:2

  234:18,24,25
  252:4 268:16
  270:19 271:21
  277:8 279:20
  299:17,17
  308:13 314:11
**wanted**  107:7
  144:8 156:16
  159:15 161:24
  230:24,25
  232:16,22
  233:17 249:17
  259:17,20
  260:18 285:2
  290:22 310:20
**washington**
  2:15 307:20
  308:5,19
**waste**  79:5
**watch**  230:19
**watched**  211:14
**watches**  9:3
**watching**  70:2,6
**way**  20:11 30:20
  40:23 57:11
  85:9 95:4
  100:17 101:9
  106:21 129:14
  135:21 143:17
  154:22 158:6,24
  179:12 247:11
  252:7 256:4
  282:15 288:6
  292:8 296:6
  297:5 314:10

**[way - witness]**                                                    Page 392

322:17

**ways**  20:12,13
20:17 247:21
248:6

**we've**  135:2
172:25 173:19
188:10 214:20
215:2 252:6

**weapon**  137:8
231:7 232:10

**wear**  127:22
158:24

**wearing**  44:19
121:14 129:6
154:20 159:14
160:18

**website**  74:5

**wednesday**
176:6,13,24
177:2,8 212:19

**week**  28:11
173:20 190:15
267:9 314:12

**weekend**  107:15
130:21 171:15
284:17

**weeks**  35:15
103:23 142:8
158:22 283:10

**weight**  274:25
275:2,6

**weird**  284:21

**welcome**  173:2

**welcoming**
24:14 26:22

**went**  11:24,25
12:4 66:7 69:4,6
89:11,23 113:22
142:24 166:25
177:16 178:6
185:24 232:5
257:19,23
288:10

**wessling**  295:23
295:24

**west**  2:6 11:10
15:11 33:2
37:24 38:2,9
48:2 108:7,20
158:21 172:24
208:6,15 291:19
292:13

**western**  1:3
5:22

**whatsapp**
174:10 253:2
284:12 288:16
289:23 303:10

**whereof**  322:19

**widely**  133:22

**wife**  14:10

**william**  10:13
10:15

**wilson**  85:7,15

**win**  79:16

**windshield**
273:2,13

**winner**  42:6

**witness**  1:16
3:10,16,18 6:14

6:17,19,20 17:7
22:19 23:25
25:19 26:18
30:23,24 31:11
32:12 33:14,20
34:10 36:13
38:12 39:13
40:11,14,20
41:3,7 42:16
45:5,16 46:18
48:6,25 49:9,21
51:12,17 54:18
54:20 56:16
57:5 59:6 60:18
61:6,22 62:8
63:7,16 64:22
66:17 67:21
68:14 70:11
71:22 75:14
78:21 80:11
83:7 87:24
89:15 90:7 91:3
92:16 93:3
94:13,18 95:8
95:20 96:9
97:18 98:3 99:3
99:15 100:6
110:19 115:22
125:10,13
128:25 129:19
131:16 132:2
135:19 136:7
140:25 142:18
143:16 146:9,19
148:3 149:7,11

149:14 153:20
157:12 161:23
167:23 168:11
168:13 170:7,13
172:10,17,21
179:5 193:18
194:4,18,25
195:4 196:11
198:3,12 199:3
199:18 201:4,14
202:25 203:19
204:7 205:23
206:18 207:15
210:8,9,11,21
212:9 216:7,18
218:7,12,18
222:15,23
223:15 224:19
225:23 227:6,9
227:11 230:13
231:10,23
232:14 233:6,13
234:4,14 236:4
236:10,18,25
238:2,10 240:12
241:9 244:2
246:2 248:3,19
250:5,9 251:18
251:23 252:5
256:12 257:15
257:22 258:23
260:6,22 262:16
263:10 264:17
265:25 266:8,20
267:22 269:3,11

