FILED

2026 Aug-13  PM 08:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| **KAI SPEARS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **NO. 7:23-CV-00692-ACA** |
| | * | **OPPOSED** |
| | * | |
| **THE NEW YORK TIMES CO.** | * | |
| | * | |
| **Defendant.** | * | |

_____

## PLAINTIFF KAI SPEARS' RESPONSE TO DEFENDANT THE NEW YORK TIMES COMPANY'S TRIAL MEMORANDUM (DOC. 279)

_____

R. Matt Glover
Prince Glover Hayes
2311 University Blvd Suite A
Tuscaloosa, Alabama 35401
(205) 345-1234
mglover@princelaw.net

Stephen P. New
*Pro Hac Vice*
Stephen New and Associates
P.O. Box 5516
430 Harper Park Drive
Beckley, WV 25801
Phone: (304) 250-6017
steve@newlawoffice.com

M. Virginia Buck
Attorney at Law
13112 Martin Rd. Spur
Northport, AL 35473
(205) 752-6773
bucklaw@charter.net

*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

Table of Citations ............................................................................................. ii

Introduction ....................................................................................................1

Argument.........................................................................................................1

   I.   DEFAMATION BY IMPLICATION IS NOT AN ISSUE IN THIS CASE..1

   II.   THE FALSE STATEMENTS ABOUT KAI SPEARS HAVE A DEFAMATORY MEANING…………………………………………….2

   III.   THE ARTICLE IS FALSE IN ALL MATERIAL RESPECTS……………4

   IV.   PROOF OF STANDARDS FOR A PRIVATE FIGURE WHERE CHALLENGED SPEECH RELATES TO A MATTER OF PUBLIC CONCERN………………………………………………………………..6

   V.   ACTUAL MALICE…………………………………………………………8

   VI.   DAMAGES FOR SPEARS' DEFAMATION CLAIM………………....23

   VII.   FALSE LIGHT………………………………………………………..…24

   Certificate of Service ...............................................................................27

# TABLE OF CITATIONS

**Cases**

*Anderton v. Gentry*,
  577 So. 2d 1261 (Ala. 1991) ..................................................................3

*Blevins v. W.F. Barnes Corp.*,
  768 So. 2d 386 (Ala. 1999) ...................................................................3

*Brokers' Choice of America, Inc. v. NBC Universal, Inc.*,
  861 F.3d 1081 (10th Cir. 2017)..............................................................5

*Clarage v. Kuzma*,
  795 N.E.2d 348 (Ill. 2003)......................................................................4

*Cottrell v. NCAA*,
  975 So. 2d 306 (Ala. 2007) ....................................................................3

*Curtis Pub. Co. v. Butts*,
  388 U.S. 130 (1967) ..................................................... 14, 15, 17, 18

*Drill Parts and Service Co., Inc. v. Joy Mfg. Co.*,
  619 So.2d 1280 (Ala. 1993) ...................................................................3

*Gary v. Crouch*,
  867 So.2d 310 (Ala. 2003) ..................................................................2, 3

*Gertz v. Robert Welch*,
  418 U.S. 323 (1974) ................................................................................7

*Global Relief Foundation, Inc. v. New York Times Co.*,
  390 F.3d 973 (7th Cir. 2004)...................................................................5

*Gray v. WALA-TV*,
  384 So.2d 1062 (Ala. 1980) .................................................................20

*Harte-Hanks Communications, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ........................................... 9, 10, 11, 13, 18, 19, 20, 21, 22

*Herbert v. Lando*,
  441 U.S. 153 (1979) ..............................................................................10

*Hunt v. Liberty Lobby*,
  720 F.2d 631 (11th Cir. 1983).......................................................... 16, 18

*Johnson Pub. Co. v. Davis*,
  124 So.2d 441 (Ala. 1960) ...................................................................23

*Lovingood v. Discovery Communications, Inc.*,
   No.: 5:14-cv-00684-MHH, 2015 WL 5719169 (N.D. Ala. Sept. 30, 2015)..........5

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) .................................................................................................5

*Mead Corp. v. Hicks*,
   448 So. 2d 308 (Ala. 1983) ................................................................................6, 7

*Moore v. Cecil*,
   174 F.4th 862 (11th Cir. 2026)................................................................................1

*Moore v. Senate Majority PAC*,
   No. 4:19-cv-1855-CLM, 2023 WL 7220943 (N.D. Ala. Sept. 29, 2023)..............5

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .................................................................................................7

*Parekh v. CBS Corporation*,
   820 Fed. Appx. 827 (11th 2020) .............................................................................1

*Regions Bank v. Plott*,
   897 So. 2d 239 (Ala. 2004) ...................................................................................24

*Slack v. Stream*,
   988 So.2d 516 (Ala. 2008) ....................................................................................24

*Weaver v. Lancaster Newspapers, Inc.*,
   926 A.2d 899 (Pa. 2007)..........................................................................................6

**Statutes**

Ala. Code § 6-11-20............................................................................... 8, 23, 25

**Other Authorities**

APJI 49.05...............................................................................................................25

## INTRODUCTION

The Times has filed a Trial Memorandum in this case outlining its contentions with regard to the applicable law governing this case. (Doc. 279).  Plaintiff Spears agrees with many of The Times' general statements of the applicable law.  However, Spears disputes some of those contentions as discussed below.

