FILED
2026 Nov-16 PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KAI SPEARS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 7:23-CV-00692-ACA |
| | ) | |
| THE NEW YORK TIMES COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT THE NEW YORK TIMES COMPANY'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS


I. Spears Misstates the Governing Standards……………………………………..1

A. Actual Malice Is a Well-Defined Standard………………………….....1

B. Actual Malice Must Be Proven as of 7:10 p.m. on March 15, 2023….2

C. The March 15 Article Is the Only Defamatory Statement at Issue……..3

D. Disbelief of The Times's Witnesses Is Not Affirmative Evidence of Actual Malice……………………………………………………………4

II. There Is No Legally Sufficient Evidence Proving Actual Malice at 7:10 p.m. on March 15, 2023……………………………………………………...5

A. Pre-Publication Reliance on a Trusted Source Is Not Actual Malice…..6

B. Twenty-Two Pre-Publication Reporting Contacts Are Not Purposeful Avoidance of the Truth………………………………………………..8

C. Even an "Extreme Departure from Professional Standards" Is Not Actual Malice…………………………………………………………..11

D. Animus Toward the University Is Not Motive Toward Spears……….12

III. Post-Publication Events Do Not Prove Pre-Publication Doubt……………..12

A. Conduct Between 7:10 p.m. on March 15 and 3:57 p.m. on March 16 Does Not Prove Actual Malice at the Time of Publication………..12

B. Communications by Times Employees After 3:57 p.m. on March 16 Do Not Prove Actual Malice……………………………………….14

IV. The Article Did Not Expose Spears to Public Ridicule or Contempt………..15

V. Spears Did Not Prove The Times Knew the False Light Meaning Was Likely………………………………………………………………………16

VI. The Verdict, Itself, Does Not Prove Falsity, and the Article Was Substantially True……………………………………………………………..18

VII. Spears Proved Neither Actual Injury Nor a Basis for Punitive Damages……………………………………………………………………19

CONCLUSION…………………………………………………………………...20

CERTIFICATE OF SERVICE……………………………………………………22

# TABLE OF AUTHORITIES

## Cases

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)..........4, 5, 17

*Carbone v. Cable News Network, Inc.*,
2017 WL 5244176 (N.D. Ga. Feb. 14, 2017)..........13

*Castellani v. Scranton Times, L.P.*,
124 A.3d 1229 (Pa. 2015)..........13

*Celle v. Filipino Reporter Enters., Inc.*,
209 F.3d 163 (2d Cir. 2000)..........7

*Chaney v. City of Orlando*,
483 F.3d 1221 (11th Cir. 2007)..........3

*Curtis Publ'g Co. v. Butts*,
388 U.S. 130 (1967)..........11

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..........5, 19

*Grogan v. KOKH, LLC*,
256 P.3d 1021 (Okla. Civ. App. 2011)..........17

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989)..........*passim*

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983)..........11, 13

*Liberty Nat'l Life Ins. Co. v. Daugherty*,
840 So. 2d 152 (Ala. 2002)..........19-20

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016)..........10, 14

*Montgomery Ward & Co. v. Duncan*,
311 U.S. 243 (1940)..........3

*Moore v. Cecil*,
174 F.4th 862 (11th Cir. 2026)......................................................*passim*

*Moore v. Chesapeake & Ohio Ry. Co.*,
340 U.S. 573 (1951)..........................................................................5

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................................................................13, 15

*Sharon v. Time, Inc.*,
599 F. Supp. 538 (S.D.N.Y. 1984)......................................................7

*St. Amant v. Thompson*,
390 U.S. 727 (1968).................................................................1, 6, 7

*United States v. Olano*,
507 U.S. 725 (1993)..........................................................................3

*Westmoreland v. CBS, Inc.*,
596 F. Supp. 1170 (S.D.N.Y. 1984)....................................................8

*Zerangue v. TSP Newspapers, Inc.*,
814 F.2d 1066 (5th Cir. 1987)..........................................................13

**Statutes**

Ala. Code § 6-11-20..............................................................................20

Ala. Code § 8-2-8..................................................................................15

**Rules**

Fed. R. Civ. P. 50(b).........................................................................3, 4

On this motion for judgment as a matter of law, the question before the Court is whether the evidence was legally sufficient to support the jury's verdict under the standards on which the jury was instructed. Spears's opposition does not answer that question. Instead, he argues issues that have already been decided or are not properly before the Court: the applicability of the actual malice standard; the relevant time of publication; whether unpleaded statements were defamatory. Spears further relies on evidence and legal theories that cannot properly sustain a finding of actual malice here. As a matter of law and measured against the instructions the jury actually received, the evidence does not support the verdict. The Times's motion should be granted.