[witness - witz]                                                    Page 393

| | | | |
|---|---|---|---|
| 271:9,14 274:8 | 44:11 45:1 46:1 | 126:1 127:1 | 195:1 196:1 |
| 275:4 278:7,23 | 47:1 48:1,15 | 128:1 129:1 | 197:1 198:1,10 |
| 279:8,13 281:14 | 49:1 50:1 51:1 | 130:1 131:1 | 199:1 200:1 |
| 283:2,5,18 | 52:1,6 53:1 54:1 | 132:1 133:1 | 201:1 202:1,13 |
| 285:14 287:3 | 54:17 55:1 56:1 | 134:1 135:1 | 203:1 204:1 |
| 291:2,23 292:5 | 57:1,20 58:1,23 | 136:1,4 137:1 | 205:1 206:1 |
| 297:19 298:15 | 59:1 60:1 61:1,4 | 137:13 138:1 | 207:1 208:1 |
| 300:11 301:9,23 | 62:1 63:1 64:1 | 139:1 140:1 | 209:1 210:1 |
| 304:6 305:10 | 65:1 66:1 67:1 | 141:1 142:1 | 211:1 212:1 |
| 306:20 308:7,24 | 68:1 69:1 70:1 | 143:1 144:1 | 213:1 214:1 |
| 311:3 312:6 | 71:1 72:1,9 73:1 | 145:1 146:1,7 | 215:1 216:1 |
| 314:19 315:10 | 73:13,16 74:1 | 147:1 148:1 | 217:1 218:1 |
| 320:10 322:10 | 75:1 76:1 77:1 | 149:1 150:1 | 219:1 220:1 |
| 322:13,19 | 78:1 79:1 80:1,9 | 151:1 152:1 | 221:1 222:1 |
| 323:18 | 81:1 82:1 83:1 | 153:1,11 154:1 | 223:1 224:1 |
| **witnesses**  207:6 | 84:1 85:1 86:1 | 155:1 156:1 | 225:1 226:1 |
| 207:13 211:16 | 87:1 88:1 89:1 | 157:1 158:1 | 227:1,20,23 |
| 227:4 314:12 | 90:1,19 91:1 | 159:1 160:1,14 | 228:1 229:1,11 |
| **wits**  233:4 | 92:1 93:1 94:1 | 161:1,19 162:1 | 230:1 231:1,21 |
| **witz**  1:17 5:17 | 94:11 95:1 96:1 | 163:1 164:1 | 232:1 233:1 |
| 7:1,4,11 8:1 9:1 | 97:1,16,25 98:1 | 165:1 166:1 | 234:1 235:1 |
| 10:1,14,15 11:1 | 98:25 99:1 | 167:1,21 168:1 | 236:1,2,23 |
| 12:1 13:1 14:1,9 | 100:1 101:1 | 169:1,18 170:1 | 237:1,6,24 |
| 15:1 16:1 17:1,9 | 102:1,16 103:1 | 171:1,3 172:1 | 238:1 239:1,5 |
| 18:1 19:1 20:1 | 104:1 105:1 | 173:1,6 174:1 | 239:24 240:1 |
| 21:1 22:1 23:1 | 106:1 107:1 | 175:1 176:1 | 241:1 242:1 |
| 23:23 24:1 25:1 | 108:1 109:1 | 177:1 178:1 | 243:1 244:1 |
| 25:10 26:1 27:1 | 110:1 111:1 | 179:1 180:1 | 245:1,8,24 |
| 27:10 28:1 29:1 | 112:1 113:1 | 181:1 182:1 | 246:1,19 247:1 |
| 29:21 30:1 31:1 | 114:1 115:1 | 183:1 184:1 | 248:1 249:1 |
| 32:1 33:1 34:1 | 116:1 117:1 | 185:1 186:1 | 250:1 251:1 |
| 34:20 35:1 36:1 | 118:1 119:1 | 187:1 188:1,25 | 252:1,22 253:1 |
| 37:1 38:1 39:1 | 120:1 121:1 | 189:1 190:1 | 253:22 254:1 |
| 39:11 40:1 41:1 | 122:1 123:1 | 191:1 192:1 | 255:1 256:1 |
| 42:1 43:1 44:1 | 124:1 125:1 | 193:1 194:1 | 257:1 258:1 |

**[witz - wrote]**                                                                Page 394

| | | | |
|---|---|---|---|
| 259:1 260:1 | **woman**  158:9 | 130:16 150:3 | 32:17 34:14 |
| 261:1,14 262:1 | **won**  41:18 | 166:2 169:18 | 52:16 58:14 |
| 263:1 264:1 | 109:24 112:9 | 170:18,25 175:9 | 87:3 103:21 |
| 265:1,23 266:1 | 146:14 154:15 | 182:20 211:20 | 123:7,10,14 |
| 267:1 268:1 | **wong**  75:7,21 | 214:3,9,24 | 124:18 217:25 |
| 269:1 270:1 | 76:12 | 217:21 299:3 | 219:16 242:21 |
| 271:1 272:1 | **wong's**  81:16 | 303:18 317:21 | 261:16 307:5 |
| 273:1 274:1 | **word**  76:6 98:13 | 320:8 | **written**  36:14 |
| 275:1 276:1 | 99:6 136:13 | **works**  10:9 88:5 | 59:13 118:21 |
| 277:1 278:1 | 138:12 161:18 | 130:4 283:20 | 161:15 220:3 |
| 279:1 280:1 | 161:20 169:23 | **world**  145:20 | 263:4 308:21 |
| 281:1 282:1 | 214:10,16,22 | 146:12 147:2 | **wrong**  30:12 |
| 283:1 284:1 | 215:2 240:2 | 231:5 | 71:5 77:18,23 |
| 285:1 286:1,17 | 261:13 262:13 | **worse**  64:12 | 78:4 101:15 |
| 287:1 288:1 | 270:15 271:8 | 65:3 69:23 | 135:13,14 |
| 289:1,18 290:1 | 274:4,12,13,25 | 70:17,25 74:11 | 138:19,19 |
| 291:1,11 292:1 | 286:25 289:2,14 | 98:19 190:23 | 146:12,25 |
| 293:1 294:1 | 289:19 304:2 | 192:16 193:2 | 161:12 246:20 |
| 295:1 296:1,21 | 320:7 | 230:23 232:20 | 266:12 285:5,9 |
| 297:1 298:1 | **wording**  254:24 | 264:22 | 285:24 286:14 |
| 299:1 300:1 | 288:6 | **wrap**  312:16 | 293:5,18,20,24 |
| 301:1 302:1,19 | **words**  154:24 | **write**  2:20 5:23 | 294:8,15,22 |
| 303:1 304:1 | **work**  10:7 84:16 | 24:24 26:12 | 295:6 297:15 |
| 305:1 306:1 | 90:12 103:23 | 31:24 32:18 | 298:11,23,23 |
| 307:1 308:1,5 | 106:6 134:9 | 35:4 86:16 | 299:3,6,10,17 |
| 309:1 310:1,5 | 241:19 286:8 | 148:6 192:15 | 302:20 303:10 |
| 311:1 312:1,13 | **worked**  19:9 | 241:10 279:9 | 303:14 304:17 |
| 312:24 313:1 | 20:20 21:4,8 | 285:18 296:22 | 308:21 310:5 |
| 314:1,12,16 | 28:5 50:19,21 | **writer**  86:23 | **wrongdoing** |
| 315:1,5 316:1 | **working**  12:23 | **writers**  59:14,25 | 300:3 |
| 316:15 317:1 | 15:4,5,5,12 | **writing**  7:24 | **wrongly**  249:23 |
| 318:1 319:1 | 17:21 19:25 | 14:16,17 18:7 | **wrote**  23:4 35:6 |
| 320:1 321:1 | 20:25 28:9 | 19:22 21:16 | 132:4,15 133:16 |
| 322:1 323:2 | 86:20 106:2 | 22:6,16 26:8,15 | 138:23 148:8 |
| | 117:2 124:3 | 26:21 27:4 | 203:20 |