## ARGUMENT

### I.    DEFAMATION BY IMPLICATION IS NOT AN ISSUE IN THIS CASE

The Times' Trial Memorandum asserts that this is a case involving defamation by implication. (Doc. 279 at 2).  The applicability of that doctrine in this case has been thoroughly briefed by both Parties. (Doc. 268; Doc. 271). To briefly recap,

> Defamation by implication arises where "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them," even though the particular ***facts stated are true***. …It may also arise where the defendant "creates a defamatory implication by omitting facts[.]" *Id*. In other words, it allows "impos[ing] liability upon the defendant who ***has the details right*** but the 'gist' wrong."

*Parekh v. CBS Corp.*, 820 Fed. Appx. 827, 835 (11th Cir. 2020)(quoting *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1108 (Fla. 2008)(emphasis added).

The present case is the opposite situation. Spears contends that The Times' statements about him are literally ***false***.  The Times concedes "it ha[d] the details" wrong, but argues it got "the 'gist' right." 820 Fed. Appx at 835.  Unlike the plaintiff in *Moore v. Cecil*, 174 F.4th 862 (11th Cir. 2026), Spears has not pled or proceeded under a theory of defamation by implication but, rather, he repeatedly pled The

1

Times' statements about him are "false." (Doc. 28, ¶¶12, 14, 15, 47, 48, 49, 51, 59, 66, 69, 83, 95, 101).  Therefore, the doctrine has no applicability in this case.

## II.  THE FALSE STATEMENTS ABOUT KAI SPEARS HAVE A DEFAMATORY MEANING

The subject article reports that Kai Spears was in Brandon Miller's car at the time Miller brought the murder weapon to the scene of a shooting after Miller received a text message from Darius Miles saying, "I need my joint."

This Court previously found that the false statements about Kai Spears constitute "libel *per se*." (Doc. 22 at 7-11). The article itself contains the facts necessary to understand why the printed, false statements would expose Spears to "public ridicule or contempt." *Gary v. Crouch*, 867 So.2d 310, 316 (Ala. 2003)(quoting *Marion v. Davis*, 114 So. 357, 359 (Ala. 1927).  The article falsely reports that Spears was in the vehicle with Brandon Miller when, as reported in the article, Miller brought the murder weapon to the scene of a shooting in response to a text message from Darius Miles stating that he needed his "joint."  The article states that Jamea Harris was murdered with that gun. The article states that Darius Miles has been charged with capital murder. The article also reports, "Miller … has become a lightning rod since his presence during the shooting became public."  The article notes that Miller had been subjected to crowd chants of "lock him up" and "Brandon Killer" at basketball games, and that Miller had to be "accompanied by an armed guard" due to death threats. The article further describes the killing as a

"shooting that ***involved*** members of the top-ranked Alabama men's basketball team," and asserts that the University of Alabama had "kept quiet" "the ***involvement*** of" these "other players" in the shooting. (Emphasis added). A jury could find that "an ordinary reader or a reader of average intelligence" without going outside the article itself or resorting to any extrinsic facts and "reading the article as a whole, would ascribe a defamatory meaning to the language." *Drill Parts and Service Co., Inc. v. Joy Mfg. Co.*, 619 So.2d 1280, 1289 (Ala. 1993).

The Times cites the following Alabama cases in support of its argument that the false statement that Spears was in Miller's car at the time he delivered the murder weapon to the scene of the shooting were not defamatory. *Anderton v. Gentry*, 577 So. 2d 1261, 1263-64 (Ala. 1991); *Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386 (Ala. 1999); *Cottrell v. NCAA*, 975 So. 2d 306 (Ala. 2007). However, those are the same ***slander*** cases The Times cited in its Motion to Dismiss and which this Court found inapplicable because they "apply the stricter standard for slander *per se* and, therefore, are inapposite here." (Doc. 22 at 11).  The standard for liable *per se* asks only whether the jury could find that the false report that Spears was in Miller's car at the time he delivered the murder weapon to the scene of the shooting would expose Spears to "public ridicule or contempt." *Gary,* 867 So.2d at 316 (Ala. 2003). Spears would respectfully contend that the false statement could and did expose him to "public ridicule or contempt."