## I. Spears Misstates the Governing Standards.

### A. Actual Malice Is a Well-Defined Standard.

Spears begins his opposition by arguing that the standard for actual malice is "elusive" and poorly defined (Doc. 307 at 7) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 686 (1989) and *St. Amant v. Thompson,* 390 U.S. 727, 730 (1968)). It is not. Spears is relying on language from 1968, only four years after the actual malice standard was established. The actual malice standard is no longer new. This Court has more than sixty years of controlling or persuasive precedent to draw on and it is now well established what kind of evidence is sufficient, as a matter of law, to prove actual malice. No such evidence was presented in this case.

### B. Actual Malice Must Be Proven as of 7:10 p.m. on March 15, 2023.

Throughout his opposition, Spears muddles or ignores the legally relevant point in time for determining actual malice. At trial, this Court charged the jury with determining "The Times's actual state of mind when it published the Article," which it defined as the material "published at 7:10 p.m. on March 15, 2023." (Doc. 290 at 4-5, 9-10, 14-16); Tr. 29:17-30:15 (Aug. 19). Although the Court admitted evidence that occurred after that point in time, not all of that evidence was admitted—or can properly be considered—for the purposes of proving actual malice. For example, evidence of falsity that arrives *after* publication necessarily cannot create knowledge of falsity *prior* to publication. The Court acknowledged this distinction when it instructed the jury and when it reserved for post-verdict review "whether the jury's verdict is consistent with the evidence that was admissible and the purpose for which it was admitted." Tr. 36:22-37:2 (Aug. 19).

Spears nevertheless repeatedly and wrongly relies on such post-publication evidence. And, in an effort to get around the Court's ruling and the jury instructions, Spears also makes the extraordinary argument that the time of publication should be treated differently now because (in his telling) earlier in the case, The Times advocated for actual malice to be evaluated as of 3:57 p.m. on March 16 and therefore "waived any argument that such evidence cannot be weighed into the analysis of whether the record contains clear and convincing evidence of actual

malice." (Doc. 307 at 39). These arguments are inaccurate, improper, and legally meritless.[1] The question before this Court is whether the evidence admitted at trial was legally sufficient under the charge the jury actually was given. *See Chaney v. City of Orlando,* 483 F.3d 1221, 1227-28 (11th Cir. 2007). Spears does not argue that the Court erred in charging the jury. And the appropriate venue for such arguments is a motion for a new trial, not an opposition brief to a Rule 50(b) motion. *See Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940).

**C. The March 15 Article Is the Only Defamatory Statement at Issue.**

In another effort to get around this Court's clear rulings and jury instructions, Spears also repeatedly argues that statements *other than the Article* defamed him. For example, Spears says that actual malice should be judged as of The Times's March 17 public statement that it "stood by" its reporting, because that March 17 statement "effectively repeated the defamation." (Doc. 307 at 40). *See also id.* at 1, 10, 14, 17, 49 (citing The Times's March 17 statement). But Spears has never pleaded that the March 17 statement was defamatory. (Doc. 1 at ¶¶ 20, 44-46).

[1] Spears's "waiver" argument is factually inaccurate and legally unavailing. (Doc. 307 at 39-40). Waiver is the "intentional relinquishment or abandonment of a known right," *United States v. Olano,* 507 U.S. 725, 733 (1993) (citations omitted). The statements Spears points to were made during arguments about the admissibility of post-publication evidence. *See* Tr. 15:20-16:1 (Aug. 11); *id.* at 70:3-73:22. The Court drew a distinction: the parties could "stipulate to the relevancy of…any evidence," but "that doesn't change the legal definition of publication," and "as a matter of law" the relevant time "is at 7:10 on March 15." Tr. 12:10-19 (Aug. 12). A party that argues about the scope of admissible evidence while affirming the governing legal standard waives nothing.