[x - zeke]                                                  Page 395

| x | 158:6 160:21 | **yesterday** | 240:23 245:3,18 |
|---|---|---|---|
| **x**  1:3,9 317:2 | 165:19 166:24 | 157:21,24 | 247:14,24 248:8 |
| 319:16 | 167:9,9 169:6,7 | 193:16 293:17 | 249:2 250:15 |
| **y** | 174:23 178:23 | **york**  1:8,16,21 | 251:11 253:23 |
| **y**  6:20 | 185:7 188:12 | 1:21,23 2:14,23 | 254:8,18 259:14 |

**yeah** 10:8 11:22 15:7,25 19:2,16 21:12 22:2,20 25:8 26:19 27:2 30:14 32:13 33:16 36:7,18 40:5 41:4,4,7 42:7 47:13 48:7 48:11 49:16 51:17 54:20 59:8,12 61:14 61:15 70:4 82:2 82:7,7 83:13 85:22 86:3,5,17 86:18 89:5,16 89:18 90:11,14 91:4,15 92:8 93:11,22 94:21 96:13 107:6 120:22 125:13 127:21 128:13 134:7 136:8,24 137:24 138:3 139:8 142:2 143:9 144:7,16 145:7 154:24 155:16,18 156:12 157:6

198:3,14 199:18 200:10,15 205:18,20 206:15 208:13 215:22,23,24 217:17 219:4 220:14 222:24 229:6 239:25 241:25 242:3 244:11 245:12 247:8 252:5 255:9 264:5 274:19 276:12 276:21 278:9 279:7,13,24 280:6,15,16 284:20 287:9 290:2 294:10,10 296:24 298:5,16 300:25 303:4 304:16 311:6,21 **year** 14:13 17:19 43:12 107:2 146:13 **years** 11:20 13:20 35:24 57:8 77:2 137:12,19 296:21

5:19 6:17,22 7:7 7:8 11:4,11,17 12:12 14:12,16 14:18 15:12,13 15:16 16:2,10 16:12,17 21:10 21:13 22:14 24:17 25:17 26:13 38:18,22 44:2 46:15,19 47:20 48:3 50:14 51:2 52:7 55:11 59:3 66:13 67:12 68:10 72:19 77:8,24 82:9 90:12 93:11,12 94:25 95:14 96:4,6 97:9,21 99:12,20 100:17 100:22 101:4,20 113:20 115:19 120:15 121:10 122:2,11 167:16 168:9 179:14 189:12 208:17 213:17 223:2 227:24 229:12 230:5 236:22 237:7 239:6

259:14,16 271:16 277:19 278:11 285:10 288:13 290:22 294:4 295:21 296:2 297:15 298:12 301:16 302:21 303:8 305:5,24 306:15 307:21 308:4,20 310:23 311:6,10 311:15 312:12 312:21 322:4,8 **young** 137:19 231:6,18 234:10 **yup** 11:9 48:10 167:24 169:8 240:18 246:8 250:15 253:11 263:15 270:23 312:17

| **z** |
|---|
| **z**  6:20 |
| **zeke**  292:11 |

**EXHIBIT 1**

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 1**

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored

**EXHIBIT 1**

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.