3

## III.    THE ARTICLE IS FALSE IN ALL MATERIAL RESPECTS

In its Trial Memorandum, The Times sets out the law generally as to material falsity and the substantial truth doctrine without making any argument as to how the doctrine applies in this case. (Doc. 279 at 8).

Spears would contend, as he has before, that this is not a proper case for the application of the substantial truth doctrine.  Spears was named in the subject article because Billy Witz was looking to publish something no other media outlet covering the shooting had reported, which was the name of the unidentified passenger in Miller's car at the time of the shooting whom investigator Brandon Culpepper referenced during Darius Miles' preliminary hearing. (Doc. 229-1, Abrams Depo II at 21:15-16).[1]  Kai Spears was *100 percent not* that passenger. The Times eventually published a correction admitting it "misidentified the person who was in the car with Brandon Miller when the shooting occurred," so it is in no position to now assert that the statement was "substantially true." *See e.g. Clarage v. Kuzma*, 795 N.E.2d 348, 356 (Ill. 2003)(defendant could not claim its statements were "substantially true" after publishing a retraction admitting the earlier statements "are not true").

Second, this is not a case where there is some question as to whether the false statement is false "in all material respects."  *Every part* of the assertion that Spears

---

[1] Spears recognizes this is inconsistent with Witz's testimony today. This is a credibility issue for the jury to resolve.

4

was in Miller's car at the time he delivered the murder weapon to the scene of the shooting is utterly and completely false.

The Times has previously argued the article is not materially false because it is "substantially true." However, as previously argued by Spears, this is an affirmative defense to be proven by The Times. *Global Relief Foundation, Inc. v. New York Times Co.*, 390 F.3d 973, 982 (7th Cir. 2004); *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1110 (10th Cir. 2017); *Moore v. Senate Majority PAC*, No. 4:19-cv-1855-CLM, 2023 WL 7220943 (N.D. Ala. Sept. 29, 2023) *rev'd and remanded on other grounds sub nom. Moore v. Cecil, supra*.

But regardless of who bears this burden, the article is not "substantially true" within the meaning of that doctrine. The Supreme Court has noted, "***Minor*** inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991)(quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. 1936)(emphasis added). However, the subject article "contains more than a minor inaccuracy" with regard to Spears. *Lovingood v. Discovery Communications, Inc.*, Case No.: 5:14-cv-00684-MHH, 2015 WL 5719169 at *4 (N.D. Ala. Sept. 30, 2015). The whole point of the article was to identify Miller's passenger at the time of the shooting, which no other media outlet had reported. Completely misidentifying the passenger in question is not a "minor inaccuracy." *Id*.

5

Finally, to the extent The Times has previously argued that Spears somehow has the burden to prove that he was not "reprehensibly involved in the shooting," Spears fully expects the evidence will show this.

## IV. PROOF OF STANDARDS FOR A PRIVATE FIGURE WHERE CHALLENGED SPEECH RELATES TO A MATTER OF PUBLIC CONCERN

### A. LIABILITY STANDARDS

Spears generally agrees with The Times' statements as to the standards for liability with one caveat. The Times argues, "[T]he conduct that matters for purpose of negligence are those of the publisher *prior* to publication." (Doc. 279 at 11)(citing Restatement (Second) of Torts § 580B, cmt. G (1977))(emphasis added by The Times).

The Alabama Supreme Court has, in fact, noted,

> In determining whether the defendant acted as a reasonable, prudent person under the circumstances in publishing the defamatory communication the finder of fact may take into account the thoroughness of the check that a ***reasonable person would*** make ***before publishing the statement***, the nature of the interests that the defendant was seeking to promote in publishing the statement, and the extent of damage to which the statement exposed the plaintiff's reputation.

*Mead Corp. v. Hicks*, 448 So. 2d 308, 312 (Ala. 1983)(emphasis added).

As Spears more fully briefed in Doc. 225, "subsequent acts can be relevant to the determination of previous states of mind." *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 906 (Pa. 2007) (citing *Herbert v. Lando*, 441 U.S. 153 (1979)).

6

The conduct of The Times and Witz after the article was published is highly relevant to "the thoroughness of the check that a ***reasonable person would*** make before publishing the statement." *Mead Corp*, 448 So. 2d at 312 (emphasis added). The fact that Witz ***failed*** to take those steps ***until*** after publication is a large part of what demonstrates negligence in this case. Accordingly, that evidence is relevant and admissible.