Spears's Complaint is singularly focused on the Article: it is the sole defamatory statement on which he based his tort claims. And the jury was thus charged to determine "The Times's actual state of mind when it published *the Article.*" (Doc. 290 at 4-5) (emphasis added). Just as Spears cannot relitigate the jury charges at the Rule 50(b) stage, he cannot amend his Complaint through an opposition to The Times's post-trial motion, either. *See infra* Section III-B.

### D. Disbelief of The Times's Witnesses Is Not Affirmative Evidence of Actual Malice.

Much of Spears's opposition is devoted to arguing that the jury "must have" rejected defense witnesses' testimony that they published in good faith, *see, e.g.,* (Doc. 307 at 10, 21, 45), as if discarding that testimony is itself enough to meet his burden of proving actual malice by clear and convincing evidence. It is not. As a matter of law, a jury's disbelief of that testimony is not affirmative evidence that Witz or Garcia knew the Article was false or seriously doubted its truth.

In *Moore v. Cecil*, for example, the Eleventh Circuit accepted that "the jury must have discredited and rejected" the defense witnesses' testimony about intent but went on to explain that "the jury's rejection of the…witnesses' testimony about the intent of the ad is not itself clear and convincing evidence of actual malice." 174 F.4th 862, 884-85 (11th Cir. 2026). The Supreme Court has held the same thing. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512 (1984). In other words, even crediting Spears's argument that the jury "must have" disbelieved the testimony

of Times witnesses, in order for this Court to uphold the jury's verdict, Spears was required to identify affirmative evidence that Witz or Garcia knew the Article was false or seriously doubted its truth at 7:10 p.m. on March 15, 2023.[2]

This requirement that a plaintiff present affirmative evidence is not unique to defamation law. It is the same in any post-trial review: the party with the burden of proof must offer affirmative evidence, and the jury's rejection of the other side's testimony does not supply it. *Moore v. Chesapeake & Ohio Ry. Co.,* 340 U.S. 573, 576 (1951). Even in a car wreck case, a jury that disbelieves a defendant's testimony that he stopped at a red light has not thereby heard evidence that the defendant ran a red light. So too here: "[n]ormally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose,* 466 U.S. at 512.

## II. There Is No Legally Sufficient Evidence Proving Actual Malice at 7:10 p.m. on March 15, 2023.[3]

In addition to the foregoing, Spears makes a number of other arguments regarding the evidence presented at trial. But he fails to identify legally sufficient evidence to support the jury's finding of actual malice.

---

[2] Spears's assertions of what the jury "must have found" go well beyond the inferences allowed by *Harte-Hanks.* The defamation questions on the verdict form asked whether the Article was materially false and "conveyed a defamatory meaning." They did not ask which meaning. And no question asked the jury about any pre-publication doubt concerning Source A. Those are not credibility findings the jury necessarily made and are not entitled to deference.

[3] Spears asks the Court to hold that he need not prove actual malice because *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), should be overruled. (Doc. 307 at 40-41). The Court declined that request at the charge conference, Tr. 49:6-17 (Aug. 19), charged the jury under *Gertz*, and is bound by it. Only the Supreme Court can grant the relief Spears seeks.

### A. Pre-Publication Reliance on a Trusted Source Is Not Actual Malice.

Spears argues that Witz's reliance on "an unidentified source of an anonymous source" is legally sufficient evidence of a reckless disregard for the truth and thus actual malice (Doc. 307 at 18). For this argument, he principally relies on dicta from *St. Amant v. Thompson,* 390 U.S. 727, 732 (1968), which observed that a publisher's insistence that it acted in good faith is unlikely to persuade when a story "is based wholly on an unverified anonymous telephone call." 390 U.S. at 732.

But *St. Amant* itself demonstrates that the facts here are legally insufficient to prove actual malice. There, the defendant went on television and accused the plaintiff of criminal conduct. The defendant "had no personal knowledge" of the facts, and relied entirely on a third party: a union representative. 390 U.S. at 730. The defendant did not probe the source of the union representative's information or independently verify it. *Id.* And the defendant could not point to a track record of his source being reliable. Nevertheless, the Supreme Court held that those facts fell "short of proving…reckless disregard." *Id.* In particular, the Court rejected the idea that a defamation defendant is obligated to show that their source has a track record of "veracity;" rather, it is for the plaintiff to show that prior to publication the source was known to be *un*trustworthy. *Id.* at 733.