### B. STANDARD TO RECOVER PRESUMED OR PUNITIVE DAMAGES

Spears generally agrees with The Times' statements of law in this section of its brief but would address two matters. First, Spears agrees that *Gertz v. Robert Welch*, 418 U.S. 323 (1974) held that when a private figure brings a defamation action against a media defendant speaking on an issue of public concern, the plaintiff cannot recover presumed damages or punitive damages unless the plaintiff can show that the defendant acted with the actual malice standard provided by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). That is the law that binds this Court. However, Spears has filed a Notice of Preservation of Issue for Appeal with Regard to Overruling *Gertz v. Robert Welch*. (Doc. 256). Spears contends, only for purposes of preserving this issue for appeal, that *Gertz* should be overruled to the extent that it requires a private figure to prove actual malice to recover presumed or punitive damages.

Second, Spears notes that The Times contends that in order to recover punitive damages on his defamation claim, Spears "must prove *both* constitutional actual malice and common law malice as defined by [Ala. Code § 6-11-20]." (Doc. 279 at 14)(emphasis in original). Ala. Code § 6-11-20(a) provides,

> Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.

First, Spears notes that this statute allows punitive damages if the defendant engaged in "wantonness, *or* malice," so it does not require "common law malice" as suggested by The Times.  Additionally, however, Spears would note that The Times has made a number of objections to evidence of animus, ill will, personal animosity, evil intent, or spite or any other evidence relevant to "common law malice," arguing that common law malice is not an issue in this case. (Doc. 211 at 9-10; Doc. 257 at 7; Doc. 260 at 6).  If Spears must show "common law malice," as The Times now contends, obviously all such evidence of animus, ill will, personal animosity, evil intent, or spite is relevant and admissible.

Damages with regard to Spears' false light claim are addressed below.

## V.    ACTUAL MALICE

Spears disagrees with much of The Times' Trial Memorandum as it relates to the issue of actual malice, including its continued assertion that post-publication

conduct has no relevance to that inquiry.  Spears would like to provide this Court with a more thorough analysis of the question of actual malice and how it applies to the evidence in this case as revealed in trial evidence so far and related discovery for expected testimony.[2]

The Supreme Court has made clear that the question of actual malice in a defamation case is a very fact sensitive inquiry that requires the examination of any number of small pieces of evidence to determine whether the totality of evidence provides clear and convincing evidence of actual malice.  The court in *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) explained, "The meaning of terms such as 'actual malice'—and, more particularly, 'reckless disregard—however, is not readily captured in 'one infallible definition. …Rather, only through the course of ***case-by-case*** adjudication can we give content to these otherwise elusive constitutional standards." 491 U.S. at 686 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968)(emphasis added).

The court in *Harte-Hanks* also explained the unique review of defamation cases involving actual malice following any jury verdict finding actual malice under the standard set out in *New York Times Co. v. Sullivan*:

---

[2] Since trial is still ongoing, Spears will rely, at this time, on some evidence offered at trial and other discovery evidence which had previously been submitted with various legal briefs in this case with reference to those document numbers. Some evidence cited has been excluded and is included to highlight Spears' argument that evidence if relevant and should not be excluded.

9

> In determining whether the constitutional standard has been satisfied, the reviewing court ***must consider the factual record in full***. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," … the reviewing court must "examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect."

491 U.S. at 688 (cleaned up)(emphasis added).

The Supreme Court has explained, "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks*, 491 U.S. at 688. "The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and ***all the relevant circumstances*** surrounding the transaction may be shown[.]" *Herbert v. Lando*, 441 U.S. 153, n.12 (1979)(emphasis added).

The evidence in this case which has and will be produced in this case would support a jury verdict finding actual malice when all ***credibility*** decisions are properly left to the jury to decide. There are two Supreme Court cases in particular that are relevant to the question of actual malice in this case. The first is *Harte-Hanks*, in which the court found sufficient evidence of actual malice after a newspaper published a source's false allegations against a candidate for public office. In finding that the totality of the factual record, with proper deference to the jury on credibility determinations, provided clear and convincing evidence of actual malice, the court identified a number of individual facts which were all properly

10

weighed into the analysis. In particular, the court emphasized three facts it found to be especially illuminating. First, the court noted that the newspaper failed to interview a "key" witness, Patsy Stephens, whom the newspaper knew could have decisively confirmed or refuted the source's allegations. 491 U.S. at 692. The court reasoned that if the newspaper "was committed to running the story, there was good reason not to interview Stephens" since "*a denial coming from Stephens would quickly put an end to the story*." *Id*. at 682 (emphasis added). The court noted, "Although failure to investigate will not alone support a finding of actual malice … the *purposeful avoidance of the truth* is in a different category." *Id*. at 692 (emphasis added).

Second, the court noted that tape recordings had been made available to the newspaper which would have cast doubt on the allegations of the source, but the newspaper did not listen to them. The editorial director of the newspaper testified he did not listen to the tapes "because he thought they would provide him with no new information." *Id*. at 690. The Supreme Court however, found, "Although simply one piece of evidence in a much larger picture, one might reasonably infer in light of this broader context that the decision not to listen to the tapes was motivated by a concern that they would raise additional doubts concerning [the source's] veracity." *Id*. at 684-685.