The Court's reasoning is directly applicable here. Spears argues it is legally sufficient evidence of "reckless disregard" where: Witz repeated Source A's

statements knowing Source A lacked firsthand knowledge; Witz had known Source A for only a week and could not point to an established track record of reliability; and Witz did not have independent verification of the information. (Doc. 307 at 19-21, 31-32). But *St. Amant* deemed this kind of evidence legally *insufficient* to prove actual malice. And, like the plaintiff in *St. Amant,* Spears offered no evidence that Witz had any reason, before publication, to doubt Source A.

The other cases Spears cites are also distinguishable on that basis: in each, the plaintiff proved there were substantial reasons to doubt the source's information before publication. *See, e.g., Sharon v. Time, Inc.*, 599 F. Supp. 538, 583 (S.D.N.Y. 1984) (denying summary judgment where the report the magazine relied on was silent about the meeting it described, which "provided an obvious reason to question" the reporter's information); *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (publisher's sole source no longer worked on the account, and the publisher did not investigate and harbored personal ill will). There is no evidence like that in this record.

Moreover, while Spears protests that Witz should have spoken directly to Source A's source, even Spears's expert agreed that it is not "uncommon at all for a source to have a source." Tr. 59:20-60:8 (Aug. 13). Mayfield also conceded that it is not unusual or improper to rely on an investigator or similar individual involved in a case for information that they might not know directly. *Id.* at 87:11-15.

Finally, Spears argues that actual malice can be found if The Times made the identification of Spears as Miller's passenger "seem more convincing" than it was by presenting the identification "as an unequivocal fact" and by omitting that Source A was not an eyewitness. (Doc. 307 at 37-39). For this theory of actual malice, Spears cherry-picks language from a forty-year-old case from another district, *Westmoreland v. CBS, Inc.,* 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984). And the case does not support his argument. *Westmoreland* requires proof that the reporter "knowingly or recklessly misstate[d]" the origin of the evidence. The Article misstated nothing about its source. It said that "[a] person familiar with the case identified that person as Spears," (Ex. 1). The decision of where to identify the source is a question of editorial judgment, not evidence of subjective doubt. *See Moore,* 174 F.4th at 887 (the First Amendment "cautions courts against intruding too closely into questions of editorial judgment") (quotation omitted).

**B. Twenty-Two Pre-Publication Reporting Contacts Are Not Purposeful Avoidance of the Truth.**

The evidence at trial showed that after Witz met with Source A and prior to publication he made *twenty-two* efforts to speak with individuals or organizations in a position to know whether Spears was at the scene of the shooting. (Doc. 300 at 12-14). Spears does not dispute that those contacts occurred. Nevertheless, he still argues there was legally sufficient evidence for the jury to find actual malice, based on "purposeful avoidance of the truth." Courts have rarely found actual malice on

this basis and the case Spears relies on, *Harte-Hanks*, is clearly distinguishable. There, a newspaper never contacted the one witness it knew could refute its source and it did not listen to tapes *in its possession* that would have disproven the allegations. *Id.* at 682, 692. In those unusual circumstances, the Court found actual malice due to the newspaper's "purposeful avoidance of the truth," and Spears has not cited (nor has The Times located) another U.S. Supreme Court or Eleventh Circuit case affirming an actual malice jury finding on this basis in the forty years since.

Spears's effort to shoehorn this case into *Harte-Hanks* is entirely unavailing. For example, he argues that UA was "this case's equivalent of Patsy Stephens," the witness the newspaper in *Harte-Hanks* chose not to interview. But Witz went to significant lengths to speak to UA representatives, even driving to another city in an effort to speak with Spears's coach. Tr. 148:6-10 (Aug. 10); Tr. 32:16-17 (Aug. 11); Tr. 184:1-185:8 (Aug. 13). Spears next asserts that Witz contacted Spears's parents too late—but Christian Spears's own testimony demonstrated that he was aware that Witz was attempting to contact him, had the means to respond, and elected not to. Tr. 160:3-163:9 (Aug. 12); Tr. 5:1-9:3 (Aug. 13). Spears also argues that Witz should have waited longer for a response from the University. (Doc. 307 at 23-24). But Paré testified that UA was not providing statements containing information that had not already been made public, and, at the direction of counsel, UA made the decision not