11

Finally, the court found that the fact that the newspaper had run an editorial the previous day hinting as to the allegations it was to later publish was "also just a small part of the larger picture" which supported a finding of actual malice. *Id*. at 684. The court reasoned that the editorial could "be taken to indicate that [the newspaper] had ***already decided to publish Thompson's allegations, regardless of how the evidence*** developed[.] *Id*. at 685 (emphasis added).

The University of Alabama is this case's equivalent of Patsy Stephens. Billy Witz knew that UA could, with certainty, confirm or refute the allegation of Source A that Kai Spears was Miller's passenger at the time of the shooting. In the subject article, Witz reported that "the school was aware" of which of its players were "involve[d] in the shooting." Yet UA Athletic Department Deputy Director Jessica Pare testified that Witz did not approach her in the open locker session to ask her if she could confirm the information about Spears. This was notwithstanding the fact that Pare had worked with Witz on a previous article and had given Witz her cell phone number. (Tr. Aug. 10, p. 55-56, 58).[3]

Additionally, the evidence produced so far shows that Witz waited until 4:27 PM CT the afternoon before Alabama's first NCAA tournament game to send his email to UA's athletic department with his questions about Spears knowing this would make it unlikely he would get an immediate response. Witz then published

---

[3] Witz testified today he did not recognize Pare. This is a credibility decision for the jury.

12

the story before UA could respond.  As was true in *Harte-Hanks,* if Witz "was committed to running the story, there was good reason not to" ask Jessica Pare about the information in the locker room, was "good reason not to" timely send the email to UA, and "good reason not to" wait for UA to respond to the email. *Harte-Hanks*, 491 U.S. at 682.  In light of the fact that The Times had acknowledged that UA knew which players were at the scene, "a denial coming from" UA concerning Spears "would quickly put an end to the story." *Id*.

Finally, this case is similar to *Harte-Hanks* in that Witz and Garcia had already put Kai Spears' name as the passenger in question in the draft article by 2:32PM CT as is reflected in the timeline introduced into evidence during Witz's testimony today. So before Witz did anything else to confirm Source A's information beyond approaching Spears and Miller in the open locker room seeking comment, he already named Spears as the passenger in his draft article.  As was true in *Harte-Hanks*, the fact this could "be taken to indicate that [Witz] had already decided to publish [Source A's] allegations, regardless of how the evidence developed[.]" 491 U.S. at 684.

Additionally, the Court in *Harte-Hanks* noted that other pieces of evidence which were "supportive of the court's ultimate conclusion that the record 'demonstrated a reckless disregard as to the truth or falsity of [the source's] allegations'" included "the newspaper's ***departure from accepted standards*** and the

13

evidence of motive." 491 U.S. at 668 (emphasis added). The court found that while "courts must be careful not to place too much reliance on such factors," "evidence concerning motive or care" can be weighed in the balance in determining whether the record contains sufficient evidence of actual malice. *Id.* In the present case, Witz had only one person who told him Spears was the passenger in question. That person never told Witz that he actually knew this from his or her own knowledge. Witz never received corroboration of this fact from any other person. Witz claimed that Source B, whom he met with before Source A, provided "partial corroboration" of Source A's information. (Abrams Depo II at 82:5-16). Yet a later text exchange between Witz and Andrew Das tends to indicate that Witz never checked back with Source B after being given Spears' name to see if his so-called corroborating source believed Spears could be the passenger. Rather, Witz waited until after the false information was already published to check back with Source B who told him he was "likely wrong."[4]

This is worse than the investigation in *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967) in which the court found that the plaintiff proved actual malice after the Saturday Evening Post printed a story accusing the plaintiff of fixing a football game

---

[4] Witz testified today, for the first time, that he did go back to Source B before publishing the article to specifically tell him Source A had said the passenger was Kai Spears and see if he thought that was right. And Source B did not tell him he thought that information was wrong. This is hard to reconcile with the text message from Source B telling him the next day he was "likely wrong," and it is inconsistent with prior testimony, as will be explored on cross-examination.

14

between the University of Georgia and the University of Alabama.  In affirming the jury's verdict, and the Fifth Circuit's independent review of the evidence, the court noted that the district court had instructed the jury to assess "the reliability, the nature of the sources of the defendant's information, its acceptance or rejection of the sources, and its care in checking upon assertions." 388 U.S. at 156. In finding sufficient evidence of actual malice based on the factual record, the court noted that the evidence showed that the Post published the story based on the affidavit of only one source "without substantial independent support." *Id*. at 157.  A key witness who could have shed light on the allegations "was not interviewed." *Id*.  Further, "No attempt was made to screen the films of the game to see if [the source's] information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information." *Id*.  The court noted, "The evidence showed that the Butts story was in no sense 'hot news' and the editors of the magazine recognized the need for a thorough investigation of the serious charges. Elementary precautions were, nevertheless, ignored." *Id*.  The court explained,

> The Saturday Evening Post was anxious to change its image by instituting a policy of 'sophisticated muckraking,' and ***the pressure to produce*** a successful expose ***might have induced a stretching of standards***. In short, the evidence is ample to support a finding of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."