to call Witz back. Tr. 81:6-10; 83:17-84:7; 97:3-6 (Aug. 10). And Spears critiques the way in which Witz approached him for comment, arguing that his poorly framed questions demonstrate avoidance of the truth. (Doc. 307 at 22-27). But both Paré and Spears testified they understood the meaning behind that question: Witz had a misimpression Spears was present at the time of the shooting. Tr. 40:10-12 (Aug. 18); Tr. 59:15-17 (Aug. 10). Contacting the subject of an article, his parents, his teammate, his college, and his local police is not "purposeful avoidance." *See, e.g., Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 703-04 (11th Cir. 2016) ("actual malice requires . . . some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth" and plaintiff failed to do so where "the record . . . indicates that the reporters conducted some outreach and engaged in due diligence").

Finally, Spears contends that because his name appeared in a draft version of the Article by 2:32 p.m., Witz "had already decided to publish," regardless of what his investigation revealed, and then avoided learning the truth. (Doc. 307 at 25). But a draft is just that: a preliminary and unfinalized writing. The only thing it demonstrates is that Witz credited Source A, began writing a story—and then made eighteen more reporting contacts. *Moore*, 174 F.4th at 877 ("a defendant's efforts to verify the accuracy of its statements militates against a finding of actual malice").

### C. Even an "Extreme Departure from Professional Standards" Is Not Actual Malice.

Spears argues that departures from The Times's guidelines and from industry standards show a "grossly inadequate" investigation from which the jury could properly infer actual malice. (Doc. 307 at 34). Spears's arguments are fatally flawed in a number of ways. First, as this Court instructed the jury (without objection from Spears), actual malice is not evaluated based on whether a reasonable or prudent publisher would have published the Article. (Doc. 290 at 10*,* 16-17); Tr. 28:13-29:1 (Aug. 19); *see also Curtis Publ'g Co. v. Butts,* 388 U.S. 130 (1967) (rejecting the "responsible publisher" test Spears quotes). Second, the Supreme Court has unequivocally held that a plaintiff "must prove *more* than an extreme departure from professional standards," *Harte-Hanks,* 491 U.S. at 665. Third, the purported deficiencies Spears identifies—lack of masthead review, a secondhand source, no deadline to the University, and the placement of attribution—speak to a negligence standard; they do not come remotely close to the kind of "extreme" departure from professional standards that might be legally sufficient to support actual malice. And, finally, Spears urges this Court to adhere to the "hot news" standard articulated in *Hunt v. Liberty Lobby,* 720 F.2d 631 (11th Cir. 1983). But that decision predates *Harte-Hanks* by six years, and since then, the Eleventh Circuit has never cited *Hunt* for the proposition upon which Spears relies. This is simply not a proper basis to affirm the jury verdict.

### D. Animus Toward the University Is Not Motive Toward Spears.

Finally, Spears argues that Witz and Garcia's "hostility toward UA" is shown by a prior article critical of the University and a "heated exchange" with a basketball staffer, and that this animus supplies a motive to disregard the truth *about Spears*. (Doc. 307 at 35-37). But the jury was instructed that it could consider motive only if a Times employee was "so motivated toward Mr. Spears," (Doc. 290 at 10-11). Spears has identified no evidence of hostility toward him. *See Harte-Hanks,* 491 U.S. at 665 ("motive…cannot provide a sufficient basis for finding actual malice"). And, even law aside, Spears's claim is nonsensical. The prior article is a news report about a controversial decision by the University. Ex. 259; Tr. 90:11-91:2 (Aug. 12). Reporting on a controversy is journalism, not "animus." And Witz's single retort to a basketball staffer was prompted by frustration at bureaucratic stonewalling of what Witz viewed as a nuanced issue, Tr. 188:15-189:14; not deep-seated loathing.

## III. Post-Publication Events Do Not Prove Pre-Publication Doubt.

### A. Conduct Between 7:10 p.m. on March 15 and 3:57 p.m. on March 16 Does Not Prove Actual Malice at the Time of Publication.