*Id*. at 158 (emphasis added).

15

The Eleventh Circuit, citing *Curtis v. Butts* among other authorities, has likewise noted,

> [W]hen an article is not in the category of "hot news," that is, information that must be printed immediately or it will lose its newsworthy value, "actual malice may be inferred when the investigation for a story ... was grossly inadequate in the circumstances."

*Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983)(quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971)(also citing *Butts*, and *Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980)).

Billy Witz admitted in his deposition there was no reason The Times had to rush out a story identifying Spears as the passenger in Miller's car at a shooting that had occurred two months earlier. Rather, Witz testified that The Times ran the story when it did simply because "***we felt like we had enough information to publish it***." (Doc. 225-18, Depo. of Witz at 92, *see also* pgs. 93-98, 191-192). But Witz also admitted Garcia had chosen a deadline by which they wanted "to publish a story on Alabama basketball," and he felt pressured to meet that deadline. (Depo. of Witz at 189:11-190:13).

A jury could find that The Times had chosen its own deadline, which was to publish "a story on Alabama basketball" in print by the morning of the first tournament game, and "the pressure to produce" a story by that time with the added scoop of being the first media outlet to publish the name of Miller's passenger at the

16

time of the shooting "might have induced a stretching of standards." *Butts*, 388 U.S. at 158.

Indeed, Mark Mayfield, Plaintiff's expert on journalistic standards who testified today, identified a host of violations of accepted standards, including The Times' own standards, in The Times' uncharacteristic handling of this story. This includes violations of The Times' guidelines for "special scrutiny" for stories where "the primary news element — is based entirely on one or more anonymous sources." Mayfield also noted that Witz failed to obtain corroboration from any other source, notwithstanding Source A never purported to have first hand knowledge of the information. Mayfield also opined that Witz and Garcia violated The Times' requirement that an editor must know the identity of any anonymous source since neither Witz nor Garcia knew the identity of the underlying source who actually supplied the information. Mayfield also opined that the manner in which Witz investigated before the story's publication also fails to meet the SPJ Code of Ethics' admonition to journalists to "verify information before releasing it."

The gross inadequacy of the pre-publication investigation is also highlighted by how quickly contradictory information surfaced after publication. When the article was first published online at 7:10PM CT, UA responded ***within the hour*** informing Witz his story inaccurately reported Spears' presence at the scene. (Tr. Aug. 10, p. 66). By the next day, Spears and his father had publicly denied the report

17

as had UA Athletic Director Greg Byrne. (Tr. Aug. 10, p. 110; Tr. Aug. 11, pgs. 48-49, 144). More tellingly, later that same day, Witz's primary source was equivocating and was telling Witz "perhaps my source was wrong." (Tr. Aug. 12, pgs. 39, 43). The next day Witz's other source told him he was "likely wrong." (Tr. Aug. 12, p. 37).   A jury could find all of this provides evidence that the pre-publication investigation was "grossly inadequate" under circumstances in which the story was not "hot news.' *Butts*, 388 U.S. at 156, 157; *Hunt*, 720 F.2d at 643.

Also, as was true in *Harte-Hanks*, there is evidence of an improper "motive" which that court said was "supportive" of the finding of actual malice. 491 U.S. at 668.  The last thing that happened before Witz decided to just go ahead and put Spears' name in the article as the passenger in the 2:32PM draft was a heated exchange between Witz and Steve Gonzalez, UA's Associate Director of Men's Basketball. (Tr. Aug. 10 pgs. 60-61, Ex. 14).  A recording of the exchange reveals that Witz attempted to buttonhole Coach Oats following the press conference as Oats was walking onto the court to begin practice. When Gonzalez stopped Witz and told him the time for questions from the media was over, Witz became angry and threatened Gonzalez that if did not allow him to ask Coach Oats his "sensitive question," he would just ask it in a press conference the next day, when it "would be on TV." (*Id*.) A jury could find that Witz decided to just go ahead and publish the allegations about Spears as a member of the Alabama basketball team based on

18

Witz's anger and hostility at UA which was further revealed in the hostile and accusatory email he sent to UA later that afternoon. While "just a small part of the larger picture," this is relevant evidence of "motive" which can be considered along with all the other evidence in the case. *Harte-Hanks*, 491 U.S. at 668, 684.