It is axiomatic that the press "need not accept denials, however vehement," *Harte-Hanks,* 491 U.S. at 691 n. 37, yet Spears spends an inordinate amount of time in his opposition arguing that the manner in which The Times handled the post-publication denials proves that The Times doubted the veracity of the Article before

publication,[4] but still "would have published the story if they learned that information before publication." (Doc. 307 at 10-17) (quoting *Harte-Hanks,* 491 U.S. at 683-84). Spears is incorrect. While the Court allowed the jury to consider post-publication conduct as circumstantial evidence of intent at publication, it expressly reserved for post-verdict review "whether the jury's verdict is consistent with the evidence that was admissible and the purpose for which it was admitted." Tr. 36:22-37:2 (Aug. 19).

The evidence does not survive that review. First, a refusal to retract, or an insistence post-publication that no mistake was made, is not evidence of state of mind at the time of publication. *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 286 (1964); *Hunt,* 720 F.2d at 643 n. 19. Spears's assertion that Witz and Garcia "would have published" anyway is speculation, unsupported by any evidence at trial, and is not probative of what they knew *at the time of publication*.[5] Second, The Times's treatment of the denials belies actual malice. The Times added the post-publication denials of Paré, Christian Spears, and Athletic Director Greg Byrne to the Article,

---

[4] The Times's opening brief stated "all of the evidence of post-publication conduct admitted by the Court during trial postdates even the final update to the Article at 3:57 p.m. on March 16." (Doc. 300 at 17 n.4). More precisely, the post-publication *denials* came before 3:57 p.m. on March 16.

[5] Spears's authorities involved republication after notice of falsity, and the Court ruled here that the updates "are not republications." Tr. 17:15-19 (Aug. 12). *See Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066 (5th Cir. 1987) (newspaper reprinted an error it had already retracted); *Castellani v. Scranton Times, L.P.,* 124 A.3d 1229 (Pa. 2015) (newspaper republished accusation); *Carbone v. Cable News Network, Inc.*, 2017 WL 5244176, at *18 (N.D. Ga. Feb. 14, 2017) (continued reporting of a state investigation after the agency said none existed).

and "reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice." *Michel,* 816 F.3d at 703. Without any legal support, Spears complains that the denials were placed too low in the Article or were only partially quoted (Doc. 307 at 17-18), but that is not evidence of subjective doubt. *See Moore,* 174 F.4th at 887 (the First Amendment "cautions courts against intruding too closely into questions of editorial judgment") (quotation omitted).

### B. Communications by Times Employees After 3:57 p.m. on March 16 Do Not Prove Actual Malice.

Source A's March 16 text (Ex. 430) was admitted only for impeachment, *see, e.g.*, Tr. 161:14-15 (Aug. 10), and in any event confirms that, before publication, Source A believed the information was "100% accurate." Similarly, Witz's March 18 text (Ex. 474A) describes what he learned *after publication*, including a source's statement "yesterday" that he was "likely" wrong, and Spears has yet to articulate how it shows what Witz actually knew or believed when the Article was published.

While Spears also argues about the significance of internal communications at The Times, all postdate the final update to the Article, *see supra* Section III-A, and none of the communications involve those at The Times responsible for publication of the Article. For example, Phil Corbett, a standards editor who did not write the Article, sent an email on March 16 after reading the Article for the first time, questioning whether Witz and Garcia had employed the "usual level of due

diligence" to the sourcing. Ex. 433; Tr. 44:1-46:22 (Aug. 12); (Doc. 307 at 16). Corbett's question says nothing about what Witz or Garcia believed the night before.

Similarly, the March 17 statement that The Times "stood by its reporting" does not say anything about what Witz and Garcia believed on March 15, and, if anything, shows that two days later they still believed the accuracy of the information. The June 2, 2023 article, authored by Steve Eder *after* Cooper Lee was identified as Miller's passenger in Spears's Complaint, sheds absolutely no light on what different journalists believed more than two months earlier. (Doc. 307 at 45-46). At bottom, actual malice must be "brought home" to those responsible for the publication at the time of publication. *Sullivan,* 376 U.S. at 287. None of the evidence Spears points to satisfies that legal standard.[6]

## IV. The Article Did Not Expose Spears to Public Ridicule or Contempt.

Spears contends that an ordinary reader would have understood that he "rode with Miller as he delivered the murder weapon to the scene." (Doc. 307 at 6). But that is Spears's gloss; as the Court observed, "[n]owhere in the article does it say that Mr. Miller brought the gun to the scene." Tr. 114:1-2 (Aug. 18). Read as a whole—as Spears agrees it must be—the Article reported that two Alabama players were in a car "struck by bullets in the crossfire" in a shooting "that could have been