Another "small part of the larger picture" to be considered in determining the issue of actual malice is the fact that Witz apparently was untruthful in his deposition about in testifying that Source A source had merely been equivocating about "how" the source knew.

> Q. "My source has been steadfast, but there's some equivocation about how the source knew." Tell me what you mean by that?
>
> A. Well, the source had been steadfast, solid, but -- but there was some -- when I asked the source how they knew this information, there were some things that -- there -- there were some things that the source told me that they couldn't tell me about where or how they -- how they knew.
>
> Q. Told you that your story was wrong?
>
> A. No. On the contrary, this was ***just*** in questions about ***how the source knew.***
>
> Q. Who was equivocating, your source?
>
> A. The source was -- the source said that there were some restrictions - not -- maybe not or maybe constraints about what the source could tell me about how they knew.

(Depo. of Witz at 295:16 - 296:15).

19

In fact, Source A's equivocation was "[p]erhaps my source was wrong," and was not simply "how" the Source claimed to know the information. (Tr. Aug. 10, p. 170).

Yet another "small part of the larger picture" to be considered in determining the issue of actual malice is The Times' handling of the story after the public denials. *Harte-Hanks*, 491 U.S. at 684. The Times' own standards provide, "It is our policy to correct our errors, large and small, as soon as we become aware of them."[5] Yet after UA informed The Times the information was inaccurate, and Spears, Spears' father, Spears' attorney and UA Athletic Director Greg Byrne issued public denials, The Times not only failed to correct the false information, ***it reasserted the allegations*** again. The online article was updated at least three times after The Times was alerted the information was false with the false information being reasserted each time. Furthermore, after The Times' own anonymous source told Witz "perhaps my source is wrong," The Times made public statements to Fox News and others, "We're confident in our reporting and stand by it." (Doc. 201-3). In *Gray v. WALA-TV*, 384 So.2d 1062 (Ala. 1980), limited on other grounds in *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, n. 3 (Ala. 1988), the court found evidence of actual malice where a radio station re-reported defamatory allegations even though denials following the first broadcast created "serious doubts" about the information. In

---

[5] https://www.nytimes.com/editorial-standards/ethical-journalism.html

*Gray*, a radio station ran reports indicating that the plaintiffs had been paid by the City of Mobile for work on a contract it failed to perform. Following the initial broadcast, one of the plaintiffs informed the news director of the station that the report was inaccurate. ***In response, the station conducted further investigation*** including contacting various officials at city hall. Subsequently, the plaintiff's attorney sent a letter to the news director informing him the broadcast was inaccurate. Additionally, a city commissioner issued a statement which contradicted the station's report. Nonetheless, the station "***continued with its version of the story***." 384 So.2d at 1066 (emphasis added). The court found under these facts, "Whether the defendant entertained serious doubts as to the truth of these broadcasts is a question peculiarly suited for a jury determination." *Id*.

Likewise, in the present case, a jury could find that The Times reported the allegations at a time when it had developed serious doubts about the accuracy of the information rather than correcting the article in accordance with its own standards.

Additionally, the manner in which The Times handled its publishing of the denials is another "small part of the larger picture" to be considered in determining the issue of actual malice. *Harte-Hanks*, 491 U.S. at 684. Witz and Garcia first updated the article the night of March 15 to purportedly include the denial emailed by Jessica Pare. But Witz and Garcia ***buried*** the denial in the 12th paragraph of the story. Witz hid the denial so well that a fellow sports writer, Adam Zagoria, emailed

21

Witz the next day to let him know UA was denying Spears' presence at the scene, thinking that Witz did not know this. Furthermore, Witz modified Pare's statement to change its meaning. Witz omitted the phrase "Your story is inaccurate" as well as her statement, "The reporting about additional student-athletes being at the scene was, and is, factually inaccurate." Instead, Witz reported that Paré had merely said "based on the information we have, there were no current student-athletes present at the scene other than Brandon Miller and Jaden Bradley." This changes the meaning of what Paré said to downplay her certainty about the inaccuracy of the article.

Similarly, the following day, the article was changed and republished to include the denials of Christian Spears and Greg Byrne but, again, those denials were buried in the 12th and 13th paragraphs. Furthermore, the updates made no mention of Kai Spears' lengthy denial posted on his Instagram account that morning, and instead, continued to assert that Spears had refused to comment on the allegation.

Finally, another "small part of the larger picture" to be considered in determining the issue of actual malice is that The Times corrected the story only after it was sued. *Harte-Hanks*, 491 U.S. at 684. This was in spite of the fact that credible representatives from UA informed The Times the information was wrong, one of Witz's own sources told him he was "likely wrong," Witz's primary source was equivocating, and Spears and his father issued public denials. While a mere refusal to correct a story after learning it is wrong is generally not sufficient by itself

22

to amount to actual malice, it adds to the weight of the rest of the above outlined evidence from which a jury could permissibly find actual malice.