[6] Spears's reliance on Ala. Code § 8-2-8 is misplaced. (Doc. 307 at 16). A state statute imputing an agent's knowledge to a principal cannot satisfy the constitutional requirement of proof that the persons responsible for the publication subjectively knew it was false or doubted its truth. *See Sullivan,* 376 U.S. at 287.

far worse," (Ex. 1), and portrayed Spears as a witness and near victim. In his opposition, Spears only grapples with the pleading-stage standard that the Article must be *capable* of a defamatory meaning, (*see* Doc. 307 at 3-6), but he does not even address the jury's standard set by this Court that the meaning Spears claims was *in fact* conveyed and understood as defamatory, (*see* Doc. 290 at 7).

## V. Spears Did Not Prove The Times Knew the False Light Meaning Was Likely.

Spears contends that *Moore* does not apply here because this is not an implication case and therefore he need not prove that The Times "knew when it published the Article that it would place Mr. Spears in a false light or acted with reckless disregard as to whether it would place him in a false light." (Doc. 292 at 4). Spears's argument that *Moore* does not apply is confounding, particularly because, as shown below, the Court's false light charge contains *Moore's* intent rule, nearly word for word.

| ***Moore v. Cecil*** | **False Light Jury Charge** |
|---|---|
| Holding that a plaintiff must prove "that the defendant intended to communicate the defamatory meaning or recklessly disregarded the defamatory meaning—i.e., the defendant knew that the defamatory meaning was not just possible, but likely, and still made the statement despite their knowledge of that likelihood." *Moore*, 174 F.4th at 883 (cleaned up). | "For element (3), . . . Spears must prove . . . that [The Times] intended the Article to convey the false light meaning . . . or . . . recklessly disregarded that the Article conveyed that meaning. In other words, . . . that [The Times] knew the false light meaning was not just possible, but likely, and still published the Article despite that knowledge." (Doc. 290 at 7). |

In an effort to meet the *Moore* standard, Spears argues, first, that because the Article detailed the hostility directed at Miller, Witz and Garcia knew that whoever they named as Miller's passenger "would be regarded the same way." (Doc. 307 at 42-43). But anticipating how the public might react to a fact is not the same as intending the Article to convey a particular meaning about that fact. The hostility the Article described was directed at Miller, whose role in the events had been public for weeks and was different from what the Article stated about Spears.

Second, Spears says Witz and Garcia made Spears's presence more "condemnatory" by featuring it in the headline, using the word "involved" in the first sentence, and placing the identification after the "I need my joint" passage. *Id.* at 43-44 (quoting *Westmoreland,* 596 F. Supp. at 1174). These are commonplace and unremarkable editorial decisions, not evidence that the authors intended a defamatory meaning. *See Bose,* 466 U.S. at 512-13.

Third, Spears argues that defense testimony that Witz and Garcia believed Spears was merely a potential victim at the time of publication somehow proves that they knew that the Article would likely convey that Mr. Spears was reprehensibly involved in the events of the shooting. For this argument, Spears relies on *Grogan v. KOKH, LLC,* 256 P.3d 1021 (Okla. Civ. App. 2011), a nonbinding decision from an Oklahoma intermediate appellate court. But Spears's argument and his application of *Grogan* are at odds with this Court's jury instructions, which require that Spears

prove by clear and convincing evidence that Witz and Garcia "knew the false light meaning was not just possible, but likely, and still published the Article despite that knowledge." (Doc. 290 at 15-16). Even knowledge that an alleged meaning is false is not knowledge that the meaning existed in the Article in the first place. Evidence that Witz and Garcia understood Spears to be a witness or near victim is evidence that they did *not* intend the Article to convey that he was a wrongdoer, not the other way around.