## VI.    DAMAGES FOR SPEARS' DEFAMATION CLAIM

Spears generally agrees with most of the substance of the Damages section of The Times' Trial Memorandum as it relates to Spears' defamation claim with two caveats.  First, as noted above, Spears does not believe Alabama law is clear that he must meet the requirements of Ala. Code § 6-11-20(b) in addition to proving *New York Times Co. v. Sullivan* actual malice to recover punitive damages on his defamation claim.

Second, Spears would disagree with The Times' contention that *Johnson Pub. Co. v. Davis*, 124 So.2d 441 (Ala. 1960) is applicable to potentially reduce a punitive damages award in this case in the event the jury awards punitive damages. (Doc. 279 at 20-21). In *Johnson Pub. Co.*, a teacher sued the publisher of Jet magazine after it published an article stating,

> Davis … attacked Rev. Abernathy with a hatchet and pistol after accusing him of an affair with his (Davis') wife. Held on an attempted murder charge, he was the same Davis who resigned in June from a Greenville, Ala., grade school following charges of having sex relations with students. Montgomery Negroes speculated he was the pawn of persons seeking to embarrass Reverends Abernathy and King.

124 So.2d at 444.

There evidence showed that the second allegation in the article, the one about resigning because of charges of sex with students, was false. *Id*. at 447.  The jury

23

found the statement was libelous and awarded the plaintiff $67,500, without breaking the award down into compensatory or punitive damages. *Id*. at 450. The defendant argued the award was excessive because there was no "correlation between the actual and punitive damages." *Id*. at 451. The court disagreed. *Id*. However, the court did find the plaintiff was entitled to a reduction in punitive[6] damages because the evidence showed that one of the two allegedly defamatory statements, the one asserting that Davis attacked Abernathy, was true. *Id*. at 453. The court concluded, "***Truth*** of ***some of the statements*** attributed to the defendant may be shown in mitigation of damages." *Id*. (emphasis added).

In the present case, the jury is not being presented with one defamatory statement about Spears that is false and another defamatory statement about Spears that is true. Therefore, *Johnson Pub. Co.* has no application.

## VII.   FALSE LIGHT

The elements of false light invasion of privacy have been established by the Alabama Supreme Court, rather than by statute. Those elements were explained in *Regions Bank v. Plott*, 897 So. 2d 239 (Ala. 2004) as follows:

> One who gives publicity to a matter concerning another that places the
> other before the public in a false light is subject to liability to the other
> for invasion of his privacy, if

---

[6] *Slack v. Stream*, 988 So.2d 516, 533 (Ala. 2008) made clear this doctrine does not apply to compensatory damages.

24

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

897 So. 2d 239, 244 (other citations omitted).

A plaintiff who proves the elements of a false light claim may recover compensatory damages for all resulting harm and may recover damages for emotional distress, including shame and humiliation. APJI 49.05.

A plaintiff who proves the elements of a false light claim may also recover punitive damages by satisfying the requirements of Ala. Code § 6-11-20(b) which requires "clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff."

In this case, the elements for false light invasion of privacy are met. It was "highly offensive" to report that Spears was in the vehicle which delivered the murder weapon to the scene of a deadly shooting. Furthermore, Spears has presented sufficient evidence to establish actual malice, as discussed at length above. Additionally, having presented sufficient evidence as to actual malice, Spears has necessarily presented sufficient evidence as to wantonness under Ala. Code § 6-11-20(b) in order to receive punitive damages.

25

Respectfully submitted this 13th day of August, 2026.

/s/ R. Matt Glover (asb-7828-a43g)
R. MATT GLOVER
PRINCE GLOVER HAYES
2311 University Blvd Suite A
Tuscaloosa, Alabama 35401
Phone: (205) 345-1234
Email: mglover@princelaw.net

/s/ Stephen P. New (WV Bar #7756)
STEPHEN P. NEW
Attorney for Plaintiff
STEPHEN NEW AND ASSOCIATES
P.O. Box 5516
430 Harper Park Drive
Beckley, West Virginia 25801
Phone: (304) 250-6017
Email: steve@newlawoffice.com

/s/ M. Virginia Buck (asb- 7341-C58M)
M. VIRGINIA BUCK
Attorney at Law
Attorney for Plaintiff
13112 Martin Rd. Spur
Northport, AL 35473
(205) 752-6773
Email: bucklaw@charter.net

26

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court by using the CM/ECF system on August 13th 2026. Participants in the case

who are registered CM/ECF users will be served by the CM/ECF system.

 */s/ R. Matt Glover*
R. MATT GLOVER

27