## VI. The Verdict, Itself, Does Not Prove Falsity, and the Article Was Substantially True.

Spears argues that "the jury found" that the Article conveyed that he was "reprehensibly involved in the events of the shooting," and he relies on *Harte-Hanks,* 491 U.S. at 690 (Doc. 307 at 47), to treat that finding as settled. But *Harte-Hanks* does not make findings on meaning or falsity binding, *see supra* Section I-D & n. 2, and the verdict—which asked only, for defamation, whether the Article "conveyed a defamatory meaning" and, for false light, whether it conveyed a "highly offensive" meaning, not which meaning it conveyed—cannot carry Spears's burden on either count. On both counts, falsity turns on comparing what the publication conveyed with what the truth could have conveyed. (Doc. 290 at 6, 14-15). Ultimately, a truthful article could have reported that Spears was with Miller when the text arrived, was on the call when Bradley said they were needed, that Miller was "trying to get Kai in the car," and that Spears set out to follow Miller and ended up a block and a

half away. Tr. 124:5-125:24; 130:1-133:12; 143:8-12 (Aug. 17). That account would not "have a different effect on the mind of the reader" than an account that he rode in Miller's car, and so the Article was neither materially false nor a "major misrepresentation." (Doc. 290 at 6, 14-15).

**VII. Spears Proved Neither Actual Injury Nor a Basis for Punitive Damages.**

Spears is unable to point to any evidence of reputational harm, economic loss, medical treatment, mental health treatment, or to a witness who identified any individual who read the Article and thought less of him. (Doc. 300 at 33-35). Instead, he relies on evidence about The Times: its subscriber count, its statement that its "voice is loud and far-reaching," and what he calls The Times's decision to "double down." (Doc. 307 at 48-49). But those facts describe the size of The Times's audience and its post-publication handling of the Article. They are not "competent evidence concerning the injury" to Spears. *Gertz,* 418 U.S. at 350. And The Times's overall subscriber count is irrelevant because it is undisputed that fewer than 300,000 people read the Article. (*See* Doc. 309 at 2-3). Moreover, although Spears testified that opposing fans and others heckled him, there is no evidence that any of them did so because they had read the Article. *See id.* at 4 n. 2. Accordingly, all that remains is Spears's own testimony that he was "embarrass[ed]," "humiliat[ed]," and felt "helpless." (Doc. 307 at 49). There is "little or no direct evidence concerning the degree of suffering" he experienced, *Liberty Nat'l Life Ins. Co. v. Daugherty,* 840

So. 2d 152, 163 (Ala. 2002), so for the reasons stated in The Times's opening brief, it does not establish actual injury. (Doc. 300 at 33-35).

Spears cannot recover punitive damages either. He does not contend that there is evidence of oppression, fraud, or malice under Ala. Code § 6-11-20(b). Instead, and without citing authority, he relies solely on wantonness, which he equates with reckless disregard of the truth. (Doc. 307 at 50). But because the record contains no clear and convincing evidence of actual malice, that theory fails. And reckless disregard of the truth is not "reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3). Nor has Spears shown that The Times "consciously or deliberately engaged in" wanton conduct with regard to *him*, as § 6-11-20(a) requires.

## CONCLUSION

For these reasons, the Court should enter judgment as a matter of law in favor of The Times or, in the alternative, enter judgment that Spears is entitled only to compensatory damages on his defamation claim.

Respectfully submitted,

*/s/ John G. Thompson*

Michael L. Bell
*mbell@lightfootlaw.com*
John G. Thompson
*jthompson@lightfootlaw.com*
Matthew J. Winne
*mwinne@lightfootlaw.com*
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, AL 35203-3200
(205) 581-0700
(205) 581-0799 (facsimile)

Chad R. Bowman (pro hac vice)
*bowmanchad@ballardspahr.com*
Emmy Parsons (pro hac vice)
*parsonse@ballardspahr.com*
Ballard Spahr LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
(202) 661-2200
(202) 661-2299 (facsimile)

**Attorneys for Defendant**
**The New York Times Company**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 16th day of November 2026, I filed the foregoing with the Clerk of Court and electronically served same to the following:

R. Matt Glover
PRINCE GLOVER HAYES
1 Cypress Point
701 Rice Mine Road North
Tuscaloosa, AL 35406
Phone: (205) 345-1234
Fax: (205) 752-6313
Email: mglover@princelaw.net

Stephen P. New
NEW, TAYLOR & ASSOCIATES
430 Harper Park Drive
P.O. Box 5516
Beckley, WV 25801
Telephone: 304-250-6017
Facsimile: 304-250-6012
Email: steve@newlawoffice.com

Mary Virginia Buck
BUCK LAW
13112 Martin Road Spur
Northport, AL 35473
Phone: (205) 752-6773
Email: bucklaw@charter.net

*/s/ John G. Thompson*
OF COUNSEL